# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, on behalf of itself, its staff, and its patients; | ) ) ) | |
| and | ) ) | |
| J. DOE, DO, MPH, individually and on behalf of Dr. Doe's patients, | ) ) ) | Case No. _____ |
| Plaintiffs, | ) ) | **COMPLAINT FOR** |
| v. | ) ) | **DECLARATORY AND** **INJUNCTIVE RELIEF** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; | ) ) ) | |
| ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; | ) ) ) | |
| OFFICE OF POPULATION AFFAIRS; | ) ) | |
| and | ) ) | |
| DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary for Population Affairs, | ) ) ) ) | |
| Defendants. | ) | |

## PRELIMINARY STATEMENT

1.      This case challenges and seeks to enjoin the final rule titled *Compliance with Statutory Program Integrity Requirements* (the "Rule"), published by the United States Department of Health and Human Services ("HHS") on March 4, 2019.[1]  The Rule imposes drastic and unlawful changes to the Title X family planning program, and would undo decades of

---

[1] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714 (Mar. 4, 2019) (to be codified at 42 C.F.R. pt. 59).

progress for the health of those most in need.  If it is not enjoined, the Rule will wreak havoc on reproductive health care across the country, with devastating effects in the state of Maine.

2.    For nearly half a century, Title X has been the only federal program dedicated to providing family planning services in the United States, with remarkable success.  Services provided by Title X grantees have substantially improved the health and well-being of women around the country, particularly underserved populations.

3.    Today, the Title X family planning program provides reproductive health care services to approximately four million low-income, uninsured, and underserved individuals across the country, over 60% of whom use the program as their usual source of health care.  In Maine, where Plaintiff Maine Family Planning has been the sole Title X grantee in the state for the last forty-eight years, Title X clinics served nearly 24,000 patients in 2018.  Title X clinics are critical in Maine, in part because it is one of the most rural states in the country.  Among other factors, poverty, lack of health insurance, and unpredictable driving conditions in Maine make accessing health care in the state especially challenging for many Mainers.

4.    The statute creating the Title X program provides that Title X funding cannot be used "in programs where abortion is a method of family planning."  In compliance with this statute and as confirmed by regular audits and site visits, Plaintiff Maine Family Planning has always scrupulously complied with longstanding HHS regulations, ensuring that Title X funds are kept apart from its separate provision of abortion services, without issue.  Upon information and belief, other Title X grantees nationwide have similarly complied with these Title X regulations.

5.    Nonetheless, asserting without basis that the longstanding regulations are now somehow inadequate to ensure *potential* compliance issues and to prevent the possibility of *hypothetical* patient confusion, and with no regard for the widespread harms it will *actually* cause,

2

the Rule imposes radical changes on the program, including at least two restrictions that particularly impact Plaintiffs and their patients.

6.      *First*, the Rule includes a "Gag Rule" that singles out abortion from all other health care topics by, among other things, prohibiting health professionals from providing their patients with abortion referral information even if patients directly request it.  At the same time, the Rule mandates that the patient be referred for prenatal services, regardless of whether such a referral is wanted or appropriate.  In Maine, where patients frequently have nowhere else to go for reproductive health care, and where many women are misinformed about or unaware of their abortion options, the Gag Rule will burden access to abortion by confusing and delaying patients seeking such care.  Decades of Supreme Court precedent, strengthened and reaffirmed as recently as last year, prohibit the government from meddling in the provider-patient relationship in this way.  Indeed, the First Amendment's free speech protections are at their zenith when the government seeks to control the form and content of individuals' protected speech.  Likewise, the Affordable Care Act specifically protects the rights of health care professionals and patients to unfettered communication regarding patients' medical options.

7.      To provide just one example that demonstrates the absurdity of how the Gag Rule would operate, while a patient is in the middle of an appointment or consultation with a trusted medical provider, perhaps while the patient is partially disrobed or in the middle of being examined in some way, the Rule would require that provider to rebuff that patient's questions about where to obtain an abortion, by refusing to answer.  Still worse, even if that patient makes clear her decision to have an abortion, the provider would then be required to provide, instead of a referral for the care she actually needs, a government-mandated referral for prenatal care.

8.      *Second*, the Rule requires that all abortion services be physically separated from clinics that also provide Title X services, regardless of the fact that Title X funds are not now and never have been used to provide abortion at those sites.  This requirement specifically targets Title X providers, like Maine Family Planning, that have been providing Title X services and abortion at the same location for decades.  Since the inception of the Title X program, these providers have been able to share facilities among their abortion and family planning practices so long as costs are pro-rated and properly allocated.  Maine Family Planning and other such providers have employed this structure and built their practices around the program's requirements without issue.  But the Rule now mandates that abortion services be cut off from other reproductive health services, in contravention of decades-old care-delivery models and good medical practice, and without any acknowledgment that it is functionally impossible for many providers to meet these requirements.

9.      Defendants, who portray the Rule in part as a mere administrative effort to avoid *hypothetical*, *possible* confusion or commingling, utterly fail to acknowledge the significant negative impacts the Rule will have on the Title X program, on family planning patients, and on patients seeking abortion services.  By contrast, any purported "need" for these restrictions is contravened by the Title X program's 48-year record of overwhelming success in its current form, and by the dearth of real-world evidence of patient confusion, provider noncompliance, or violations of Congressional intent.

10.     The Rule will devastate family planning services because it will force health care providers either to curtail their family planning services or to leave the Title X program altogether.  For some clinics, it will be impossible to stay in the Title X program and fulfill their missions to offer comprehensive and quality reproductive health care.  For others, it will simply

be financially or physically infeasible for them to separate their established practices in the burdensome manner contemplated by the Rule.  Indeed, Planned Parenthood, which treats more than 40% of Title X patients nationwide, has already asserted that it will leave the Title X program if the Rule goes into effect.  Even more clinics may attempt to comply with the Rule but ultimately fail, given the vagueness of the propounded requirements.  With so many providers forced out of the program, women across the country will lose access to subsidized family planning services.  For many women in underserved communities, this would be a loss of their sole health care provider.

11.     For Maine Family Planning, the choice of whether or not to remain in the Title X program, which comprises a substantial and material portion of its annual budget, presents no tenable options.  Implementing the Rule will eliminate 85% of the abortion clinics in the state, and there is no evidence that other, non-Title X providers will step into the resulting void.  These closures will impose enormous burdens on women who currently seek abortion services at the shuttered clinics, including onerous and potentially prohibitive increases in driving distances to receive abortion care.  Furthermore, the Gag Rule prevents Maine Family Planning and its health care providers from providing their patients with the care necessary to fulfill their ethical duties.

12.     On the other hand, if Maine Family Planning is forced to leave the Title X program, the resulting loss of revenue would soon require it to reduce the services it provides and close clinics entirely.  This would mean that thousands of women in Maine would lose access to family planning services *and* abortion services.

13.     By imposing barriers to healthcare access, and by forcing health care providers to give their patients misleading information about pregnancy options, the Rule violates multiple federal statutes.

14.     And the Rule's attempt to withhold federal funds based on protected activity performed outside the program and without Title X funds is precisely the type of coercive government conduct forbidden by the United States Constitution.

15.     For these reasons and others described below, the Rule violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C), and the First and Fifth Amendments to the United States Constitution.  The Court should invalidate and enjoin the Rule.

## PARTIES

16.     Plaintiff Maine Family Planning is a non-profit corporation incorporated in Maine with its principal place of business in Augusta, Maine.  Maine Family Planning has served as the sole statewide Title X grantee for the State of Maine's family planning program for forty-eight years.  It is currently the recipient of a seven-month Title X grant awarded in September 2018 and has applied for a three-year grant to begin on April 1, 2019.

17.     Since its founding, Maine Family Planning has worked to ensure that all Mainers have access to high-quality, affordable reproductive health care, comprehensive sexual health education, and the right to control their reproductive lives.  To carry out its mission, Maine Family Planning directly operates eighteen family planning centers throughout Maine and provides funding through subcontracts that support twenty-nine additional sites.  Plaintiff Maine Family Planning sues on its own behalf and on behalf of its staff and patients.

18.     Maine Family Planning provides a range of health care services at its sites, including annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including continuing the pregnancy and parenting, making a plan for adoption or foster care, or ending the pregnancy with an abortion); abortion care; miscarriage care; referrals for adoption; prenatal consultation; colposcopy; endometrial and vulvar biopsy; screening, diagnosis, and

treatment of urinary, vaginal, and sexually transmitted infections; hormone therapy and other services for transgender clients; and services for mid-life women.[2]

19.     Maine Family Planning has, since 1997, provided first trimester abortion care, which is made available without using any federal resources.

20.     Plaintiff J. Doe, DO, MPH, is a physician and doctor of osteopathy, licensed in family medicine and with experience in women's health.  Plaintiff Doe is one of seven physicians providing abortion services at Maine Family Planning.  Dr. Doe provides abortion care through a Maine Family Planning clinic and medication abortion via telemedicine.  Plaintiff Doe sues individually and on behalf of all patients.

21.     Defendant the United States Department of Health and Human Services ("HHS") is an executive agency of the United States that is responsible for issuing and enforcing the Rule.

22.     Defendant Alex M. Azar II is the Secretary of Health and Human Services and is sued in his official capacity.  He is responsible for the operation and management of HHS.

23.     Defendant Office of Population Affairs ("OPA") is the office within HHS that administers the Title X program and serves as the focal point to advise the Secretary and Assistant Secretary of HHS on reproductive health topics, including the Title X program and family planning.

24.     Defendant Diane Foley, M.D., is the Deputy Assistant Secretary for OPA.  She is sued in her official capacity.  She is responsible for the operation and management of OPA.

---

[2] Maine Family Planning provides additional services at a few of its sites in response to clear need: comprehensive primary care services at its Ellsworth site; a Women, Infants and Children nutrition program for Hancock and Washington Counties; and a home visiting program for new parents in Hancock County.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, as this action arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 702, and Federal Rules of Civil Procedure 57 and 65.

26.     Venue is proper in this district under 28 U.S.C. § 1391(e).  Maine Family Planning is located in this judicial district, and a substantial part of the events, actions, or omissions giving rise to these claims are occurring in this judicial district.  Defendants are a United States agency, an office of that agency, and United States officials sued in their official capacities.

## FACTUAL BACKGROUND

I.     **Title X Family Planning Program**

   A.  **Enactment and Scope of Title X Family Planning Services**

27.     In 1970, Congress enacted Title X of the Public Health Service Act ("Title X" or the "Act"), 84 Statute 1506, as amended 42 U.S.C. §§ 300 to 300a-6, which provides federal funding for family planning services.  Title X was passed with broad bipartisan support and has enjoyed broad bipartisan support for decades.

28.     Title X was enacted to address the growing disparity in unintended childbearing between low-income individuals and those with the resources to access contraception.  Thus, the core of Title X's mission is the expansion of access to reproductive health care services to low-income individuals, including communities of color, immigrants, and rural residents who may otherwise lack access to family planning services and related preventive care.[3]

---

[3] Pub. L. No. 91–572 §2, 84 Stat. 1506 (1970); 42 U.S.C. §300(a) (2012).

29.     Title X is the only federal program solely dedicated to providing family planning services in the United States.  Although other federal programs, such as Medicaid, also provide family planning funding through reimbursement for clinical services provided to individual, insured patients, Title X funding is a critical portion of a publicly-funded family planning center's fiscal portfolio because it can be used to cover costs not covered by more restricted funds—for example, the costs of purchasing contraceptives (including expensive but highly effective methods of long-acting reversible contraception ("LARC") like intrauterine devices ("IUDs")), training staff, and building infrastructure.  Title X funds also are used to pay for a wide variety of family planning services and the infrastructure that makes delivery of such services possible, including, but not limited to, gynecological examinations and basic lab tests; screening services for sexually transmitted infections and cancer; contraceptive information and services; pregnancy testing; and community outreach.

30.     Title X funds may not be used to pay for abortion services.[4]  That restriction, which is set forth in Section 1008 of Title X, was intended to ensure that Title X funds would "be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities."[5]  But, Section 1008 was never intended to interfere with communications concerning abortion between Title X providers and their patients—a distinction that Congress and HHS have repeatedly made clear.  Since the inception of the Title X program, providers have been allowed to offer Title X family planning services and abortion care at the same site, so long as costs are pro-rated and properly allocated.  And, since July 2000, federal regulations have expressly permitted colocation of Title X family

---

[4] 42 U.S.C. § 300a-6.

[5] H.R. Rep. No. 91-1667, at 8 (1970).

planning services and abortion care subject to those same conditions.[6]

31.     Title X is a competitive grant program, meaning that eligible entities must apply to OPA to be awarded funds.  The Act authorizes the Secretary to make grants to "assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."[7]  State, county, and local health departments make up roughly half of the current cohort of Title X grantees, with hospitals, family planning councils, Planned Parenthood health centers, federally qualified health centers ("FQHCs"), and other private non-profit organizations making up the rest of the network. Plaintiff Maine Family Planning is a private not-for-profit family planning council grantee.

32.     Title X programs are not funded exclusively by Title X—indeed, by law they cannot be.[8]  Rather, in 2017, Title X *funding* itself accounted nationwide for only 19% of Title X project revenue, with the remainder coming from fees for service and other government grants.[9]

33.     Title X grantees are subject to regular and extensive compliance review by HHS. Indeed, OPA itself has touted its thorough and comprehensive oversight of the program. According to OPA, "family planning projects that receive Title X funds are closely monitored to ensure that federal funds are used appropriately and that funds are not used for prohibited activities such as abortion."[10]  As identified by HHS, there are several "safeguards" in place to ensure abortion activities are kept "separate and distinct" from Title X programs, including:

---

[6] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270 (July 3, 2000).

[7] 42 U.S.C. § 300(a).

[8] 42 C.F.R. §59.7(c) (2018).

[9] OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2017 NATIONAL SUMMARY A-33 (Aug. 2018) [hereinafter 2017 FPAR], https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2017-national-summary.pdf.

[10] ANGELA NAPILI, CONG. RESEARCH SERV., TITLE X (PUBLIC HEALTH SERVICE ACT) FAMILY PLANNING PROGRAM 22 (Aug. 31, 2017) [hereinafter 2017 CRS REPORT], https://fas.org/sgp/crs/misc/RL33644.pdf; ANGELA NAPILI,

> (1) careful review of grant applications to ensure that the applicant understands the requirements and has the capacity to comply with all requirements; (2) independent financial audits to examine whether there is a system to account for program-funded activities and nonallowable program activities; (3) yearly comprehensive reviews of the grantees' financial status and budget report; and (4) periodic and comprehensive program reviews and site visits by OPA regional offices.[11]

Grantees also are responsible for monitoring their sub-recipients' financial compliance on an ongoing basis and must get pre-approval from OPA for any changes in the scope of their Title X project or new sub-recipient contracting relationships.

## B. Success of the Title X Program

34.     The Center for Disease Control and Prevention ("CDC") has hailed Title X as one of the greatest public health achievements of the 20th century.[12]  The program currently serves over four million low-income, uninsured, and underserved individuals at 3,858 sites across the country.[13]  It is a critical source of care for these groups: for the past 15 years, at least two-thirds of Title X patients had incomes at or below the poverty level.[14]  And in 2017, 90% of patients qualified for either subsidized or no-charge services.[15]  As of 2016, 60% of women receiving Title

---

CONG. RESEARCH SERV., TITLE X (PUBLIC HEALTH SERVICE ACT) FAMILY PLANNING PROGRAM 16 (Apr. 27, 2018) [hereinafter 2018 CRS REPORT], https://fas.org/sgp/crs/misc/R45181.pdf.

[11] *Id.*

[12] *See* CDC, *Achievements in Public Health, 1990–1999: Family Planning*, 48 MORBIDITY & MORTALITY WKLY. REP. 1073, 1073 (1999).

[13] 2017 FPAR, *supra* note 9, at ES-1.

[14] 2017 FPAR, *supra* note 9, at ES-2; OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2003 SUMMARY 22 (Aug. 2004) [hereinafter 2003 FPAR], https://www.hhs.gov/opa/sites/default/files/fpar-2003-national-summary-part-1.pdf.

[15] 2017 FPAR, *supra* note 9, at 21.

X services reported that a Title X–funded health center was their usual source of medical care, and 40% reported that a Title X–funded health center was their only source of health care.[16]

35.     Title X also serves an increasingly diverse population.  Between 1997 and 2017, the number of patients who identified as white dropped from 67% to 54%.[17]  Patients identifying as Latino or Hispanic have increased in the past 15 years from 22% to 33%, and African American or Black users have continued to account for 21-22% of Title X patients.[18]

36.     In particular, publicly funded family planning clinics are critically important resources for the 24% of U.S. residents living in rural areas, including nineteen million women. Rural areas already experience a significant shortage of reproductive health providers.

37.     Title X has prevented millions of unintended pregnancies.  One study estimated that in 2015 (the most recent year for which these numbers are available), the contraceptive care provided by Title X providers helped prevent more than 820,000 unintended pregnancies, over 270,000 of which likely would have ended in abortion.[19]  In the absence of this reduction, the U.S. unintended pregnancy rate would have been 31% higher and the unintended pregnancy rate among teens would have been 44% higher.[20]

---

[16] Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X–Funded Facilities in 2016*, 50 PERSP. ON SEXUAL & REPROD. HEALTH 101, 105 (2018).

[17] 2003 FPAR, *supra note* 14, at 14; 2017 FPAR, *supra note* 9, at 12.

[18] 2003 FPAR, *supra note* 14, at 14; 2017 FPAR, *supra note* 9, at ES-2, 12.  Title X patients are disproportionately Black and Hispanic or Latino compared to the U.S. population as a whole.  *See, e.g.*, NAT'L FAMILY PLANNING & REPROD. HEALTH ASS'N, TITLE X: AN INTRODUCTION TO THE NATION'S FAMILY PLANNING PROGRAM (Nov. 2017), https://www.nationalfamilyplanning.org/file/Title-X-101-November-2017-final.pdf; C.I. Fowler et al., OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2016 NATIONAL SUMMARY (Aug. 2017), https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[19] JENNIFER J. FROST ET AL., GUTTMACHER INST., PUBLICLY FUNDED CONTRACEPTIVE SERVICES AT U.S. CLINICS, 2015 (Apr. 2017), https://www.guttmacher.org/report/publicly-funded-contraceptive-services-us-clinics-2015.

[20] *Id.*

38.     Title X also helps health care providers carry out broader public health mandates. For example, in 2017, Title X funds helped provide 5,200,000 sexually transmitted infection ("STI") tests (including 1,200,000 HIV tests), nearly 700,000 Pap tests, and nearly 900,000 clinical breast exams.[21]

39.     Moreover, because many Title X providers have been in the program for decades, they have developed particular expertise in treating this patient population.  Studies show that women prefer to get reproductive health and family planning care from medical professionals who specialize in family planning, even if they have other available primary care options.[22]

40.     A recent study published by HHS administrators showed that Title X providers are more likely than non-Title X providers to provide reproductive health care that is consistent with current, evidence-based clinical guidelines, such as offering the most effective contraceptive methods on-site.[23]

41.     As the benefits of comprehensive reproductive health services have become increasingly recognized, family planning and abortion services have accordingly grown more likely to be provided at the same site.  An estimated one in ten Title X clinic sites offer abortion services using non-federal funds.[24]

---

[21] 2017 FPAR, *supra* note 9, at ES-2.

[22] Jennifer J. Frost et al., *Specialized Family Planning Cinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 WOMEN'S HEALTH ISSUES 519, 523 (2012).

[23] Marion W. Carter et al., *Four Aspects of the Scope and Quality of Family Planning Services in US Publicly Funded Health Centers: Results from a Survey of Health Center Administrators*, 94 CONTRACEPTION J. 340 (2016); Heike Thiel de Bocanegra et al., *Onsite Provision of Specialized Contraceptive Services: Does Title X Funding Enhance Access?*, 23 J. WOMEN'S HEALTH 428 (2014).

[24] ANGELA NAPILI, CONG. RESEARCH SERV., FAMILY PLANNING PROGRAM UNDER TITLE X OF THE PUBLIC HEALTH SERVICE ACT 14 (Oct. 15, 2018), https://fas.org/sgp/crs/misc/R45181.pdf; *see also A Domestic Gag Rule and More: The Administration's Proposed Changes to Title X*, GUTTMACHER INST. (June 18 2018), https://www.guttmacher.org/article/2018/06/domestic-gag-rule-and-more-administrations-proposed-changes-title-x.

### C. **History of Title X Regulations Relating to Abortion**

42. Prior to 1988, the regulations that governed Title X allowed Title X projects to share facilities with abortion providers, and HHS's Family Planning Guidelines and other policy documents prior to 1988 all consistently required Title X providers to offer "nondirective" options counseling to pregnant women and referrals for abortion services upon request.[25] "Nondirective counseling" is commonly understood in medicine to mean patient-directed counseling that presents neutral and unbiased information regarding all options relevant to the patient and consistent with the patient's expressed wishes to hear the information, including in the context of pregancy, prenatal care, adoption, and/or abortion.[26]

---

[25] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. at 41,272-73.

[26] The preamble to the Rule provides a different, vague definition for "nondirective counseling" that appears to contemplate counseling directing the patient toward prenatal care even in cases where a patient only requests and/or needs information about abortion:

> Nondirective pregnancy counseling is the meaningful presentation of options where the physician or advanced practice provider (APP) is "not suggesting or advising one option over another." . . . Nondirective counseling does not mean that the counselor is uninvolved in the process or that counseling and education offer no guidance, but instead that clients take an active role in processing their experiences and identifying the direction of the interaction.  In nondirective counseling, the Title X physicians and APPs promote the client's self-awareness and empower the client to be informed about a range of options, consistent with the client's expressed need and with the statutory and regulatory requirements governing the Title X program.  In addition, the Title X provider may provide a list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some (but not the majority) of which may provide abortion in addition to comprehensive primary care.

Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,716 (Mar. 4, 2019) (to be codified at 42 C.F.R. pt. 59) (citations omitted).  By contrast, the regulations for the program promulgated in 2000 identified the directive nature of such care:

> If projects were to counsel on an option even where a client indicated that she did not want to consider that option, there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option.  We note that under the ''on request'' policy a Title X grantee is not prohibited from offering to a pregnant client information and counseling on all options for pregnancy management, including pregnancy termination; indeed, such an offer is required under § 59.5(a)(5) below.  However, if the client indicates that she does not want information and counseling on any particular option, that decision must be respected.

Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. at 41,273.

43.     In 1988, HHS issued a rule ("the 1988 Rule") setting out a new standard of compliance for family planning projects under Title X.[27]  For the first time in the program's history, the 1988 Rule prohibited Title X recipients who perform, refer for, or counsel on abortion care from receiving federal family planning funds, a specific provision often referred to as the "1988 gag rule."  The 1988 Rule also required for the first time physical and financial separation of Title X services from abortion services, as well as physical and financial separation of any ancillary activities connected to abortion.  The 1988 Rule did not restrict prenatal or adoption counseling and referral.  To the contrary, the 1988 Rule stated "that pregnant women must be referred to appropriate prenatal care services."[28]

44.     The 1988 Rule was challenged by recipients of Title X funding in several district courts, which granted preliminary injunctions.  Two district courts granted permanent injunctions, which were affirmed by the First and Tenth Circuit Courts of Appeals.  The Second Circuit upheld the regulations, and that decision ultimately reached the United States Supreme Court in *Rust v. Sullivan*.[29]  The *Rust* Court held that the 1988 Rule was lawful.

45.     In November 1991, in response to the ongoing outcry from the medical community, President George H.W. Bush directed HHS to implement the 1988 Rule in a manner that would permit counseling on abortion.  Because the guidelines then issued by HHS permitted physicians, but not nurse practitioners, to counsel on abortion services, they were challenged again.  Ultimately, in November 1992, the D.C. Circuit upheld an injunction preventing the

---

[27] Statutory Prohibition on Use of Appropriated Funds In Programs Where Abortion Is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects, 53 Fed. Reg. 2,922 (Feb. 2, 1988).

[28] 53 Fed. Reg. at 2,925 (emphasis added).

[29] 500 U.S. 173 (1991).

guidelines from being enforced for failure to follow notice-and-comment requirements.[30]

46.     In September 1992, Congress passed a bill to explicitly allow for abortion counseling within Title X (the "Family Planning Amendments Act").[31]   The bill would have required counseling and referral on all pregnancy options, including prenatal care and delivery, infant care, foster care, adoption, and abortion.[32]

47.     In discussing the Family Planning Amendments Act, members of Congress were clear that they intended to overrule the 1988 gag rule and thus ensure that abortion counseling and referral were permitted.  Representative Waxman called the 1988 gag rule "bad medicine, bad law, and bad precedent."[33]   Others cautioned that "without [eliminating the gag rule] we will take another step toward two-tier health care in America.  Already the gap in health care is widening between the haves and have nots.  [If the gag rule remains in place] the gap will get wider."[34] "Every woman in America, regardless of income, is entitled to receive all the information about her pregnancy options."[35]   Others recognized that overriding the gag rule was necessary to "retain the credibility of medical professionals,"[36] emphasizing that "quality patient care [would] be severely impaired"[37] if the gag rule remained in place.  And according to Representative Roukema, "constraints on what a physician can say to a patient can only result in serious medical

---

[30] *Nat'l Family Planning and Reprod. Health Assoc. v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992).

[31] *See* Family Planning Amendments Act of 1992, S. 323, 102nd Cong. (1992).

[32] *See* 138 CONG. REC. 9,862 (1992).

[33] *Id.* at 9,859 (statement of Rep. Waxman).

[34] *Id.* at 9,860 (statement of Rep. Wyden).

[35] *Id.* at 9,859 (statement of Rep. Richardson).

[36] *Id.* at 9,863 (statement of Rep. McDermott).

[37] *Id.* at 9,864 (statement of Rep. Lowey).

implications for the patient."[38]  Representative AuCoin called the gag rule "institutionalized

medical malpractice."[39]  Even more bluntly, Representative Atkins concluded, "Madam

Chairman, the gag rule is monumentally stupid."[40]

48.     To ensure that the intent of Congress was absolutely clear, Representative Studds

unequivocally stated: "*When we created the title X program 20 years ago, we did not intend to

muzzle health care providers.*  But we didn't say that loudly and clearly enough. But this time, let

there be no mistake.  Title X providers must be able to inform individuals of all pregnancy

management options and we must write this explicitly into law."[41]

49.     Notwithstanding Congress's clear demand that the gag rule be lifted, President

George H.W. Bush vetoed the Family Planning Amendments Act, and Congress was unable to

override the veto.

50.     On January 20, 1993, Bill Clinton was sworn in as President.  Two days later, on

January 22, 1993, he suspended the 1988 Rule by presidential memorandum, directing HHS to

promulgate new rules.  The 1988 Rule was never implemented on a nationwide basis.

51.     In 1995, Congress rejected an appropriations bill seeking to defund the Title X

program[42] and instead voted in favor of a competing appropriations amendment that restored Title

X funding and further clarified that nondirective counseling by Title X providers does not

---

[38] *Id.* at 9,864 (statement of Rep. Roukema).

[39] *Id.* at 9,867 (statement of Rep. AuCoin).

[40] *Id.* at 9,873 (statement of Rep. Atkins).

[41] *Id.* at 9,872 (statement of Rep. Studds) (emphasis added).

[42] *See* Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1996, H.R. 2127, 104th Cong. (1996).

constitute "funding abortion."[43]  Since 1996, Congress has continued to pass this nondirective

counseling mandate—which expressly requires that "all pregnancy counseling shall be

nondirective"—annually as part of Title X appropriations, including in the current appropriations

Act (the "Nondirective Counseling Mandate").[44]

52.     On July 3, 2000, HHS issued new Title X rules (the "2000 Rules") and

accompanying clarification.[45]  The 2000 Rules officially revoked the 1988 Rule and clarified that

the co-location of Title X family planning services and abortion care is consistent with Title X, so

long as costs are pro-rated and properly allocated.[46]  The 2000 Rules also clarified that the

provision by Title X providers of information about abortion services to their patients, including

the names, addresses, telephone numbers, and other relevant factual information about abortion

providers does not "promote or encourage abortion," and therefore is permissible.[47]

53.     The 2000 Rules also include a *requirement* that Title X recipients offer patients the

option to receive nondirective counseling on prenatal care, abortion, and adoption.  Notably, this

aspect of the 2000 Rules aligns with Congress's Nondirective Counseling Mandate.

54.     In addition, OPA has regularly set forth clinical standards for the Title X Program

confirming that the 2000 Rules and the Nondirective Counseling Mandate are consistent with

well-settled and evidence-based standards for high-quality provision of family planning services.

---

[43] Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104–134, 110 Stat. 1321 (1996); H.R. Rep. No. 104-537 (1996) (Conf. Rep.) ("[A]ll pregnancy counseling shall be nondirective . . . .").

[44] *See* Consolidated Appropriations Act, 2018, at 369, Pub. L. 115–141, 132 Stat. 348 (2018) (requiring "that all pregnancy counseling shall be nondirective"); Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71 (requiring that "all pregnancy counseling shall be nondirective").

[45] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270.

[46] *Id.* at 41,281–82.

[47] *Id.* at 41,281.

OPA requires Title X grantees to follow the federal Quality Family Planning Guidelines issued by the CDC.[48]  According to those guidelines, upon a positive pregnancy test, "[r]eferral to appropriate providers of follow-up care should be made *at the request of the client*, as needed," and "[e]very effort should be made to expedite and follow through on *all* referrals."[49]  The Quality Family Planning Guidelines are not limited to referrals for prenatal care and clearly encompass referrals for termination of pregnancy.

55.     The interpretation of Title X in the Nondirective Counseling Mandate, the 2000 Rules, and the Quality Family Planning Guidelines was further reinforced by Congress in 2010, when Congress passed the Patient Protection and Affordable Care Act ("ACA").[50]  Section 1554 of the ACA is titled "Access to Therapies" and explicitly prevents HHS from enacting regulations that create unreasonable barriers to obtaining medical care and that bar health care providers from making full and fair disclosures of treatment options to their patients.

56.     Section 1554 reads:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that— (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care

---

[48] CDC, *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 MORBIDITY & MORTALITY WKLY. REP. RECOMMENDATIONS & REP., Apr. 25, 2014, at 1, https://www.cdc.gov/mmwr/preview/mmwrhtml/rr6304a1.htm?s_cid=rr6304a1_w.  These standards are incorporated into OPA's Title X program guidance, also published in 2014.  OFFICE OF POPULATION AFFAIRS, PROGRAM REQUIREMENTS FOR TITLE X FUNDED FAMILY PLANNING PROJECTS (Apr. 2014), https://www.hhs.gov/opa/sites/default/files/Title-X-2014-Program-Requirements.pdf.

[49] CDC, *Providing Quality Family Planning Services*, *supra* note 48, at 14 (emphasis added).

[50] Pub. L. 111–148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 42 U.S.C.)

professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.[51]

## II.    HHS's New Separation and Gag Rule

### A.  Proposal and Review of New Rule

57.    On May 22, 2018, HHS released a notice of proposed rulemaking ("Proposed Rule") that would rescind the longstanding 2000 Rules.  The Proposed Rule would, among other things, severely limit and in many circumstances ban Title X recipients from providing their patients with necessary referral and counseling for abortion services.  The Proposed Rule also would require strict physical and financial separation between abortion services and Title X services.

58.    HHS received over 500,000 comments in response to the Proposed Rule.

59.    Most major medical associations, including the American Medical Association,[52] the American College of Obstetricians and Gynecologists,[53] the American College of Physicians,[54] the American Academy of Family Physicians,[55] the American Academy of

---

[51] 42 U.S.C. § 18114 (2012).

[52] Letter from James L. Madara, CEO & Exec. Vice President, Am. Med. Ass'n, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-179739.

[53] Letter from Lisa M. Hollier, President, Am. Coll. of Obstetricians & Gynecologists, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-179339.

[54] Letter from Ana María López, President, Am. Coll. of Physicians, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-184400.

[55] Letter from John Meigs, Jr., Bd. Chair, Am. Acad. of Family Physicians, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-102966.

Nursing,[56] and the American Academy of Pediatrics,[57] have submitted comments publicly opposing the Proposed Rule.

60.     The organizations opposed the Proposed Rule for numerous reasons, including because it would interfere with the relationship between patients and their health care providers, threaten patient confidentiality, undermine patients' access to evidence-based family planning methods, exclude providers that separately offer abortion services from receiving Title X funds, and restrict patients' access to care.

61.     Numerous members of the U.S. Senate[58] and House of Representatives,[59] as well as several states,[60] spoke out against the Proposed Rule, citing the detrimental effects the proposed changes would have on the Title X program.  In total, nearly 200 legislators submitted comments opposing the Proposed Rule.

---

[56] Letter from Karen S. Cox, President, Am. Acad. of Nursing, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 26, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624.

[57] Letter from Colleen A. Kraft, President, Am. Acad. of Pediatrics, and Deborah Christie, President, Soc'y for Adolescent Health & Med., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-181588.

[58] Letter from 25 U.S. Senators to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-107356.

[59] Letter from 173 Members of the House of Representatives, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-184863.

[60] *See, e.g.*, Letter from 14 Democratic Governors, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (May 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-204415; Letter from Andrew M. Cuomo, Governor, State of N. Y., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-155772; Letter from Jay Inslee, Governor, State of Wash., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-190685; Letter from Bruce S. Anderson, Dir. of Health, State of Haw. Dep't of Health, to Diane Foley, Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-185729.

62.     Major Title X providers, including Planned Parenthood,[61] and policy and research organizations such as the Guttmacher Institute,[62] the American Civil Liberties Union,[63] and the National Family Planning & Reproductive Health Association[64] described the significant negative impacts the Proposed Rule would likely have on patients, particularly members of vulnerable populations, including women of color, LGBTQ+ women, and victims of intimate partner violence.  These comments—like many others—cited to a myriad of empirical studies, case studies, and other research indicating the dramatic unfavorable outcomes likely to result from the Proposed Rule.  In addition, a number of organizations representing public health professionals[65] and community health centers,[66] along with thousands of individual Americans from across the country[67] submitted comments expressing grave concerns about the Proposed Rule as drafted.

[61] *See, e.g.*, Letter from Dana Singiser, Vice President of Pub. Policy & Gov't Relations, Planned Parenthood Action Fund, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841.

[62] Letter from Rachel Benson Gold, Vice President for Pub. Policy, Guttmacher Inst., to Office of Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-178129.

[63] Letter from Faiz Shakir and Georgeanne M. Usova, Am. Civil Liberties Union, Office of Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-190184.

[64] Letter from Clare Coleman, President & CEO, Nat'l Family Planning & Reprod. Health Ass'n, to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-192227.

[65] *E.g.*, Letter from Georges C. Benjamin, Executive Director, Am. Pub. Health Ass'n, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-156243.

[66] *E.g.*, Letter from Tom Van Coverden, President & CEO, Nat'l Ass'n of Cmty. Health Ctrs., to Office of the Assistant Sec'y for Health, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-177172.

[67] Some commenters organized their submissions through organizations such as CREDO Action. *E.g.*, Letter from Nicole Regalado, Campaign Manager, CREDO Action, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (Aug. 6, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-200769 (attaching 51,018 comments from individuals opposing the Proposed Rule).  Many others submitted comments directly, taking the opportunity to express the impact of Title X services on their lives and the harm the Proposed Rule would cause. *See, e.g.*, Letter from Jodi Bolduc to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-89886 (describing reliance on Maine Family Planning's confidential Title X services as a teenager and visiting with her daughters for a contraceptive visit).

63.     The Proposed Rule received overwhelmingly negative responses from the Maine-based organizations that submitted comments.  Maine chapters of national organizations such as Maine Family Planning,[68] the American Civil Liberties Union of Maine,[69] and the Maine Section of the American College of Obstetricians and Gynecologists,[70] submitted comments describing the disproportionate impact the Proposed Rule would have on residents of this largely rural state.[71]  Organizations local to the state, including Maine Equal Justice Partners,[72] Grandmothers for Reproductive Rights,[73] and the Maine Coalition Against Sexual Assault[74] also articulated their opposition to the Proposed Rule and its significant drawbacks.

64.     On February 22, 2019, HHS posted a draft of the final rule on its website.  The Rule was published in the Federal Register on March 4, 2019.  Notwithstanding the hundreds of thousands of comments submitted to HHS, the Rule is largely identical to the Proposed Rule.

65.     The Rule makes sweeping changes to the requirements for Title X family planning recipients.  Among other things, the Rule severely restricts Title X recipients' ability to provide

---

[68] Letter from George A. Hill, President & CEO, Family Planning Ass'n of Me., to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-155939.

[69] Letter from Oamshri Amarasingham, Advocacy Dir., Am. Civil Liberties Union of Me., to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-180549.

[70] Letter from Danielle M. Salhany, Chair, Me. Section of the Am. Coll. of Obstetricians & Gynecologists, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-183469.

[71] U.S. Census Bureau, Maine: 2010 Population and Housing Unit Counts 2 (2010); Press Release, U.S. Census Bureau, Growth in Urban Population Outpaces Rest of Nation (Mar. 26, 2012) (reporting Maine as the nation's most rural state).

[72] Letter from Kathy Kilrain del Rio, Policy Analyst, Me. Equal Justice Partners, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-200662.

[73] Letter from Judy G. Kahrl, PhD, Founder, Grandmothers for Reprod. Rights, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-161182.

[74] Letter from Elizabeth Ward Saxl, Exec. Dir., Me. Coal. Against Sexual Assault, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-182456.

their patients with abortion referrals and requires strict physical and financial separation of Title X and abortion services.

66.     Compliance with the physical separation requirement is required within one year of publication of the final rule.  Compliance with the financial separation requirement and changes to the reporting requirements is required within 120 days of publication of the final rule, by July 2, 2019.  The Rule contains conflicting deadlines for compliance with the referral ban: compliance with some portions of the regulation that bear on the referral ban is required within 120 days of publication of the final rule, by July 2, 2019, while compliance with other portions is required within 60 days, by May 3, 2019.  All other requirements must be met within 60 days following publication of the final rule, by May 3, 2019.

### B.   Referral Prohibition and Directive Counseling Requirements

67.     The Rule prohibits Title X recipients from providing their patients with necessary referrals for abortion care, even for patients who specifically request such a referral.

68.     In a section of the Rule captioned "Prohibition on referral for abortion," the Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion."[75]  Under this provision, even when a pregnant patient explicitly requests a referral for abortion, a health care provider is prohibited from speaking to their patient about their referral options.  The provider cannot even provide a list of the available abortion providers, much less speak to their patient about which abortion provider could meet their particular needs and why.

69.     At most, the Rule allows the medical professional to provide the patient "a list" of "licensed, qualified, comprehensive primary health care providers (including providers of prenatal

---

[75] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. at 7,778–89.

care), some, but not the majority, of which also provide abortion as part of their comprehensive services."[76]  The list thus *may* include abortion providers, but only if those abortion providers also offer comprehensive primary health care services.  Health professionals are prohibited from including on the list any providers who only offer abortion services, even if those are the only abortion providers in the region.  Further, while the list "may" include abortion providers, it does not need to include any, even if a patient explicitly asks for a referral to an abortion provider.[77]

70.     By these terms, the Rule compels Title X providers to withhold the identities of most abortion providers, since most abortion providers do not also offer the full spectrum of primary care.  The Rule further requires providers to withhold medical advice about which abortion providers are most appropriate for their patients' needs and medical circumstances.  In sum, when a patient seeks an abortion referral, the list she can receive *at best* must: (1) include a majority of health care providers who will not offer the patient the care she seeks; and (2) exclude providers who can offer that necessary care because they do not also offer other services that are unnecessary for the patient.

71.     Moreover, even to the extent there may sometimes be an abortion provider on the allowable "list" a patient receives, the list "cannot be used to indirectly refer for abortion or to identify abortion providers to a client,"[78] and the Rule makes explicit that "[n]either the list nor project staff may identify which providers on the list perform abortion."[79]  This means medical professionals cannot even tell their patients that the list is responsive to their request for a referral to an abortion provider at all, much less which provider on the "list" performs abortions or that

---

[76] *Id.* at 7,789.

[77] *Id.*

[78] *Id.* at 7,761.

[79] *Id.* at 7,789.

there are other, more appropriate abortion care options available, even if the patient specifically asks for this information.  The patient would be left to locate publicly-available information, much of which is unreliable with respect to abortion,[80] without any guidance from a medical professional, much less one who is familiar with her medical history.

72.     At the same time, the Rule mandates that the staff of Title X recipients are compelled to provide all pregnant patients with directive counseling by giving them a referral for prenatal services.  These medical professionals must provide that prenatal referral regardless of whether the patient has requested such a referral, and even if it is against the medical judgment of the health professional to provide that prenatal referral to that particular patient absent any such request.[81]  The preamble to the Rule purports to justify this requirement on the incongruous basis that prenatal referrals are "medically necessary for the health of the pregnant mother, as well as the unborn baby."[82]  The Rule does not explain why or how prenatal care is "medically necessary" for a woman seeking an abortion.

73.     In addition to mandating directive counseling by requiring referrals for prenatal care and prohibiting referrals for abortion, the Rule also allows further directive options counseling for prenatal care and post-conception adoption.  The Rule provides that a Title X

---

[80] The preamble includes a conclusory, unsupported statement that "[i]nformation about abortion and abortion providers is widely available and easily accessible, including on the internet," *id.* at 7,746, but Maine Family Planning's experiences with patients demonstrate that this is not the case in Maine.  In part, many Maine Family Planning patients have difficulty accessing the internet.

[81] The Rule also requires Title X providers to "offer either comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity, to the Title X site, in order to promote holistic health and provide seamless care."  *Id.* at 7,788.  But, the Rule fails to provide any information about what constitutes "close physical proximity," which would mean something very different in a populous state like New York versus a rural state like Maine.  In addition to being so vague as to be unworkable, this requirement is counter to the purposes of the Title X program.  On its face, it would mean that a Title X site could be excluded from the program based on the *absence* of nearby health providers—thereby eliminating the only source of health care in a particular location and leaving patients with no "proximate" health care options at all.

[82] *Id.* at 7,728.

provider may opt to provide only "[r]eferral to social services or adoption agencies; and/or [i]nformation about maintaining the health of the mother and unborn child during pregnancy."[83] In other words, a Title X provider can selectively inform pregnant patients about only their options for prenatal care and adoption, without providing any information about abortion, including, but not limited to, the availability of abortion and whether it is an option for that patient.

74.     On the other hand, the Rule states that a Title X provider "may also choose to provide" "nondirective pregnancy counseling," but only when provided by physicians or advanced practice practitioners ("APPs"), [84] and then only if he or she also provides information about at least one other option (prenatal care or adoption) in conjunction with any counseling about abortion.[85]  The doctor or APP is required to provide information about prenatal care or adoption, regardless of whether the patient wants or needs that additional information, and even if the patient explicitly asks that it not be provided.

75.     Moreover, notwithstanding the Rule's purported allowance for "nondirective pregnancy counseling" that presents abortion as one of several options, the Gag Rule provides no guidance as to how a physician or an APP can practically provide information about abortion without arguably violating the Gag Rule.  The Rule bans any speech that could be interpreted to "promote" or "support abortion as a method of family planning," as well as any speech during

---

[83] *Id*. at 7,789.

[84] *Id*.  The Rule defines APP to mean "a medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients.  The term [APP] includes physician assistants and advanced practice registered nurses."  *Id.* at 7,787.  This definition both fails to properly reflect the qualifications of individuals licensed as midlevel health care professionals, and does not account for the fact that other health care professionals are qualified and often better situated to provide options counseling to pregnant patients in some circumstances.

[85] *Id*. at 7,747.

counseling or in connection with the permitted list of "comprehensive primary health care providers" that could be interpreted "as an indirect means of encouraging or promoting abortion as a method of family planning."[86]  The Rule fails to adequately define or explain these terms, and it is entirely unclear how a doctor or APP could explain the availability of abortion to a patient in a manner that would not be interpreted as a violation.

76.     Indeed, the preamble to the Rule even recognizes the vague and overbroad nature of its restrictions, warning that "providers must be careful that nondirective counseling related to abortion does not diverge from providing netural, nondirective information into encouraging or promoting abortion as a method of family planning, or into referral for abortion as a method of family planning."[87]  It goes on to state that "[t]he Department anticipates that it may provide further guidance to grantees on this issue" without any timeline for delivery of such guidance.[88]

### C. Separation Requirements

77.     In a sharp departure from prior standards, the new Rule requires a strict physical and financial separation of Title X and abortion services.  The Rule gives the Secretary of HHS discretion to determine whether there is a violation of the separation requirements based on a "review of facts and circumstances."[89]  The Rule enumerates a non-exclusive list of factors the Secretary must consider as part of the review, including:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of

---

[86] *Id*. at 7,788–89.

[87] *Id.* at 7,746.

[88] *Id.*

[89] *Id.* at 7,789.

> such prohibited activities; (c) The existence of separate personnel,
> electronic or paper-based health care records, and workstations;
> and (d) The extent to which signs and other forms of identification
> of the Title X project are present, and signs and material
> referencing or promoting abortion are absent.[90]

78.     This non-exhaustive list leaves Title X recipients with little way of knowing whether they are in compliance with the Rule.  The preamble also suggests that hospitals and freestanding clinics will be treated differently under the Rule: for freestanding clinics like Maine Family Planning, "physical separation might require more circumstances to be taken into account in order to satisfy a clear separation between Title X services and abortion services."[91]  Grantees will be forced to go to the far end of the spectrum in order to ensure compliance, lest they expend substantial resources and still remain at risk.  Or they may have no choice but to forgo offering abortion services altogether because it is the only way they can be guaranteed to be found in compliance.  Non-compliance can subject grantees to remedies up to and including forfeiting funds awarded in the ongoing grant cycle as well as exclusion from future rounds of funding.[92]

### D.  Restrictions on the Use of Title X Funds

79.     The Rule includes new and broader restrictions that directly target the use of Title X funding for infrastructure building.  Under the Rule, "[g]rantees must use the majority of grant funds to provide direct services to clients . . . ."[93]  But, without explanation, the Rule defines "infrastructure" so broadly as to include "bulk purchasing of contraceptives or other medical supplies," as well as "clinical training for staff" and "community outreach."[94]

---

[90] *Id.*

[91] *Id.* at 7,767.

[92] 45 CFR § 75.371 (2018).

[93] *Id.*

[94] 84 Fed. Reg. at 7,790.

80.     The Rule prohibits providers who participate in the Title X program from participating in "activities that encourage, promote or advocate for abortion"[95] by, among other things, requiring physical and financial separation of such activities, including "lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning," "using legal action to make abortion available in any way as a method of family planning," and "developing or disseminating in any way materials (including printed matter, audiovisual materials and web-based materials) advocating abortion as a method of family planning," including making brochures for clinics providing abortions available anywhere in the same place where Title X services are provided.[96]

### E.  Reporting Requirements

81.     The Rule also imposes new reporting requirements on Title X grantees that are vague and unduly burdensome.  Title X grantees must provide assurance "satisfactory to the Secretary" that it does not provide abortion, that it complies with the Rule's restrictions on referral for abortion, that it maintains physical separation of any abortion services and family planning services, and that it does not conduct any "activities that encourage, promote or advocate for abortion."[97]  The Rule provides no explanation of what would be deemed "satisfactory to the Secretary," only that "[s]uch assurance must also include, at a minimum, representations (supported by documentary evidence where the Secretary requests it) as to compliance with . . . each of the requirements."[98]

---

[95] *Id.* at 7,789.

[96] *Id.* at 7,790.

[97] *Id.* at 7,788.

[98] *Id.*

82.     The Rule also requires Title X grantees to report a "[d]etailed description of the extent of the collaboration with subrecipients, referral agencies, and any individuals providing referral services."[99]

### F.  New Restrictions on Care for Adolescents

83.     The Rule imposes new requirements on Title X services for adolescents that will erect unnecessary and harmful barriers for minors seeking important reproductive health care. Until now, minors have always been afforded confidential access to Title X services without any program requirement that they obtain consent from a parent or guardian.  Indeed, many minors seek out contraception and other reproductive health services from Title X clinics precisely *because* Title X clinics are the only health care option that promises to maintain their privacy and confidentiality.

84.     Under the Rule, however, a minor can only be found financially eligible for subsidized Title X services if their provider documents "specific actions taken by the provider to encourage the minor to involve her/his family (including her/his parents or guardian) in her/his decision to seek family planning services."[100]  The Rule does not provide any explanation of what constitutes "specific actions" that would be sufficient to meet this requirement, and the only exceptions are when the provider suspects child abuse or incest and has reported the situation to relevant state or local authorities consistent with applicable state law.[101]

85.     Even if minors are able to pay for Title X services out-of-pocket, the provider still must document in their medical record what specific actions were taken to encourage family

---

[99] *Id.*

[100] *Id.* at 7,787.

[101] *Id.*

participation or else the reason why family participation was not encouraged.[102]  The Rule fails to explain the purposes of this requirement, or how the documented information is intended to be used and by whom.

### G.  Justifications for and Cost-Benefit Analysis of the Rule

86.     Defendants' justification for the Rule fails to assess its true costs; ignores its health consequences; and is based upon unfounded assumptions that the Rule will expand coverage and patient access to services, will improve quality of service, and will not cause an increase in unintended pregnancies.[103]  Defendants' cost-benefit analysis of the Rule is thus fundamentally deficient.

87.     Defendants assert that the Rule's separation requirement is justified in order to protect against "the intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs."[104]  However, Defendants identify no direct evidence of misuse of funds contrary to Section 1008,[105] despite the fact that Title X has been in existence for decades and Title X providers are subject to detailed reporting and audit requirements.  Instead, Defendants point only to the "potential for confusion,"[106] and cite examples of abuse in *other* federal programs,[107] as a meager attempt to suggest that there is a need for clarity.

---

[102] *Id.* at 7,785.

[103] *Id.* at 7,732, 7,741, 7,782.

[104] *Id.* at 7,715.

[105] *Id.* at 7,715, 7,725, 7,764, 7,765, 7,777.

[106] *Id.* at 7,725.

[107] *Id.*  In the notice of proposed rulemaking, HHS pointed to only two examples of potential misuse of funds by Title X grantees or subrecipients.  Compliance With Statutory Program Integrity Requirements, 83 Fed. Reg. 25,502, 25,509–10 (proposed June 1, 2018).  In the Final Rule, HHS argues only generally that "examples of abuse in other Federal programs help illustrate the need for clarity with respect to permissible and impermissible activities in connection with the Title X program and Title X funds."  84 Fed. Reg. at 7,725.  In a footnote, HHS cites to a paper from the Lozier Institute—an arm of the anti-abortion group Susan B. Anthony List—that includes the two examples HHS had cited in the notice of proposed rulemaking, but does not provide any other examples.  *Id.* n.33.

88.     In the face of these unfounded and purely speculative benefits, Defendants dramatically underestimate the costs of the separation requirement, asserting that it will be $36.08 million nationwide, or between $20,000 and $40,000 per site.[108]  At a minimum, the costs of one-time physical separation alone will significantly exceed this amount.

89.     Defendants also assume without evidence that there will be no reduction in Title X services, asserting without basis that current providers will not be driven out of the program and that, in any event, new grantees will take the place of any grantees that leave.[109]  Yet, Planned Parenthood and at least four states have already explained in comments that they will withdraw from the program if the Rule goes into effect, and experience shows that new grantees are unlikely to provide a sufficient substitute in quantity or quality.  In rural areas in particular, there are shortages of primary and specialty health care providers, making it unlikely that rural areas will see a proliferation of new family planning organizations to take the place of current Title X grantees leaving the program.  Moreover, while Defendants state that "new providers who previously were unable to participate in Title X projects due to conscience concerns" will now apply to and participate in a Title X project, experience suggests instead that new organizations are unlikely to apply to and become successful Title X grantees, particularly without significant transition costs.

90.     Because Defendants assume there will be no reduction in Title X services provided under the Rule, they do not consider any costs related to the reduction in services the Rule will cause.  For one, Defendants somehow do not expect an increase in unintended pregnancies, stating that they are unaware of "actual data that could demonstrate a causal connection between"

---

[108] 84 Fed. Reg. at 7,781–82.

[109] *Id*. at 7,723, 7,749, 7,782.

the Rule and "an increase in unintended pregnancies, births or costs associated with either."[110]
This does not account for evidence in the record that the loss even of just Planned Parenthood
alone from the Title X program is likely to lead to a "decline in the use of the most effective
methods of birth control and an increase in births among women who previously used long-acting
reversible contraception."[111]

91.     Likewise, Defendants claim there will be no costs associated with either the Rule's
removal of the nondirective pregnancy counseling requirement, or the Rule's prohibition on
abortion referral.[112]  Defendants justify both changes by claiming the Rule will provide more
"flexibility" for applicants that may not have applied to Title X due to purported "burdens on
conscience" imposed by the requirement to provide nondirective pregnancy counseling and
referrals for abortion.  But Defendants acknowledge that "[t]he Title X statute has coexisted with
federal conscience laws for over 40 years"[113] without incident, and again cite no evidence to

---

[110] *Id*. at 7,775.

[111] American Academy of Nursing, Comment Letter on Proposed Rule for Compliance with Statutory Program
Integrity Requirements 3 (July 26, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624
(citing Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health
Program*, 374 NEW ENG. J. MED. 853 (2016)); *see also* U.S. House of Representatives, Comment Letter on
Proposed Rule for Compliance with Statutory Program Integrity Requirements 7 (July 31, 2018),
https://www.regulations.gov/document?D=HHS-OS-2018-0008-184863 ("[T]he consequent changes in the Title X
system are likely to increase unintended-pregnancy rates in the most vulnerable segments of the population and are
thus more likely to increase than to reduce the incidence of abortions." (internal quotation marks omitted) (quoting
Janet M. Bronstein, *Radical Changes for Reproductive Health Care—Proposed Regulations for Title X*, 379 NEW
ENG. J. MED. 706 (2018))); Planned Parenthood Federation of America, Comment Letter on Proposed Rule for
Compliance with Statutory Program Integrity Requirements 18 (July 31, 2018),
https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841 ("In 2015, the Guttmacher Institute
estimated that Planned Parenthood's provision of contraceptive services averted 430,000 unintended pregnancies."
(citing *Unintended Pregnancies and Abortions Averted by Planned Parenthood, 2015*, GUTTMACHER INST. (June 13,
2017), https://www.guttmacher.org/infographic/2017/unintended-pregnancies-and-abortions-averted-planned-
parenthood-2015)); American Civil Liberties Union, Comment Letter on Proposed Rule for Compliance with
Statutory Program Integrity Requirements 2 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-
2018-0008-190184 ("The proposed rule's disruptions to the nation's Title X network and prohibitions on standard
medical care would lead to more unintended pregnancies . . . .").

[112] 84 Fed. Reg. at 7,719.

[113] *Id.* at 7,747.

demonstrate that there will be an expanded number of medical providers participating in Title X after removing the abortion counseling and referral requirements.[114]

92.     Defendants acknowledge that there are no quantified benefits associated with the Rule, pointing only to non-quantified benefits such as the "program integrity of Title X."[115]

## III.    Implementation of the Rule in the State of Maine

93.     Implementation of the Rule will meaningfully damage the provision of both family planning services and abortion care in Maine.  Maine Family Planning, which is the state's only Title X grantee and the provider or funder of much of Maine's family planning services and abortion care, will be forced to significantly cut its services as a direct result of the Rule.  The rurality and poverty in Maine will exacerbate the effects of those cuts and the resulting hardships.

### A.  <u>Geography and Demographics of Maine</u>

94.     Maine is the most rural state in the country, with more than 60% of the population living outside of urban areas.[116]  Maine's diverse geography includes thousands of miles of coastline, 15 year-round inhabited islands, and the highest percent of forest-covered land area (89%) of any state in the nation.[117]  Of Maine's 1.3 million inhabitants, 61.3% reside in rural areas.[118]  Maine's three largest cities, Portland (66,715), Lewiston (36,211), and Bangor (32,237),

---

[114] *Id.* at 7,777.

[115] *Id.*

[116] U.S. CENSUS BUREAU, MAINE: 2010 POPULATION AND HOUSING UNIT COUNTS 2 tbl. 2 (2012), https://www2.census.gov/library/publications/decennial/2010/cph-2/cph-2-21.pdf; Press Release, U.S. Census Bureau, Growth in Urban Population Outpaces Rest of Nation (Mar. 26, 2012), https://www.census.gov/newsroom/releases/archives/2010_census/cb12-50.html.

[117] COLBY, ENVTL. POLICY GRP., THE STATE OF MAINE'S ENVIRONMENT 108 (2014), http://web.colby.edu/stateofmaine2014/files/2012/09/2014-Full-Report-Draft.pdf  ("15 unbridged Maine islands support year-round populations."); U.S. DEP'T OF AGRIC., FOREST INVENTORY AND ANALYSIS: FISCAL YEAR 2016 BUSINESS REPORT 71 tbl. B-11 (2017), https://www.fs.fed.us/sites/default/files/fs_media/fs_document/publication-15817-usda-forest-service-fia-annual-report-508.pdf (showing 89% of forest-covered land area).

[118] *See* sources cited in note 116, *supra.*

contain only 10% of the state's population (1,330,158).[119]  Fourteen of Maine's 16 counties are more than 50% rural; nine of the 16 are more than 80% rural.[120]

95.     Geography and low population density account for many of the challenges rural Mainers face in accessing health care.  Interstate 95, which in winter weather is usually reduced to one lane north of Orono and is occasionally closed, is the sole north-south highway and transportation within and among counties is limited.  The long distances and excessive travel time are major obstacles to accessing health care, especially with limited public transportation outside of Portland.  The more remote and rural areas, with low population densities, have fewer health care choices compared with the more heavily populated southern counties.

96.     There are also several economic indicators that directly affect Maine residents' need for subsidized family planning services, including income, poverty rates, and insurance coverage.

97.     Poverty is a significant problem in Maine.  Nearly 13% of Maine residents,[121] and 42.1% of single mothers in the State,[122] have incomes at or below the federal poverty level ($12,060 for a single person and $20,420 for a family of three).  The poverty rate is disproportionately high among women of color: 51.3% of African-American women, 27.8% of

---

[119] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter desired city or state in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down) (last visited Mar. 1, 2019).

[120] MAINE: 2010 POPULATION AND HOUSING UNIT COUNTS, *supra* note 116, at 9 tbl. 7.

[121] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter "Maine" in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down; then select "Poverty" in left column) (last visited Feb. 28, 2019).

[122] INST. FOR WOMEN'S POLICY RES., THE STATUS OF WOMEN IN THE STATES, 2015, at 158 (2015), https://iwpr.org/wp-content/uploads/wpallimport/files/iwpr-export/publications/R400-FINAL%208.25.2015.pdf.

Latina women, and 35.5% of Native American women in Maine were living in poverty between 2011 and 2013.[123]  It is also higher in Maine's more rural counties: Aroostook, Oxford, Penobscot, Piscataquis, Somerset, and Washington Counties all have poverty rates over 15%; the rate in Piscataquis and Washington Counties is over 18%.[124]

98.     Lack of health insurance and limited coverage also are barriers to accessing health care in Maine.  9% of Mainers lack health insurance.[125]  Title X subsidized services, in addition to accepting Medicaid, provide a safety net for uninsured and underinsured Mainers.  Thus, while a patient may come in primarily seeking contraception, STI testing, or pregnancy testing, the relationship with their provider reaches far beyond simply dispensing a pack of birth control pills.

### B.  History and Scope of Services Provided by Maine Family Planning

99.     Maine Family Planning was founded in 1971 for the express purpose of competing for, receiving, distributing, and managing the Title X grant for the state of Maine—and to do so in a manner that addresses the complex geography and challenges faced by Mainers.

100.    For forty-eight years, Maine Family Planning has been the sole statewide Title X grantee for Maine.  Thus, Maine Family Planning's compliance with all Title X rules and regulations has been tested and confirmed over the course of decades, both by OPA and by a

---

[123] INST. FOR WOMEN'S POLICYY RES., THE STATUS OF WOMEN IN MAINE, 2015: HIGHLIGHTS 3 (2015), http://statusofwomendata.org/app/uploads/2015/08/Maine-Fact-Sheet.pdf.  Because the federal poverty level does not take into account the cost of child care, medical expenses, utilities, or taxes, these statistics undercount the number of Maine residents who are struggling to make ends meet.

[124] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter county name in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down menu; then select "Poverty" in left column) (last visited Feb. 28, 2019).

[125] U.S. CENSUS BUREAU: AMERICAN COMMUNITY SURVEY, https://www.census.gov/acs/www/data/data-tables-and-tools/data-profiles/2017/ (enter "Maine" in left drop-down menu; then select "Economic Characteristics" from the hyperlinks listed below) (last visited Feb. 28, 2019).

diverse and frequent array of auditors.  Neither OPA nor any other government or independent

auditor has ever found a violation of the Title X requirements by Maine Family Planning.

101.    Maine Family Planning began as an umbrella agency, subcontracting with eight

other non-profits in other parts of Maine to provide Title X-supported services for low-income

women and teens.  Maine Family Planning's role during its first 15 years included grant

management, training, some research, and advocacy.

102.    Beginning in April 1997, Maine Family Planning started providing abortion care,

using resources independent from the Title X program.  Maine Family Planning's decision to

separately provide abortion was in response to a growing dearth of abortion services in the region.

This need became critical after several violent incidents against abortion providers in the region,

including a 1994 mass shooting at Planned Parenthood clinics in Brookline, Massachusetts that

resulted in multiple fatalities, caused existing providers throughout New England to stop

providing abortion services.  Maine Family Planning thus elected to fill the resulting gap in

necessary health care for the people of Maine, working closely with the Maine State Attorney

General's Office of Civil Rights to facilitate that effort.  To that end, Maine Family Planning

identified and purchased a stand-alone building in North Augusta, which would serve as Maine

Family Planning's headquarters and would include a clinical space fully equipped to offer first

trimester abortion care.

103.    In 1997, Maine Family Planning decided to end its subcontract with the local

agency providing family planning services in Augusta, and to hire its family planning staff in

order to co-locate family planning services with the abortion care services already being provided

at Maine Family Planning's new headquarters site.  Maine Family Planning began offering Title

X services in its Augusta building in July 1998, a year after its initiation of abortion services.

104.    Over the course of the following decade, Maine Family Planning also took direct control over other family planning clinics.  By 2012, Maine Family Planning directly managed 18 clinical sites where Title X services would be provided.

105.    Today, Maine Family Planning operates eighteen family planning centers and provides funding through subcontracts that support 29 additional sites.[126]  Altogether, Maine Family Planning's 47-site network is geographically comprehensive with sites in fifteen counties, and meets the clinical and educational reproductive health needs of approximately 24,000 Mainers annually.  As of 2018, 78% of patients qualified for free or reduced fee services.

106.    Through Maine Family Planning's clinics, it provides a broad range of family planning services for individuals and families, so that they can postpone, prevent, or facilitate the spacing of pregnancy.  Services tailored to the unique needs of the individual patient include: annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; preconception consultation; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections.  An extensive, well-established referral network connects clients to comprehensive primary care and other diagnostic screenings and services, if not offered on-site.  All of Maine Family Planning's Title X services are provided by advanced practice registered nurses ("APRNs"), *i.e.*, certified nurse practitioners and/or certified nurse-midwives, often with the support of medical assistants.

---

[126] Specifically, Maine Family Planning's network includes:  eighteen family planning clinics directly operated by Maine Family Planning (located in Augusta, Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Rockland, Rumford, Skowhegan and Waterville); four sites managed by Planned Parenthood of Northern New England (in Portland, Sanford, Topsham, Biddeford); four FQHCs with 20 clinic sites in total (six of which are located in Portland, and others are in Belgrade, Bethel, Bingham, Lovejoy, Madison, Mt. Abram, Rangeley, Sheepscot, Strong, Waterville, Vinalhaven); and five school-based Health Centers (three in Portland, and one in Readfield, and one in Calais).

107.    At Maine Family Planning's Augusta clinic, the organization also provides medication abortions through ten weeks of pregnancy, as dated from the last day of a woman's menstrual period ("LMP"), and aspiration abortions through the end of the first trimester (*i.e.,* 14.0 weeks LMP).  Abortion services are provided one day a week in Augusta, a day on which no Title X services are provided at that site.

108.    Maine Family Planning employs seven physicians part-time at its Augusta clinic, including Plaintiff Dr. Doe, whose only role at Maine Family Planning is to provide abortion services.  Each physician works at most one or two days a month.  And, except for rare occasions, there is only one physician offering abortion services on any given day.  Maine Family Planning's Augusta facility employs physicians for this limited purpose only because of 22 M.R.S. § 1598(3) ("the Physician-Only Law"), which restricts the performance of an abortion in Maine to physicians only.[127]

109.    Maine Family Planning's other seventeen clinics offer only medication abortion through ten weeks LMP through a telehealth program, as follows:  The patient is first evaluated by an APRN trained in abortion care, including the administration or review of an ultrasound, to ensure that she is an appropriate candidate for medication abortion.  The patient then consults with a physician via a secure, HIPAA-compliant video platform.  After confirming that a medication abortion is medically appropriate for the patient, that the patient has given informed consent to the abortion, and that the APRN has worked with the patient to establish a contraception plan, the physician instructs the patient to take a first pill (mifepristone) during the real-time video encounter.  The patient takes additional pills (misoprostol) as instructed at home 6

---

[127] The Physician-Only Law currently is being challenged in a separate lawsuit brought by Maine Family Planning and others.  *Jenkins v. Almy*, 2:17-cv-00366-NT (D. Me. filed Sept. 20, 2017).

to 48 hours later.  At a follow-up visit four to fourteen days later, the APRN confirms that the abortion was complete.  The use of the telehealth program is necessitated by the Physician-Only Law as there are no physicians on site at these locations.

110.    In accordance with longstanding Title X policy and regulations, Maine Family Planning has always clearly and properly separated its Title X activities from non-Title X activities, including abortion services.  This is primarily done by maintaining a financial management system that clearly separates and accounts for all expenses and revenues associated with the Title X project.  It is Maine Family Planning's policy that only costs that are reasonable, allowable, and allocable to a federal award will be charged to that award, either directly or indirectly.  In addition, Maine Family Plainning's contracts with all its subgrantees require those subrecipients to separate or identify family planning expenses as appropriate.

### C.  Implementation of the Rule's Separation Requirements by Maine Family Planning

111.    In order to comply with the Rule's separation requirements, Maine Family Planning would have no choice but to eliminate abortion services at seventeen of its eighteen locations, leaving at most only its abortion practice in Augusta.

112.    As a threshold matter, it would be physically implausible for Maine Family Planning to execute the Rule's separation requirements and continue to provide abortion services near its non-Augusta locations.  In more rural parts of the state, it is difficult or impossible to find landlords willing to rent space for the sole purpose of providing abortion care.  Nor could Maine Family Planning convert its existing non-Augusta clinics into multiple or "separate" spaces; the sites are far too small and consist only of one or two exam rooms.

113.    But, even if it were physically possible to create separate spaces for abortion care at or near some existing Maine Family Planning clinics, the costs of creating a physically and

financially separate entity at each site would be prohibitive.  Establishing even small new clinic sites to provide abortion care—which would require staffing, separate work stations and record-keeping systems, and much more—would cost far more than the $20,000–$40,000 estimated in the preamble to the Rule.[128]

114.    Nor would it be logistically and financially feasible for Maine Family Planning to create separate abortion clinics at or near its seventeen non-Augusta sites while still providing the full range of other family planning services.  Maine Family Planning provides approximately 500 abortions per year, about 75% of which typically are performed at its Augusta clinic.  This discrepancy is due to factors outside Maine Family Planning's control, including the rural nature of Maine which results in sparse populations in large parts of the state, as well as state legal restrictions on who can provide abortion services in Maine.

115.    Finally, it would be extremely challenging, if not impossible, for Maine Family Planning to staff any such new abortion facilities in those locations.  Because of Maine's Physician-Only Law, Maine Family Planning can offer medication abortions via telehealth at its non-Augusta sites only on a limited number of days and times per month when the schedules of the patient, the APRN at the non-Augusta site, and the physician all align.  The resulting low volume and unpredictable scheduling of abortion services would make it extremely difficult for Maine Family Planning to recruit APRNs exclusively to facilitate these *ad hoc* telehealth abortions.

116.    Likewise, while Maine Family Planning could endeavor to create a separate abortion facility near its Augusta location in order to continue providing the abortion services currently offered at its Augusta Headquarters, it is by no means clear that it would be able to do

---

[128] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. at 7,781–82.

so.   To create a new facility in Augusta, the startup costs alone would exceed $200,000, and likely would cost much more.

117.    Upon information and belief, it is unlikely that new health care professionals or organizations would begin providing abortion services in Maine if Maine Family Planning were to close its clinics, particularly in the rural areas where those clinics are located.  Only physicians are allowed by law to provide abortion in Maine, and physicians who are trained and motivated to provide abortion services do not hesitate to make themselves known to Maine Family Planning or its physician contractors.  However, there is a very limited pool of such physicians who are willing and able to provide abortion care.  Maine Family Planning provides only telemedicine abortions at its smaller clinics in part because its contract physicians do not live within feasible traveling distance of those areas, and Maine Family Planning is unable to identify any other physicians in those areas willing and able to provide abortion services.

118.    As a result, if Maine Family Planning were to comply with the Rule's separation requirements, the State of Maine would go from having twenty abortion clinics to at most just three—an 85% decrease in the number of clinics in the state.  The only three remaining publicly-accessible health centers (*i.e.*, clinics that are open to women who are not already established patients) where a woman would be able to obtain abortion care in Maine would be: (1) Maine Family Planning's Augusta clinic; (2) Planned Parenthood's Portland Health Center; and (3) Mabel Wadsworth Center, located in Bangor, Maine.[129]

---

[129] The only other providers of abortion care in Maine—Maine Medical Center in Portland and Central Maine Medical Center in Lewiston—generally treat only pre-existing patients, among other limitations on their services. In addition, neither of these other facilities advertises abortion services on their website.

### D.  Implementation of the Gag Rule by Maine Family Planning

119.    The Gag Rule will require Maine Family Planning's health care providers and staff, as well as the medical professionals who work for other providers in its network, to fundamentally alter how they speak to patients regarding their health care options.  Currently, Maine Family Planning's APRNs and its other medical staff refer their family planning patients who are interested in abortion services to an appropriate physician upon request.  Maine Family Planning has a state-wide network of referral options, which its APRNs and other medical staff invoke based on each patient's particular medical condition, location, preferences, and other needs.

120.    If the Gag Rule is not enjoined, abortion referral would be expressly prohibited.[130] Any time a patient comes to Maine Family Planning for Title X services and also requests referral information for abortion, the medical staff would be required to refuse to provide that information—even if the patient has explicitly stated that she has decided to have an abortion, even if the patient is persistent in her desire or need for that information, and even if she explains that she does not know how to find an abortion provider on her own.

121.    Instead, Maine Family Planning's staff would be able to give patients who want an abortion referral only a list of comprehensive primary health care providers.  Upon information and belief, if Maine Family Planning's satellite clinics stop providing abortion in compliance with the Separation Rule, there will be at most one comprehensive primary health care provider in Maine that also provides abortion services to new patients: the Mabel Wadsworth Clinic in Bangor.  Mabel Wadsworth Clinic would, therefore, be the only abortion provider that Maine

---

[130] The only exception in the Rule is for cases requiring "emergency care."  *Id.* at 7,789.  Even that narrow exception is ambiguous at best as the Rule fails to define what constitutes an "emergency."

Family Planning could include on a list given to its patients—and staff would not be able to identify Mabel as an abortion provider or even tell patients that the list *contained* an abortion provider.  Women of reproductive age in the state of Maine live an average of 103 miles from Mabel, with 82% living farther than 50 miles away.

122.    Maine Family Planning would no longer be able to refer patients to its own abortion providers, nor could any other Title X providers refer abortion patients to it, since most of Maine Family Planning's sites do not provide primary care and, in any event, the organization's remaining abortion services, if any, would be annexed to a standalone practice in Augusta due to the Rule's new separation requirements.

123.    At the same time, the Rule's restrictions on "nondirective counseling" would prevent Maine Family Planning's APRNs and medical staff from engaging in an open dialogue with their patients about abortion as an option.  Indeed, some of Maine Family Planning's medical professionals will be prevented from speaking to patients about abortion at all because they will not meet the Rule's definition of APPs.[131]

124.    The implementation of the Gag Rule also will be complicated, time-consuming, and expensive.  For decades, in reliance on the existing Title X program, Maine Family Planning has been providing abortion counseling, including referrals, in a manner consistent with the standard of care and applicable rules.  All of Maine Family Planning's existing policies, call center scripts, and consent forms contemplate provision of these services accordingly.  If the new Rule is not enjoined, Maine Family Planning would need to create new policies, new call center

---

[131] While all of Maine Family Planning's APRNs hold a specialized nursing license from the state of Maine like those identified in the Rule as meeting the definition of APP, several of them do not have a graduate level degree and thus would not qualify under the Rule's definition of APP for purposes of providing "nondirective counseling." *See id.* at 7,787.  These APRNs were licensed in Maine prior to the State's graduate degree requirement for these programs, and thus have been "grandfathered in" as allowed by the State.   As recognized by the State, these APRNs are highly qualified to provide family planning and abortion services due to their years of experience and training.

scripts, and all new forms to address the Gag Rule.

125.     Maine Family Planning also would need to provide robust in-person training for both its staff and its call centers.  Many people on Maine Family Planning's staff have been working in family planning services for decades and are experienced in providing care based on the longstanding requirement that they must provide counseling on abortion, among other things, and can refer for abortion services.  Because the Gag Rule will require Maine Family Planning's staff to fundamentally alter how they interact with and treat patients, it would need to dedicate significant resources to retrain its staff accordingly.

126.     Finally, upon information and belief, if Maine Family Planning implements the Rule, it is likely to lose at least PPNE as a subgrantee given Planned Parenthood's stated intent to stop participating in the program under the Rule.  Other subgrantees may also stop participating. When this occurs, Maine Family Planning will be required to change its scope of project for the operative grant cycle in order to eliminate those providers from its Title X network.  It will then have to go through the complex and time-consuming process of identifying a new subgrantee in the same region, which may not be possible.  Changes of scope takes months to implement and no services are provided by the subgrantee in the interim.  Furthermore, if Maine Family Planning does not get approval for any changes of scope, fewer patients would be served and Maine Family Planning's funding would likely be reduced.

**E.  Impact if Maine Family Planning Were Forced to Leave the Title X Program**

127.     Alternatively, if Maine Family Planning were forced to leave the Title X program because compliance with the Rule is untenable or impossible, the resulting impact on the provision of both family planning and abortion services in Maine would be severe.

128.    As a threshold matter, any purported "choice" to forego Title X funding is no choice at all for Maine Family Planning.  Participation in the Title X program is inextricably intertwined with Maine Family Planning's historical mission and with its ability to operate. Maine Family Planning's reliance on Title X funds, in order to continue providing services at its own sites and through its established network of subgrantees, is significant.  Over 27% of Maine Family Planning's current annual budget comes from Title X funds.  Without those funds, Maine Family Planning would soon be forced to cut back a significant portion of its services, including closing anywhere from 11 to 15 of its clinics, downsizing staff, and eliminating some family planning services altogether.[132]  Even then, Maine Family Planning's remaining 3 to 7 clinics would be providing family planning services at a substantial loss, and Maine Family Planning does not currently have access to funds that could sustain that scenario longterm.  As a result, Maine Family Planning could be forced to close even more of its few remaining clinics going forward.

129.    In addition, Maine Family Planning would potentially need to end its provision of subsidized family planning services through many of its subgrantee sites.  Title X funds are indispensable to maintaining Maine Family Planning's larger network of Title X providers.

130.    The result of these dramatic reductions in health care services and options would be devastating to Maine Family Planning's patients and to the people of Maine, many of whom have no other access to health care, much less to family planning services.

---

[132] While Maine Family Planning could attempt to use its limited reserve funds to forestall clinic closures for a brief period, it does not currently have access to funds that could sustain the loss of Title X funds in the long term.

**ANY IMPLEMENTATION OF THE RULE WILL CAUSE IMMEDIATE AND
IRREPARABLE HARM BOTH NATIONWIDE AND IN MAINE**

## I.   The Rule Will Irreparably Harm the Family Planning Program

131.   By placing impossible restrictions on family planning providers, the Rule will gut the efficacy of the Title X program and do irreparable and lasting damage to this critical public service throughout the country, resulting in poor health outcomes for countless individuals going forward.  Even in clinics where Title X services continue to be provided, the relationship between patients and providers will be damaged.

### A.   The Rule Will Gut the Nationwide Provision of Family Planning Services

132.   Upon information and belief, as a result of the Rule many clinics around the country will be forced to leave the Title X program because compliance is infeasible for them.

133.   Planned Parenthood has already stated in its comment on the Proposed Rule that "Planned Parenthood affiliates and their health centers would be forced to discontinue their participation in Title X if the [] Rule takes effect."[133]  Planned Parenthood clinics are the source of care for more than 40% of the approximately four million patients served through Title X. According to the Guttmacher Institute, exclusion of Planned Parenthood from the Title X program would create a massive surge of demand on remaining comprehensive reproductive health care providers.[134]

134.   Similarly, the governors of four states—Hawaii, New York, Oregon, and Washington—have stated that they would reject federal funds were the Rule to go into effect.[135]

---

[133] Letter from Dana Singiser, *supra* note 61.

[134] Kinsey Hasstedt, *Beyond Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X*, 20 GUTTMACHER POL'Y REV. 86, 87 (2017), https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[135] Letter from David Y. Ige, Governor, State of Haw., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. 1 (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-189799; Letter from Andrew M.

Collectively, Title X providers in those four states served over 460,000 patients in 2017, over 10% of the total patients receiving care from the program.[136]

135.    Title X funds comprise 19% of the funds for family planning services nationwide—a significant percentage of the annual budget for many clinics.[137]  Thus, if forced to leave the program and give up Title X funds, some family planning clinics would have no choice but to shut their doors, and others would need to reduce their services.  This inevitably would cause demand for health services to surge at the remaining clinics, and wait times for appointments would expand at the remaining health centers that could still afford to offer reduced-rate services.

136.    Non-specialized health centers, like federally qualified health centers ("FQHCs"), do not have the capacity or the geographic distribution to absorb as many new family planning patients as would be necessary.  Studies demonstrate that, depending on the size of the remaining supply of care in medically underserved communities, health centers could face as much as a tripling in the number of family planning patients served based solely on the effects of excluding Planned Parenthood from the Title X program.[138]  In reality, the number of patients seeking care

---

Cuomo, *supra* note 60, at 2; Press Release, Kate Brown, Governor, State of Or., Governor Brown on Federal Title X Rollbacks on Access to Reproductive Health (July 30, 2018), https://www.oregon.gov/newsroom/Pages/NewsDetail.aspx?newsid=2844; Press Release, Jay Inslee, Governor, State of Wash., Inslee Statement on Protecting Washington Women from Trump Gag Rule (July 30, 2018), https://www.governor.wa.gov/news-media/inslee-statement-protecting-washington-women-trump-gag-rule.

[136] 2017 FPAR, *supra* note 9, at Ex. B-1.

[137] 2017 FPAR, *supra* note 9, at A-33.

[138] As of 2015, only 60% of FQHCs even offered contraceptive care to more than 10 women per year.  JENNIFER J. FROST & MIA R. ZOLNA, GUTTMACHER INST., RESPONSE TO INQUIRY CONCERNING THE AVAILABILITY OF PUBLICLY FUNDED CONTRACEPTIVE CARE TO U.S. WOMEN: MEMO TO SENATOR PATTY MURRAY, RANKING MEMBER, SENATE HEALTH, EDUCATION, LABOR AND PENSIONS COMMITTEE 2 (2017), https://www.guttmacher.org/article/2017/05/guttmacher-murray-memo-2017.

at remaining health centers is likely to grow at an even greater rate because clinics outside the Planned Parenthood network will also have to leave the Title X program as a result of the Rule.

137.    Moreover, many family planning providers are located in geographic areas that are nowhere near other health care options, much less other centers that provide contraceptive care.[139] Thus, even assuming *arguendo* that other health centers had capacity to absorb increased demand in their existing locations, patients will be discouraged from accessing care as a result of increased travel distances and resulting costs.  A study of the effects of closures of women's health clinics in Wisconsin (due to funding cuts aimed at clinics affiliated with providers of abortion services) and in Texas demonstrated that an increase in distance to the nearest provider decreased utilization of preventive care, with the greatest effect on individuals with less education.[140]

138.    That family planning clinics will be driven to close or to cut services by the Rule, and that patient care will be harmed as a result, is predictable based on the results of similar restrictions that have been imposed by state governments.  In recent years, both Texas and Iowa have passed legislation that excluded providers of abortion from state family planning programs.  A study in Texas, conducted two years after this legislation along with companion measures cutting family planning budgets were enacted, found that roughly one quarter of the state's family planning clinics had closed entirely—including 40% of the specialized family planning providers that had been most heavily targeted by the legislation.  Service hours were reduced at an

---

[139] For example, in 13% of counties with Planned Parenthood affiliates there are no FQHCs offering contraceptive care at all.  *Id.* at 5.

[140] Yao Lu & David J.G. Slusky, *The Impact of Women's Health Clinic Closures on Preventive Care*, 8 AM. ECON. J.: APPLIED ECON. 100 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/app.20140405.

additional 15% of clinics and in total 54% fewer patients were seen.[141]  Wait times for reduced

rate services in the Rio Grande Valley typically increased to several months.[142]  The impact on

women's reproductive health, due to the resulting cuts in service in Texas, was significant.

Insurance claims for LARC declined by over a third in counties where a Planned Parenthood

affiliate had been excluded from the state family planning program,[143] and the rate of childbirth

covered by Medicaid for women who relied on contraceptive injections went up by 27%.[144]

Similarly, in Iowa, Planned Parenthood was forced to close four clinics based on its loss of

funding.[145]  As a result, the number of patients enrolled in the program fell by half, and the

services provided over a comparable three-month period declined by 73%—despite there being

$2.5 million dollars remaining in the program that was not spent.[146]  In other words, the ban on

funding clinics that provided both abortion services and family planning could not be remedied by

provision of services at other locations, even when funding was available.

139.    In Maine, Maine Family Planning contemplates a similar choice.  If it remains in

the program, its provision of family planning services will be impaired by the limitations of the

Gag Rule and the other provisions of the Rule described above.  But if Maine Family Planning

---

[141] Kari White et al., *The Impact of Reproductive Health Legislation on Family Planning Clinic Services in Texas*, 105 AM. J. PUB. HEALTH 851, 853–55 (2015).

[142] CTR. FOR REPROD. RIGHTS & NAT'L LATINA INST. FOR REPROD. HEALTH, NUESTRA VOZ, NUESTRA SALUD, NUESTRO TEXAS: THE FIGHT FOR WOMEN'S REP RODUCTIVE HEALTH IN THE RIO GRANDE VALLEY 4 (Nov. 2013), http://www.nuestrotexas.org/wp-content/uploads/2015/03/NT-executive-summary-EN1.pdf.

[143] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 NEW ENG. J. MED. 853, 858 (2016).

[144] *Id.* at 853.

[145] Tony Leys & Barbara Rodriguez, *State Family Planning Services Decline 73 Percent in Fiscal Year as $2.5M Goes Unspent*, DES MOINES REG. (Oct. 18, 2018), https://www.desmoinesregister.com/story/news/health/2018/10/18/iowa-health-care-family-planning-contraception-services-planned-parenthood-abortion-medicaid/1660873002/.

[146] *Id.*

leaves the program, the closure of 11 to 15 directly controlled clinics, and the termination of services through subgrantees, will be devastating to the provision of family planning services across Maine and to those patients who are most vulnerable—the most rural and isolated.

140.    Importantly, once forced to close, financial and other barriers involved in reopening clinics often are insurmountable.[147]

141.    The reduction in subsidized family planning access that accompanies clinic closures or reduction in services has long-lasting effects on women who use these programs and on their families.[148]

## B.  The Rule Will Harm the Relationship between Patients and Their Family Planning Providers and Require Providers to Violate Ethical Principles

142.    The Rule unreasonably undermines the patient-provider relationship and will result in worse health care for patients immediately upon going into effect.

143.    Under the Rule, many patients will no longer be able to receive comprehensive care from their regular provider.  This is particularly significant in light of two facts.  First, the majority of women (60%) who use Title X-supported health care centers report that it is their usual source of medical care, and 40% report that it is their only source of medical care.[149]  In rural areas in particular, where there are greater shortages of both primary and specialty care,[150]

---

[147] *See* N. MADSEN ET AL., ABORTION CARE NETWORK, COMMUNITIES NEED CLINICS: THE ROLE OF INDEPENDENT ABORTION CARE PROVIDERS IN ENSURING MEANINGFUL ACCESS TO ABORTION CARE IN THE UNITED STATES 8 (2017), https://www.abortioncarenetwork.org/wp-content/uploads/2017/08/CommunitiesNeedClinics2017.pdf.

[148] Martha J. Bailey et al., *Does Access to Family Planning Increase Children's Opportunities? Evidence from the War on Poverty and the Early Years of Title X,* 54 J. HUM. RESOURCES (forthcoming 2019) (manuscript at 4), http://jhr.uwpress.org/content/early/2018/07/03/jhr.55.1.1216-8401R1.abstract?sid=d50e256e-9ce7-4025-8bae-d9b4f46dbaec; Martha J. Bailey, *Fifty Years of Family Planning: New Evidence on the Long-Run Effects of Increasing Access to Contraception*, 2013 BROOKINGS PAPERS ON ECON. ACTIVITY 341, 362 (2013).

[149] Adam Sonfield et al., GUTTMACHER INST., MOVING FORWARD: FAMILY PLANNING IN THE ERA OF HEALTH REFORM 32 (2014), https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

[150] The National Rural Health Association reports that there are 13.1 physicians per 10,000 people in rural areas compared to 31.2 physicians per 10,000 people in urban areas.  There are only 30 specialists per 100,000 people in

nonspecialized family planning clinics take on an even greater significance.  And second, many Title X programs are not located at clinics dedicated exclusively to family planning.  For example, 26% of Title X–funded clinics are FQHCs, which by definition are intended to provide primary care and to be the primary medical home for patients.[151]  That figure has increased from only 7% in 2001.  Roughly 10% of all FQHCs in 2015 received Title X funding.[152]

144.    Accordingly, when patients visit Title X–funded health centers, they have no reason to know where the funding for their services comes from, much less that they are seeing a Title X–funded provider or even what Title X is.  Rather, patients come to their health center with an expectation that they will receive a range of services, and that they will receive the full spectrum of information that is to be expected from candid conversations between health professionals and their patients.  The Rule undermines this expectation.

145.    By requiring physical separation of family planning services and abortion, the Rule will disrupt the continuity of care as to patients for whom abortion is part of their comprehensive reproductive health care.  Evidence indicates that continuity is valuable and important to providers and patients because it enables improved patient-provider relationships and results in improved clinical outcomes.[153]  Continuity of care reduces unnecessary testing, and potential for miscommunication.  It results in higher rates of preventive care, better record-keeping, and increased patient trust and satisfaction with their health care providers.[154]

---

rural areas, while urban areas have 263 specialists per 100,000 people.  *About Rural Health Care*, NAT'L RURAL HEALTH ASSOC., https://www.ruralhealthweb.org/about-nrha/about-rural-health-care (last visited Mar. 5, 2019).

[151] Jennifer J. Frost et al., *supra* note 19, at 9.

[152] *Id*.; HEALTH RES. & SERVS. ADMIN., HRSA FACT SHEET FY 2015—NATION (Sept. 30, 2015), https://data.hrsa.gov/data/fact-sheets (select "FY 2015"; then select "View Fact Sheet").

[153] Vidya Sudhakar-Krishnan & Mary CJ Rudolf, *How Important is Continuity of Care?*, 92 ARCHIVES DISEASES CHILDHOOD 381, 381–82 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2083711/.

[154] *Id.*

146.    These harms are further compounded by the fact that the Gag Rule prohibits these same Title X providers from engaging in an open dialogue about and referring their patients for abortion services.  The many women for whom Title X providers are their usual or only source of health care will not have ready access to other health professionals who can otherwise provide this information. [155]  Patients seeking abortion referrals inevitably will be confused and frustrated by their providers' unwillingness to provide this information, thereby further eroding their patient-provider relationship.  Other patients may be misled by their providers' insistence on giving them information about prenatal care and adoption and may interpret their providers' insistence on providing this unwanted and unnecessary information as disapproval of the patient's stated choice to have an abortion.

147.    Moreover, the Gag Rule forces providers to act and speak contrary to their medical judgment, their ethical codes, and the standard of care.  A cornerstone of the patient-provider relationship is the ability to provide accurate, complete, evidence-based information.  By restricting abortion referral, limiting speech about abortion, and compelling speech about post-conception options, the Rule will prevent these providers from providing complete, accurate, and evidence-based information to their patients.  Accordingly, it infringes on providers' ability to provide medical advice to their patients in a manner consistent with medical ethics and with the standard of care, and it deprives patients of information they need about treatment choices and alternatives so that they can make decisions about how to proceed with their medical treatment. In these ways and others, the Gag Rule further forces Title X family planning providers to violate a wide spectrum of applicable medical standards and codes of medical ethics.

---

[155] To the extent some related information is available on the Internet, the unsubstantiated and unvetted web of information on the Internet is no substitute for the type of information and counseling patients receive from a qualified health care provider, which must be provided in accordance with the governing standard of care. Moreover, much of the information about abortion on the Internet is misleading and medically inaccurate.

148.    For example, the American Medical Association ("AMA") states in its code of ethics that "Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care.  Successful communications in the patient-physician relationship fosters trust and support shared decision making."[156]  "Patients should be able to expect that their physicians will provide guidance about what they consider the optimal course of action for the patient based on the *physician's objective professional judgment.*"[157]  The AMA's code of ethics further states that "withholding information without the patient's knowledge or consent is ethically unacceptable."[158]

149.    Similarly, the American College of Obstetricians and Gynecologists' ("ACOG") code of professional ethics states the importance of the patient-physician relationship, noting "the respect for the right of individual patients to make their own choices about their healthcare."[159] ACOG's policy statement on abortion notes that "[i]nduced abortion is an essential component of women's health care."[160]

150.    The code of ethics for the American College of Nurse-Midwives states that midwives will "develop a partnership with the woman, in which each shares relevant information

---

[156] Am.  Med. Assoc., Code of Medical Ethics § 2.1.1 Informed Consent (2016), https://www.ama-assn.org/delivering-care/informed-consent; *see also* Letter from James L. Madara, *supra* note 52 ("The proposed changes on counseling and referral described above would not only undermine the patient-physician relationship, but also could force physicians to violate their ethical obligations.").

[157] Am.  Med. Assoc., Code of Medical Ethics Opinions § 1.1.3 Patient Rights, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-1.pdf (emphasis added).

[158] Am. Med. Assoc., *supra* note 156, § 2.1.3 Withholding Information from Patients, https://www.ama-assn.org/delivering-care/withholding-information-patients.

[159] Am. Coll. of Obstetricians & Gynecologists, Code of Prof. Ethics 1 (2018), https://www.acog.org/-/media/Departments/National-Officer-Nominations-Process/ACOGcode.pdf?dmc=1&ts=20180726T1911469633; *see also* Letter from Lisa M. Hollier, *supra* note 53, at 6 ("The Proposed Rule's restrictions on counseling and referral for abortion are a violation of the patient-physician relationship, undermine the quality of care provided to patients, place physicians in ethically compromising situations, and, accordingly, should not be implemented.").

[160] Am. Coll. of Obstetricians & Gynecologists, College Statement of Policy, Abortion Policy 1 (2014), https://www.acog.org/-/media/Statements-of-Policy/Public/sop069.pdf?dmc=1&ts=20180726T1910257757.

that leads to informed decision-making" and notes in a position statement that "everyone has the right to access factual, evidence-based, unbiased information about available sexual and reproductive health care services in order to make informed decisions."[161]  The American Nurses Association code of ethics likewise states, "Patients have the moral and legal right to determine what will be done with and to their own person; to be given accurate, complete, and understandable information in a manner that facilitates an informed decision."[162]

151.    For providers at Maine Family Planning and other Title X clinics, upholding these ethical standards is central to every single patient interaction—whether it is telling a patient who discloses a new onset of substance use about treatment options, or a patient who has high risk sexual behaviors about the importance of condom use and testing, or a patient who is experiencing domestic violence about available resources who does not know that there are resources available, or a pregnant patient about comprehensive options.

152.    By restricting abortion referral, limiting speech about abortion, and compelling speech about post-conception options, the Rule will prevent Title X providers from providing candid, complete, accurate, and medically-useful information to their patients and will prevent patients from having the information they need to make decisions about their medical care.  The

---

[161] Am. Coll. of Nurse Midwives, Code of Ethics (2013), http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000048/Code-of-Ethics.pdf; Am. Coll. of Nurse-Midwives, Position Statement: Access to Comprehensive Sexual and Reproductive Health Care Servs. 1 (2016), http://www.midwife.org/acnm/files/ACNMLibraryData/UPLOADFILENAME/000000000087/Access-to-Comprehensive-Sexual-and-Reproductive-Health-Care-Services-FINAL-04-12-17.pdf; *see also* Letter from Amy M. Kohl, Dir. of Advocacy & Gov't Affairs, Am. Coll. of Nurse-Midwives, to the Office of Population Affairs, U.S. Dep't of Health & Human Servs. 3 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-198447 ("The proposed changes to the Title X program would interfere with the provider-patient relationship by barring providers from providing critical reproductive-health information that midwives and other health care providers have a moral and ethical obligation to provide.").

[162] Am. Nursing Ass'N, Code of Ethics for Nurses with Interpretive Statements § 1.4 (2015), https://www.nursingworld.org/coe-view-only.

Rule accordingly pits health care professionals' ethical responsibilities against their continued receipt of Title X funding.

## II. The Rule Will Harm Patients Who Seek Abortion Access

153.    There is no typical abortion patient.  Nationally, approximately 39% of abortion patients are white; 28% are Black; 25% are Hispanic; 6% are Asian or Pacific Islander; and 3% identify with other racial or ethnic classifications.  Sixty percent of abortion patients are in their twenties, and a quarter are in their thirties.  Many abortion patients (59%) have had at least one previous birth.  Three-quarters of abortion patients in the United States are low-income, with nearly half living below the federal poverty level.[163]

154.    The Rule will significantly harm women seeking to exercise their fundamental right to abortion by: limiting the availability of abortion services; delaying and even preventing patients from accessing health care; and increasing abortion stigma.  The predictable result of these harms is that abortion will become inaccessible for many women.

155.    As applied to patients seeking medication abortion via telemedicine at Maine Family Planning's satellite clinics, the Rule has the purpose and effect of placing a substantial obstacle in the path of these women seeking abortion.

### A.  Limiting the Availability of Abortion Services

156.    The Rule would greatly exacerbate the existing scarcity of abortion services, both in Maine and nationwide. According to the most recent statistics, 90% of all U.S. counties already lacked an abortion clinic in 2014, and 39% of women of reproductive age lived in those

---

[163] JENNA JERMAN ET AL., GUTTMACHER INST., CHARACTERISTICS OF U.S. ABORTION PATIENTS IN 2014 AND CHANGES SINCE 2008, at 1 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

counties.[164]

157.    The Rule's physical separation requirement would force many providers, like Maine Family Planning, that currently provide both abortion care and Title X family planning care, to choose between providing the two services at their clinics.  Many Title X projects are established practices that have developed over the course of many years (and some, like Maine Family Planning, over the course of decades), in reliance on the longstanding policy that allows them to share facilities with abortion providers.  Forcing *post hoc* physical separation of these established practices decades later would be expensive, complicated and, in many cases, impossible.

158.    The Rule unrealistically suggests that this effort of separating facilities can be done in one year and would cost between \$20,000–\$40,000 per service site in the first year.[165]  In reality, the cost of separating facilities can total hundreds of thousands of dollars.

159.    The Rule will thus cause many existing clinics to stop providing abortion services.  For example, seventeen of Maine Family Planning's clinics will be unable to logistically and/or financially manage the physical separation required by the Rule.  Thus, in order for Maine Family Planning to implement the Rule, those clinics would be forced to stop providing abortion care altogether.  Similarly, if Maine Family Planning leaves the Title X program, it could soon be forced to close 11 to 15 of its clinics and stop providing abortion care at those sites accordingly.  Under either scenario, abortion access in Maine would be severely curtailed.  A substantial burden will be placed on women's ability to obtain abortion care, due to significantly increased travel distances to abortion providers and the hurdles associated with such travel.  This would

---

[164] Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 PERSP. ON SEXUAL & REPROD. HEALTH 1, 4 (2017).

[165] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. at 7,781–82.

delay women's access to abortion care, deny women access to their preferred abortion procedure, and prevent some women from accessing abortion altogether.

160.    As it stands, Maine has only three publicly accessible health centers where a woman can obtain an aspiration abortion or any abortion care after 10 weeks LMP, each of which primarily offers such care only one day per week:[166]  Maine Family Planning in Augusta, Planned Parenthood of Northern New England in Portland, and Mabel Wadsworth Center in Bangor.  But Maine Family Planning's satellite clinics at least provide broader access to medication abortion in the state—a crucial option for rural patients.[167]  If Maine Family Planning complies with the Rule, more than half of Maine women would live in counties without an abortion provider, and the distances many women would have to travel to obtain *any* kind of abortion services would be substantial, increasing by multiple orders of magnitude.  For example, while currently 7.9% of patients are traveling more than 25 miles to reach their nearest abortion provider, if Maine Family Planning's 17 satellite clinics close, 76% of patients (including those seeking medication abortion) would have to travel more than 25 miles to reach their nearest clinics.  In addition, none of these women are currently traveling 100 miles or more to a clinic offering at least medication abortion, but if Maine Family Planning's satellites close, 10% of patients will have to travel more than 100 miles to their nearest clinic (including those seeking medication abortion).  This large shift in travel distances will affect the utilization of abortion services in Maine.

161.    A woman who lives in Fort Kent, for example, would need to travel more than six hours round-trip to Bangor to obtain care.  A woman who lives in Skowhegan, Farmington, or

---

[166] Medication abortion, the only other abortion method offered in the first trimester of pregnancy, is available only through 10 weeks of pregnancy.  *See supra* ¶ 109.

[167] Maine Family Planning's satellite clinics can offer only medication abortion via telehealth, because the APRNs on site are not permitted to provide abortion services independently under the State's Physician-Only Law.

Belfast would be required to travel up to two hours round-trip to Augusta to obtain an abortion.  If she lives in Calais, Machias, or Presque Isle, she would have to travel up to four or five hours round-trip to Bangor.

162.   A woman who lives on the island of Vinalhaven would face a full-day commute, or more, to obtain any abortion care.  She would first have to take a ferry to Rockland (which runs only six times daily), and then find and pay for transportation for the one-hour drive to Augusta. After her procedure, she would need to find and pay for transportation to return to Rockland, and then take a return ferry, the last of which departs at 4:30 pm.  If she were unable to make the return ferry, she would need to find and pay for overnight lodging.

163.   A woman who lives on one of Maine's more remote islands would have an even more difficult and expensive commute to obtain abortion care.  For instance, a woman on Matinicus would have only two travel options: an air taxi to Knox County Regional Airport (which flies only twice daily; typically has only three seats available; and costs $60 each way) or a ferry (which runs only two to four days in any given month and takes more than two hours each way).  She would then need to find and pay for transportation to and from Augusta, and she would almost certainly have to find and pay for overnight lodging before she can return to the island.

164.   A variety of factors make travel throughout Maine particularly difficult if not impossible for many women, including but not limited to: high rates of rural poverty; lack of public transportation; Maine's large rural population; poor weather conditions during the winter; and Maine's limited access to major roadways, as Interstate 95 is the only major highway in the state.  For some women, increased travel distances will lead to significantly longer travel times, particularly where women must travel on local or country roads and/or during inclement weather.

Depending on the weather conditions, these journeys may take far longer, or simply be impossible.

165.     Empirical evidence demonstrates that even comparatively small increases in driving distance, like 25 miles, can lead to substantial decreases in access to abortion.[168]  In part, this is because increased travel distances also translate to additional travel costs and incidentals. A woman facing these long travel distances to obtain an abortion typically must arrange and pay for transportation and take time off work.  Low-wage workers often have no access to paid time off or sick days.  A woman facing such a lengthy journey to access an abortion often also must arrange and pay for child care.[169]  These costs can be prohibitive for poor and low-income women who cannot afford to forgo wages or risk job loss.

166.      Two-thirds of the patients who sought abortion services at Maine Family Planning in 2018 required financial support.  Maine Family Planning's poor and low-income patients routinely tell their health care providers that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for abortion care.  Although Maine's Medicaid program covers the cost of transportation to receive Medicaid-covered health services, because Maine's Medicaid program excludes coverage for abortion in almost all cases, Plaintiffs' poor and low-income patients who are enrolled in or eligible for Medicaid cannot receive state assistance either with the cost of their abortions or with the cost of travel to their appointments.

---

[168] Some scholars estimate that an increase in travel distance from 0 to 25 miles reduces abortion rates by approximately 10%.  Jason M. Lindo et al., *How Far Is Too Far? New Evidence on Abortion Clinic Closures, Access, and Abortions* 2, 18 (Nat'l Bureau of Econ. Research, Working Paper No. 23366, 2018), http://people.tamu.edu/~jlindo/HowFarIsTooFar.pdf.

[169] 59% of women who obtained abortion in 2014 had had at least one previous birth.  JENNA JERMAN ET AL., GUTTMACHER INST., CHARACTERISTICS OF U.S. ABORTION PATIENTS IN 2014 AND CHANGES SINCE 2008 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

167.    For the women who are nonetheless able to overcome the burdens associated with increased travel distances, travel will still inevitably delay access to abortion, and that delay harms patients in myriad ways.

168.    First, while abortion is safe at any point in pregnancy, delayed abortion care is associated with health risks.  The risks of complications and the risks of abortion failure both increase with increasing gestational age.  Abortion-related mortality occurs at a rate of 0.3 per 100,000 procedures at eight weeks of gestation or less, but 6.7 per 100,000 procedures at 18 weeks of gestation or more.[170]  Thus, forcing pregnant people to delay abortion care is detrimental to their health and exposes them to greater risks with no medical justification.  Additionally, every day a woman remains pregnant, she endures the continued risks of complications of pregnancy and the physical and emotional symptoms of pregnancy, including fatigue and nausea, which can be severe and even debilitating.  The complexity of the abortion procedure also increases with increasing gestational age.

169.    Second, delays can increase the cost of an abortion procedure.  Abortion care during the first trimester of pregnancy is substantially less expensive than in the second trimester: the median prices of a surgical abortion at ten weeks LMP is $508, while the cost rises to $1,195 at twenty weeks LMP.[171]  For patients who struggle to afford a first trimester procedure, a second trimester procedure could be completely out of reach.  This is especially true for women with low incomes who must pay for the procedure out of pocket in most states.[172]

---

[170] Suzanne Zane et al., *Abortion-Related Mortality in the United States: 1998–2010*, 126 OBSTETRICS & GYNECOLOGY 258, 260 tbl.2 (2015).

[171] Rachel K. Jones et al., *Differences in Abortion Service Delivery in Hostile, Middle-ground, and Supportive States in 2014*, 28 WOMEN'S HEALTH ISSUES 212, 216 tbl. 4 (2018); *Medicaid Funding of Abortion*, GUTTMACHER INST. (Feb. 2018), https://www.guttmacher.org/evidence-you-can-use/medicaid-funding-abortion.

[172] Thirty-four states and the District of Columbia ban Medicaid coverage for abortion care.  *Medicaid Funding of Abortion*, supra note 171.  Twenty-six states also prohibit plans purchased on the ACA Marketplace from covering

170.    Third, delays in access to care will prevent some women from accessing their preferred abortion procedure and will prevent other women from accessing abortion care in the state of Maine altogether.

171.    Some women prefer medication abortion and it is clinically preferred for women with certain medical conditions, including obesity and uterine anomalies.  Because the FDA has only approved use of medication abortion through 10 weeks LMP, women delayed past that cutoff will be deprived the choice of a medication abortion.

172.    The burdens from delayed access to care for women seeking abortion care in the second trimester are greater still.  Fewer providers may be available to treat patients who experience significant delays in accessing abortion care.  As of 2014, only 72% of abortion clinics in the United States provided care after the first trimester of pregnancy (between 12 and 14 weeks LMP, depending on the state).[173]  The scarcity of second trimester providers is particularly burdensome for patients with low incomes.  If a patient misses her opportunity to access abortion care in the first trimester, accessing abortion care during the second trimester will likely involve significantly increased travel distance and cost.

173.    Some women, especially from rural areas of the state, will be unable to travel to Maine Family Planning's Augusta clinic before its gestational limit of 14.0 weeks.  On information and belief, Mabel Wadsworth Center in Bangor only provides abortion through 14.3 weeks while Planned Parenthood's Portland Health Center provides abortion services through 18.6 weeks.  Thus, a patient seeking abortion care in Maine between 14.0 and 14.3 weeks would

---

abortion care.  Alina Salganicoff & Laurie Sobel, *Abortion Coverage in the ACA Marketplace Plans: The Impact of Proposed Rules for Consumers, Insurers and Regulators*, HENRY J. KAISER FAMILY FOUNDATION, at fig.1 (Dec. 21, 2018), https://www.kff.org/womens-health-policy/issue-brief/abortion-coverage-in-the-aca-marketplace-plans-the-impact-of-proposed-rules-for-consumers-insurers-and-regulators/.

[173] *Induced Abortion in the United States*, GUTTMACHER INST. (Jan. 2018), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states.

have to travel to either Bangor or Portland, and the only option for patients seeking abortion in Maine after 14.3 weeks would be to travel to Portland.

174.    Due to a combination of factors, including relative lack of access to medical services and difficulty accessing and affording contraceptives, women with low incomes have more unintended pregnancies, and higher abortion rates, than women with higher incomes. Consequently, a disproportionately high percentage of women who seek abortions nationwide have poverty-level incomes, including the patients at Maine Family Planning and throughout Maine.

**B.   Delaying or Preventing Patients from Accessing Necessary Health Care Information**

175.    Patients seeking access to an abortion will also be prevented by the Gag Rule from learning information that is necessary to their receipt of timely care.

176.    First, within a Title X family planning appointment, a patient who desires an abortion will encounter either a health care professional who refuses to provide her with *any* information about abortion services, as permitted by the Rule, or a health care professional who is required by the Rule to give her unwanted and stigmatizing information about prenatal care and who is limited by the Rule's vague language as to what he or she can say about abortion.

177.    Next, the health care professional will be required to withhold information about where the patient can receive her desired services.  The patient would then have to research whether any abortion providers offering care at the gestational stages needed by the patient are located nearby.  As part of that research, the patient may then have to contact or visit several providers in order to find one providing the care she seeks.  Some patients will encounter "Crisis Pregnancy Centers" during this search, which have been shown to intentionally mislead and delay patients seeking abortion care.

178.    These hurdles will significantly delay a large percentage of affected patients' ability to access abortion care, and exacerbate the existing burdens patients with low incomes already face in accessing care, without any medical benefit.  For most patients with low incomes, visiting even one health care provider on the referral list who does not provide abortion care, and then taking time off to actually obtain an abortion, would mean multiple days of missed wages, and may even lead to job loss.

179.    In addition, as detailed above, delays in access to abortion care will increase health risks for patients and the complexity and costs of their abortion procedures, limit patients' options of providers, force women to endure the continued risks of complications of pregnancy and the physical and emotional symptoms of pregnancy, prevent some women from accessing their preferred abortion procedure, and prevent others from accessing abortion altogether in the state of Maine and elsewhere.

C.  **Increasing Abortion Stigma and Exposure to External Harms**

180.    Increased logistical burdens associated with the Rule will make it more difficult for patients who desire to keep their decision to have an abortion private.  This exposes patients who are seeking abortions in dangerous situations, such as those in abusive relationships or victims of unreported rape or incest, to a greater risk of violence or other harms.

181.    The Rule would further contribute to a climate of secrecy and stigma against abortion, which deters clinicians from offering abortion care and penalizes those who continue to provide it.  Stigma in turn harms pregnant women seeking abortions by reducing the number of abortion providers, reducing their access to the few remaining providers, and demeaning their constitutionally-protected decisions.

182.     These burdens can result in patients incurring increased risks and costs, experiencing psychological harm, and potentially attempting to self-induce abortions if they cannot get to a provider, even though they would have preferred a clinic-based abortion.  For some patients, the needless delays created by the Rule will result in them not being able to obtain abortion care at all.

183.     Patients who cannot obtain abortion care, and who are therefore required to give birth, experience meaningful physical, economic, and emotional harms as a result.  Recent studies demonstrate that women denied abortions are more likely to live in poverty, to raise children alone, and to remain with an abusive partner, and they are less likely to have and achieve aspirational plans for the future.[174]

184.     Ultimately, the barriers to abortion access imposed by the Separation Requirement and Gag Rule, both individually and cumulatively, will severely diminish, and in many cases foreclose, abortion access and endanger women's health.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION—ADMINISTRATIVE PROCEDURE ACT: CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORITY

185.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

186.     Plaintiffs are entitled to relief under the Administrative Procedure Act because the Rule is unlawful under federal statutes and the Constitution.

---

[174] Diana Greene Foster et. al, *Effects of Carrying an Unwanted Pregnancy to Term on Women's Existing Children*, 205 J. PEDIATRICS 183 (2019), https://www.jpeds.com/article/S0022-3476(18)31297-6/pdf.

187.     The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action, finding, or conclusion that is "an abuse of discretion," "not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority, or limitations, or short of statutory right."[175]

188.     The Rule violates the law because its Gag Rule provisions contravene the Nondirective Counseling Mandate set forth in the Continuing Appropriations Act, 2019.[176]

189.     The Rule further violates the law because its physical separation and Gag Rule provisions contravene section 1554 of the Patient Protection and Affordable Care Act.[177]

190.     Section 1554 requires that HHS not promulgate any regulation that "interferes with communications regarding a full range of treatment options between the patient and the provider," that "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," or that "violates the principles of informed consent and the ethical standards of health care professionals."

191.     Because the Rule prevents health care providers from providing appropriate referrals to their patients to address the possibility of an abortion, and because it prevents medical professionals from engaging in an open dialogue with their patients about abortion, the Rule does not allow providers to discuss a full range of treatment options or fully disclose all relevant information.  In forcing health care providers to arrange for unnecessary and unwanted prenatal care referrals, the Rule similarly interferes with patient–provider communications.  As attested to by the American Medical Association, the American College of Obstetricians and Gynecologists,

---

[175] 5 U.S.C. § 706(2)(A)–(C).

[176] Pub. L. 115–245, Div. B, § 208, 132 Stat. 2981, 3070–71.

[177] 42 U.S.C. § 18114 (2012).

the American Academy of Nursing, and other organizations, it also violates the ethical standards of health care professionals.

192.    Section 1554 further requires that HHS not promulgate any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services."

193.    Because the Rule requires Title X providers to physically segregate their Title X family planning services from their abortion services, forcing patients to seek care at multiple locations, it creates unreasonable barriers for patients with unwanted pregnancies to obtain care and impedes timely access to abortion services.  Furthermore, the Rule's ban on referring Title X patients for abortion care impedes those patients' timely access to abortion care given the difficulties for patients of obtaining accurate and appropriate information about abortion providers.  The Rule also creates unreasonable barriers and impedes timely access to healthcare services by imposing restrictions that will force many health care providers to leave the Title X program and/or close clinics altogether.

194.    The Rule violates the law because it is not based on a permissible construction of Title X.  By way of example and not limitation, the Rule contravenes Congress's mandate that Title X projects provide "comprehensive" and "voluntary" services.[178]

195.    The Rule also is not a permissible construction of Title X because it is contrary to Congress's clear intent, as evidenced by the legislative history leading up to Title X, as well as Congress's legislative actions and its statements on the floor relating to the Title X program throughout the nearly fifty years since Title X's enactment.

196.    The Rule is unlawful because it violates the First Amendment.

---

[178] 42 U.S.C. §§ 300a, 300a-5.

197.    The Rule is unlawful because it violates the Due Process Clause of the Fifth

Amendment.

198.    The Rule is unlawful because it discriminates based on the exercise of a

fundamental right and based on sex.

199.    The Rule is unlawful because it erects an unconstitutional condition to receipt of

federal funds.

200.    By issuing the unlawful Rule, Defendants abused their discretion in violation of

5 U.S.C. § 706(2)(A).

201.    Because Defendants' actions are "not in accordance with law," "contrary to

constitutional right," "an abuse of discretion," and in excess of statutory authority and short of

statutory right, the Government Defendants have violated the Administrative Procedure Act.

202.    Absent declaratory and injunctive relief, Defendants' violations will cause ongoing

harm to Plaintiffs.

## SECOND CAUSE OF ACTION—ADMINISTRATIVE PROCEDURE ACT: ARBITRARY AND CAPRICIOUS

203.    The foregoing allegations are re-alleged and incorporated by reference as if

restated fully here.

204.    Plaintiffs are entitled to relief under the Administrative Procedure Act because the

Rules are arbitrary and capricious.

205.    The Administrative Procedure Act requires courts to "hold unlawful and set aside"

any agency action, finding, or conclusion that is "an abuse of discretion," "arbitrary and

capricious," "not in accordance with the law," "contrary to constitutional right, power, privilege,

or immunity," or "in excess of statutory . . . authority, or limitations, or short of statutory

right."[179]

206.    Defendants' issuance of the Rule exceeded their statutory authority, abused their discretion, and is arbitrary and capricious because the Rule was adopted without permissible or valid justification.

207.    Defendants' issuance of the Rule exceeded their statutory authority, abused their discretion, and is arbitrary and capricious because the Rule rescinds longstanding regulatory requirements without any reasoned explanation.

208.    Although the Rule purports to identify "justifications" for reversing its longstanding position, it provides no reasonable explanation for these significant changes.

209.    At the same time, the Rule fails to address and/or meaningfully consider material facts and evidence submitted during the comment period on the Proposed Rule, including but not limited to harms that would be imposed by the separation requirements and Gag Rule.

210.    Defendants' cost-benefit analysis likewise fails to weigh meaningful harms caused by the Rule against its purely speculative benefits.

211.    The Rule is inconsistent with the weight of the hundreds of thousands of comments that were submitted in response to the notice of public rulemaking, and thus is arbitrary, capricious, and an abuse of discretion.

212.    By issuing the unlawful Rule, Defendants abused their discretion in violation of 5 U.S.C. § 706(2)(A).

213.    Because Defendants' actions are "arbitrary and capricious," "an abuse of discretion," and in excess of statutory authority and short of statutory right, Defendants have violated the Administrative Procedure Act.

---

[179] 5 U.S.C. § 706(2)(A)–(C).

214.    Absent declaratory and injunctive relief, the Defendants' violations will cause ongoing harm to Plaintiffs.

### THIRD CAUSE OF ACTION—FIFTH AMENDMENT DUE PROCESS, UNDUE BURDEN ON PLAINTIFFS' PATIENTS' RIGHT TO LIBERTY AND PRIVACY

215.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

216.    The Due Process Clause of the Fifth Amendment prohibits the government from denying fundamental rights such as the right to liberty.

217.    The right to liberty encompasses the right to abortion.

218.    The government may not impose upon the right to abortion an undue burden, which exists if a regulation's purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before viability.

219.    As applied to Plaintiffs' patients seeking abortion from Maine Family Planning's non-Augusta clinics (the "satellite clinics"), the Rule has the purpose and effect of placing substantial obstacles in the way of patients' access to abortion care.

220.    The Rule, as applied to patients seeking abortion at Maine Family Planning's satellite clinics, individually and in conjunction with related federal and Maine state laws, violates Plaintiffs' patients' right to liberty as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because it imposes an undue burden on Plaintiffs' patients' fundamental right to choose abortion before viability.

221.    Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs' patients.

## FOURTH CAUSE OF ACTION—FIRST AMENDMENT

### [On Behalf of Maine Family Planning and Maine Family Planning's Employees]

222.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

223.    Plaintiff Maine Family Planning is entitled to relief because the Rule subjects, and will continue to subject, Maine Family Planning and Maine Family Planning's employees to deprivations of their rights under the First Amendment to the United States Constitution.

224.    Providers of family planning services, including those funded by Title X, are medical providers who are obliged by their training, their codes of ethics, and their duties toward their patients to provide appropriate and complete information to those patients.  These providers help their patients make deeply personal decisions and their candor is crucial.

225.    The Rule significantly impinges on the relationship between Title X providers and their patients, including but not limited to patient's relationships with physicians and APRNs.

226.    The relationship between health care professionals and patients is a traditional sphere of free expression that is entitled to protection under the First Amendment, even when subsidized by the government.

227.    The First Amendment provides a right to be free from governmental prohibitions on speech as well as from compelled speech by the government.

228.    The First Amendment further provides a right to be free from governmental regulations of speech that prefer one particular viewpoint in speech over other perspectives on the same topic.

229.    Defendants have violated, and will continue to violate, Maine Family Planning and Maine Family Planning's employees' rights under the First Amendment, including in the following ways:

a.      by prohibiting Maine Family Planning and Maine Family Planning's employees from speaking their professional and medical opinions;

b.      by compelling Maine Family Planning and Maine Family Planning's employees to speak in ways that they would not otherwise speak;

c.      by barring Maine Family Planning and Maine Family Planning's employees from answering their patients' questions or requests for medical guidance;

d.      by compelling Maine Family Planning and Maine Family Planning's employees to mislead their patients;

e.      by undermining the sacred trust inherent in the patient-provider relationship;

f.      by compelling Maine Family Planning and Maine Family Planning's employees to violate medical ethics and the standard of care;

g.      by imposing a content-based and viewpoint-based restriction on the speech of Maine Family Planning and Maine Family Planning's employees;

h.      by prohibiting Maine Family Planning and Maine Family Planning's employees from expressing their viewpoints;

i.      by prohibiting Maine Family Planning and Maine Family Planning's employees from engaging in activities that encourage, promote, or advocate for abortion;

j.      by chilling Maine Family Planning and Maine Family Planning's employees' speech through use of a vague standard that exposes Maine Family Planning and Maine Family Planning's employees to penalties for expressing their viewpoint and/or their statements regarding the best standard of care for patients.

230.    The Rule's restrictions on First Amendment rights are not justified by a compelling or important governmental interest.

231.    Even if Defendants have a compelling or important government interest, the Rule is not substantially related or narrowly tailored to achieve that interest and/or achieves it in ways that are far more intrusive than necessary.

232.     Absent declaratory and injunctive relief, the Defendants' violations will cause ongoing harm to Maine Family Planning and Maine Family Planning's employees.

## FIFTH CAUSE OF ACTION—UNCONSTITUTIONAL CONDITIONS AS APPLIED TO PLAINTIFFS

233.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

234.     The Rule imposes an unconstitutional condition on Plaintiffs' receipt of Title X funds.

235.     The Rule requires Plaintiffs to adopt policies and standards of care for patients that violate Plaintiffs' First Amendment and Fifth Amendment rights, and interferes with Plaintiffs' practice of medicine.

236.     The Rule requires Plaintiffs to adopt policies and take steps that will inflict a substantial burden on patients' ability to access abortion care, and thus infringe those patients' fundamental right to abortion access.

237.     The Rule therefore imposes an unconstitutional condition on Plaintiffs' receipt of federal funding and violates Plaintiffs' and Plaintiffs' patients' rights as secured by the First and Fifth Amendments of the United States Constitution.

238.     Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs and Plaintiffs' patients.

## SIXTH CAUSE OF ACTION—EQUAL PROTECTION

239.     The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

240.     The Due Process Clause of the Fifth Amendment prohibits the government from denying equal protection of the laws.

241.    The Rule denies Plaintiffs the equal protection of the laws because it treats pregnant individuals seeking abortion care differently from pregnant individuals seeking prenatal care or otherwise intending to continue their pregnancies.

242.    Pursuant to the Rule, health care providers in a Title X program must provide incomplete, inaccurate, and misleading information that is inconsistent with medical ethics to pregnant patients seeking abortion care.  By contrast, they may provide complete, accurate, and medically appropriate care to pregnant patients seeking prenatal care.

243.    The Rule further denies Plaintiffs the equal protection of the laws because it discriminates on the basis of sex.

244.    Defendants cannot proffer any rationally related legitimate government interest or legitimate justification for the Rule, let alone an important, exceedingly persuasive, or compelling justification.  The reasons offered by Defendants in the preamble to the Rule are unfounded and pretextual.

245.    Even if Defendants have an important, exceedingly persuasive, or compelling government interest, the Rule is not substantially related or narrowly tailored to achieve that interest.

246.    Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## SEVENTH CAUSE OF ACTION—VOID FOR VAGUENESS

247.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

248.    The Rule does not provide adequate guidance as to how providers can satisfy the separation requirement, nor does it protect against arbitrary and discriminatory enforcement.

249.    The Rule's Separation Requirements do not provide meaningful guidance on how Title X providers must maintain physical and financial separation of abortion services and related activities.  Instead, the Rule gives the Secretary discretion to determine whether sufficient "separation" exists "based on a review of facts and circumstances," and then advances a number of ambiguous and non-exclusive factors that Defendants should consider in determining whether an organization has sufficiently separated Title X services from abortion care and/or abortion related activities.

250.    The Rule does not provide adequate guidance as to how providers can satisfy the Gag Rule, nor does it protect against arbitrary and discriminatory enforcement.

251.    Although the Gag Rule purports to allow "nondirective counseling," it prohibits Title X projects from "promot[ing]" or "support[ing] abortion as a method of family planning," without defining those terms or providing any explanation regarding their meaning.  These provisions are contradictory.

252.    The Rule includes vague reporting requirements that do not provide adequate guidance as to how providers can meet them and leave providers vulnerable to arbitrary and discriminatory enforcement.

253.    Furthermore, the Rule provides no process for appeal by which the risk of arbitrary and discriminatory enforcement can be mitigated.

254.    Because Plaintiffs are unable to determine what is required under the Rule, Defendants have violated Plaintiffs' rights secured to them by the Due Process Clause of the Fifth Amendment.

255.    The Rule is not justified by a governmental interest sufficient to justify this violation, nor is it sufficiently tailored to achieve any such interest.

256.    Absent injunction and declaratory relief against the Regulation, Defendants' violations will cause ongoing harm to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a.    Issue a declaratory judgment that the Rule was issued in violation of, and violates, the Administrative Procedure Act, the Affordable Care Act, and the First and Fifth Amendments to the United States Constitution, on its face and/or as applied to Plaintiffs;

b.    Issue a preliminary injunction prohibiting Defendants from implementing or enforcing the Rule;

c.    Enter a permanent injunction prohibiting Defendants from implementing or enforcing the Rule and vacating the Rule in its entirety;

d.    Retain jurisdiction until Defendants have fully satisfied their court-ordered obligations;

e.    Award Plaintiffs attorneys' fees and costs, as provided by any applicable statute or regulation or the inherent powers of the Court;

f.    Grant all further and additional relief that the Court may determine is just and proper.

Dated:  March 6, 2019                    Respectfully submitted,


                                         /s/ Richard L. O'Meara
                                         Richard L. O'Meara
                                         MURRAY PLUMB & MURRAY
                                         75 Pearl Street, P.O. Box 9785
                                         Portland, ME 04104
                                         Telephone: (207) 773-5651
                                         *romeara@mpmlaw.com*

                                         Emily Nestler*
                                         Molly Duane*
                                         Arielle Humphries*
                                         CENTER FOR REPRODUCTIVE RIGHTS
                                         199 Water Street, 22nd Floor
                                         New York, NY 10038
                                         Telephone: (917) 637-3600
                                         *enestler@reprorights.org*

                                         Emily Ullman*
                                         Jennifer Saperstein*
                                         COVINGTON & BURLING LLP
                                         One CityCenter
                                         850 Tenth Street NW
                                         Washington, DC 20001
                                         Telephone: (202) 662-6000
                                         *eullman@cov.com*
                                         _____

                                         Attorneys for Plaintiffs The Family Planning
                                         Association of Maine d/b/a Maine Family Planning
                                         and J. Doe, DO, MPH


* Motion for *pro hac vice* forthcoming.