UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, *et al.*,<br><br>Plaintiffs<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants | No. 1:19-cv-00100-LEW |

## <u>DECISION AND ORDER ON MOTION FOR PRELIMINARY INJUNCTION</u>

The matter is again before the Court on Plaintiffs' motion for preliminary injunctive relief.[1]  In this action, The Family Planning Association of Maine d/b/a Maine Family Planning, on its own behalf and on behalf of its staff and patients, and J. Doe, a doctor of osteopathic medicine, who similarly seeks to vindicate personal and third-party/patient rights ("Plaintiffs"), allege that the United States Department of Health and Human

---

[1] Plaintiffs withdrew their Motion for Preliminary Injunction (ECF No. 65) two days after oral argument, after obtaining nationwide injunctions from federal courts in Oregon and Washington. (One of the nationwide injunctions was initially issued from the bench.  The District Courts for the Northern District of California and the District of Maryland issued statewide injunctions only.)  On June 20, 2019, the United States Court of Appeals for the Ninth Circuit issued a *per curiam* order granting the Defendants' motions to stay the nationwide injunctions pending appeal, in which order it concluded the Defendants were likely to prevail on all issues upon which the injunction orders rested. *California v. Azar*, No. 19-35394, 2019 WL 2529259 (9th Cir. June 20, 2019) (per curiam panel order on motions for stay pending appeal).  Similarly, on July 2, 2019, the Fourth Circuit stayed the statewide preliminary injunction entered in the District of Maryland. *Mayor and City Council of Baltimore v. Azar*, No. 19-1614 (4th Cir. July 2, 2019).

Services, Secretary Alex M. Azar II, and Deputy Assistant Secretary Diane Foley, M.D., through the Department's Office of Population Affairs ("Defendants"), have exercised rulemaking authority under the Title X family planning program in violation of the Administrative Procedures Act, and that the new Final Rule [2] governing post-conception activities and certain program separation requirements, if allowed to stand, will deprive Plaintiffs and those they represent of fundamental freedoms enshrined in the First and Fifth Amendments to the United States Constitution.

In the course of this decision, I will do my level best to explain why the extraordinary relief of a preliminary injunction is not warranted in this case. For the uninitiated let me stress that in this decision the District Court does not strike down or otherwise circumscribe any right to abortion previously recognized by the Supreme Court. Instead, the Court simply concludes – on a preliminary and non-final basis – that Plaintiffs have failed to meet the burden required by law for preliminary injunctive relief to issue. To that end, my role is circumscribed by Article III of the United States Constitution, which does not charge federal courts with the duty of judging the wisdom of public policy as the Oracle of Delphi heroically saving the republic from the product of its own democratic process. The exercise of sound judicial review must be hallmarked by restraint.

## BACKGROUND

The Title X program is a federal welfare program that provides grants to providers to support public access to contraceptive and reproductive health products and services.

---

[2] Compliance with Statutory Program Integrity Requirements ("Final Rule"), 84 Fed. Reg. 7714 (Mar. 4, 2019) (to be codified at 42 C.F.R. pt. 59).

Plaintiff Maine Family Planning is the sole statewide Title X grantee for the State of Maine. Maine Family Planning is also one of the primary providers and funders of abortion services in Maine, even though the federal statute that creates the Title X program states that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.

In this civil action, Plaintiffs challenge a Final Rule promulgated by the Department of Health and Human Services that they contend is irrational, unlawful, and unconstitutional because it unduly interferes with their ability to counsel Title X patients about abortion and to provide abortion services within their Title X clinics.  Importantly, the Final Rule does not prohibit Plaintiffs from continuing to provide abortion services, although it does raise significant barriers which will require Plaintiffs to reconfigure their operations.  The following background is provided to contextualize how Maine Family Planning came to be both the sole Title X grantee for the State of Maine and a major provider of abortion services in Maine, and to lay the groundwork for the legal arguments that inform Plaintiffs' request for preliminary injunctive relief.

## I.      THE TITLE X PROGRAM

In 1969, President Richard Nixon delivered a special message to Congress focusing on the nation's ever-growing concern with population growth – both globally and in the United States.  Richard Nixon, Special Message to the Congress on Problems of Population Growth (July 18, 1969).[3]   President Nixon decried the far-reaching ramifications of

---

[3] A transcript of this speech is available at https://www.presidency.ucsb.edu/documents/special-message-the-congress-problems-population-growth.

"involuntary childbearing" and its role in the perpetuation of poverty.[4]  *Id.*  He concluded: "[N]o American woman should be denied access to family planning assistance because of her economic condition."  *Id.*

On the heels of this presidential imperative, Congress enacted the Family Planning Services and Population Research Act ("the Act") with the primary purpose of "assist[ing] in making comprehensive voluntary family planning services readily available to all persons desiring such services."[5]  Pub. L. No. 91–572, § 2, 84 Stat. 1506 (1970) (codified as amended at 42 U.S.C. §§ 300 – 300a-8) ("Title X").  In words that have remained largely unchanged to this day, Congress authorized the Secretary of the Department of Health and Human Services ("the Department") "to make grants to and enter into contracts with public or nonprofit private entities" in order to further Congress's goal of supporting "voluntary family planning projects."[6]  42 U.S.C. § 300(a).  This far-reaching legislation provided

---

[4] President Nixon stated:

> We know that involuntary childbearing often results in poor physical and emotional health for all members of the family. It is one of the factors which contribute to our distressingly high infant mortality rate, the unacceptable level of malnutrition, and the disappointing performance of some children in our schools. Unwanted or untimely childbearing is one of several forces which are driving many families into poverty or keeping them in that condition. Its threat helps to produce the dangerous incidence of illegal abortion. And finally, of course, it needlessly adds to the burdens placed on all our resources by increasing population.

Richard Nixon, Special Message to the Congress on Problems of Population Growth (July 18, 1969).

[5] Congress also outlined seven additional purposes of the Act, ranging from establishing an Office of Population Affairs in the Department of Health, Education, and Welfare to "enabl[ing] public and nonprofit private entities to plan and develop comprehensive programs of family planning services." Pub. L. No. 91–572, 84 Stat. 1504 (1970).

[6] In its current iteration, the statute provides guidance regarding the services these voluntary family planning projects may offer within the Title X program: "a broad range of acceptable and effective family planning methods and services (including natural family planning methods, infertility services, and services for adolescents)." 42 U.S.C. § 300(a).

authorization for a broad range of grants to meet the needs of affiliated programs and the population they serve.  *See id.* (authorizing family-planning project grants); *see also id*. § 300a (authorizing formula grants to State health authorities); *id*. § 300a-1 (authorizing training grants); *id*. § 300a-2 (authorizing research grants in "biomedical, contraceptive development, behavioral, and program implementation fields related to family planning and population"); *id*. § 300a-3 (authorizing grants for the development and distribution of educational materials).  The Act also empowered the Secretary of the Department with discretion to determine the amount of each grant as well as the conditions to which each grant is subject.  42 U.S.C. § 300a-4(a), (b) ("Grants under this subchapter shall be payable in such installments and subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made.").  "Grants and contracts under Title X must 'be made in accordance with such regulations as the Secretary may promulgate.'"  *Rust v. Sullivan*, 500 U.S. 173, 178 (1991) (quoting 42 U.S.C. § 300a-4(a)).

Specific to the issue of abortion, Section 1008 of the Act provided (and still provides today) that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a-6.  As commented by the Supreme Court, "[t]hat restriction was intended to ensure that Title X funds would 'be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities.'"  *Rust*, 500 U.S. at 178-79 (*citing* H.R. Conf. Rep. No. 91-1667, p. 8 (1970), U.S. Code Cong. & Admin. News 1970, pp. 5068, 5081–82).

5

II.   TITLE X REGULATORY HISTORY, PRIOR TO 2019

A.  Initial abortion-related regulations (1970s)

In accordance with Congress's mandate, in 1971, the Department issued regulations indicating that a Title X "project will not provide abortions as a method of family planning."  Grants for Family Planning Services, 36 Fed. Reg. 18,465, 18,466 (Sept. 15, 1971) (codified at 42 C.F.R. § 59.5(9) (1972)).  For many years, this prohibition was the extent of the official guidance provided by the Department regarding the topic of abortion and even abortion counseling.  However, in this period of rapidly-evolving legal acceptance of abortion, the Department, through its Office of General Counsel opinions, generally "took the view that activity which did not have the immediate effect of promoting abortion or which did not have the principal purpose or effect of promoting abortion was permitted."  Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects ("1988 Regulations"), 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988).  Thus, as observed by the United States Court of Appeals for the District of Columbia, the Department adopted a permissive viewpoint regarding abortion counseling and "[d]uring the mid–1970s, HHS General Counsel memoranda made a . . . distinction between directive ('encouraging or promoting' abortion) and nondirective ('neutral') counseling on abortion, prohibiting the former and permitting the latter."[7]  *Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Sullivan*, 979 F.2d 227, 229 (D.C. Cir. 1992).

---

[7] Similarly, a 1978 memo from the Office of General Counsel stated:

## B.  Emergence of the "non-directive" counseling ethos (1980s)

In 1981, the Department issued guidelines that solidified its previously-informal stance regarding abortion counseling and, for the first time, explicitly required Title X programs to provide pregnant women, upon request, with "non-directive counseling" regarding "options for the management of an unintended pregnancy," including "[p]renatal care and delivery"; "[i]nfant care, foster care, or adoption"; and "[p]regnancy termination." HHS, Program Guidelines for Project Grants for Family Planning Services, 13 (1981).

## C. 1988 backpedaling on non-directive counseling; preclusion of abortion referral, promotion and advocacy; separation requirement

In 1988, the Department dramatically changed course and promulgated new regulations which aimed to "bring program practices into conformity with the language of the statute" by providing "'clear and operational guidance' to grantees about how to preserve the distinction between Title X programs and abortion as a method of family

---

This office has traditionally taken the view that Section 1008 not only prohibits the provision by Title X grantees of abortion as a method of family planning as part of the Title X-supported program, but also prohibits activities which promote or encourage the use of abortion as a method of family planning by the Title X-supported program. Under this view, the provision of information concerning abortion services, mere referral of an individual to another provider of services for an abortion, and the collection of statistical data and information regarding abortion are not considered to be proscribed by Section 1008. The provision of "pregnancy counseling" in the sense of encouraging persons to obtain abortions and the provision of transportation to persons to enable them to obtain abortions, on the other hand, are considered to be proscribed by Section 1008. The test to be applied, then, appears to be whether the immediate effect of the activity is to encourage or promote the use of abortion as a method of family planning.

Brief for Respondent, *Rust v. Sullivan*, 500 U.S. 173 (1991) (No. 89-1391), 1990 WL 10012655, at *4 n.3 (citing Memorandum from Carol C. Conrad, Office of the General Counsel, Dep't of Health, Educ. & Welfare, to Elsie Sullivan, Ass't for Information and Education, Office of Family Planning (Apr. 14, 1978)).

planning." [8] 1988 Regulations, 53 Fed. Reg. at 2923.  The 1988 regulations (1) prohibited Title X projects from "provid[ing] counseling concerning the use of abortion as a method of family planning or provid[ing] referral for abortion as a method of family planning," 42 C.F.R. § 59.8(a)(1) (1989), (2) barred Title X projects from participating in activities that "encourage, promote or advocate abortion as a method of family planning," *id.* § 59.10(a), and (3) required Title X projects to be "physically and financially separate" from abortion activities, *id.* § 59.9.

In *Rust v. Sullivan*, the Supreme Court upheld the 1988 regulations following a facial challenge brought by "Title X grantees and doctors who supervise Title X funds suing on behalf of themselves and their patients."  500 U.S. at 181.  As in this case, the claims included challenges based on the First Amendment and the Fifth Amendment, and a challenge to the Department's authority to regulate under *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, *Inc*., 467 U.S. 837 (1984).  *Rust,* 500 U.S. at 181 (resolving a circuit split by affirming the judgment of the Second Circuit in *New York v. Sullivan*, 889 F.2d 401 (1989), and vacating the judgments of the First Circuit and Tenth Circuit in *Massachusetts v. Secretary of Health and Human Services*, 899 F.2d 53 (1st Cir. 1990) (en

---

[8] The Department explained its revised stance:

> Because counseling and referral activities are integral parts of the provision of any method of family planning, to interpret section 1008 as applicable only to the performance of abortion would be inconsistent with the broad prohibition against use of abortion as a method of family planning. . . . "[F]amily planning," as clearly contemplated by Title X and its legislative history, refers to activities relating to facilitating or preventing pregnancy, not to terminating it.

1988 Regulations, 53 Fed. Reg. at 2923.

banc), and *Planned Parenthood Federation of America v. Sullivan*, 913 F.2d 1492 (10th Cir. 1990)).[9]

### D. 1992 moderation of 1988 regulations; abortion counseling and referral permitted by physicians

Despite the Supreme Court's approval of the Department's interpretation of the Act and, in part, due to a memorandum issued by President George H. W. Bush,[10] in March 1992, the Department issued a directive moderating its stance regarding abortion counseling.  *See Nat'l Family Planning & Reprod. Health Ass'n, Inc.*, 979 F.2d at 230 (discussing the March 1992 HHS directive).  This directive allowed for physicians working within Title X programs to provide abortion counseling to their patients.  *Id.*  The directive addressed separately the provision of abortion information and the provision of abortion referral.  *Id.*

### E. 1992 congressional response to *Rust*

Following the Supreme Court's ruling in *Rust v. Sullivan*, both houses of Congress voted in favor of the Family Planning Amendments Act of 1992, which, in part, would have permitted "nondirective counseling and referrals" regarding "termination of

---

[9] The Supreme Court overturned the First Circuit only on the constitutional questions.  The First Circuit rejected the *Chevron* challenge, and in doing so vacated a portion of the district court's ruling below. *Massachusetts*, 899 F.2d at 63-64 (rejecting district court's conclusion that the Secretary had failed to justify new policy direction that conflicted with previous, longstanding administrative interpretation). The Tenth Circuit sustained the *Chevron* challenge, in part, reasoning that it "violate[d] congressional intent to deny the issuance of Title X grants solely because the grantee is not sufficiently funded to meet the separation requirements of [then] 42 C.F.R. § 59.9."  *Planned Parenthood Federation of America*, 913 F.2d at 1498 (observing that one of the plaintiffs was a doctor who performed abortions for private, paying patients, but also served Title X patients in the same office).

[10] The content of this memorandum is discussed in *National Family Planning & Reproductive Health Association, Inc. v. Sullivan*, 979 F.2d 227, 230 (D.C. Cir. 1992).  In this memorandum, President Bush "urg[ed] that the 'confidentiality' of the doctor-patient relationship be preserved and that operation of the Title X program be 'compatible with free speech and the highest standards of medical care.'" *Id.*

pregnancy."  Family Planning Amendments Act of 1992, S. 323, 102nd Cong. (1992).

However, the bill failed to pass over President Bush's veto.  *Id.*

### F.  Clinton era rejection of "Gag Rule"; eventual permission for co-location of abortion services

In 1993, President William Clinton directed the Department to suspend the 1988

prohibition on nondirective abortion counseling (the "Gag Rule") pending the

promulgation of new regulations.  The Title X "Gag Rule," 58 Fed. Reg. 7455 (Jan. 22,

1993) (Memorandum for the Secretary of Health and Human Services).  First proposed in

1993, the new regulations eventually emerged in 2000.  *See* Standards of Compliance for

Abortion-Related Services in Family Planning Services Projects ("2000 Rule"), 65 Fed.

Reg. 41,270 (July 3, 2000).  Like the Family Planning Amendments Act of 1992, the 1993

proposed rule and the eventual 2000 Rule drew a distinction between "abortion counseling

and referral."  Standards of Compliance for Abortion-Related Services in Family Planning

Service Projects, 58 Fed. Reg. 7464, 7464 (Feb. 5, 1993); 2000 Rule, 65 Fed. Reg. at

41,273.

The 2000 Rule reaffirmed the prohibition against Title X projects "provid[ing]

abortion as a method of family planning," but required a Title X project to offer and, if

requested, provide "neutral, factual information and nondirective counseling, and referral"

regarding "(A) [p]renatal care and delivery; (B) [i]nfant care, foster care, or adoption; and

(C) [p]regnancy termination."  42 C.F.R. § 59.5(a)(5) (2000).  In addition, the 2000 Rule

allowed for 'co-location' or, in other words, for "shared facilities . . . , so long as it is

possible to distinguish between the Title X supported activities and non-Title X abortion-

related activities."[11]  Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281 (July 3, 2000) (Notice); *see also* 2000 Rule, 65 Fed. Reg. 41,270, 41,275-76 (discussing physical separation as wasteful and inefficient).

### G. 1996 and forward, congressional appropriations riders

In partial agreement with President Clinton's directive, from 1996 forward, Congress has included a provision in each Title X appropriation bill that requires "all pregnancy counseling" under Title X to be "nondirective."  *See* Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-221; Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, Pub. L. No. 115-245, 132 Stat. 2981, 3070-71.  These riders have never included language endorsing the Clinton-era referral requirement or the co-location authorization.

## III.   MAINE FAMILY PLANNING'S ORGANIZATIONAL EVOLUTION

Maine Family Planning is "the provider or funder of much of Maine's abortion care," Compl. ¶ 91, and this development appears to be the product of Maine Family Planning's dependence on the 2000 Rule, in particular the co-location authorization. Maine Family Planning was founded in 1971 for the express purpose of competing for, receiving, distributing, and managing the Title X grant for the state of Maine – and to do so in a manner that addresses the complex geography and challenges faced by Mainers.  *Id.*

---

[11] These regulations allowed for a "common waiting room," "common staff," "a hospital performing abortions for family planning purposes and also housing a Title X project," and "a single file system for abortion and family planning patients," but only "as long as the costs [were] properly pro-rated." Provision of Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,281 (July 3, 2000).

¶ 99.  For forty-eight years, Maine Family Planning has been the sole statewide Title X grantee for Maine.  *Id.* ¶ 100.  In this time, no government or independent auditor, including agents of the Office of Population Affairs, has ever found a violation of the Title X requirements by Maine Family Planning.  *Id.*  Maine Family Planning began as an umbrella agency, subcontracting with eight other non-profits in other parts of Maine to provide Title X-supported services for low-income women and teens.  Maine Family Planning's role during its first 15 years included grant management, training, some research, and advocacy.  *Id.* ¶ 101.

In April 1997, Maine Family Planning began providing abortion care using resources independent from the Title X program to fund these supplemental services.  Maine Family Planning perceived a dearth of abortion services in the region and wanted to fill the void.  *Id.* ¶ 102.  At this time, the Clinton administration had not yet approved the co-location of Title X services and abortion services through the rulemaking process, and the Rehnquist Court had upheld the 1988 Rules prohibiting Title X grantees from making abortion referrals in *Rust v. Sullivan*; however, in 1993, President Clinton had banned enforcement of the Gag Rule and his administration had proposed a new rule that would permit co-location of Title X and abortion services.

Maine Family Planning identified and purchased a stand-alone building in North Augusta, which would serve as its headquarters and would include a clinical space fully equipped to offer first trimester abortion care.  *Id.* ¶ 102.  It then hired a family planning staff with the specific intention of co-locating family planning services with the abortion care services already being provided at Maine Family Planning's new headquarters.  *Id.* ¶

103.   Maine Family Planning began offering Title X services in its Augusta building in July 1998, a year after its initiation of abortion services.  *Id.*  In the ensuing decade, Maine Family Planning acquired other family planning clinics.  By 2012, it directly managed eighteen clinical sites where Title X services would be provided.  *Id.* ¶ 104.  Today, Maine Family Planning operates eighteen family planning centers and provides funding through subcontracts that support twenty-nine additional sites.  *Id.* ¶ 105.  Maine Family Planning describes its network as geographically comprehensive with sites in fifteen counties, providing clinical and educational reproductive health services to approximately 24,000 Mainers annually, 78% of whom qualify for free or reduced fee services. [12]  *Id.*

All of Maine Family Planning's Title X services are provided by advanced practice registered nurses ("APRNs"), i.e., certified nurse practitioners and/or certified nurse-midwives, often with the support of medical assistants.  *Id.* ¶ 106.  Maine Family Planning's provision of abortion services is coordinated through its Augusta headquarters, where it provides medication abortions through ten weeks of pregnancy, as dated from the woman's last menstrual period ("LMP"), and aspiration abortions through the end of the first trimester (i.e., fourteen weeks LMP).  *Id.* ¶ 107.  These services are provided one day per week, and on that particular day no Title X services are provided at the Augusta site.  *Id.*

Maine Family Planning employs seven physicians part-time at its Augusta location, including Plaintiff Dr. Doe.  The physicians are employed for the exclusive purpose of

---

[12] Given the rural nature of the State and the high percentage of citizens who live at or near the poverty line, Maine Family Planning believes that piggybacking abortion services on the Title X program is the only way to provide meaningful access to abortion services to its patient base, who predominantly seek services from Maine Family Planning through its subsidized Title X program and may lack the means to travel significant distances to secure abortion services.

providing abortion services. The physicians in this network fill a rotation, working one or two days per month to provide abortion services on the one day per week in which Maine Family Planning provides its patients access to abortion services. Maine Family Planning employed physicians for this purpose only because, until very recently, Maine law, 22 M.R.S. § 1598(3), restricted the performance of abortions to physicians.[13] In addition to performing aspiration abortions, these physicians facilitate medication abortions at Maine Family Planning's seventeen other clinics through a "telehealth program." An APRN trained in abortion care evaluates the patient at a "satellite" clinic, including by administration or review of an ultrasound, to ensure the patient is an appropriate candidate for medication abortion. The patient then consults with one of the Augusta-based Maine Family Planning physicians via a secure video platform. After confirming that a medication abortion is medically appropriate for the patient, obtaining informed consent to the abortion, and ensuring that the APRN has worked with the patient to establish a contraception plan, the physician instructs the patient to take a first pill (mifepristone) during the real-time video encounter. The patient takes additional pills (misoprostol) at home, as instructed. At a follow-up visit four to fourteen days later, the APRN confirms abortion. *Id.* ¶ 109. Through its telehealth medication abortion program, Maine Family Planning has expanded the reach of its abortion services to all of its satellite clinics. However, it has done so only since 2014. Declaration of Evelyn K ¶ 16 n.3 (ECF No. 17-

---

[13] On June 10, 2019, Governor Janet Mills signed into law An Act to Authorize Certain Health Care Professionals to Perform Abortion, P.L. 2019, ch. 262, §§ 1596 to 1599-A, which authorizes advanced practice providers other than physicians to provide abortion services. Passage of the Act changes, considerably, the legal landscape surrounding the provision of abortion services in Maine and undermines many of the assumptions upon which Plaintiffs' motion for preliminary injunction relies.

3).  Maine Family Planning more recently, in 2017, initiated a "meds-by-mail" study, but the program still requires travel to obtain an ultrasound and lab work.  *Id.*  Despite the availability of these more remote services, only 25% of the roughly 500 abortions performed per year take place at a clinic other than the Augusta clinic.[14]  *Id.* ¶ 20.

But for Maine's physician-only abortion law, Maine Family Planning's APRN staff members would have performed the counseling and prescribed the abortion medication on-site, i.e., under the same roof as the Title X clinic, because the 2000 Rule authorized co-location provided that abortions are not paid for with Title X grant funds.  Compl. ¶ 109.  Now, with the passage of An Act to Authorize Certain Health Care Professionals to Perform Abortion, P.L. 2019, ch. 262, §§ 1596 to 1599-A, it appears Maine Family Planning is authorized to do so, except to the extent its implementation of this authorization would run afoul of the Department's 2019 Rule.

In summary, Maine Family Planning has taken advantage of the 2000 Rule, in particular the co-location rule, to develop a statewide program to deliver "a range of health care services," including both family planning services and abortion services.  *Id.* ¶ 18.  Maine Family Planning describes it current services as follows:

> Maine Family Planning provides a range of health care services at its sites, including annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including continuing the pregnancy and parenting, making a plan for adoption or foster care, or ending the pregnancy with an abortion); abortion care; miscarriage care;

---

[14] In 2016, only 5% of the abortions facilitated by Maine Family Planning were not performed in the Augusta clinic.  Declaration of Evelyn K. ¶ 20.  Plaintiffs' assertions concerning the location at which abortion services are provided are confusing, particularly in relation to medicated abortion.  While a physician in Augusta counsels and prescribes the abortion medication, the APRN in the satellite clinic evidently dispenses the medication.

> referrals for adoption; prenatal consultation; colposcopy; endometrial and vulvar biopsy; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections; hormone therapy and other services for transgender clients; and services for mid-life women.

*Id.* According to Plaintiffs, from an accounting standpoint, care is taken to ensure that Title X grant monies are not used in the provision of abortion services. *Id.* ¶ 33. Plaintiffs aver that all abortion-related costs are "pro-rated and properly allocated." *Id.* ¶ 52.

Today, Maine Family Planning is both the sole Maine-based Title X grantee with a statewide network and also "the provider or funder of much of Maine's abortion care." *Id.* ¶¶ 91, 100. Although Plaintiffs state that Maine Family Planning "has always clearly and properly separated its Title X activities from non-Title X activities, including abortion services" by "maintaining a financial management system that clearly separates and accounts for all expenses and revenues associated with the Title X project," *id.* ¶ 110, Plaintiffs attest that despite Title X providing only 27% of Maine Family Planning's total revenue, the abortion network Maine Family Planning developed under the 2000 Rule is unsustainable without the Title X grant monies.

## IV.   THE CONTESTED "FINAL RULE"

On March 4, 2019, following a public notice and comment period, the Department promulgated new regulations with the goal of "ensur[ing] compliance with, and enhance[ing] implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family

planning, as well as related statutory requirements."[15]  Compliance with Statutory Program Integrity Requirements ("Final Rule"), 84 Fed. Reg. 7714, 7715 (March 4, 2019) (to be codified at 42 C.F.R. pt. 59).  As impetus for the Final Rule, the Department cited concerns that "the 2000 regulations fostered an environment of ambiguity surrounding appropriate Title X activities."  *Id*. at 7721.

The Final Rule reintroduces certain of the requirements contained in the 1988 regulations, by requiring "clear physical and financial program separation from programs that use abortion as a method of family planning."  *Id.* at 7765, 7789, codified at 42 C.F.R. § 59.15 (the "Separation Requirement").  It also reformats the standards to be applied to consultation services with respect to "post-conception activities."  *Id.* at 7788, codified at 42 C.F.R. § 59.14.  These standards entail a return of the so-called "Gag Rule" (a prohibition on abortion referral), an option to supply patients with a nondirective referral list, and a requirement that the Title X program refer pregnant patients for prenatal services.

## A. Separation Requirement

Under the Separation Requirement, Title X projects "must be organized so that [they are] physically and financially separate . . . from activities which are prohibited."  42 C.F.R. § 59.15 (2019).  The rule continues: "[A] Title X project must have an objective integrity and independence from prohibited activities.  Mere bookkeeping separation of Title X funds from other monies is not sufficient."  *Id.*  In determining whether a Title X project

---

[15] The Department also asserts the 2000 regulations "conflict[ed] with HHS enforced statutes protecting conscience in health care, including the Church Amendment, Coats-Snowe Amendment and the Weldon Amendment."  Final Rule, 84 Fed. Reg. at 7716.

has achieved physical and financial separation, the rule allows the Department to consider

factors such as:

    (a)  The existence of separate, accurate accounting records;

    (b)  The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities;

    (c)  The existence of separate personnel, electronic or paper-based health care records, and workstations; and

    (d)  The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.*

      In support of this provision, the Department asserts the requirements will serve to

"protect[] against the intentional or unintentional co-mingling of Title X resources with

non-Title X resources or programs" as well as counteract "the potential for ambiguity

between approved Title X activities and non-Title X activities and services." [16]  Final Rule,

84 Fed. Reg. at 7715 (discussing need for "clear financial and physical separation"), 7765

("The performance of abortions at nonspecialized clinics that also may provide Title X

services increases the risk and potential both for confusion and for the co-mingling or

misuse of Title X funds.").  The Rule does not preclude Title X grantees from also

providing abortion services through separate programs and facilities.  "The rule continues

---

[16] By addressing "the fungibility of Title X resources and the potential use of Title X resources to support programs where . . . abortion is a method of family planning," the Department seeks to prevent the use of Title X resources to "facilitate the development of, and ongoing use of, infrastructure for non-Title X activities." Final Rule, 84 Fed. Reg. at 7715.  "Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirms the need for such separation. If the co-location of a Title X clinic with an abortion clinic permits the abortion clinic to achieve economies of scale, the Title X project (and, thus, Title X funds) would be supporting abortion as a method of family planning." *Id.* at 7766.

18

to allow organizations to receive Title X funds even if they also provide abortion as a method of family planning, as long as they comply with the physical and financial separation requirements." *Id.* at 7766.

## B. Post-Conception Activities

The Final Rule's post-conception activities provision begins with an express prohibition on abortion referral: "A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 42 C.F.R. § 59.14(a) (2019). In a list of examples, the Department extends the prohibition against referral for abortion (including any specific identification of abortion providers as such) to cover communications with any "pregnant woman," not just existing Title X clients/patients. *Id.* § 59.14(e)(4). I will refer to this provision, shorthand, as the Gag Rule.

The post-conception activities provision also requires Title X projects to provide patients who are "medically verified as pregnant" with a referral for prenatal care. *Id.* § 59.14(b). According to the Department, "[p]renatal care is medically necessary for any patient who is pregnant, so referrals for such care do not render counseling directive." Final Rule, 84 Fed. Reg. at 7761. In the Department's view, referrals for prenatal care should be *de rigueur* "[b]ecause prenatal care is essential in order to optimize the health of the mother and unborn child, and to help ameliorate the current health inequality as it relates to low income women." *Id.* at 7762.

19

Finally, the post-conception activities provision states that once a Title X client is confirmed to be pregnant, a Title X project "may also choose to provide" the client with additional information, including:

    (i)    Nondirective pregnancy counseling, when provided by physicians or advanced practice providers;

    (ii)   A list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care);

    (iii)  Referral to social services or adoption agencies; and/or

    (iv)  Information about maintaining the health of the mother and unborn child during pregnancy.

*Id*. § 59.14(b).

In contrast to the 2000 regulations which, upon the request of the patient, required pregnancy counseling and referral (including counseling and referral for abortion if desired by the patient), *see* 2000 Rule, 65 Fed. Reg. 41,270, the Final Rule permits, but does not require, nondirective counseling by a doctor or advanced practice provider ("APP").  42 C.F.R. § 59.14(b)(1)(i).  As explained by the Department, "[n]ondirective pregnancy counseling is the meaningful presentation of options where the physician or advanced practice provider (APP) is 'not suggesting or advising one option over another.'"  Final Rule, 84 Fed. Reg. at 7716 (citing 138 Cong. Rec. H2822, H2826, 1992 WL 86830).  While physicians or APPs[17] "within Title X projects" may choose to provide nondirective pregnancy counseling – including counseling regarding abortions, "among other options"

---

[17] As defined in the rule, an "Advanced Practice Provider" is a "medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients."  42 C.F.R. § 59.2.  This term explicitly includes: "physician assistants and advanced practice registered nurses (APRN)" such as a "certified nurse practitioner (CNP), clinical nurse specialist (CNS), certified registered nurse anesthetist (CRNA), and certified nurse-midwife (CNM)."  *Id.*

– they must not make a referral for an abortion "as a method of family planning."[18] *Id.* at

7745. The Department explains:

> In nondirective counseling, abortion must not be the only option presented by physicians or APPs; otherwise the counseling would violate not only the Congressional directive that all pregnancy counseling be nondirective, but also the prohibitions in this rule on encouraging, advocating, or supporting abortion as a method of family planning, which the Department prohibits in order to implement, among other provisions, section 1008. Each option discussed in such counseling must be presented in a nondirective manner. This involves presenting the options in a factual, objective, and unbiased manner and (consistent with other Title X requirements and restrictions) offering factual resources that are objective, rather than presenting the options in a subjective or coercive manner.

*Id.* at 7747. Thus, a Title X project need not provide post-conception pregnancy counseling

at all, but "[w]hen a project chooses to offer such pregnancy counseling, it must be

nondirective." *Id.* at 7761. In addition to requiring nondirective counseling, the 2000 Rule

also required abortion referral upon a patient's request. 42 C.F.R. § 59.5(a)(5) (2000). The

Final Rule removes this requirement and replaces it, in part, with an option to provide a

nondirective referral list and, in part, with a mandatory referral for prenatal care services.

Should a Title X provider decide to do so, it may furnish a client with a list of

"comprehensive primary health care providers," which list "may be limited to those that

do not provide abortion" or may include providers that "also provide abortion as part of

their comprehensive health care services"; however, those providers who perform

abortions must not constitute the majority of the references provided. 42 C.F.R. §

---

[18] However, under these rules, "[r]eferrals for abortion for emergency care purposes are not prohibited." Final Rule, 84 Fed. Reg. at 7747. The rule provides that in cases of emergency – such as the discovery of an ectopic pregnancy – a Title X provider "shall only be required to refer the client immediately to an appropriate provider of medical services needed to address the emergency," which may include a referral for abortion. 42 C.F.R. § 59.14(b)(2), (e)(2); Final Rule, 84 Fed. Reg. at 7747-48.

59.14(c)(2) (2019).  While the project cannot exclude from its list providers that do not supply abortion services, *id.*, it may exclude providers that do.  *Id.* § 59.14(e)(4), (5). Additionally, if the list includes both types of providers, "[n]either the list nor project staff may identify which providers on the list perform abortion."[19]  *Id.* § 59.14(c)(2).

The Final Rule's post-conception activities provision then concludes much as it begins: "[a] Title X project may not use the provision of any prenatal, social service, emergency medical, or other referral, of any counseling, or of any provider lists, as an indirect means of encouraging or promoting abortion as a method of family planning."  *Id.* § 59.14(c)(1).

## IV.   IMPLICATIONS OF THE FINAL RULE FOR MAINE FAMILY PLANNING'S PROGRAM, AS ALLEGED

Plaintiffs contend that reformatting Maine Family Planning's statewide practice to conform to the Final Rule would likely result in wide-scale closures of several clinics, depriving Maine residents of valuable family planning and other health care services.  In particular, Plaintiffs state that Maine Family Planning would have to eliminate abortion services at seventeen of its eighteen clinics that currently provide the services (all but the Augusta clinic).  Compl. ¶ 111.  Plaintiffs allege it is economically impossible for Maine

---

[19] In support of the prohibition on providing referrals for abortion providers, the Department asserts:

> [I]n most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning.  The Department believes both the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs.

Final Rule, 84 Fed. Reg. at 7717.

Family Planning to sustain their abortion program at its current level because its clinics are too small to subdivide and securing separate facilities is prohibitively expensive. *Id.* ¶¶ 112-13. Evidently, the number of abortions provided annually (roughly 500, most of which occur in or near one of Maine's population centers) would also tend to make so many free-standing abortion-specific satellite clinics – each staffed by an APRN – impractical, particularly if the clinics would exist only to facilitate telemedicine through the Augusta headquarters.[20] *Id.* ¶ 114.

Plaintiffs also allege that it would prove prohibitively expensive to separate its Augusta abortion clinic from its headquarters, and that without a telemedicine program, rural access to a physician willing to provide abortion services would effectively require a long road trip. *Id.* ¶¶ 116-17. Maine Family Planning forecasts that full implementation of the Final Rule would result in there being only three abortion clinics in the state; one each in Augusta, Bangor, and Portland.[21] *Id.* ¶ 118.

In addition to the logistical challenges posed for Maine Family Planning's telehealth abortion program under the Separation Rule, Plaintiffs say the path forward is also grim

---

[20] Plaintiffs allege that 75% of the abortions are "typically" performed at the Augusta clinic because a physician is required to provide the treatment. Plaintiffs allege it would not be "logistically and financially feasible" for Maine Family Planning to create so many abortion clinics or staff them with APRNs who cannot individually prescribe the abortion pill(s). Compl. ¶¶ 114-15. Plaintiffs state: "The resulting low volume and unpredictable scheduling of abortion services would make it extremely difficult for Maine Family Planning to recruit APRNs exclusively to facilitate these *ad hoc* telehealth abortions." *Id.* ¶ 115. These assertions are worthy of note given the recent passage by the Maine Legislature of An Act to Authorize Certain Health Care Professionals to Perform Abortion, P.L. 2019, ch. 262, §§ 1596 to 1599-A, which Act removes the physician-only impediment and appears to authorize Maine Family Planning's advanced practice nurses to provide abortion services without the direct participation of a doctor.

[21] According to Plaintiffs, medical centers in Portland and Lewiston also provide abortion services, but are not as accessible to walk-in care (require a provider relationship) and do not advertise the services. Compl. ¶ 118 n.129.

23

for abortion access because the return of the Gag Rule would prevent an in-house referral to one of the physicians affiliated with Maine Family Planning's Augusta-based network (or even a referral to some other provider of abortion services, which would likely not be a provider of "comprehensive health care services" under the Rule).  *Id.* ¶¶ 121-22. Relatedly, they contend the Final Rule would interfere with their current ability to counsel regarding the abortion option, in particular insofar as the Rule's nondirective counseling provision does not permit lower-echelon staff (those who are neither a physician nor an "advance practice provider"[22]) to provide abortion counseling.  *Id.* ¶ 123.  Plaintiffs also express frustration that they will need to redesign call center scripts, internal forms and policies, and training programs, and will likely need to find one or more new subgrantee(s) and reconfigure the grant proposal accordingly, all at significant expense and inconvenience.  *Id.* ¶¶ 124-26.

Plaintiffs relate in their Complaint additional allegations concerning the impact the Final Rule may have "nationwide."  *Id.* ¶¶ 132-38. I am not persuaded that the current motion calls for issuance of a nationwide injunction.  Plaintiffs also explain why they and many in the medical establishment believe the Final Rule is wrongheaded.  *Id.* ¶¶ 142-152. Nothing set forth in the discussion portion of this decision should be construed as being based on the view that it is not sensible and efficient to co-locate family planning and abortion services.  The limited question for me to resolve is whether the political branches are permitted under existing law to administer a Title X program without enabling that

---

[22] Maine Family Planning's APRNs are advance practice providers under the Final Rule. 42 C.F.R. § 59.2 (2019).

arrangement.  For better or for worse – you be the judge – our democratic model calls upon politicians and increasingly, executive branch agencies, to make those calls, rather than a consensus of experts; at least until our representatives agree to endorse the expert consensus.

As for patients, whose interests Plaintiffs raise via third-party standing, Plaintiffs state that access to abortion services will be substantially burdened under the Final Rule, "due to significantly increased travel distances to abortion providers and the hurdles associated with such travel."  *Id.* ¶ 159.  Based varyingly on the assumption that Maine Family Planning will close eleven to fifteen clinics, *id.*, or all seventeen satellite clinics, *id.* ¶ 160, Plaintiffs allege:

> [M]ore than half of Maine women would live in counties without an abortion provider, and the distances many women would have to travel to obtain any kind of abortion services would be substantial, increasing by multiple orders of magnitude.  For example, while currently 7.9% of patients are traveling more than 25 miles to reach their nearest abortion provider, if Maine Family Planning's 17 satellite clinics close, 76% of patients (including those seeking medication abortion) would have to travel more than 25 miles to reach their nearest clinics.  In addition, none of these women are currently traveling 100 miles or more to a clinic offering at least medication abortion, but if Maine Family Planning's satellites close, 10% of patients will have to travel more than 100 miles to their nearest clinic (including those seeking medication abortion).  This large shift in travel distances will affect the utilization of abortion services in Maine.

*Id.* ¶ 160.[23]

In support of their motion for preliminary injunction, Plaintiffs have introduced

---

[23] Once more, the recent passage of An Act to Authorize Certain Health Care Professionals to Perform Abortion, P.L. 2019, ch. 262, §§ 1596 to 1599-A, has serious implications for Plaintiffs' preliminary injunction showing.  Given it is now lawful for APRNs to provide abortion services, Plaintiffs' portrayal of driving burdens is not calibrated to existing conditions.

affidavits from Maine Family Planning's CEO (ECF No. 17-2), Senior Vice President of Program Services (ECF No. 17-3), and a Belfast-based Women's Health Nurse Practitioner[24] (ECF No. 17-7). The affidavits largely provide evidentiary support for complaint allegations pertaining to Maine Family Planning's programmatic purpose and expansion, and also contextualize the provision of Title X and abortion services in Maine. They also largely substantiate the difficulties the Final Rule presents for Maine Family Planning moving forward if it can no longer self-refer for abortion services and co-locate abortion clinics within Title X clinics.

Additional affidavits include those of a physician medical ethicist (ECF No. 17-5) who opines the Final Rule prevents medical professionals providing Title X services from complying with well-recognized standards of medical ethics; a professors of economics (ECF No. 17-4) who addresses the beneficial economic outcomes of the Title X program (in particular in regard to contraception) and the potential for the Final Rule to impose a "significant burden" on access to both Title X services and abortion services in Maine; and another professor of economics (ECF No. 17-6) who addresses the additional driving burdens that would result if one assumes Maine Family Planning completely dismantles the telehealth abortion program and cannot modify it in light of the recent amendment to Maine abortion law.  I have reviewed and considered these exhibits carefully.

---

[24] If the nurse practitioner's description of her dedication to Maine Family Planning's mission is any indication, it is not unheard of for Maine Family Planning's nursing staff to travel significant distances to facilitate abortion access through the telehealth program.

## DISCUSSION

Plaintiffs want to ensure that Maine Family Planning and its providers and staff can continue offering, and that patients are able to continue receiving at Maine Family Planning clinics, "comprehensive reproductive health care" which they define – perfectly understandably – to encompass abortion services.  Compl. ¶ 145.  With respect to fundamental constitutional rights, this case is not about whether they have a right to do so – ineluctably, they have – but rather whether, as Title X grantee or patients, they are *fundamentally entitled* under existing law to provide or receive abortion services, referrals, and education at Title X clinics.  This specific question has been answered before, by the Supreme Court, and not in Plaintiffs' favor.

As a federal district court judge, I am not free to disregard binding Supreme Court precedent that addresses the controversy before me.  Moreover, to the extent Plaintiffs raise a claim of arbitrary and capricious rulemaking in violation of the Administrative Procedures Act, the Rule Plaintiffs claim will be their undoing was written on the wall long ago, and Plaintiffs knowingly built their abortion network on shifting sands.[25]  Under the circumstances, and for the reasons elaborated upon below, I am not convinced that Plaintiffs are likely to succeed, ultimately, on the legal merits of their claim that the Final Rule cannot be implemented as it has been drawn.

---

[25] Although Plaintiffs attest that Maine Family Planning carefully monitors practices to ensure Title X funds are not applied to abortion services, Plaintiffs also acknowledge that because Title X provides "over 27%" of Maine Family Planning's overall funding its expansive network would unravel without the Title X grant monies.  *Id*. ¶ 128 ("Participation in the Title X program is inextricably intertwined with Maine Family Planning's historical mission and with its ability to operate.").

# I.   STANDARD FOR INJUNCTIVE RELIEF

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor. *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick*, *Inc. v. Baccarat*, *Inc*., 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs*., *Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). If the party seeking injunctive relief fails to make a persuasive showing of likelihood of success, then generally the court acts within its discretion if it denies relief without addressing the remaining factors. *New Comm. Wireless Servs*., *Inc. v. SprintCom*, *Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."). On the other hand, "[a]s a matter of equitable discretion, a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."

*Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018) (per curiam).  In the final analysis, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief."  *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

## II.   LIKELIHOOD OF SUCCESS ON THE MERITS

The primary thrust of Plaintiffs' Motion for Preliminary Injunctive Relief is that the 2019 Final Rule is contrary to law and, therefore, exceeds the Department's rule-making authority under the Administrative Procedures Act (APA).  Pls. Mem. in Support of Mot. for Prelim. Injunction ("Pls. Mem."), 14-31 (ECF No. 17-1).  Plaintiffs additionally argue the Rule violates their patients' fundamental right to choose abortion, *id.* 31-39, violates the free speech rights of medical professionals, *id.* 39-45, and is unconstitutionally vague, *id.* 45-46.

### A.   APA Review

The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be," *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (B), (C).  "[A]gency action is presumptively valid," and I am not at liberty to substitute my own policy judgment for that of the agency.  *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008).  An administrative decision that is "contrary to the 'unambiguously expressed intent of Congress'" will not stand, but in order to overturn agency action on this ground, an "unmistakably clear expression of congressional intent" must be evident.  *Id.* at 34 (quoting

*Strickland v. Comm'r*, 48 F.3d 12, 16-17 (1st Cir. 1995)).  Unless a clear line has been crossed, I must "defer to the views of the agency Congress has entrusted with relevant rule-making authority," and afford "considerable deference" to its views.  *Id.* (quoting *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 145 (1st Cir. 2007)).

### 1. *Congress's nondirective counseling mandate*

In the Continuing Appropriations Act that funds the Department for 2019, Congress specified that "all pregnancy counseling" under Title X "shall be nondirective."  132 Stat. 2981, 3070-71 (2018).  Citing this language, Plaintiffs argue the Final Rule clearly violates Congressional intent because the Rule does not mandate nondirective counseling "about all … options in pregnancy, consistent with the patient's desire to hear that information."  Pls. Mem. at 14.  Plaintiffs further contend that because the Rule makes prenatal care referrals mandatory while also permitting a Title X grantee to decline a patient's request for pregnancy counseling, the Rule is nondirective in name only.  *Id.* at 15.  In short, Plaintiffs argue the Final Rule's requirements concerning post-conception activities are arbitrary or not in compliance with law because they are inconsistent with the nondirective counseling mandate.

The history of Title X regulation permits a line of demarcation between counseling and referrals.  The special nature of nondirective counseling was first recognized in the 1981 guidelines and was drawn expansively.  While the 1988 Rule did not permit either abortion counseling or abortion referral, the 1992 directive moderating the 1988 Rule was permissive of nondirective counseling and allowed physicians alone to counsel and refer for abortion.  Importantly, the 1992 directive spoke separately concerning the provision of

abortion information and the provision of abortion referral.  *See Nat'l Family Planning &*
*Reprod. Health Ass'n, Inc.*, 979 F.2d at 230.  The 1993 proposed rule also drew a distinction
between counseling and referral.  Specifically, the Department proposed the requirement
that Title X projects "provide nondirective counseling to the patient on all options relating
to her pregnancy, including abortion, and to refer her for abortion, if that is the option she
selects."  Standards of Compliance for Abortion-Related Services in Family Planning
Service Projects, 58 Fed. Reg. at 7464.  Furthermore, since 1996, the most Congress has
been able to achieve as far as expressing legislative intent, which necessarily and most
reliably comes to us by way of the plain language of the laws Congress enacts, is the
requirement that counseling be nondirective.[26]  Congress evidently has not agreed that
abortion referral is consistent with the Title X program.[27]  Nor have "administrative and

---

[26] I emphasize the need for a clear statement by Congress enshrined in law because the One Hundred and
Second Congress voted in favor of the Family Planning Amendments Act of 1992, which would have
permitted "nondirective counseling and referrals" regarding "termination of pregnancy."  Family
Planning Amendments Act of 1992, S. 323, 102nd Cong. (1992).  Given that the bill was vetoed, it did
not become the law of the land, and therefore I am not persuaded that this is an expression of
congressional intent which aids judicial review.  Pls. Mem. at 20-22.  Rather, given that the One Hundred
and Second Congress agreed on such language, it is even more revealing that more recent congresses
have only agreed on nondirective counseling without also authorizing abortion referral and co-location
in more than two decades of agency appropriations.  It is vexing enough a task to conjure the intent of
535 members of Congress lurking invisibly beneath the text of the laws it passes; to attribute a particular
congressional intent to a bill that was vetoed strikes me as an exercise in judicial vanity that disregards
my limited constitutional authority.

[27] When discussing *adoption* referrals, Congress has characterized an adoption referral as a matter that
should be included in nondirective counseling, where appropriate. 42 U.S.C. § 254c-6.  Defendants have
repeated this provision in the Final Rule.  Final Rule, 84 Fed. Reg. at 7730 ("[P]ostconception adoption
information and referrals [should] be included as part of any nondirective counseling in Title X projects"),
7748 ("Referrals for . . . adoption are . . . permitted, as long as the counseling remains nondirective.").
Plaintiffs argue Congress's conflation of adoption referrals and counseling in this singular Title X
provision informs Congress's use of the term counseling in the appropriations riders.  I am not convinced
that § 254c-6 has such a talismanic effect where abortion referral is at issue, particularly read against
§ 1008 in the context of a Maine family planning program that self-refers for the provision of abortion
services.  At most, Congress has indicated that adoption referrals should be provided during pregnancy
counseling.  It strikes me as a non sequitur that the special mention of referrals in the context of adoption

judicial interpretations … settled the meaning" of the term "counseling" such that the courts can know with confidence that the nondirective counseling mandate encompasses abortion referral. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (observing that "the uniformity of the administrative and judicial interpretations" of a statutory provision "confirm[ed]" the Court's interpretation of how Congress understood the provision would be applied). Under the circumstances, the likelihood that Plaintiffs will prevail against the Gag Rule is subject to legitimate doubt.

I confess, I have struggled with the question whether the congressional mandate that all counseling be nondirective[28] speaks in clear language to insulate the provision of information concerning the availability of abortion through other health care providers or programs, or whether the provision of such information amounts to a "referral" for abortion that the Department may lawfully prohibit. The result of my own rumination on the topic has not been particularly satisfying. As I see it, the affirmative identification of abortion

---

compels the legal inference that Congress expects Title X projects will subsidize the provision of abortion referrals (including self-referrals) in the course of nondirective pregnancy counseling, particularly given the § 1008 prohibition. *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) (noting there is a presumption that Congress has acted coherently if it "includes particular language in one section of a statute but omits it in another section of the same Act"). Moreover, there would be no need to specify that adoption referrals should be afforded if congressional understanding of the counseling concept encompassed referrals. Given the history, it appears as likely that the appropriations riders are limited to nondirective counseling and omit the abortion referral and abortion co-location condoned in the 2000 Rule (first proposed in 1993) because an attempt to achieve congressional authorization of abortion referral and co-location would likely impede the appropriations process.

[28] When the *Rust* Court considered the matter of congressional intent, Congress had at no time addressed "the issues of abortion counseling, referral, or advocacy." 500 U.S. at 185. Since *Rust*, Congress has specified that all counseling be nondirective, but has not extended the requirement to abortion referral or advocacy. This is noteworthy because it had attempted to do so through the vetoed Family Planning Amendments Act of 1992. Certainly Congress understands the issue and is capable of providing clearer guidance if its intention is to require that any provider list include abortion providers and identify them as such.

providers or the provision of a list that includes (and flags) abortion providers is neither "counseling" nor a "referral" in the strictest sense of either term. That is, pregnancy counseling entails medical guidance about treatment options, and not necessarily identification of the providers who perform a particular service. Similarly, the referral concept might be defined narrowly to include only a referral designed to influence the selection of a particular treatment provider, or it might be defined more loosely to include the recitation of a list of several treatment providers. Given this definitional slack in the joints, I am not persuaded at this juncture that it would be appropriate for a district court judge to serve as the Nation's lexicographer rather than the executive agency authorized to administer the program in question. Congress remains free to address the question. And so far, although the legislative history reflects that Congress also understands the difficulty here, the most it has indicated in the appropriations bills is that counseling be nondirective.[29]

Consistent with the appropriations mandate, the Final Rule provides that if there is to be pregnancy counseling, all such counseling will be nondirective and will focus on treatment options (e.g., prenatal care, adoption, pregnancy termination), not providers (e.g., where to go to obtain services).[30] Because nondirective referrals are neither prescribed nor prohibited by Congress, it strikes me as at best equivocal whether Plaintiffs will be able to

---

[29] I must also be mindful of the particular facts that apply for Maine Family Planning in Maine. When one considers Congress's nondirective counseling mandate against the backdrop of § 1008 and in the specific context of Maine Family Planning's network, it is difficult to assume that the nondirective counseling mandate girds Plaintiffs with a defensive penumbra strong enough to condone not only an in-house abortion referral, but also dispensation and administration of an abortifacient in a Title X clinic.

[30] Except in the limited case of adoption planning. *See supra* note 27.

demonstrate that the Gag Rule or the mandatory prenatal service referral contradicts the nondirective counseling mandate.  In particular, abortion referral would appear to be at odds with the § 1008 prohibition against using project money in programs where abortion is a method of family planning, particularly where, as here, the abortion referral is facilitated in-house through a telemedicine practice.  As for the mandatory prenatal services referral and optional list of comprehensive primary health care providers, it strikes me as significant that Title X grantees like Maine Family Planning retain the ability to provide nondirective counseling concerning the abortion option and may inform their patients that the prenatal care referral is mandated and an abortion referral is prohibited by the Department.[31]  Additionally, concerning Plaintiffs' argument that the Final Rule requires them to mislead their patients, Plaintiffs can inform patients desiring an abortion that there are time restrictions on the availability of abortions, provide a referral list that does not include any abortion providers, and inform the patient that the list does not include any abortion providers.  In other words, there would appear to be a ready approach that does not result in any misdirection whatsoever.  Importantly, notwithstanding the referral for

---

[31] I note that the Final Rule's mandatory referral for prenatal services does not appear to require that the prenatal service referral be to a provider of comprehensive primary health care services.  Assuming, arguendo, that a hypothetical Title X project was opposed to abortion and was also a provider of prenatal services, it strikes me that a patient of that project who was interested in abortion would be free to look elsewhere for abortion services and would find them available in multiple locations in the State of Maine. I am also unpersuaded that the Final Rule's requirement of a prenatal care referral is an adequate fulcrum upon which to lever a preliminary injunction.  Because Title X grantees like Maine Family Planning can incorporate into their service plan nondirective pregnancy counseling, including abortion counseling, they are free to inform the patient that the prenatal care referral is required by Department rule, and thus the mandatory prenatal care referral is not likely to result in irreparable harm warranting the extraordinary and drastic remedy of preliminary injunctive relief.  To the extent another Title X provider might proceed differently, such as by withholding pregnancy counseling and making a prenatal care referral, I am not persuaded that Plaintiffs have standing to obtain a preliminary injunction on behalf of hypothetical patients of hypothetical providers.

prenatal care, the patient remains free to pursue abortion counseling, referral, and/or services from another source, at her election. Indeed, an existing Title X patient who has the knowledge that Maine Family Planning provides abortion services through another program at another location is free to access those services on her own initiative, despite the referral for prenatal services and without a referral from her Title X provider.

In summary, insofar as Plaintiffs' challenge is based on congressional intent expressed after *Rust* in the context of Title X appropriations, my assessment is that the Department's effort to recalibrate the balance between the congressional determination that all pregnancy counseling be nondirective and the statutory requirement that "[n]one of the funds appropriated under [Title X] shall be used in programs where abortion is a method of family planning," 42 U.S.C. § 300a–6, is not simply an act of legerdemain and may well overcome Plaintiffs' challenge with further development of the record.

### 2. *The Affordable Care Act*

Plaintiffs also argue that certain restrictions Congress imposed on the Department under the auspices of the Affordable Care Act (ACA) apply with equal force in the specific context of the Title X program. Specifically, in § 1554 of the ACA Congress legislated as follows:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that—
>
> (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care;
> (2) impedes timely access to health care services;
> (3) interferes with communications regarding a full range of treatment options between the patient and the provider;
> (4) restricts the ability of health care providers to provide full disclosure of

all relevant information to patients making health care decisions;

(5) violates the principles of informed consent and the ethical standards of
health care professionals; or

(6) limits the availability of health care treatment for the full duration of a
patient's medical needs.

42 U.S.C. § 18114 (§ 1554).

While the ACA is an expansive piece of legislation, I am not persuaded that the restraints imposed under § 1554 against undue administrative interference in the private healthcare arena prevent the Department from administering its own health services grant program. Otherwise, in all matters pertaining to government medical assistance programs administered by the Department of Health and Human Services, the boards of professional healthcare organizations will have, effectively, captured the agency. Plaintiffs have not demonstrated that these entities have a special commission from Congress to determine the best means of reconciling § 1008 and the nondirective counseling madate.

In its recent panel decision, the Ninth Circuit was not impressed by the ACA argument. Among other observations, it noted that the preamble to § 1554 only purports to give preclusive effect "[n]otwithstanding any other provisions of this Act," and not "notwithstanding any other provision of law." *California v. Azar*, No. 19-35394, 2019 WL 2529259, at *6 n.4 (9th Cir. June 20, 2019). I do not see any likelihood of success on this issue.

### 3. *Rulemaking supported by reasoned analysis*

Plaintiffs argue the Secretary's justification for the Final Rule is not supported by "reasoned analysis" and, to the extent there is an effort to support the rule change, the effort runs contrary to expert guidance, making the Rule "arbitrary and capricious." Plaintiffs

discuss the physical separation requirement, Pls. Mem. at 23-28, and the post-conception

activities provisions , *id.* at 29-31, individually in this context.  The Supreme Court recently

set forth the guiding principles in *Encino Motorcars v. Navarro*, and I excerpt them here.

> One of the basic procedural requirements of administrative rulemaking is that
> an agency must give adequate reasons for its decisions.  The agency "must
> examine the relevant data and articulate a satisfactory explanation for its
> action including a rational connection between the facts found and the choice
> made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut.
> Automobile Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks
> omitted).  That requirement is satisfied when the agency's explanation is
> clear enough that its "path may reasonably be discerned." *Bowman Transp.,
> Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).  But
> where the agency has failed to provide even that minimal level of analysis,
> its action is arbitrary and capricious and so cannot carry the force of law.  *See*
> 5 U.S.C. § 706(2)(A); *State Farm*, *supra*, at 42–43.
>
> Agencies are free to change their existing policies as long as they provide a
> reasoned explanation for the change. *See*, *e.g.*, *National Cable &
> Telecommunications Assn. v. Brand X Internet Services*, 545 U.S. 967, 981–
> 982 (2005); *Chevron*, 467 U.S., at 863–864. When an agency changes its
> existing position, it "need not always provide a more detailed justification
> than what would suffice for a new policy created on a blank slate." *FCC v.
> Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  But the agency must
> at least "display awareness that it is changing position" and "show that there
> are good reasons for the new policy." *Ibid.* (emphasis deleted).  In explaining
> its changed position, an agency must also be cognizant that longstanding
> policies may have "engendered serious reliance interests that must be taken
> into account." *Ibid.*; *see also Smiley v. Citibank (South Dakota)*, *N.A.*, 517
> U.S. 735, 742 (1996). "In such cases it is not that further justification is
> demanded by the mere fact of policy change; but that a reasoned explanation
> is needed for disregarding facts and circumstances that underlay or were
> engendered by the prior policy." *Fox Television Stations*, *supra*, at 515–516.
> It follows that an "[u]nexplained inconsistency" in agency policy is "a reason
> for holding an interpretation to be an arbitrary and capricious change from
> agency practice." *Brand X*, *supra*, at 981.   An arbitrary and capricious
> regulation of this sort is itself unlawful and receives no *Chevron* deference.
> *See [United States v.] Mead Corp.*, [533 U.S. 218,] 227 [(2001)].

*Encino Motorcars*, *LLC v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016).  In short, "an agency

is not forever bound by an earlier resolution of an interpretive issue, but … a change must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent." *Nat'l Labor Relations Bd. v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.).

### a.  Separation

Plaintiffs argue that the Department's "only purported justifications for the Separation Requirement" are, at best, theoretical (fear of comingled funds), if not utterly chimerical (potential for confusion over the Title X mission). Pls. Mem. at 23-24.  In their view, the fact that Title X projects are closely monitored for fiscal compliance is more than adequate to ensure that Title X funds are not expended on abortion.  *Id.*  Plaintiffs also maintain that the 2000 Rule (initially proposed in 1993) has given rise to "serious reliance interests" that the new rule will upset, such that its implementation will result in severe economic harm to Maine Family Planning and a reduction in the availability of Title X services for patients.  *Id.* at 25-28.

Reliance, of course, is a two-way street.  To garner judicial protection, reliance must itself be reasonable.  The slate here most certainly is not blank.  It includes a black letter provision that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a–6.  Scribbled on the surface of that black-letter statutory backdrop is a regulatory history that foreshadowed the Final Rule (i.e., the 1988 Rule, upheld by the Supreme Court over similarly strident objection).  Meanwhile, on the legislative side, it is evident that the most Congress has been able to agree on, for over two decades, is that Title X should continue

to be funded and that, with respect to abortion, all *counseling* shall be nondirective.  Finally, there is the fact that Title X grants are not indefinite and expire on a regular basis.  42 C.F.R. § 59.8(b).

To be sure, the waters were relatively calm for quite some time.  However, I do not, at present, consider it likely that the Supreme Court would hold that Defendants acted arbitrarily, capriciously, or irrationally when they concluded that the current state of affairs validates their concern over mission drift in the Title X program and suggests the need for course correction.   Indeed, Maine Family Planning's circumstances reinforce that conclusion.  At least in Maine, with limited exception, the place to go for abortion services is your nearest Title X grantee or subgrantee, and the provision of those abortion services under the current practitioner model (according to Maine Family Planning) is rather remarkably sustainable only with the support of the Title X grant, even though "[n]one of the funds appropriated under [Title X] shall be used in programs where abortion is a method of family planning."  42 U.S.C. § 300a–6.  As the Court stated in *Rust*, the course correction can be viewed, reasonably, as "more in keeping with the original intent of the statute."  500 U.S. at 187.

In considering the pending motion for preliminary injunctive relief, I am also mindful that the reliance harm is one that Maine Family Planning played a role in developing, likely understanding all-the-while that the pendulum could eventually reverse course.  In making these observations, I am aware that Maine Family Planning's integration of pre-conception family planning services and abortion services under one roof makes sense from a purely economic perspective, and perhaps even reflects the model of care

most members of the medical establishment would prefer when it comes to the provision of increasingly medicated abortion services. However, requiring physical separation between Title X clinics and abortion clinics is a rational way to administer the Title X federal spending program, given the prohibition against utilization of program funds in programs that offer abortion as a method of family planning.

In *Rust*, the Supreme Court similarly considered a new rule that upset a relatively longstanding regulatory scheme. There, the Court considered reasonable the explanation that a course correction was warranted to "preserve the distinction between Title X programs and abortion as a method of family planning." 500 U.S. at 187 (discussing the Gag Rule before turning to consider the separation requirement, quoting 53 Fed. Reg. 2923, 2923-2924 (1988)). On the specific question of separation, the Court summarized: "Certainly the Secretary's interpretation of the statute that separate facilities are necessary, especially in light of the express prohibition of § 1008, cannot be judged unreasonable." *Id.* at 190.

Moreover, at least as far as the provision of abortion services in Maine is concerned, the current highly distributed abortion network provided by Maine Family Planning is of relatively recent vintage (2014) and is the product of a telehealth medicated abortion program. While the new separation requirement would require modification of the telehealth program, such a program would appear to be more versatile and adaptable than the services in place when the Supreme Court issued *Rust*. Furthermore, Maine Family Planning may be able to reconstitute a well-distributed telehealth abortion network without building out or obtaining new physical space in all seventeen of its satellite locations,

40

especially where it can now rely on advanced practice nurses to administer the program.
Thus, I am not persuaded on the current record that the Final Rule calls for measuring the
harm as the complete discontinuation of the telehealth abortion service started by Maine
Family Planning in 2014.  Rather, it seems at least as likely that Maine Family Planning
could (and would) continue this innovative telehealth program and provide meaningful
access to medicated abortion services for Maine women at fewer than all seventeen
locations where it presently has satellite clinics (or in other locations), which changes the
calculus considerably from the extremely dire financial projections upon which Maine
Family Planning has premised its motion (arguing there is the need to build or rent
seventeen new spaces).  I, therefore, conclude that Plaintiffs have not demonstrated a
likelihood of success on their APA challenge to the Separation Requirement and have
significantly overplayed their economic impact hand.[32]

### b.  Post-Conception Activities

Plaintiffs assert that when implementing "the Gag Rule," Defendants "failed to
engage in a 'reasoned analysis,' 'consider [] important aspect[s] of the problem,' or account
for the evidence presented."  Pls. Mem. 29 (quoting *State Farm*, 463 U.S. at 42-43).
Specifically, Plaintiffs assert the Gag Rule is not only "incompatible with health care
professionals' ethics obligations and the standard of care," but also poised to "do indelible
harm to the health of Americans and to the relationship between patients and their

---

[32] "Compliance with the physical separation requirements … is required March 4, 2020."  Final Rule, 84
Fed. Reg. at 7714.  However, in-house referrals for abortion services will be disrupted as of May 3, 2019.
*Id.*

41

providers." *Id.* In sum, they argue the Department's rule runs contrary to the evidence provided during the notice and comment period by medical associations and public health policy organizations and ultimately fails to articulate "a rational connection between the facts found and the choice made." *Id.* at 31 (quoting *State Farm*, 463 U.S. at 43).

Given that the Final Rule does not prevent nondirective counseling and prohibits only directive counseling and referrals to abortion providers, I am not persuaded that Plaintiffs will, more likely than not, succeed with their claim that the Final Rule violates the APA. In particular, it strikes me that, given the ability to provide pregnant patients nondirective pregnancy counseling and to explain that the Title X program requires referrals for prenatal services and does not permit abortion referrals, Title X program providers are not required to misinform or mislead their patients concerning health care options, and the patients should not develop a mistrust of their Title X providers simply because the trail to an abortion provider is not blazed through the Title X program.[33] Additionally, a Title X program provider (or even non-advance-practice staff) can explain to the patient that the Title X program is limited in its scope and exists to provide contraceptive and pre-conception reproductive health services, not post-conception

---

[33] The Supreme Court in *Rust* came to a similar conclusion:

> [T]he Title X program regulations do not significantly impinge upon the doctor-patient relationship. Nothing in them requires a doctor to represent as his own any opinion that he does not in fact hold. Nor is the doctor-patient relationship established by the Title X program sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice. The program does not provide post conception medical care, and therefore a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her. The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program.

500 U.S. at 200.

services.  While neither Title X program providers nor their support staff can direct

abortion traffic to abortion providers, it would seem likely that the patient would be able

to find her way to available abortion services (including at another Maine Family Planning

location), much in the same way that she likely first accessed Maine Family Planning's

Title X program.  This could be by means of the Internet, including a webpage maintained

by Maine Family Planning that is not affiliated with the Title X program, or it could be by

means of state or local public health announcements, third-party information campaigns,

or word-of-mouth. [34]

Plaintiffs also take issue with the Department's contention that the revised Rule is

designed to reduce ethical barriers to entry faced by those providers who would enter into

contract with the Department to provide Title X services if they did not have to comply

with the abortion-related provisions of the Rules implemented in 2000.  According to

Plaintiffs, Defendants are "prioritizing hypothetical new providers" who, assuming they

---

[34] To the extent Plaintiffs contend Defendants ignored the evidence, that is not a fair characterization.  Prior to finalizing the 2019 Rule, the Department received "over 500,000 public comments."  Final Rule, 84 Fed. Reg. at 7722.  Following the public notice and comment period, the Department "consider[ed] the comments," made modifications to the rule in response to those comments, and ultimately finalized the rule.  *Id.*  In the Final Rule, the Department specifically acknowledged and discussed the merits of comments that supported its reading of the statute as well as comments voicing concerns similar to the ones Plaintiffs now raise regarding the "Gag Rule."  *Id.* at 7744.  For example, the Department reported comments asserting that withholding information about abortion "interferes with the patient-provider trust relationship, is contradictory to patient-centered care, and compromises the health of the patient, as well as the ability of the patient to make timely and fully informed decisions."  *Id*. at 7745.  Other comments espoused the view that "restricting counseling for and information about abortion in Title X projects would encroach on physicians' codes of ethics and responsibilities to patients" as well as be in conflict with the codes of ethics of medical professional associations.  *Id.*  Comments of this nature came from many within the medical profession/establishment, including the American College of Physicians and the American College of Obstetricians and Gynecologists.  *Id.*  In a document that stretches over seventy pages – sixty of which are devoted to a recital of the comments received and discussion of the Department's responses – the Department provides reasoned justifications for its rule reversing its stance on abortion counseling and referral.

joined the program, would not offer services to Title X participants as "broad" or "effective" as those provided by Plaintiffs.  To the extent the new rules are drawn to make room for such providers, I am not persuaded that Plaintiffs are likely to expose the provisions as arbitrary and capricious.  Nor do I see how the potential for participation by providers who are opposed to abortion based on religious belief is likely to give rise to irreparable harm for Plaintiffs or their patients.

Finally, with regard to the post-conception provisions that mandate a referral for prenatal services and delineate what can and cannot be provided in a referral list of providers, these particular pieces of the puzzle, it occurs to me, are not the cause of the alleged irreparable injury.  Rather, the irreparable injury for which Plaintiffs seek an injunction is the product of the new physical separation requirement and the prohibition on abortion referral (including self-referral).  Because the provisions pertaining to prenatal service referral and the referral list are not the cause of the alleged irreparable injury – except as discussed, *infra*, in regard to professional speech rights – I do not believe they could support a preliminary injunction in the context of judicial review of administrative action under the APA.  In other words, even if Plaintiffs could persuade me that it is irrational for the Department to require a referral for prenatal care services for a patient intent on terminating her pregnancy, a victory on that issue, or the related issue of the referral list, would do nothing to prevent the alleged irreparable injury, particularly as the Final Rule includes a severability passage[35] that would permit a court to limit relief to those

---

[35] The Final Rule includes the following language: "The Department believes that each component of the rule is legally supportable, individually and in the aggregate. To the extent a court may enjoin any part

44

two provisions, if appropriate.

<u>c.</u>  <u>2014 QFP</u>

In their reply brief, Plaintiffs supplemented their APA argument with a reference to a recommendation and report jointly authored by the Department and the Centers for Disease Control, titled *Providing Quality Family Planning Services*, *Recommendations of the CDC and the U.S. Office of Population Affairs* (the "2014 QFP").  In Plaintiffs' view, the Defendants acted arbitrarily when promulgating the Final Rule because they disregarded certain passages of the 2014 QFP, without discussion, and therefore a violation of the APA is demonstrated.[36]  I am not persuaded that the 2014 QFP is inconsistent with the Final Rule or that it was arbitrary for Defendants not to discuss the QFP in the rulemaking process.

**B.     Due Process Right to Choose Abortion**

Plaintiffs assert the Final Rule violates their patients' Fifth Amendment right to terminate a pregnancy prior to viability through abortion.  Acknowledging first that "[t]he Government has no affirmative duty to 'commit any resources to facilitating abortions,'" *Rust*, 500 U.S. at 201 (quoting *Webster v. Reproductive Health Services*, 492 U.S. 490, 511 (1989)), the Plaintiffs focus on the "undue burden" they anticipate their patients will shoulder should the regulations go into effect.  Pls. Mem. 31-32.  Plaintiffs conclude these burdens – including increased travel distances, restricted access to information regarding

---

of the rule, the Department intends that other provisions or parts of provisions should remain in effect." Final Rule, 84 Fed. Reg. at 7725.

[36] The QFP, according to Plaintiffs, "discusses pregnancy testing, nondirective counseling, and referrals under the heading 'Pregnancy Testing and Counseling.'"  Pls. Reply 7.

abortion, and the potential for prevention or delay of abortion procedures – greatly outweigh the benefits espoused by the Department in favor of the Rule. *Id.* 31-32, 34-38. Furthermore, Plaintiffs assert the benefits lauded by the Department are not supported by evidence. *Id.*

Plaintiffs argue for the application of an incorrect standard.  Plaintiffs correctly assert that the Supreme Court in *Planned Parenthood of Southeastern Pennsylvania v. Casey* reaffirmed the "right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." [37]  505 U.S. 833, 846 (1992). However, despite the undeniable existence of this right, the standard in *Rust* remains:

> The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and may validly choose to fund childbirth over abortion and "implement that judgment by the allocation of public funds" for medical services relating to childbirth but not to those relating to abortion. *Webster,* [492 U.S. at 510]. The Government has no affirmative duty to "commit any resources to facilitating abortions," [*id.* at 511], and its decision to fund childbirth but not abortion "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest." [*Harris v. McRae*, 448 U.S. 297, 315 (1980)].

*Rust*, 500 U.S. at 201.  Thus, as the Supreme Court concluded:

> Congress' refusal to fund abortion counseling and advocacy leaves a

---

[37] In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, the Supreme Court established the basic building blocks of the "undue burden" test, stating: "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  505 U.S. at 877.  Thus, "there 'exists' an 'undue burden' on a woman's right to decide to have an abortion, and consequently a provision of law is constitutionally invalid, if the 'purpose or effect' of the provision 'is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'"  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2299 (2016) (citing *Casey,* 505 U.S. at 878).  However, these standards and the facts of each case addressed legislation directed at regulating or limiting pre-viability abortion – not the government's affirmative choice to deny funding to abortion service providers or advocates – and are inapplicable here.

pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all. The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral leaves her in no different position than she would have been if the Government had not enacted Title X.

*Id.* at 202.

Despite Plaintiffs' arguments to the contrary, application of the *Rust* standard does not "immunize [the Rule] from constitutional scrutiny." Pls. Mem. 31. Rather, the *Rust* standard is precisely the standard dictated by the challenge at hand. Consideration of the weight of the burdens that may be imposed on the Plaintiffs' patients or the compelling need of the patients served by Title X projects does not change the calculus and Plaintiffs' attempts to distinguish *Rust* on this point are unpersuasive. Although the *Rust* Court did not independently weigh the regulation's purported benefits or weigh the burdens imposed when evaluating the Fifth Amendment argument in the manner the Court more recently did in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) (involving an analysis of, inter alia, burdens associated with driving distances to clinics, but not involving governmental funding), it is difficult to accept the premise that the *Rust* Court was unaware of the reliance concern associated with the change of administrative policy. For example, Justice Blackmun, in dissent, decried the "formidable obstacles in the path of Title X clients' freedom of choice." 500 U.S. at 216.

Talk of economic justice was limited in *Rust*, but it seems this scarcity was due to the considerable heated debate on that front in cases leading up to *Rust*. For example, economic justice and unfair burden arguments were heavily contested in *Harris v. McRae*,

448 U.S. 297 (1980).[38]  In *Harris*, the Supreme Court rejected a constitutional challenge to the Hyde Amendment, which withdrew federal funding for "medically necessary abortions"[39] under the Medicaid program, a significantly larger federal welfare program than Title X, and one that affords pregnancy services and not just preconception reproductive health services.  Justice Brennan, in dissent, criticized the Hyde Amendment because it did "not foist that majoritarian viewpoint with equal measure upon everyone in our Nation, rich and poor alike; rather, it imposes that viewpoint only upon that segment of our society which, because of its position of political powerlessness, is least able to defend its privacy rights from the encroachments of state mandated morality."  *Id.* at 332

---

[38] Similarly, in *Beal v. Doe*, the Court reflected:

> Our dissenting Brothers, in this case and in *Maher v. Roe*, 432 U.S. 464, 482, express in vivid terms their anguish over the perceived impact of today's decisions on indigent pregnant women who prefer abortion to carrying the fetus to childbirth. We think our Brothers misconceive the issues before us, as well as the role of the judiciary.

> In these cases we have held merely that (i) the provisions of the Social Security Act do not require a State, as a condition of participation, to include the funding of elective abortions in its Medicaid program; and (ii) the Equal Protection Clause does not require a State that elects to fund expenses incident to childbirth also to provide funding for elective abortions. But we leave entirely free both the Federal Government and the States, through the normal processes of democracy, to provide the desired funding. The issues present policy decisions of the widest concern. They should be resolved by the representatives of the people, not by this Court.

432 U.S. 438, 447 n.15 (1997).

[39] The term "medically necessary abortion" did not encompass abortions to save the lives of pregnant women or, generally, abortions in cases of rape or incest, which would continue to be covered following the Hyde Amendment. *Harris*, 448 U.S. at 302.  The "medically necessary" term, which appears in many of the earlier cases, appears to have its genesis in the idea that "medically necessary" procedures should generally be covered by Medicaid, but it also appears to have evolved in reaction to earlier terminology in which the Court classified certain abortions as "elective" or "nontherapeutic" or "medically unnecessary," following which several providers protested that such abortions could be medically necessary for reasons related to the patient's mental and/or physical health, short of a pregnancy that endangered a woman's life.  *E.g.*, *Beal*, 432 U.S. at 446-48 & nn.11, 15 (holding that a state may refuse to subsidize "nontherapeutic abortions" permitted by state law, including in the context of the Medicaid program, but reserving judgment and remanding for further proceedings concerning a state law provision requiring three physicians to concur that a particular abortion is "medically necessary").

(Brennan, J., dissenting).  He found withholding an abortion subsidy particularly perverse

in the context of a program that afforded pregnancy services:

> What is critical is the realization that as a practical matter, many poverty-stricken women will choose to carry their pregnancy to term simply because the Government provides funds for the associated medical services, even though these same women would have chosen to have an abortion if the Government had also paid for that option, or indeed if the Government had stayed out of the picture altogether and had defrayed the costs of neither procedure.

*Id.* at 334.  Justice Marshall's dissent was even more harrowing:

> Under the Hyde Amendment, federal funding is denied for abortions that are medically necessary and that are necessary to avert severe and permanent damage to the health of the mother. The Court's opinion studiously avoids recognizing the undeniable fact that for women eligible for Medicaid – poor women – denial of a Medicaid-funded abortion is equivalent to denial of legal abortion altogether.  By definition, these women do not have the money to pay for an abortion themselves.  If abortion is medically necessary and a funded abortion is unavailable, they must resort to back-alley butchers, attempt to induce an abortion themselves by crude and dangerous methods, or suffer the serious medical consequences of attempting to carry the fetus to term.  Because legal abortion is not a realistic option for such women, the predictable result of the Hyde Amendment will be a significant increase in the number of poor women who will die or suffer significant health damage because of an inability to procure necessary medical services.

*Id.* at 338 (Marshall, J., dissenting).[40]  Justice Blackmun also wrote in dissent, though

succinctly, that "[t]here is 'condescension' in the Court's holding that 'she may go

---

[40] Justice Marshall also observed in his dissent that the *Harris* decision "may be traced to the Court's unwillingness to apply the constraints of the Constitution to decisions involving the expenditure of governmental funds," based on the idea that the obstacles to access that result have not actually been "imposed" by the government.  448 U.S. at 347.  The same must be said of *Rust*.  Justice Marshall noted that "some poor women will attempt to raise the funds necessary to obtain a lawful abortion" by forgoing payment of bills or "journeying to another state," burdens she would not need to assume with a Medicaid abortion coverage.  *Id.* at 346 n.7.  If Justice's Marshall's view did not carry the day in either *Harris* or *Rust*, it is difficult to see how Plaintiffs' economic arguments would, absent a rejection of *stare decisis*, which is not within my power.

elsewhere for her abortion'; this is disingenuous and alarming." *Id.* at 348 (Blackmun, J., dissenting).   Not to be overlooked, Justice Stevens deplored the denial of Medicaid coverage as "tantamount to a severe punishment" that "cannot be justified unless government may, in effect, punish women who want abortions," contrary to the teaching of *Roe v. Wade*, 410 U.S. 113 (1973) (recognizing a fundamental right to termination of pregnancy within certain time-constraints and declaring unconstitutional, in violation of the due process clause, criminalization of the same).  *Harris*, 448 U.S. at 354 (Stevens, J., dissenting).[41]

The purpose of my digression regarding *Harris* is simply this: when Plaintiffs suggest that considerations of economic justice were not a focal point of *Rust* and cases of its kind, and that more recent cases like *Whole Women's Health* (which did not involve funding of a government program) reflect the abandonment of *Rust* in all matters involving due process and abortion, such that I am free to invalidate Title X regulations based on affidavits predicting clinic closures and increased driving distances,[42] Plaintiffs are

---

[41] In 1989, in a similarly divided decision, the Supreme Court rejected a challenge to a Missouri law that withheld the assistance of public employees and facilities from performance of or assistance with nontherapeutic abortions.  *Webster*, 492 U.S. at 507 (opinion reflected in Part II-B).  The Court quoted its then-recent opinion in *DeShaney v. Winnebago County Department of Social Services*: "Our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." 489 U.S. 189, 196 (1989).

[42] Plaintiffs argue *Rust* is not instructive because it involved a facial challenge and they argue their suit does not.  *Rust* did involve a facial challenge, but it also involved a facial challenge in a strict scrutiny context. The *Rust* Court observed that its analysis might have differed in the context of a "specific fact situation," but did so only with respect to an argument that the plaintiffs feared the 1988 regulations would be imposed to ban abortion referral even if the woman's life was in "imminent peril."  500 U.S. at 195. When the *Rust* Court characterized the challenge to the 1988 Rule as facial it did so because, as here, the regulations had not yet been applied.  *Id.* at 181.  Plaintiffs have not persuaded me at this juncture that the distinction between a facial and as-applied challenge lessens the precedential impact of *Rust*.

50

essentially asking me to ignore binding precedent that only the Supreme Court, or an act of Congress, can undo.  I am not free to overlook controlling precedent and when faced with a government agency's affirmative choice not to subsidize an activity – even if that activity is protected by the Constitution – I must apply the standard dictated by the *Rust* Court.  *See United States v. Jimenez-Banegas*, 790 F.3d 253, 259 (1st Cir. 2015) ("[T]he Supreme Court has clearly stated that [a lower court] should not conclude that its more recent cases have, by implication, overruled an earlier precedent." (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).[43]  When I consider the impact of *Rust* in this case, I am not persuaded that Plaintiffs are likely to succeed with their Fifth Amendment challenge.[44]

### C.      Professional Speech Rights

Plaintiffs assert the Final Rule violates Maine Family Planning's free speech rights protected under the First Amendment.  Pls. Mem. 39.  They argue: "the Gag Rule would prevent health care providers from speaking honestly with their patients and would simultaneously compel speech about prenatal referrals even when not medically or ethically appropriate."  *Id*. at 39-40.  Plaintiffs find fault with the Final Rule's requirements,

---

[43] In *Casey*, decided not long after *Rust*, the Supreme Court instituted the "undue burden" standard for abortion-related regulations, backing away from the more exacting strict scrutiny standard applied under *Wade*.  505 U.S. at 876.  In effect, when the Supreme Court considered *Rust*, the legal landscape arguably was more conducive to Plaintiffs' position than it currently is.  However, now, as then, the essential ingredient is federal spending, which steers the due process claim out of the undue burden analysis, just as it steered the claim in *Rust* out of the strict scrutiny analysis.

[44] I am also impressed that the landscape has changed significantly in regard to the availability of abortion services, even since the 1991 decision in *Rust*.  For example, the record now before the Court reflects that abortion is available by prescription, and that patient access can be facilitated enormously through a practice of telehealth medicine.  Maine has also lowered barriers by authorizing providers with an advanced practice license to supply abortion services.  The barriers to abortion access are much, much lower today than they were when Justices Brennan, Marshall, Blackmun and Stevens authored their dissents in *Harris*, in 1980.

which they cast as impermissible content-based and viewpoint-based regulation by the government, because the Rule requires Title X health care professions to provide referrals for prenatal care and allows for adoption referral while simultaneously banning referrals for abortion, regulates the manner in which Title X health care practitioners may provide pregnancy counseling, and limits who may provide such counseling within a Title X project. *Id.* at 42-44. Plaintiffs argue for an application of strict scrutiny, but assert the Final Rule fails even under intermediate scrutiny, or, in other words, that the Final Rule is not "sufficiently tailored to further a substantial government interest." *Id.* at 44. Finally, Plaintiffs argue that as applied to Maine Family Planning, the Final Rule is "an unconstitutional condition on Maine Family Planning's right to freedom of speech." *Id.* at 45.

Central to Plaintiffs' argument is their characterization of the patient-provider relationship within the Title X program as a "traditional sphere of free expression" that should be protected from government regulation, "even within a government-funded program." *Id.* at 40. While it is true, as Plaintiffs assert, that the *Rust* Court declined to resolve whether "traditional relationships such as that between doctor and patient should enjoy protection under the First Amendment from Government regulation, even when subsidized by the Government," 500 U.S. at 200, Plaintiffs disregard subsequent Supreme Court decisions characterizing the Title X patient-client speech addressed in *Rust* – which shares so many similarities with the speech regulated by the Final Rule – as "governmental speech" appropriately regulated in furtherance of Title X's longstanding "programmatic

message" prohibiting funding for abortion services.[45] *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 548 (2001) (indicating that the "programmatic message . . . in *Rust* . . . sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives"); *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15, 217 (2013) (emphasizing that because of the distinction drawn between "conditions that define the limits of the government spending program – those that specify the activities Congress wants to subsidize – and conditions that seek to leverage funding to regulate speech outside the contours of the program itself," regulations like those addressed in *Rust* which do not "prohibit the recipient from engaging in the protected conduct outside the scope of the federally funded program" do not "run afoul of the First Amendment" (citations omitted)); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (affirming that, as the *Rust* Court reasoned, "Congress may selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way" (citation and quotation marks omitted)); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) (discussing scenarios, like those addressed in *Rust*, when "the State is the speaker" or when the government "use[s] private speakers to transmit specific information pertaining to its own program" and confirming that "when the government appropriates public funds to promote a particular policy of its own it is entitled

---

[45] Supreme Court cases predating the *Rust* decision also support this distinction. *See, e.g., Maher v. Roe*, 432 U.S. 464, 475 (1977) ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.").

to say what it wishes").

The cases Plaintiffs cite in support of their argument that the Final Rule "go[es] beyond permissible interference with the provider-patient relationship" instead serve the opposite purpose as a majority are factually distinguishable from the regulations challenged in *Rust* and in this case[46] and those more directly applicable reaffirm the relevancy of *Rust*. For example, Plaintiffs cite two Supreme Court decisions confronting regulations of professional speech as a condition on receipt of government funds in order to support the proposition that the Government cannot "use an existing medium of expression" and then "control it, in a class of cases, in ways which distort its usual functioning." Pls. Mem. 40-41 (citing *Legal Servs. Corp.*, 531 U.S. at 543; *Rosenberger*, 515 U.S. at 834). Each case found a denial of the petitioner's right of free speech; however, the Supreme Court took care to explicitly distinguish the facts presented in each case from those in *Rust*, noting that the "counseling activities of the doctors under Title X amount[] to governmental speech" which the government may, within certain parameters, permissibly regulate.[47] *Legal Servs.*

---

[46] Many of the cases upon which Plaintiffs rest their arguments are notably absent of a key factual point – the cases confront statutes regulating the speech of physicians or other professionals generally and not as a part of a federal funding paradigm. *See, Nat'l Inst. of Family & Life Advocates v. Becerra,* 138 S. Ct. 2361 (2018) (holding that a California law broadly requiring "clinics that primarily serve pregnant women" to provide specific notices to their patients violative of the First Amendment); *Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) (holding that a North Carolina statute which compelled *all* physicians to "perform an ultrasound, display the sonogram, and describe the fetus to women seeking abortions" violated physicians' free speech rights); *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) (invalidating a Florida law that "restrict[ed] (and provid[ed] disciplinary sanctions for) speech by doctors and medical professionals on the subject of firearm ownership"); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) (enjoining, as a first amendment violation, a federal law that would have revoked a physician's license or required an investigation that could ultimately result in revocation of the physician's license when the physician has provided a "professional 'recommendation' of the use of medical marijuana").

[47] The *Legal Services Corporation* Court distinguished *Rust* on three salient points. When contrasting the regulation at issue in *Legal Services Corporation* (which "prohibit[ed] legal representation funded by recipients of LSC moneys if the representation involves an effort to amend or otherwise challenge existing

*Corp.*, 531 U.S. at 541 ("We have said that viewpoint-based funding decisions can be sustained in instances in which the government is itself the speaker, or instances, like *Rust*, in which the government 'used private speakers to transmit specific information pertaining to its own program.'" (citations omitted)); *see also Rosenberger*, 515 U.S. at 833 ("[I]n *Rust v. Sullivan*, . . . the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program. . . . [W]hen the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes.  When the government disburses public funds to private entities to convey a governmental message, it may take legitimate and appropriate steps to ensure that its message is neither garbled nor distorted by the grantee." (citations omitted)).  Far from detracting from the force of *Rust*, the cases cited by Plaintiffs bolster and reaffirm the applicability of the Supreme Court's reasoning to the facts of this case.

---

welfare law" and functionally required attorneys to withdraw should a case call into question a welfare statute's validity), *see* 531 U.S. at 536–37, with the regulations scrutinized in *Rust*, the Court first noted:

> [In *Rust*], a patient could receive the approved Title X family planning counseling funded by the Government and later could consult an affiliate or independent organization to receive abortion counseling. . . . [T]he patient in *Rust* was not required to forfeit the Government-funded advice when she also received abortion counseling through alternative channels.

*Id.* at 546–47. Second, the Court emphasized the "programmatic message" underpinning the 1988 Rules "which sufficed there to allow the Government to specify the advice deemed necessary for its legitimate objectives." *Id.* at 548. Finally, the Court emphasized that the Government program at issue in *Legal Services Corporation* "differed from the program in *Rust* '[i]n th[e] vital respect' that the role of lawyers who represent clients in welfare disputes is to advocate against the Government, and there was thus an assumption that counsel would be free of state control." *United States v. Am. Library Ass'n, Inc*., 539 U.S. 194, 213 (2003) (citing *Legal Services Corp.*, 531 U.S. at 542-543).

Similarly, Plaintiffs overlook the *Rust* Court's reasoning for passing over that crucial question of whether provider-client speech within the framework of a federally-funded program is beyond the scope of governmental regulation – a reason that applies with equal force to the 1988 Rule scrutinized by the *Rust* Court as it does to the Final Rule at issue now.  In the words of *Rust* Court:

> Title X program regulations do not significantly impinge upon the doctor-patient relationship. Nothing in them requires a doctor to represent as his own any opinion that he does not in fact hold. Nor is the doctor-patient relationship established by the Title X program sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice. The program does not provide post conception medical care, and therefore a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her. The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program. In these circumstances, the general rule that the Government may choose not to subsidize speech applies with full force.

*Rust*, 500 U.S. at 200.

Plaintiffs fail to identify a meaningful way in which the Final Rule differs from the 1988 Regulations for purposes of a First Amendment inquiry.[48]  Once again, I am not free to overlook controlling precedent and a review of *Rust* and subsequent free speech

---

[48] The Final Rule, like the 1988 Regulations, requires "[i]ndividuals who are voluntarily employed for a Title X project" to "perform their duties in accordance with the regulation's restrictions on abortion counseling and referral." *Rust*, 500 U.S. at 198.  However, Title X employees such as those individuals employed by Maine Family Planning "remain free . . . to pursue abortion-related activities when they are not acting under the auspices of the Title X project." *Id.*  As the *Rust* Court concluded: "The regulations, which govern solely the scope of the Title X project's activities, do not in any way restrict the activities of those persons acting as private individuals. The employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority." *Id.* at 198-99.

decisions casts serious doubt regarding Plaintiffs' ability to successfully challenge the Final Rule within the existing First Amendment framework.  Indeed, similar arguments to those the Plaintiffs raise have fallen on deaf ears, for, as the Supreme Court has held: "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *All. for Open Soc'y Int'l*, 570 U.S. at 214.

### D.    Void for Vagueness

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations*, *Inc*., 567 U.S. 239, 253 (2012).  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *Id.*

Focusing on the separation requirements of the Final Rule, Plaintiffs contend the Final Rule is unconstitutionally vague because it is not clear "what providers actually need to do in order to ensure compliance (e.g., does compliance require separate entrances and rooms, or entirely separate buildings?)"  Pls. Mem. 47.  Turning to post-conception activities, Plaintiffs argue the Final Rule is vague because it "offers no guidance on how providers can offer any options counseling on abortion in a manner that does not somehow indirectly 'promote' or 'support' abortion." *Id.*

"[A] statute is unconstitutionally vague only if it 'prohibits ... an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its

meaning and modes of application.'"  *United States v. Councilman*, 418 F.3d 67, 84 (1st Cir. 2005) (*en banc*) (quoting *United States v. Hussein*, 351 F.3d 9, 14 (1st Cir. 2003)). "Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.'"  *Rose v. Locke*, 423 U.S. 48, 49-50 (1975) (per curiam) (quoting *Robinson v. United States*, 324 U.S. 282, 286 (1945)). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  Importantly, where, as here, the regulations inform the government's attempt to carry out a spending program, there is considerably greater leeway for imprecision.  *Finley*, 524 U.S. at 589.

### 1.  The Separation Requirement

I read the separation requirement as advice to Title X grantees who also provide abortion services to conduct any abortion services, other than nondirective abortion counseling, in separate facilities.   Those facilities must have their own treatment, consultation, examination and waiting rooms that cannot be shared with the Title X project. Moreover, the facilities and personnel of the respective programs cannot share phone numbers, email addresses, educational services, websites, personnel records, health care records, and workstations.  Nor can facilities associated with the Title X project post signs or distribute materials referencing abortion or abortion services.  Compliance with these requirements is due by May 2020.

Plaintiffs express concern that perhaps this requires Maine Family Planning to administer its respective programs in different buildings.  It appears that an abortion program and a Title X program can be provided in the same building by the same

organization.[49]  Certainly the guidelines do not say otherwise.  However, to the extent a disagreement develops in the future based on specific facts on the ground (e.g., a small building that houses, exclusively, an abortion clinic and a Title X clinic run by the same organization, with one entrance), the most appropriate course would be for the parties to attempt to address their differences through the regulatory process in the first instance.  42 C.F.R. § 59.10 (referencing grant appeal procedures).  Because the guidelines invite rational application, I am not persuaded that Plaintiffs are likely to establish that the separation requirements are void.

### 2.  Post-Conception Activities

The post-conception activities provisions are also sufficiently clear to advise Plaintiffs how to comply with Title X program requirements.  "A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion."  42 C.F.R. § 59.14(a).  This opening passage prohibiting abortion referral essentially sums it up, although the provision also includes examples for guidance.

Plaintiffs argue the Final Rule "offers no guidance on how providers can offer any options counseling on abortion in a manner that does not somehow indirectly 'promote' or 'support' abortion."  Pls. Mem. 47.  I disagree.  Providers can counsel patients about abortion.  They just cannot direct traffic to their own or any other abortion program in the

---

[49] Title X grantees cannot be precluded from engaging in abortion advocacy, though they can be within the confines of their Title X programs.  *All. for Open Soc'y Int'l*, 570 U.S. at 214 (emphasizing a distinction drawn in *Rust*, 500 U.S. at 196).

course of providing "nondirective counseling." Patients must find their way independently. Plaintiffs have not carried their burden of showing a likelihood of success on this issue, either.

## III.   LIKELIHOOD OF IRREPARABLE HARM ABSENT INTERIM RELIEF, THE BALANCE OF EQUITIES IN THE PLAINTIFF'S FAVOR, AND THE PUBLIC INTEREST

Given my conclusion that Plaintiffs have not shown a likelihood of success on their administrative and constitutional challenges, precedent advises that I can treat the remaining preliminary injunction factors as matters of idle curiosity. *New Comm. Wireless Servs.*, 287 F.3d at 9. I will offer a few words on these factors all the same.

I am concerned that following implementation of the Final Rule a significant number of women who would choose to access abortion services may travel a more convoluted path to access those services, at least for a time. I also appreciate that Plaintiffs and many members of the medical establishment hold very decided opinions about how best to design practice models and meet professional ideals in the delivery of abortion services, and that they do not appreciate having the government determine what can and cannot be said between provider and patient, even if the government is funding the program. These are weighty concerns, to be sure, but they also suggest that the drive for reproductive self-determination, on the one hand, and the drive for excellence in healthcare delivery, on the other, likely will facilitate access notwithstanding Defendants' Final Rule.

Since the start of this now almost 50-year-old culture war, much has changed. Abortion services in this day and age are more readily available than they have ever been, due to advances in technology, telecommunications, and medicine. Given these advances,

well-illustrated on the record now before me, it appears that reconfiguring the model for delivery of abortion services has never been easier and that the path forward likely is not as convoluted and insurmountable as Plaintiffs insist.  At least on the current record, it is not apparent that the right to reproductive self-determination cannot thrive here in the State of Maine even if the Final Rule is implemented.  As is true of a great many other freedoms that are not subsidized by the federal government, it is up to private individuals to determine whether it thrives or not and they can advance their respective interests in the usual ways people do in a law-abiding, free democratic society.

## CONCLUSION

Plaintiffs' Motion for Preliminary Injunction is denied.


**SO ORDERED.**

Dated this 3rd day of July, 2019


/S/ Lance E. Walker
LANCE E. WALKER
U.S. DISTRICT JUDGE