# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, on behalf of itself, its staff, and its patients; )<br><br>and )<br><br>J. Doe, DO, MPH, individually and on behalf of Dr. Doe's patients, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; )<br><br>ALEX M. AZAR II, in his official capacity as Secretary of Health and Human Services; )<br><br>OFFICE OF POPULATION AFFAIRS; )<br><br>and )<br><br>DIANE FOLEY, M.D., in her official capacity as the Deputy Assistant Secretary for Population Affairs, )<br><br>Defendants. )  | Case No. 1:19-cv-00100-LEW<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1.      This case challenges and seeks to enjoin the final rule titled *Compliance with Statutory Program Integrity Requirements* (the "Rule"), published by the United States Department of Health and Human Services ("HHS") on March 4, 2019.[1]  The Rule imposes drastic and unlawful changes to the Title X family planning program.  These changes are unraveling decades of progress in reproductive health for those most in need, directly harming the

_____
[1] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714 (Mar. 4, 2019) (codified at 42 C.F.R. pt. 59).

health of women served by Title X programs.  The Rule is already wreaking havoc on reproductive health care across the country, and it has entirely dismantled the Title X infrastructure in the state of Maine.

2.      For nearly half a century, Title X has been the only federal program dedicated to providing family planning services in the United States, with remarkable success.  Services provided by Title X grantees have substantially improved the health and well-being of women around the country, particularly underserved populations.

3.      Prior to the Rule, the Title X family planning program provided reproductive health care services to approximately four million low-income, uninsured, and underserved individuals across the country, over 60% of whom were using the program as their usual source of health care.  In Maine, where Plaintiff Maine Family Planning had been the sole Title X grantee in the state for the last forty-eight years, Title X clinics served nearly 24,000 patients in 2018. Title X clinics have been critical in Maine, in part because it is one of the most rural states in the country.  Among other factors, poverty, lack of health insurance, and unpredictable travel conditions make accessing health care in the state especially challenging for many Mainers.

4.      The statute creating the Title X program provides that Title X funding cannot be used "in programs where abortion is a method of family planning."  In compliance with this statute and as confirmed by regular audits and site visits, Plaintiff Maine Family Planning has, without issue, always scrupulously complied with longstanding HHS regulations, which ensured that Title X funds were kept apart from separate provision of abortion services.  Upon information and belief, other Title X grantees nationwide have similarly complied with these Title X regulations.

5.      Nonetheless, asserting without basis that these longstanding regulations are now somehow inadequate to address *potential* compliance issues and to prevent the possibility of *hypothetical* patient confusion, the Rule radically changes the Title X program with no regard for the widespread harms it *actually* causes, including by imposing two new restrictions that particularly impact Plaintiffs and their patients.

6.      *First*, the Rule includes a "Gag Rule" that singles out abortion from all other health care topics by, among other things, prohibiting health professionals from providing their patients with abortion referral information even if patients directly request it.  At the same time, the Rule mandates that the patient be referred for prenatal services, regardless of whether such a referral is wanted or appropriate.  In Maine, where patients frequently have nowhere else to go for reproductive health care, and where many women are misinformed about or unaware of their abortion options, the Gag Rule burdens access to abortion by confusing and delaying patients seeking such care.  Decades of Supreme Court precedent, strengthened and reaffirmed as recently as last year, prohibit the government from meddling in the provider-patient relationship in this way.  Indeed, the First Amendment's free speech protections are at their zenith when the government seeks to control the form and content of individuals' protected speech.  Likewise, the Affordable Care Act specifically protects the rights of health care professionals and patients to unfettered communication regarding patients' medical options.

7.      To provide just one example that demonstrates the absurdity of how the Gag Rule operates, while a patient is in the middle of an appointment or consultation with a trusted medical provider, perhaps while the patient is partially disrobed or in the middle of being examined in some way, the Rule would require that provider to rebuff that patient's questions about where to obtain an abortion, by refusing to answer.  Still worse, even if that patient makes clear her

decision to have an abortion, the provider is then required to provide, instead of a referral for the care she actually needs, a government-mandated referral for prenatal care.

8.    *Second*, the Rule requires that all abortion services be physically separated from clinics that also provide Title X services (the "Separation Requirements"), regardless of the fact that Title X funds are not now and never have been used to provide abortion at those sites.  This requirement specifically targets Title X providers, like Maine Family Planning, that have been providing Title X services and abortion at the same location for decades.  Since the inception of the Title X program, these providers have been able to share facilities among their abortion and family planning practices so long as costs are pro-rated and properly allocated.  Maine Family Planning and other such providers have employed this structure and built their practices around the program's requirements without issue.  But the Rule now mandates that abortion services be cut off from other reproductive health services, in contravention of decades-old care-delivery models and good medical practice, and without any acknowledgment that it is functionally impossible for many providers to meet these requirements.

9.    Defendants, who portray the Rule in part as a mere administrative effort to avoid *potential*, *hypothetical* confusion or commingling, utterly failed to acknowledge the significant negative impacts the Rule was predicted to have and is now having on the Title X program, on family planning patients, and on patients seeking abortion services.  By contrast, any purported "need" for these restrictions is contravened by the Title X program's 48-year record of overwhelming success in its current form, and by the dearth of real-world evidence of patient confusion, provider noncompliance, or violations of Congressional intent.

10.    The Rule is devastating to family planning services because it forces health care providers either to curtail their family planning services or to leave the Title X program

altogether.  For some clinics, like Maine Family Planning, it has proven impossible to stay in the Title X program and fulfill their missions to offer comprehensive and quality reproductive health care.  And for many clinics, including Maine Family Planning, it is simply financially or physically infeasible for them to separate their established practices in the burdensome manner contemplated by the Rule.

11.     To date, Maine Family Planning has been forced to leave the program, leaving the state of Maine with no Title X provider at all. Five other states (Hawaii, Oregon, Utah, Vermont, and Washington) also now have *no* clinics using Title X funding, and six more have lost the majority of their Title X clinics.[2]  Even more clinics are likely to leave the program going forward, including when the Separation Requirements go into effect on March 4, 2020.  With so many providers forced out of the program, and others likely to exit the program in the coming months, women across the country will lose access to subsidized family planning services.  For many women in underserved communities, this would be a loss of their sole health care provider.

12.     For Maine Family Planning, remaining in the Title X program proved untenable under the Rule, notwithstanding the fact that Title X funds had comprised a substantial and material portion of its annual budget.  Implementing the Rule would have eliminated 85% of the abortion clinics in the state, and there is no evidence that other, non-Title X providers would step into the resulting void.  These closures would impose enormous burdens on women who currently seek abortion services at these clinics, including onerous and potentially prohibitive increases in driving distances to receive care.

---

[2] Kaiser Family Foundation, The Status of Participation in the Title X Federal Family Planning Program (Oct. 9, 2019), https://www.kff.org/interactive/the-status-of-participation-in-the-title-x-federal-family-planning-program/.

13.     At the same time, compliance with the Gag Rule in the context of providing family planning services would prevent Maine Family Planning and its health care providers from fulfilling their ethical duties to their patients by forcing them to mislead patients and withold necessary information.

14.     By imposing barriers to health care access, and by forcing health care providers to give their patients misleading information about pregnancy options, the Rule violates multiple federal statutes.

15.     And the Rule's attempt to withhold federal funds based on protected activity performed outside the program and without Title X funds is precisely the type of coercive government conduct forbidden by the United States Constitution.

16.     Maine Family Planning was forced out of the Title X program upon the Rule going into effect, and had to rely on its limited reserves while scrambling to raise funds to make up for the resulting loss.  While private donors and foundations have stepped in to help Maine Family Planning keep clinics open in the near term, such funding will not permanently fill the vast gap created by the Rule's unlawful changes to the Title X program.

17.     Going forward, without Title X funds or an equivalent influx of money from elsewhere, Maine Family Planning will soon be forced to cut back on a significant portion of its services, including closing clinics, downsizing staff, and eliminating some family planning services altogether.  In addition, Maine Family Planning may need to end its provision of subsidized family planning services through many of its subgrantee sites.  The result of such dramatic reductions in health care services and options would be devastating to Maine Family Planning's patients and to the people of Maine.

18.     For these reasons and others described below, the Rule violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(C), and the First and Fifth Amendments to the United States Constitution.  The Court should invalidate and vacate the Rule.

## PARTIES

19.     Plaintiff Maine Family Planning is a non-profit corporation incorporated in Maine with its principal place of business in Augusta.  Maine Family Planning served as the sole statewide Title X grantee for the State of Maine's family planning program for forty-eight years, until it was forced to leave the Title X program on August 23, 2019 as a result of the Rule.  Prior to being forced out of the program, Maine Family Planning was the recipient of a three-year Title X grant that began on April 1, 2019.

20.     Since its founding, Maine Family Planning has worked to ensure that all Mainers have access to high-quality, affordable reproductive health care and comprehensive sexual health education so that they can control their reproductive lives.  To carry out this mission, Maine Family Planning directly operates eighteen family planning centers throughout Maine and provides funding through subcontracts to thirty-two additional sites.  Plaintiff Maine Family Planning sues on its own behalf and on behalf of its staff and patients.

21.     Maine Family Planning provides a range of health care services at its sites, including annual gynecological exams; screening for cervical and breast cancer; family planning counseling; contraceptive services; pregnancy testing and counseling regarding pregnancy options (including continuing the pregnancy and parenting, making a plan for adoption or foster care, or ending the pregnancy with an abortion); abortion care; miscarriage care; referrals for adoption; prenatal consultation; colposcopy; endometrial and vulvar biopsy; screening, diagnosis, and

treatment of urinary, vaginal, and sexually transmitted infections; hormone therapy and other services for transgender clients; and services for mid-life women.[3]

22.     Maine Family Planning has, since 1997, provided first trimester abortion care, which has always been made available without using any federal resources.

23.     Plaintiff J. Doe, DO, MPH, is a physician and doctor of osteopathy, licensed in family medicine and with experience in women's health.  Plaintiff Doe is one of seven physicians providing abortion services at Maine Family Planning.  Dr. Doe provides abortion care through a Maine Family Planning clinic and medication abortion via telemedicine.  Plaintiff Doe sues individually and on behalf of all patients.

24.     Defendant the United States Department of Health and Human Services ("HHS") is an executive agency of the United States that is responsible for issuing and enforcing the Rule.

25.     Defendant Alex M. Azar II is the Secretary of Health and Human Services and is sued in his official capacity.  He is responsible for the operation and management of HHS.

26.     Defendant Office of Population Affairs ("OPA") is the office within HHS that administers the Title X program and serves as the focal point to advise the Secretary and Assistant Secretary of HHS on reproductive health topics, including the Title X program and family planning.

27.     Defendant Diane Foley, M.D., is the Deputy Assistant Secretary for OPA.  She is sued in her official capacity.  She is responsible for the operation and management of OPA.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361, as this action

---

[3] Maine Family Planning provides additional services at a few of its sites in response to clear community need: comprehensive primary care services at its Ellsworth site; a Women, Infants and Children nutrition program for Hancock and Washington Counties; and a home visiting program for new parents in Hancock County.

arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 702, and Federal Rules of Civil Procedure 57 and 65.

29.     Venue is proper in this district under 28 U.S.C. § 1391(e).  Maine Family Planning is located in this judicial district, and a substantial part of the events, actions, or omissions giving rise to these claims are occurring in this judicial district.  Defendants are a United States agency, an office of that agency, and United States officials sued in their official capacities.

## FACTUAL BACKGROUND

### A. Title X Family Planning Program

#### a)  Enactment and Scope of Title X Family Planning Services

30.     In 1970, Congress enacted Title X of the Public Health Service Act ("Title X" or the "Act"), 84 Statute 1506, as amended 42 U.S.C. §§ 300 to 300a-6, which provides federal funding for family planning services.  Title X was passed with broad bipartisan support and has enjoyed broad bipartisan support for decades.

31.     Title X was enacted to address the growing disparity in unintended childbearing between low-income individuals and those with the resources to access contraception.  Thus, the core of Title X's mission is the expansion of access to reproductive health care services to low-income individuals, including communities of color, immigrants, and rural residents who may otherwise lack access to family planning services and related preventive care.[4]

32.     Title X is the only federal program solely dedicated to providing family planning services in the United States.  Although other federal programs, such as Medicaid, also provide family planning funding through reimbursement for clinical services provided to individual,

---

[4] Pub. L. No. 91–572 §2, 84 Stat. 1506 (1970); 42 U.S.C. §300(a) (2012).

insured patients, Title X funding is a critical portion of a publicly-funded family planning center's fiscal portfolio because it can be used to cover costs not covered by more restricted funds—for example, the costs of purchasing contraceptives (including expensive but highly effective methods of long-acting reversible contraception ("LARC") like intrauterine devices ("IUDs")), training staff, and building infrastructure. Title X funds also are used to pay for a wide variety of family planning services and the infrastructure that makes delivery of such services possible, including, but not limited to, gynecological examinations and basic lab tests; screening services for sexually transmitted infections and cancer; contraceptive information and services; pregnancy testing; and community outreach.

33.     Title X funds may not be used to pay for abortion services.[5]  That restriction, which is set forth in Section 1008 of Title X, was intended to ensure that Title X funds would "be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities."[6]  But, Section 1008 was never intended to interfere with *communications* concerning abortion between Title X providers and their patients—a distinction that Congress and HHS have repeatedly made clear.  Since the inception of the Title X program, providers have been allowed to offer Title X family planning services and abortion care at the same site, so long as costs are pro-rated and properly allocated. And, since July 2000, federal regulations have expressly permitted colocation of Title X family planning services and abortion care subject to those same conditions.[7]

34.     Title X is a competitive grant program, meaning that eligible entities must apply to

---

[5] 42 U.S.C. § 300a-6.

[6] H.R. Rep. No. 91-1667, at 8 (1970).

[7] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270 (July 3, 2000).

OPA to be awarded funds.  The Act authorizes the Secretary to make grants to "assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."[8]  Prior to the Rule taking effect, state, county, and local health departments made up roughly half of the cohort of Title X grantees, with hospitals, family planning councils, Planned Parenthood health centers, federally qualified health centers ("FQHCs"), and other private non-profit organizations making up the rest of the network.  Plaintiff Maine Family Planning was a private not-for-profit family planning council grantee.

35.     Title X programs are not funded exclusively by Title X; by law, they cannot be.[9] In 2018, Title X funding itself accounted nationwide for 19% of Title X project revenue, with the remainder coming from fees for service and other government grants.[10]

36.     Title X grantees are subject to regular and extensive compliance review by HHS. Indeed, OPA itself has touted its thorough and comprehensive oversight of the program. According to OPA, "family planning projects that receive Title X funds are closely monitored to ensure that federal funds are used appropriately and that funds are not used for prohibited activities such as abortion."[11]  As identified by HHS, there are several "safeguards" in place to ensure abortion activities are kept "separate and distinct" from Title X programs, including:

> (1) careful review of grant applications to ensure that the applicant
> understands the requirements and has the capacity to comply with

---

[8] 42 U.S.C. § 300(a).

[9] 42 C.F.R. §59.7(c) (2018).

[10] OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2018 NATIONAL SUMMARY 53 (Aug. 2019) [hereinafter 2018 FPAR], https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2018-national-summary.pdf.

[11] ANGELA NAPILI, CONG. RESEARCH SERV., TITLE X (PUBLIC HEALTH SERVICE ACT) FAMILY PLANNING PROGRAM 22 (Aug. 31, 2017) [hereinafter 2017 CRS REPORT], https://fas.org/sgp/crs/misc/RL33644.pdf; ANGELA NAPILI, CONG. RESEARCH SERV., TITLE X (PUBLIC HEALTH SERVICE ACT) FAMILY PLANNING PROGRAM 16 (Apr. 27, 2018) [hereinafter 2018 CRS REPORT], https://fas.org/sgp/crs/misc/R45181.pdf.

all requirements; (2) independent financial audits to examine
whether there is a system to account for program-funded activities
and nonallowable program activities; (3) yearly comprehensive
reviews of the grantees' financial status and budget report; and (4)
periodic and comprehensive program reviews and site visits by
OPA regional offices.[12]

Grantees also are responsible for monitoring their sub-recipients' financial compliance on an

ongoing basis and must get pre-approval from OPA for any changes in the scope of their Title X

project or new sub-recipient contracting relationships.

**b)  Success of the Title X Program**

37.     The Centers for Disease Control and Prevention ("CDC") has hailed Title X as one

of the greatest public health achievements of the 20th century.[13]  Prior to the Rule taking effect,

the program was serving nearly four million low-income, uninsured, and underserved individuals

at 3,954 sites across the country.[14]  The Title X program has been a critical source of care for

these groups: for the past 15 years, roughly two-thirds of Title X patients had incomes at or below

the poverty level.[15]  And in 2018, 89% of patients qualified for either subsidized or no-charge

services.[16]  As of 2016, 60% of women receiving Title X services reported that a Title X–funded

health center was their usual source of medical care, and 40% reported that a Title X–funded

health center was their only source of health care.[17]

---

[12] *Id.*

[13] *See* CDC, *Achievements in Public Health, 1990–1999: Family Planning*, 48 MORBIDITY & MORTALITY WKLY. REP. 1073, 1073 (1999).

[14] 2018 FPAR, *supra* note 10, at ES-1.

[15] 2018 FPAR, *supra* note 10, at ES-2; OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2003 SUMMARY 22 (Aug. 2004) [hereinafter 2003 FPAR], https://www.hhs.gov/opa/sites/default/files/fpar-2003-national-summary-part-1.pdf.

[16] 2018 FPAR, *supra* note 10, at 21.

[17] Megan L. Kavanaugh et al., *Use of Health Insurance Among Clients Seeking Contraceptive Services at Title X–Funded Facilities in 2016*, 50 PERSP. ON SEXUAL & REPROD. HEALTH 101, 105 (2018).

38.     Title X also has served an increasingly diverse population.  Between 1997 and 2018, the number of patients who identified as white dropped from 67% to 53%.[18]  Patients identifying as Latino or Hispanic have increased in the past 15 years from 22% to 33%, and African American or Black users continued to account for 21-22% of Title X patients.[19]

39.     In particular, publicly-funded family planning clinics have been critically important resources for the 24% of U.S. residents living in rural areas, including nineteen million women.  Rural areas already experience a significant shortage of reproductive health providers.

40.     Title X has prevented millions of unintended pregnancies.  One study estimated that in 2015 (the most recent year for which these numbers are available), the contraceptive care provided by Title X providers helped prevent more than 820,000 unintended pregnancies, over 270,000 of which likely would have ended in abortion.[20]  In the absence of this reduction, the U.S. unintended pregnancy rate would have been 31% higher and the unintended pregnancy rate among teens would have been 44% higher.[21]

41.     Title X also helps health care providers carry out broader public health mandates.  For example, in 2018, Title X funds helped provide over six million sexually transmitted infection ("STI") tests (including 1,200,000 HIV tests), over 600,000 Pap tests, and over 800,000 clinical

---

[18] 2003 FPAR, *supra note* 15, at 14; 2018 FPAR, *supra* note 10, at 12.

[19] 2003 FPAR, *supra note* 15, at 14; 2018 FPAR, *supra* note 10, at ES-2, 12.  Title X patients are disproportionately Black and Hispanic or Latino compared to the U.S. population as a whole.  *See, e.g.*, NAT'L FAMILY PLANNING & REPROD. HEALTH ASS'N, TITLE X: AN INTRODUCTION TO THE NATION'S FAMILY PLANNING PROGRAM (Nov. 2017), https://www.nationalfamilyplanning.org/file/Title-X-101-November-2017-final.pdf; C.I. Fowler et al., OFFICE OF POPULATION AFFAIRS, FAMILY PLANNING ANNUAL REPORT: 2016 NATIONAL SUMMARY (Aug. 2017), https://www.hhs.gov/opa/sites/default/files/title-x-fpar-2016-national.pdf.

[20] JENNIFER J. FROST ET AL., GUTTMACHER INST., PUBLICLY FUNDED CONTRACEPTIVE SERVICES AT U.S. CLINICS, 2015 (Apr. 2017), https://www.guttmacher.org/report/publicly-funded-contraceptive-services-us-clinics-2015.

[21] *Id.*

breast exams.[22]

42.     Moreover, many Title X providers that were in the program for decades have developed particular expertise in treating this patient population.  Studies show that women prefer to get reproductive health and family planning care from medical professionals who specialize in family planning, even if they have other available primary care options.[23]

43.     A recent study published by HHS administrators showed that Title X providers have been more likely than non-Title X providers to provide reproductive health care that is consistent with current, evidence-based clinical guidelines, such as offering the most effective contraceptive methods on-site.[24]

44.     As the benefits of comprehensive reproductive health have become increasingly recognized, family planning and abortion services have accordingly grown more likely to be provided at the same site.  HHS has also supported this evidence-based trend toward comprehensive reproductive healthcare by *expressly* permitting colocation of these services at Title X-funded clinics since 2000.[25]  Prior to the Rule taking effect, an estimated one in ten Title X clinic sites offered abortion services using non-federal funds.[26]

---

[22] 2018 FPAR, *supra* note 10, at ES2-3, 43-44.

[23] Jennifer J. Frost et al., *Specialized Family Planning Cinics in the United States: Why Women Choose Them and Their Role in Meeting Women's Health Care Needs*, 22 WOMEN'S HEALTH ISSUES 519, 523 (2012).

[24] Marion W. Carter et al., *Four Aspects of the Scope and Quality of Family Planning Services in US Publicly Funded Health Centers: Results from a Survey of Health Center Administrators*, 94 CONTRACEPTION J. 340 (2016); Heike Thiel de Bocanegra et al., *Onsite Provision of Specialized Contraceptive Services: Does Title X Funding Enhance Access?*, 23 J. WOMEN'S HEALTH 428 (2014).

[25] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270 (July 3, 2000).

[26] ANGELA NAPILI, CONG. RESEARCH SERV., FAMILY PLANNING PROGRAM UNDER TITLE X OF THE PUBLIC HEALTH SERVICE ACT 14 (Oct. 15, 2018), https://fas.org/sgp/crs/misc/R45181.pdf; *see also A Domestic Gag Rule and More: The Administration's Proposed Changes to Title X*, GUTTMACHER INST. (June 18 2018), https://www.guttmacher.org/article/2018/06/domestic-gag-rule-and-more-administrations-proposed-changes-title-x.

**c)** <u>**History of Title X Regulations Relating to Abortion**</u>

45.     Prior to 1988, the regulations that governed Title X allowed Title X projects to share facilities with abortion providers, and HHS's Family Planning Guidelines and other policy documents prior to 1988 all consistently required Title X providers to offer "nondirective" options counseling to pregnant women and referrals for abortion services upon request.[27]  "Nondirective counseling" is commonly understood in medicine to mean patient-directed counseling that presents neutral and unbiased information regarding all options relevant to the patient and consistent with the patient's expressed wishes to hear the information, including in the context of pregancy, prenatal care, adoption, and/or abortion.[28]

---

[27] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. at 41,272-73.

[28] As discussed *infra*, the preamble to the Rule provides a different, vague definition for "nondirective counseling" that appears to contemplate counseling directing the patient toward prenatal care even in cases where a patient only requests and/or needs information about abortion:

> Nondirective pregnancy counseling is the meaningful presentation of options where the physician or advanced practice provider (APP) is "not suggesting or advising one option over another." . . . Nondirective counseling does not mean that the counselor is uninvolved in the process or that counseling and education offer no guidance, but instead that clients take an active role in processing their experiences and identifying the direction of the interaction.  In nondirective counseling, the Title X physicians and APPs promote the client's self-awareness and empower the client to be informed about a range of options, consistent with the client's expressed need and with the statutory and regulatory requirements governing the Title X program.  In addition, the Title X provider may provide a list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care), some (but not the majority) of which may provide abortion in addition to comprehensive primary care.

Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. 7,714, 7,716 (Mar. 4, 2019) (to be codified at 42 C.F.R. pt. 59) (citations omitted).  By contrast, the regulations for the program promulgated in 2000 identified the directive nature of such care:

> If projects were to counsel on an option even where a client indicated that she did not want to consider that option, there would be a real question as to whether the counseling was truly nondirective or whether the client was being steered to choose a particular option.  We note that under the ''on request'' policy a Title X grantee is not prohibited from offering to a pregnant client information and counseling on all options for pregnancy management, including pregnancy termination; indeed, such an offer is required under § 59.5(a)(5) below.  However, if the client indicates that she does not want information and counseling on any particular option, that decision must be respected.

Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. at 41,273.

46.    In 1988, HHS issued a rule ("the 1988 Rule") setting out a new standard of compliance for family planning projects under Title X.[29]  For the first time in the program's history, the 1988 Rule prohibited Title X recipients who perform, refer for, or counsel on abortion care from receiving federal family planning funds, a specific provision often referred to as the "1988 gag rule."  The 1988 Rule also required for the first time physical and financial separation of Title X services from abortion services, as well as physical and financial separation of any ancillary activities connected to abortion.  The 1988 Rule did not restrict prenatal or adoption counseling and referral.  To the contrary, the 1988 Rule stated "that pregnant women must be referred to appropriate prenatal care services."[30]

47.    The 1988 Rule was challenged by recipients of Title X funding in several district courts, which granted preliminary injunctions.  Two district courts granted permanent injunctions, which were affirmed by the First and Tenth Circuit Courts of Appeals.  The Second Circuit upheld the regulations, and that decision ultimately reached the United States Supreme Court in *Rust v. Sullivan*.[31]  The *Rust* Court held that the 1988 Rule was lawful.

48.    In November 1991, in response to the ongoing outcry from the medical community, President George H.W. Bush directed HHS to implement the 1988 Rule in a manner that would permit counseling on abortion.  Because the guidelines then issued by HHS permitted physicians, but not nurse practitioners, to counsel on abortion services, they were challenged again.  Ultimately, in November 1992, the D.C. Circuit upheld an injunction preventing the

---

[29] Statutory Prohibition on Use of Appropriated Funds In Programs Where Abortion Is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects, 53 Fed. Reg. 2,922 (Feb. 2, 1988).

[30] 53 Fed. Reg. at 2,925 (emphasis added).

[31] 500 U.S. 173 (1991).

guidelines from being enforced for failure to follow notice-and-comment requirements.[32]

49.      In September 1992, Congress passed a bill to explicitly allow for abortion counseling within Title X (the "Family Planning Amendments Act").[33]  The bill would have required counseling and referral on all pregnancy options, including prenatal care and delivery, infant care, foster care, adoption, and abortion.[34]

50.      In discussing the Family Planning Amendments Act, members of Congress were clear that they intended to overrule the 1988 gag rule and thus ensure that abortion counseling and referral were permitted.  Representative Waxman called the 1988 gag rule "bad medicine, bad law, and bad precedent."[35]  Others cautioned that "without [eliminating the gag rule] we will take another step toward two-tier health care in America.  Already the gap in health care is widening between the haves and have nots.  [If the gag rule remains in place] the gap will get wider."[36] "Every woman in America, regardless of income, is entitled to receive all the information about her pregnancy options."[37]  Others recognized that overriding the gag rule was necessary to "retain the credibility of medical professionals,"[38] emphasizing that "quality patient care [would] be severely impaired"[39] if the gag rule remained in place.  And according to Representative Roukema, "constraints on what a physician can say to a patient can only result in serious medical

---

[32] *Nat'l Family Planning and Reprod. Health Assoc. v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992).

[33] *See* Family Planning Amendments Act of 1992, S. 323, 102nd Cong. (1992).

[34] *See* 138 CONG. REC. 9,862 (1992).

[35] *Id.* at 9,859 (statement of Rep. Waxman).

[36] *Id.* at 9,860 (statement of Rep. Wyden).

[37] *Id.* at 9,859 (statement of Rep. Richardson).

[38] *Id.* at 9,863 (statement of Rep. McDermott).

[39] *Id.* at 9,864 (statement of Rep. Lowey).

implications for the patient."[40]  Representative AuCoin called the gag rule "institutionalized

medical malpractice."[41]  Even more bluntly, Representative Atkins concluded, "Madam

Chairman, the gag rule is monumentally stupid."[42]

51.     To ensure that the intent of Congress was absolutely clear, Representative Studds

unequivocally stated: "*When we created the title X program 20 years ago, we did not intend to

muzzle health care providers.*  But we didn't say that loudly and clearly enough. But this time, let

there be no mistake.  Title X providers must be able to inform individuals of all pregnancy

management options and we must write this explicitly into law."[43]

52.     Notwithstanding Congress's clear demand that the gag rule be lifted, President

George H.W. Bush vetoed the Family Planning Amendments Act, and Congress was unable to

override the veto.

53.     On January 20, 1993, Bill Clinton was sworn in as President.  Two days later, on

January 22, 1993, he suspended the 1988 Rule by presidential memorandum, directing HHS to

promulgate new rules.  The 1988 Rule was never implemented on a nationwide basis.

54.     In 1995, Congress rejected an appropriations bill seeking to defund the Title X

program[44] and instead voted in favor of a competing appropriations amendment that restored Title

X funding and further clarified that nondirective counseling by Title X providers does not

---

[40] *Id.* at 9,864 (statement of Rep. Roukema).

[41] *Id.* at 9,867 (statement of Rep. AuCoin).

[42] *Id.* at 9,873 (statement of Rep. Atkins).

[43] *Id.* at 9,872 (statement of Rep. Studds) (emphasis added).

[44] *See* Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 1996, H.R. 2127, 104th Cong. (1996).

constitute "funding abortion."[45]  Since 1996, Congress has continued to pass this nondirective

counseling mandate—which expressly requires that "all pregnancy counseling shall be

nondirective"—annually as part of Title X appropriations, including in the current appropriations

Act (the "Nondirective Counseling Mandate").[46]

55.     On July 3, 2000, HHS issued new Title X rules (the "2000 Rules") and

accompanying clarification.[47]  The 2000 Rules officially revoked the 1988 Rule and clarified that

the co-location of Title X family planning services and abortion care is consistent with Title X, so

long as costs are pro-rated and properly allocated.[48]  The 2000 Rules also clarified that the

provision by Title X providers of information about abortion services to their patients, including

the names, addresses, telephone numbers, and other relevant factual information about abortion

providers does not "promote or encourage abortion," and therefore is permissible.[49]

56.     The 2000 Rules also include a *requirement* that Title X recipients offer patients the

option to receive nondirective counseling on prenatal care, abortion, and adoption.  Notably, this

aspect of the 2000 Rules aligns with Congress's Nondirective Counseling Mandate.

57.     In addition, OPA has regularly set forth clinical standards for the Title X Program

confirming that the 2000 Rules and the Nondirective Counseling Mandate are consistent with

well-settled and evidence-based standards for high-quality provision of family planning services.

---

[45] Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. 104–134, 110 Stat. 1321 (1996); H.R. Rep. No. 104-537 (1996) (Conf. Rep.) ("[A]ll pregnancy counseling shall be nondirective . . . .").

[46] *See* Consolidated Appropriations Act, 2018, at 369, Pub. L. 115–141, 132 Stat. 348 (2018) (requiring "that all pregnancy counseling shall be nondirective"); Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070–71 (requiring that "all pregnancy counseling shall be nondirective").

[47] *See* Standards of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270.

[48] *Id.* at 41,281–82.

[49] *Id.* at 41,281.

OPA requires Title X grantees to follow the federal Quality Family Planning Guidelines issued by the CDC.[50]  According to those guidelines, upon a positive pregnancy test, "[r]eferral to appropriate providers of follow-up care should be made *at the request of the client*, as needed," and "[e]very effort should be made to expedite and follow through on *all* referrals."[51]  The Quality Family Planning Guidelines are not limited to referrals for prenatal care and clearly encompass referrals for termination of pregnancy.

58.     The interpretation of Title X in the Nondirective Counseling Mandate, the 2000 Rules, and the Quality Family Planning Guidelines was further reinforced by Congress in 2010, when Congress passed the Patient Protection and Affordable Care Act ("ACA").[52]  Section 1554 of the ACA is titled "Access to Therapies" and explicitly prevents HHS from enacting regulations that create unreasonable barriers to obtaining medical care and that bar health care providers from making full and fair disclosures of treatment options to their patients.

59.     Section 1554 reads:

> Notwithstanding any other provision of this Act, the Secretary of Health and Human Services shall not promulgate any regulation that— (1) creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care; (2) impedes timely access to health care services; (3) interferes with communications regarding a full range of treatment options between the patient and the provider; (4) restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions; (5) violates the principles of informed consent and the ethical standards of health care

---

[50] CDC, *Providing Quality Family Planning Services: Recommendations of CDC and the U.S. Office of Population Affairs*, 63 MORBIDITY & MORTALITY WKLY. REP. RECOMMENDATIONS & REP., Apr. 25, 2014, at 1, https://www.cdc.gov/mmwr/preview/mmwrhtml/rr6304a1.htm?s_cid=rr6304a1_w.  These standards are incorporated into OPA's Title X program guidance, also published in 2014.  OFFICE OF POPULATION AFFAIRS, PROGRAM REQUIREMENTS FOR TITLE X FUNDED FAMILY PLANNING PROJECTS (Apr. 2014), https://www.hhs.gov/opa/sites/default/files/Title-X-2014-Program-Requirements.pdf.

[51] CDC, *Providing Quality Family Planning Services*, *supra* note 50, at 14 (emphasis added).

[52] Pub. L. 111–148, 124 Stat. 119 (2010) (codified as amended in scattered sections of 42 U.S.C.)

professionals; or (6) limits the availability of health care treatment for the full duration of a patient's medical needs.[53]

## B. HHS's New Separation and Gag Rule

### a) <u>Proposal and Review of New Rule</u>

60.    On May 22, 2018, HHS released a notice of proposed rulemaking ("Proposed Rule") that would rescind the longstanding 2000 Rules.  The Proposed Rule would severely limit, and in many circumstances ban, Title X recipients from providing their patients with necessary referral and counseling for abortion services.  The Proposed Rule also would require strict physical and financial separation between abortion services and Title X services.

61.    HHS received over 500,000 comments in response to the Proposed Rule.

62.    Most major medical associations, including the American Medical Association,[54] the American College of Obstetricians and Gynecologists,[55] the American College of Physicians,[56] the American Academy of Family Physicians,[57] the American Academy of Nursing,[58] and the American Academy of Pediatrics,[59] submitted comments publicly opposing the Proposed Rule.

---

[53] 42 U.S.C. § 18114 (2012).

[54] Letter from James L. Madara, CEO & Exec. Vice President, Am. Med. Ass'n, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-179739.

[55] Letter from Lisa M. Hollier, President, Am. Coll. of Obstetricians & Gynecologists, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-179339.

[56] Letter from Ana María López, President, Am. Coll. of Physicians, to Alex Azar, Sec'y , U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-184400.

[57] Letter from John Meigs, Jr., Bd. Chair, Am. Acad. of Family Physicians, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-102966.

[58] Letter from Karen S. Cox, President, Am. Acad. of Nursing, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 26, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624.

[59] Letter from Colleen A. Kraft, President, Am. Acad. of Pediatrics, and Deborah Christie, President, Soc'y for Adolescent Health & Med., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-181588.

63.     The organizations opposed the Proposed Rule for numerous reasons, including because it would interfere with the relationship between patients and their health care providers, threaten patient confidentiality, undermine patients' access to evidence-based family planning methods, exclude providers that separately offer abortion services from receiving Title X funds, and restrict patients' access to care.

64.     Numerous members of the U.S. Senate[60] and House of Representatives,[61] as well as several states,[62] spoke out against the Proposed Rule, citing the detrimental effects the proposed changes would have on the Title X program.  In total, nearly 200 legislators submitted comments opposing the Proposed Rule.

65.     Major Title X providers, including Planned Parenthood,[63] and policy and research organizations such as the Guttmacher Institute,[64] the American Civil Liberties Union,[65] and the

---

[60] Letter from 25 U.S. Senators to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-107356.

[61] Letter from 173 Members of the House of Representatives, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-184863.

[62] *See, e.g.*, Letter from 14 Democratic Governors, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (May 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-204415; Letter from Andrew M. Cuomo, Governor, State of N. Y., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 30, 2018) [hereinafter "N.Y. Letter"], https://www.regulations.gov/document?D=HHS-OS-2018-0008-155772; Letter from Jay Inslee, Governor, State of Wash., to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-190685; Letter from Bruce S. Anderson, Dir. of Health, State of Haw. Dep't of Health, to Diane Foley, Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-185729.

[63] *See, e.g.*, Letter from Dana Singiser, Vice President of Pub. Policy & Gov't Relations, Planned Parenthood Action Fund, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018) [hereinafter "PPAF Letter"], https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841.

[64] Letter from Rachel Benson Gold, Vice President for Pub. Policy, Guttmacher Inst., to Office of Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018) [hereinafter "Guttmacher Letter"], https://www.regulations.gov/document?D=HHS-OS-2018-0008-178129.

[65] Letter from Faiz Shakir and Georgeanne M. Usova, Am. Civil Liberties Union, Office of Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-190184.

National Family Planning & Reproductive Health Association[66] described the significant negative impacts the Proposed Rule would likely have on patients, particularly members of vulnerable populations, including women of color, LGBTQ+ patients, and victims of intimate partner violence.  These comments—like many others—cited to a myriad of empirical studies, case studies, and other research indicating the dramatically unfavorable outcomes likely to result from the Proposed Rule.  In addition, a number of organizations representing public health professionals[67] and community health centers,[68] along with thousands of individual Americans from across the country[69] submitted comments expressing grave concerns about the Proposed Rule as drafted.

66.     The Proposed Rule received overwhelmingly negative responses from the Maine-based organizations that submitted comments.  Maine chapters of national organizations such as

---

[66] Letter from Clare Coleman, President & CEO, Nat'l Family Planning & Reprod. Health Ass'n, to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-192227.

[67] *E.g.*, Letter from Georges C. Benjamin, Executive Director, Am. Pub. Health Ass'n, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-156243.

[68] *E.g.*, Letter from Tom Van Coverden, President & CEO, Nat'l Ass'n of Cmty. Health Ctrs., to Office of the Assistant Sec'y for Health, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-177172.

[69] Some commenters organized their submissions through organizations such as CREDO Action. *E.g.*, Letter from Nicole Regalado, Campaign Manager, CREDO Action, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (Aug. 6, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-200769 (attaching 51,018 comments from individuals opposing the Proposed Rule).  Many others submitted comments directly, taking the opportunity to express the impact of Title X services on their lives and the harm the Proposed Rule would cause. *See, e.g.*, Letter from Jodi Bolduc to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 25, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-89886 (describing reliance on Maine Family Planning's confidential Title X services as a teenager and visiting with her daughters for a contraceptive visit).

Maine Family Planning,[70] the American Civil Liberties Union of Maine,[71] and the Maine Section of the American College of Obstetricians and Gynecologists,[72] submitted comments describing the disproportionate impact the Proposed Rule would have on residents of this largely rural state.[73]  Organizations local to the state, including Maine Equal Justice Partners,[74] Grandmothers for Reproductive Rights,[75] and the Maine Coalition Against Sexual Assault[76] also articulated their opposition to the Proposed Rule and its significant drawbacks.

67.     On February 22, 2019, HHS posted a draft of the final rule on its website.  The Rule was published in the Federal Register on March 4, 2019.  Notwithstanding the hundreds of thousands of comments submitted to HHS, the Rule is largely identical to the Proposed Rule.

68.     The Rule makes sweeping changes to the requirements for Title X family planning recipients.  Among other things, the Rule severely restricts Title X recipients' ability to provide their patients with abortion referrals and requires strict physical and financial separation of Title X and abortion services.

---

[70] Letter from George A. Hill, President & CEO, Family Planning Ass'n of Me., to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-155939.

[71] Letter from Oamshri Amarasingham, Advocacy Dir., Am. Civil Liberties Union of Me., to Diane Foley, Deputy Assistant Sec'y for Population Affairs, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-180549.

[72] Letter from Danielle M. Salhany, Chair, Me. Section of the Am. Coll. of Obstetricians & Gynecologists, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-183469.

[73] U.S. CENSUS BUREAU, MAINE: 2010 POPULATION AND HOUSING UNIT COUNTS 2 (2010); Press Release, U.S. Census Bureau, Growth in Urban Population Outpaces Rest of Nation (Mar. 26, 2012) (reporting Maine as the nation's most rural state).

[74] Letter from Kathy Kilrain del Rio, Policy Analyst, Me. Equal Justice Partners, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-200662.

[75] Letter from Judy G. Kahrl, PhD, Founder, Grandmothers for Reprod. Rights, to Alex Azar, Sec'y, U.S. Dep't of Health & Human Servs. (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-161182.

[76] Letter from Elizabeth Ward Saxl, Exec. Dir., Me. Coal. Against Sexual Assault, to Alex Azar, Valerie Huber, and Diane Foley, U.S. Dep't of Health & Human Servs. (July 30, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-182456.

69.    Compliance with the physical separation requirement is required within one year of publication of the final rule.  Compliance with the financial separation requirement and changes to the reporting requirements was required within 120 days of publication of the final rule, by July 2, 2019.  The Rule contains conflicting deadlines for compliance with the referral ban: compliance with some portions of the regulation that bear on the referral ban was required within 120 days of publication of the final rule, by July 2, 2019, while compliance with other portions was required within 60 days, by May 3, 2019.  All other requirements were to have been met within 60 days following publication of the final rule, by May 3, 2019.  Currently, all provisions of the Rule are in effect except for the physicial separation requirements.

**b)    Referral Prohibition and Directive Counseling Requirements**

70.    The Rule prohibits Title X recipients from providing their patients with necessary referrals for abortion care, even for patients who specifically request such a referral.

71.    In a section of the Rule captioned "Prohibition on referral for abortion," the Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion."[77]  Under this provision, even when a pregnant patient explicitly requests a referral for abortion, a health care provider is prohibited from speaking to their patient about their referral options.  The provider cannot even provide a list of the available abortion providers, much less speak to their patient about which abortion provider could meet their particular needs and why.

72.    At most, the Rule allows the medical professional to provide the patient with "a list" of "licensed, qualified, comprehensive primary health care providers (including providers of

---

[77] Compliance With Statutory Program Integrity Requirements, 84 Fed. Reg. at 7,778–89.

prenatal care), some, but not the majority, of which also provide abortion as part of their comprehensive services."[78]  The list thus *may* include abortion providers, but only if those abortion providers also offer comprehensive primary health care services.  Health professionals are prohibited from including on the list any providers who only offer abortion services, even if those are the only abortion providers in the region.  Further, while the list "may" include abortion providers, it does not need to include any, even if a patient explicitly asks for a referral to an abortion provider.[79]

73.     By these terms, the Rule compels Title X providers to withhold the identities of most abortion providers, since most abortion providers do not also offer the full spectrum of primary care.  The Rule further requires providers to withhold medical advice about which abortion providers are most appropriate for their patients' needs and medical circumstances.  In sum, when a patient seeks an abortion referral, the list she can receive *at best* must: (1) include a majority of health care providers who will not offer the patient the care she seeks; and (2) exclude providers who can offer that necessary care because they do not also offer other services that are unnecessary for the patient.

74.     Moreover, even to the extent there may sometimes be an abortion provider on the allowable "list" a patient receives, the list "cannot be used to indirectly refer for abortion or to identify abortion providers to a client,"[80] and the Rule makes explicit that "[n]either the list nor project staff may identify which providers on the list perform abortion."[81]  This means medical professionals cannot even tell their patients that the list is responsive to their request for a referral

---

[78] *Id.* at 7,789.

[79] *Id.*

[80] *Id.* at 7,761.

[81] *Id.* at 7,789.

to an abortion provider at all, much less which provider on the "list" performs abortions or that there are other, more appropriate abortion care options available, even if the patient specifically asks for this information. The patient would be left to locate publicly-available information, much of which is unreliable with respect to abortion,[82] without any guidance from a medical professional, much less one who is familiar with her medical history.

75.    At the same time, the Rule mandates that the staff of Title X recipients are compelled to provide all pregnant patients with directive counseling by giving them a referral for prenatal services. These medical professionals must provide that prenatal referral regardless of whether the patient has requested such a referral, and even if it is against the medical judgment of the health professional to provide that prenatal referral to that particular patient absent any such request.[83] The preamble to the Rule purports to justify this requirement on the incongruous basis that prenatal referrals are "medically necessary for the health of the pregnant mother, as well as the unborn baby."[84] The Rule does not explain why or how prenatal care is "medically necessary" for a woman seeking an abortion.

76.    In addition to mandating directive counseling by requiring referrals for prenatal care and prohibiting referrals for abortion, the Rule also allows further directive options

---

[82] The preamble includes a conclusory, unsupported statement that "[i]information about abortion and abortion providers is widely available and easily accessible, including on the internet," *id.* at 7,746, but Maine Family Planning's experiences with patients demonstrate that this is not the case in Maine. In part, many Maine Family Planning's patients have difficulty accessing the internet.

[83] The Rule also requires Title X providers to "offer either comprehensive primary health services onsite or have a robust referral linkage with primary health providers who are in close physical proximity, to the Title X site, in order to promote holistic health and provide seamless care." *Id.* at 7,788. But, the Rule fails to provide any information about what constitutes "close physical proximity," which would mean something very different in a populous state like New York versus a rural state like Maine. In addition to being so vague as to be unworkable, this requirement is counter to the purposes of the Title X program. On its face, it would mean that a Title X site could be excluded from the program based on the *absence* of nearby health providers—thereby eliminating the only source of health care in a particular location and leaving patients with no "proximate" health care options at all.

[84] *Id.* at 7,728.

counseling for prenatal care and post-conception adoption. The Rule provides that a Title X provider may opt to provide only "[r]eferral to social services or adoption agencies; and/or [i]nformation about maintaining the health of the mother and unborn child during pregnancy."[85] In other words, a Title X provider can selectively inform pregnant patients about only their options for prenatal care and adoption, without providing any information about abortion, including, but not limited to, the availability of abortion and whether it is an option for that patient.

77.      On the other hand, the Rule states that a Title X provider "may also choose to provide" what it defines as "nondirective pregnancy counseling." Such counseling may only be provided by physicians or advanced practice practitioners ("APPs"),[86] and then only if he or she also provides information about at least one other option (prenatal care or adoption) in conjunction with any counseling about abortion.[87] The doctor or APP is required to provide information about prenatal care or adoption, regardless of whether the patient wants or needs that additional information, and even if the patient explicitly asks that it not be provided.

78.      Moreover, notwithstanding the Rule's purported allowance for "nondirective pregnancy counseling" that presents abortion as one of several options, the Gag Rule provides no guidance as to how a physician or an APP can practically provide information about abortion without arguably violating the Gag Rule. The Rule bans any speech that could be interpreted to

---

[85] *Id*. at 7,789.

[86] *Id*. The Rule defines APP to mean "a medical professional who receives at least a graduate level degree in the relevant medical field and maintains a license to diagnose, treat, and counsel patients. The term [APP] includes physician assistants and advanced practice registered nurses." *Id.* at 7,787. This definition both fails to properly reflect the qualifications of individuals licensed as midlevel health care professionals, and does not account for the fact that other health care professionals are qualified and often better situated to provide options counseling to pregnant patients in some circumstances.

[87] *Id*. at 7,747.

"promote" or "support abortion as a method of family planning," as well as any speech during counseling or in connection with the permitted list of "comprehensive primary health care providers" that could be interpreted "as an indirect means of encouraging or promoting abortion as a method of family planning."[88]  The Rule fails to adequately define or explain these terms, and it is entirely unclear how a doctor or APP could explain the availability of abortion to a patient in a manner that would not be interpreted as a violation.

79.    Indeed, the preamble to the Rule even recognizes the vague and overbroad nature of its restrictions, warning that "providers must be careful that nondirective counseling related to abortion does not diverge from providing neutral, nondirective information into encouraging or promoting abortion as a method of family planning, or into referral for abortion as a method of family planning."[89]  It goes on to state that "[t]he Department anticipates that it may provide further guidance to grantees on this issue" without any timeline for delivery of such guidance.[90]

   c)  **Separation Requirements**

80.    In a sharp departure from prior standards, the new Rule requires a strict physical and financial separation of Title X and abortion services.  The Rule gives the Secretary of HHS discretion to determine whether there is a violation of the Separation Requirements based on a "review of facts and circumstances."[91]  The Rule enumerates a non-exclusive list of factors the Secretary must consider as part of the review, including:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared

---

[88] *Id*. at 7,788–89.

[89] *Id.* at 7,746.

[90] *Id.*

[91] *Id.* at 7,789.

> phone numbers, email addresses, educational services, and
> websites) in which prohibited activities occur and the extent of
> such prohibited activities; (c) The existence of separate personnel,
> electronic or paper-based health care records, and workstations;
> and (d) The extent to which signs and other forms of identification
> of the Title X project are present, and signs and material
> referencing or promoting abortion are absent.[92]

81.     This non-exhaustive list leaves Title X recipients with little way of knowing

whether they are in compliance with the Rule.  The preamble also suggests that hospitals and

freestanding clinics will be treated differently under the Rule: for freestanding clinics like Maine

Family Planning, "physical separation might require more circumstances to be taken into account

in order to satisfy a clear separation between Title X services and abortion services."[93]  Grantees

will be forced to go to the far end of the spectrum in order to ensure compliance, lest they expend

substantial resources and still remain at risk.  Or they may have no choice but to forgo offering

abortion services altogether because it is the only way they can be guaranteed to be found in

compliance.  Non-compliance can subject grantees to remedies up to and including forfeiting

funds awarded in the ongoing grant cycle as well as exclusion from future rounds of funding.[94]

### d)  Restrictions on the Use of Title X Funds

82.     The Rule includes new and broader restrictions that directly target the use of Title

X funding for infrastructure building.  Under the Rule, "[g]rantees must use the majority of grant

funds to provide direct services to clients . . . ."[95]  But, without explanation, the Rule defines

---

[92] *Id.*

[93] *Id.* at 7,767.

[94] 45 CFR § 75.371 (2018).

[95] *Id.*

"infrastructure" so broadly as to include "bulk purchasing of contraceptives or other medical supplies," as well as "clinical training for staff"and "community outreach."[96]

83.     The Rule prohibits providers who participate in the Title X program from participating in "activities that encourage, promote or advocate for abortion"[97] by, among other things, requiring physical and financial separation of such activities, including "lobbying for the passage of legislation to increase in any way the availability of abortion as a method of family planning," "using legal action to make abortion available in any way as a method of family planning," and "developing or disseminating in any way materials (including printed matter, audiovisual materials and web-based materials) advocating abortion as a method of family planning," including making brochures for clinics providing abortions available anywhere in the same place where Title X services are provided.[98]

### e)   **Reporting Requirements**

84.     The Rule also imposes new reporting requirements on Title X grantees that are vague and unduly burdensome.  Title X grantees must provide assurance "satisfactory to the Secretary" that it does not provide abortion, that it complies with the Rule's restrictions on referral for abortion, that it maintains physical separation of any abortion services and family planning services, and that it does not conduct any "activities that encourage, promote or advocate for abortion."[99]  The Rule provides no explanation of what would be deemed "satisfactory to the Secretary," stating only that "[s]uch assurance must also include, at a minimum, representations

---

[96] 84 Fed. Reg. at 7,790.

[97] *Id.* at 7,789.

[98] *Id.* at 7,790.

[99] *Id.* at 7,788.

(supported by documentary evidence where the Secretary requests it) as to compliance with . . . each of the requirements."[100]

85.     The Rule also requires Title X grantees to report a "[d]etailed description of the extent of the collaboration with subrecipients, referral agencies, and any individuals providing referral services."[101]

**f)   New Restrictions on Care for Adolescents**

86.     The Rule imposes new requirements on Title X services for adolescents that will erect unnecessary and harmful barriers for minors seeking important reproductive health care. Until now, minors have always been afforded confidential access to Title X services without any program requirement that they obtain consent from a parent or guardian.  Indeed, many minors seek out contraception and other reproductive health services from Title X clinics precisely *because* Title X clinics are the only health care option that promises to maintain their privacy and confidentiality.

87.     Under the Rule, however, a minor can be found financially eligible for subsidized Title X services only if their provider documents "specific actions taken by the provider to encourage the minor to involve her/his family (including her/his parents or guardian) in her/his decision to seek family planning services."[102]  The Rule does not provide any explanation of what constitutes "specific actions" that would be sufficient to meet this requirement, and the only

---

[100] *Id.*

[101] *Id.*

[102] *Id.* at 7,787.

exceptions are when the provider suspects child abuse or incest and has reported the situation to relevant state or local authorities consistent with applicable state law.[103]

88.     Even if minors are able to pay for Title X services out-of-pocket, the provider still must document in their medical record what specific actions were taken to encourage family participation or else the reason why family participation was not encouraged.[104]  The Rule fails to explain the purposes of this requirement, or how the documented information is intended to be used and by whom.

**g)  Defendants' Unreasonable Analysis of the Rule's Costs and Benefits**

89.     Defendants' justification for the Rule failed to assess its true costs, ignored its health consequences, and was based upon unfounded assumptions that the Rule would expand coverage and patient access to services.[105]  Defendants' cost-benefit analysis of the Rule is thus fundamentally deficient.

**a.     Costs and Benefits of the Separation Requirements for Program Participants**

90.     Defendants asserted that the Rule's Separation Requirements are justified in order to protect against "the intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs."[106]  However, Defendants identified no evidence of misuse of funds contrary to Section 1008 in either the Proposed Rule or the Rule,[107] despite the fact that Title X has been in existence for decades and Title X providers are subject to detailed reporting and audit

---

[103] *Id.*

[104] *Id.* at 7,785.

[105] *Id.* at 7,732, 7,741, 7,782.

[106] *Id.* at 7,715.

[107] *Id.* at 7,715, 7,725, 7,764, 7,765, 7,777.

requirements.  Instead, Defendants pointed only to the "potential for confusion"[108] and cited examples of abuse in *other* federal programs[109] as a meager attempt to suggest that there is a need for clarity.

91.     In the face of these unfounded and purely speculative benefits, Defendants also dramatically underestimated the costs of the Separation Requirements, asserting that it will be $36.08 million nationwide, or between $20,000 and $40,000 per site.[110]  Defendants cited no evidence whatsoever to support this dollar figure.  At a minimum, the costs of one-time physical separation *alone* will significantly exceed this amount per site.  Numerous commenters cited evidence to this effect.[111]

92.     Importantly, Defendants also disregarded the costs and impacts of the physical Separation Requirements for patients.  By requiring physical separation of family planning services and abortion, the Rule will disrupt the continuity of care as to patients for whom abortion is part of their comprehensive reproductive health care.  Evidence indicates that continuity is

---

[108] *Id.* at 7,725.

[109] *Id.*  In the notice of proposed rulemaking, HHS pointed to only two examples of potential misuse of funds by Title X grantees or subrecipients.  Compliance With Statutory Program Integrity Requirements, 83 Fed. Reg. 25,502, 25,509–10 (proposed June 1, 2018).  In the Final Rule, HHS argues only generally that "examples of abuse in other Federal programs help illustrate the need for clarity with respect to permissible and impermissible activities in connection with the Title X program and Title X funds."  84 Fed. Reg. at 7,725.  In a footnote, HHS cites to a paper from the Lozier Institute—an arm of the anti-abortion group Susan B. Anthony List—that includes the two examples HHS had cited in the notice of proposed rulemaking, but does not provide any other examples.  *Id.* n.33.

[110] 84 Fed. Reg. at 7,781–82.

[111] *See, e.g.*, Letter from Jodi Tomlonovic, Executive Director, Family Planning Council of Iowa, to Diane Foley, Deputy Assistant Sec'y, U.S. Dep't of Health & Human Servs. 12 (July 31, 2018) ("[I]t typically costs hundreds of thousands, or even millions, of dollars to locate and open any health care facility (and would also cost much more than $10-30,000 to establish even an extremely simple and limited office), staff it, purchase separate workstations, set up record-keeping systems, etc."); N.Y. Dep't of Health Attachment to N.Y. Letter, *supra*, at 18-19 (highlighting hundreds of thousands of dollars in electronic records costs and thousands of dollars annually in duplicative administrative costs); PPAF Letter, *supra*, at 31-32 ("[B]uilding and renovation costs alone would total $1.2 billion in the first year after the regulation is finalized. This comes to an average cost of nearly $625,000 per affected service site.").

valuable and important to providers and patients because it enables improved patient-provider relationships and results in improved clinical outcomes.[112]  Continuity of care reduces unnecessary testing, and potential for miscommunication.  It results in higher rates of preventive care, better record-keeping, and increased patient trust and satisfaction with their health care providers.[113]

**b.      Costs and Benefits of the Gag Rule for Program Participants and Their Patients**

93.      Defendants have identified *no* benefits of the Gag Rule that accrue to patients receiving Title X care.  Instead, Defendants point only to non-quantified, poorly-defined, and unsupported reasons for the Gag Rule, such as "maintaining the integrity of the Title X program."[114]

94.      At the same time, Defendants' conclusion that "the Rule adequately accommodates medical professionals and their ethical obligations"[115] is contrary to the administrative record, which clearly demonstrated that for providers remaining in the Title X program, the Gag Rule unreasonably undermines the patient-provider relationship and results in worse health care for patients.

95.      Under the Rule, many patients will no longer be able to receive comprehensive care from their regular provider.  This is particularly significant in light of two facts.  First, the

---

[112] Vidya Sudhakar-Krishnan & Mary CJ Rudolf, *How Important is Continuity of Care?*, 92 ARCHIVES DISEASES CHILDHOOD 381, 381–82 (2007), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2083711/.; N.Y. Dep't of Health Attachment to N.Y. Letter, *supra*, at 1–2 (highlighting importance of continuity between family planning and post-conception care).

[113] Krishnan & Rudolf, *supra* note 112, at 381–82.

[114] 84 Fed Reg. at 7,724.

[115] *Id.*

majority of women (60%) who use Title X–supported health care centers report that it is their usual source of medical care, and 40% report that it is their only source of medical care.[116]   In rural areas in particular, where there are greater shortages of both primary and specialty care,[117] nonspecialized family planning clinics take on an even greater significance.   And second, many Title X programs are not located at clinics dedicated exclusively to family planning.   For example, 26% of Title X–funded clinics are FQHCs, which by definition are intended to provide primary care and to be the primary medical home for patients.[118]   That figure has increased from only 7% in 2001.   Roughly 10% of all FQHCs in 2015 received Title X funding.[119]

96.     Accordingly, when patients visit Title X–funded health centers, they have no reason to know where the funding for their services comes from, much less that they are seeing a Title X–funded provider or even what Title X is.   Rather, patients come to their health center with an expectation that they will receive a range of services, and that they will receive the full spectrum of information that is to be expected from candid conversations between health professionals and their patients.   The Rule undermines this expectation.

97.     As noted above, the Separation Requirements already disrupt the continuity of care as to Title X patients for whom abortion is part of their comprehensive reproductive healthcare. And these harms are further compounded by the fact that the Gag Rule prohibits these same Title

---

[116] Adam Sonfield et al., GUTTMACHER INST., MOVING FORWARD: FAMILY PLANNING IN THE ERA OF HEALTH REFORM 32 (2014), https://www.guttmacher.org/report/moving-forward-family-planning-era-health-reform.

[117] The National Rural Health Association reports that there are 13.1 physicians per 10,000 people in rural areas compared to 31.2 physicians per 10,000 people in urban areas.   There are only 30 specialists per 100,000 people in rural areas, while urban areas have 263 specialists per 100,000 people.   *About Rural Health Care*, NAT'L RURAL HEALTH ASSOC., https://www.ruralhealthweb.org/about-nrha/about-rural-health-care (last visited Mar. 5, 2019).

[118] Jennifer J. Frost et al., *supra* note 20, at 9.

[119] *Id.*; HEALTH RES. & SERVS. ADMIN., HRSA FACT SHEET FY 2015—NATION (Sept. 30, 2015), https://data.hrsa.gov/data/fact-sheets (select "FY 2015"; then select "View Fact Sheet").

X providers from engaging in an open dialogue about and referring their patients for abortion services. The many women for whom Title X providers are their usual or only source of health care will not have ready access to other health professionals who can otherwise provide this information.[120] Patients seeking abortion referrals inevitably will be confused and frustrated by their providers' unwillingness to provide this information, thereby further eroding their patient-provider relationship. Other patients may be misled by their providers' insistence on giving them information about prenatal care and adoption and may interpret their providers' insistence on providing this unwanted and unnecessary information as disapproval of the patient's stated choice to have an abortion.

98.    Without referral support from Title X providers, patients seeking abortions must independently research whether any abortion providers offering care at the gestational stages needed by the patient are located nearby. As part of that research, the patient may then have to contact or visit several providers in order to find one providing the care she seeks. Some patients will encounter "Crisis Pregnancy Centers" during this search, which have been shown to intentionally mislead and delay patients seeking abortion care.

99.    These hurdles will significantly delay a large percentage of affected patients' ability to access abortion care, and exacerbate the existing burdens patients with low incomes already face in accessing care, without any medical benefit. For most patients with low incomes, visiting even one health care provider on the referral list who does not provide abortion care, and then taking time off to actually obtain an abortion, would mean multiple days of missed wages, and may even lead to job loss.

---

[120] To the extent some related information is available on the Internet, the unsubstantiated and unvetted web of information on the Internet is no substitute for the type of information and counseling patients receive from a qualified health care provider, which must be provided in accordance with the governing standard of care. Moreover, much of the information about abortion on the Internet is misleading and medically inaccurate.

100.    Moreover, the Gag Rule forces providers to act and speak contrary to their medical judgment, their ethical codes, and the standard of care.  A cornerstone of the patient-provider relationship is the ability to provide accurate, complete, evidence-based information.  Pregnant patients have a range of medical options, including abortion, adoption, and carrying to term.  Nondirective counseling enables a patient to choose between the medical options in line with their individual circumstances.  A patient must be aware of their options to make that choice.

101.    By restricting abortion referral, limiting speech about abortion, and compelling speech about post-conception options, the Rule prevents providers from providing complete, accurate, and evidence-based information to their patients.  Accordingly, it infringes on providers' ability to provide medical advice to their patients in a manner consistent with medical ethics and with the standard of care, and it deprives patients of information they need about treatment choices and alternatives so that they can make decisions about how to proceed with their medical treatment.  In these ways and others, the Gag Rule further forces Title X family planning providers to violate a wide spectrum of applicable medical standards and codes of medical ethics, as was described extensively by commenters.

102.    For example, the American Medical Association ("AMA") states in its code of ethics that "Patients have the right to receive information and ask questions about recommended treatments so that they can make well-considered decisions about care.  Successful communications in the patient-physician relationship fosters trust and support shared decision making."[121]  "Patients should be able to expect that their physicians will provide guidance about

---

[121] Am.  Med. Assoc., Code of Medical Ethics § 2.1.1 Informed Consent (2016), https://www.ama-assn.org/delivering-care/informed-consent; *see also* Letter from James L. Madara, *supra* note 54 ("The proposed changes on counseling and referral described above would not only undermine the patient-physician relationship, but also could force physicians to violate their ethical obligations.").

what they consider the optimal course of action for the patient based on the *physician's objective professional judgment.*"[122]   The AMA's code of ethics further states that "withholding information without the patient's knowledge or consent is ethically unacceptable."[123]

103.    Similarly, the American College of Obstetricians and Gynecologists' ("ACOG") code of professional ethics highlights the importance of the patient-physician relationship, noting "the respect for the right of individual patients to make their own choices about their healthcare."[124]   ACOG's policy statement on abortion notes that "[i]nduced abortion is an essential component of women's health care."[125]

104.    The code of ethics for the American College of Nurse-Midwives states that midwives will "develop a partnership with the woman, in which each shares relevant information that leads to informed decision-making" and notes in a position statement that "everyone has the right to access factual, evidence-based, unbiased information about available sexual and reproductive health care services in order to make informed decisions."[126]   The American Nurses

---

[122] Am. Med. Assoc., Code of Medical Ethics Opinions § 1.1.3 Patient Rights, https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-1.pdf (emphasis added).

[123] Am. Med. Assoc., *supra* note 121, § 2.1.3 Withholding Information from Patients, https://www.ama-assn.org/delivering-care/withholding-information-patients.

[124] Am. Coll. of Obstetricians & Gynecologists, Code of Prof. Ethics 1 (2018), https://www.acog.org/-/media/Departments/National-Officer-Nominations-Process/ACOGcode.pdf?dmc=1&ts=20180726T1911469633; *see also* Letter from Lisa M. Hollier, *supra* note 55, at 6 ("The Proposed Rule's restrictions on counseling and referral for abortion are a violation of the patient-physician relationship, undermine the quality of care provided to patients, place physicians in ethically compromising situations, and, accordingly, should not be implemented.").

[125] Am. Coll. of Obstetricians & Gynecologists, College Statement of Policy, Abortion Policy 1 (2014), https://www.acog.org/-/media/Statements-of-Policy/Public/sop069.pdf?dmc=1&ts=20180726T1910257757.

[126] Am. Coll. of Nurse Midwives, Code of Ethics (2013), http://www.midwife.org/ACNM/files/ACNMLibraryData/UPLOADFILENAME/000000000048/Code-of-Ethics.pdf; Am. Coll. of Nurse-Midwives, Position Statement: Access to Comprehensive Sexual and Reproductive Health Care Servs. 1 (2016), http://www.midwife.org/acnm/files/ACNMLibraryData/UPLOADFILENAME/000000000087/Access-to-Comprehensive-Sexual-and-Reproductive-Health-Care-Services-FINAL-04-12-17.pdf; *see also* Letter from Amy M. Kohl, Dir. of Advocacy & Gov't Affairs, Am. Coll. of Nurse-Midwives, to the Office of Population Affairs, U.S. Dep't of Health & Human Servs. 3 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-198447 ("The proposed changes to the Title X program would interfere with the provider-patient relationship by

Association code of ethics likewise states, "Patients have the moral and legal right to determine what will be done with and to their own person; to be given accurate, complete, and understandable information in a manner that facilitates an informed decision."[127]

105.     By restricting abortion referral, limiting speech about abortion, and compelling speech about post-conception options, the Rule prevents Title X providers from providing candid, complete, accurate, and medically-useful information to their patients and prevents patients from having the information they need to make decisions about their medical care.  The Rule accordingly pits health care professionals' ethical responsibilities against their continued receipt of Title X funding.

### c.     Costs Associated with Forcing Providers Out of the Title X Program

106.     Defendants failed entirely to account for an enormous cost to the integrity of the Title X program and the provision of publicly-funded health care: the number of grantees and service sites that would predictably be forced out of the Title X program under the Rule. Although this cost was highlighted prominently by many commenters, Defendants ignored it by assuming without basis that current providers would not be driven out of the program and that, in any event, new grantees would take the place of any grantees that left.[128]

107.     Planned Parenthood and at least four states explained in comments to the Proposed Rule that they would withdraw from the program if the Rule went into effect.  The evidence presented to Defendants throughout the comment period, and decades of experience with the Title X program, demonstrated that new grantees were unlikely to provide a sufficient substitute in

---

barring providers from providing critical reproductive-health information that midwives and other health care providers have a moral and ethical obligation to provide.").

[127] Am. Nurses Ass'n, Code of Ethics for Nurses with Interpretive Statements § 1.4 (2015), https://www.nursingworld.org/coe-view-only.

[128] 84 Fed. Reg. at at 7,723, 7,749, 7,782.

quantity or quality for the large number of providers and state health systems leaving the program. In rural areas in particular, there are well-documented shortages of primary and specialty health care providers, making it unlikely that rural areas would see a proliferation of new family planning organizations to take the place of current Title X grantees.

108.    Rather than address this evidence, Defendants merely stated in a conclusory fashion that "new providers who previously were unable to participate in Title X projects due to conscience concerns" would apply to and participate in a Title X project because of the Rule's changes to the nondirective pregnancy counseling provisions.[129] Defendants cited no evidence in support of that conclusion.[130] On the contrary, Defendants' conclusion was belied by their own acknowledgement that "[t]he Title X statute has coexisted with federal conscience laws for over 40 years"[131] without incident. At the same time, experience suggested it was unlikely that a material number of new organizations would apply to and become successful Title X grantees, particularly in light of the significant transition costs.

109.    Because Defendants assumed there would be no reduction in Title X services provided under the Rule, they did not consider any costs associated with the reduction in services the Rule has and will cause. For one, Defendants did not expect an increase in unintended pregnancies, stating that they were unaware of "actual data that could demonstrate a causal connection between" the Rule and "an increase in unintended pregnancies, births or costs associated with either."[132] This does not account for evidence in the record that the loss even of

---

[129] *Id.*. at 7,719.

[130] *Id.* at 7,777.

[131] *Id.* at 7,747.

[132] *Id*. at 7,775.

41

just Planned Parenthood alone from the Title X program is likely to lead to a "decline in the use of the most effective methods of birth control and an increase in births among women who previously used long-acting reversible contraception."[133]

110.     Had Defendants accurately modeled the likelihood that Title X participation would decrease under the Rule, they would have been forced to acknowledge the resulting harms to patients demonstrated by public health literature that was cited and discussed by commenters in the administrative record.  As commenters informed HHS, many family planning providers, now former-Title X grantees, are the only meaningful healthcare option for their patients because they are located in geographic areas that suffer from a lack of medical providers, especially providers of contraceptive care.[134]  Thus, even assuming *arguendo* that some other health centers had capacity to absorb increased demand in their existing locations, patients will be discouraged from accessing care as a result of increased travel distances and resulting costs.  A study of the effects

---

[133] American Academy of Nursing, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements 3 (July 26, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-106624 (citing Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 NEW ENG. J. MED. 853 (2016)); *see also* U.S. House of Representatives, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements 7 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-184863 ("[T]he consequent changes in the Title X system are likely to increase unintended-pregnancy rates in the most vulnerable segments of the population and are thus more likely to increase than to reduce the incidence of abortions." (internal quotation marks omitted) (quoting Janet M. Bronstein, *Radical Changes for Reproductive Health Care—Proposed Regulations for Title X*, 379 NEW ENG. J. MED. 706 (2018))); Planned Parenthood Federation of America, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements 18 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-198841 ("In 2015, the Guttmacher Institute estimated that Planned Parenthood's provision of contraceptive services averted 430,000 unintended pregnancies." (citing *Unintended Pregnancies and Abortions Averted by Planned Parenthood, 2015*, GUTTMACHER INST. (June 13, 2017), https://www.guttmacher.org/infographic/2017/unintended-pregnancies-and-abortions-averted-planned-parenthood-2015)); American Civil Liberties Union, Comment Letter on Proposed Rule for Compliance with Statutory Program Integrity Requirements 2 (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-190184 ("The proposed rule's disruptions to the nation's Title X network and prohibitions on standard medical care would lead to more unintended pregnancies . . . .").

[134] Guttmacher Letter, *supra* note 54, at 14 (explaining that in 33% of U.S. counties, there is no FQHC site providing contraceptive services, meaning women living there would could lose access to Title X-supported services altogether).

of closures of women's health clinics in Wisconsin and in Texas (due to funding cuts aimed at clinics affiliated with providers of abortion services) demonstrated that even minor increases in distance to the nearest provider decreased utilization of preventive care, with the greatest effect on vulnerable individuals, including those with less education.[135]

111.    That family planning clinics will be driven to close or to cut services by the Rule, and that patient care will be harmed as a result, is also predictable based on the results of similar restrictions that have been imposed by state governments.  In recent years, both Texas and Iowa have passed legislation that excluded providers of abortion from state family planning programs. A study in Texas, conducted two years after this legislation and companion measures cutting family planning budgets were enacted, found that roughly one quarter of the state's family planning clinics had closed entirely—including 40% of the specialized family planning providers that had been most heavily targeted by the legislation.  Service hours were reduced at an additional 15% of clinics and, in total, 54% fewer patients were seen.[136]  Wait times for reduced rate services in the Rio Grande Valley typically increased to several months.[137]  The impact on women's reproductive health, due to the resulting cuts in service in Texas, was significant. Insurance claims for LARC declined by over a third in counties where a Planned Parenthood affiliate had been excluded from the state family planning program,[138] and the rate of childbirth

---

[135] Yao Lu & David J.G. Slusky, *The Impact of Women's Health Clinic Closures on Preventive Care*, 8 AM. ECON. J.: APPLIED ECON. 100 (2016), https://pubs.aeaweb.org/doi/pdfplus/10.1257/app.20140405.

[136] Kari White et al., *The Impact of Reproductive Health Legislation on Family Planning Clinic Services in Texas*, 105 AM. J. PUB. HEALTH 851, 853–55 (2015); *see also* Letter from Texas Policy Evaluation Project to Valerie Huber (July 31, 2018), https://www.regulations.gov/document?D=HHS-OS-2018-0008-180249.

[137] CTR. FOR REPROD. RIGHTS & NAT'L LATINA INST. FOR REPROD. HEALTH, NUESTRA VOZ, NUESTRA SALUD, NUESTRO TEXAS: THE FIGHT FOR WOMEN'S REPRODUCTIVE HEALTH IN THE RIO GRANDE VALLEY 4 (Nov. 2013), http://www.nuestrotexas.org/wp-content/uploads/2015/03/NT-executive-summary-EN1.pdf.

[138] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 NEW ENG. J. MED. 853, 858 (2016).

covered by Medicaid for women who relied on contraceptive injections went up by 27%.[139]

Similarly, in Iowa, Planned Parenthood was forced to close four clinics based on its loss of

funding.[140]  As a result, the number of patients enrolled in the program fell by half, and the

services provided over a comparable three-month period declined by 73%—despite there being

$2.5 million dollars remaining in the program that was not spent.[141]  In other words, the ban on

funding clinics that provided both abortion services and family planning could not be remedied by

provision of services at other locations, even when funding was available.

112.    Importantly, once clinics are forced to close, financial and other barriers involved

in reopening them are often insurmountable.[142]  Following the implementation of House Bill 2 in

Texas, the law declared unconstitutional by the Supreme Court in *Whole Woman's Health v.*

*Hellerstedt*, 20 Texas clinics closed.[143]  As of 2017, only 2 of those clinics had been able to

reopen.[144]

113.    The reduction in subsidized family planning access that accompanies clinic

closures or reduction in services has long-lasting effects on women who use these programs and

on their families.[145]  All of these factors were raised during the notice-and-comment period.

---

[139] *Id.* at 853.

[140] Tony Leys & Barbara Rodriguez, *State Family Planning Services Decline 73 Percent in Fiscal Year as $2.5M Goes Unspent*, DES MOINES REG. (Oct. 18, 2018), https://www.desmoinesregister.com/story/news/health/2018/10/18/iowa-health-care-family-planning-contraception-services-planned-parenthood-abortion-medicaid/1660873002/.

[141] *Id.*

[142] *See* N. MADSEN ET AL., ABORTION CARE NETWORK, COMMUNITIES NEED CLINICS: THE ROLE OF INDEPENDENT ABORTION CARE PROVIDERS IN ENSURING MEANINGFUL ACCESS TO ABORTION CARE IN THE UNITED STATES 8 (2017), https://www.abortioncarenetwork.org/wp-content/uploads/2017/08/CommunitiesNeedClinics2017.pdf.

[143] *Id.* at 8.

[144] *Id.*

[145] Martha J. Bailey et al., *Does Access to Family Planning Increase Children's Opportunities? Evidence from the War on Poverty and the Early Years of Title X*, 54 J. HUM. RESOURCES (forthcoming 2019) (manuscript at 4), http://jhr.uwpress.org/content/early/2018/07/03/jhr.55.1.1216-8401R1.abstract?sid=d50e256e-9ce7-4025-8bae-

**h)**    **HHS's Implementation of the Rule and Its Aftermath Have Borne Out Costs and Concerns that Were Laid Out in Comments**

114.    Following numerous legal challenges to the Rule by States, localities, and other Title X grantees, including several that resulted in nationwide injunctions for a number of months, HHS publicly stated that it would require compliance with the rule as of July 15, 2019.  The Rule is accordingly in effect with the exception of the physical Separation Requirements which are set to take effect on March 4, 2020.

115.    Commenters' predictions regarding loss of access to Title X services have already been borne out, and the situation continues to worsen.  As predicted, Planned Parenthood, several states, and other entities, including Maine Family Planning, have been forced to leave the program since the Rule went into effect.  In total, at least 18 of the 90 Title X grantees across the United States have been forced out of the Title X program as a result of the Rule to date, along with their subgrantees.[146]  Additional subgrantees have left the program as well.  In total, as of October 2019, more than 1000 clinics that had previously provided Title X-funded services were no longer using Title X funds, including all those in Hawaii, Vermont, Maine, Utah, Oregon, and Washington.[147]  And, upon information and belief, additional clinics will continue to be forced to leave the program as a result of the Rule, including but not limited to when the Separation Requirement goes into effect.

---

d9b4f46dbaec; Martha J. Bailey, *Fifty Years of Family Planning: New Evidence on the Long-Run Effects of Increasing Access to Contraception*, 2013 BROOKINGS PAPERS ON ECON. ACTIVITY 341, 362 (2013).

[146] Brittni Fredriksen et al., Kaiser Family Foundation, Data Note: Is the Supplemental Title X Funding Awarded by HHS Filling in the Gaps in the Program? (Oct. 18, 2019), https://www.kff.org/womens-health-policy/issue-brief/data-note-is-the-supplemental-title-x-funding-awarded-by-hhs-filling-in-the-gaps-in-the-program/.

[147] Kaiser Family Foundation, *supra* note 2, https://www.kff.org/interactive/the-status-of-participation-in-the-title-x-federal-family-planning-program/.

116.     Prior to the Rule, Title X funds comprised 19% of the funds for family planning services nationwide—a significant percentage of the annual budget for many clinics.[148]  Thus, some family planning clinics that are forced out of the program will have no choice but to shut their doors, and others will need to reduce their services.  This inevitably will cause demand for health services to surge at remaining clinics, and wait times for appointments will expand at the remaining health centers that can still afford to offer reduced-rate services.  In particular, studies indicate that the withdrawal of Planned Parenthood—which served 40% of Title X's patients— from the Title X program will create a surge of demand on remaining comprehensive reproductive health care providers.[149]

117.     The impact of these mass withdrawals from the Title X program already is being felt by patients on the ground.  Due to the loss of Title X funding at various clinics, patients have faced exponentially higher costs for contraceptives, an absence of contraceptive supply altogether, and/or increasing uncertainty about whether their healthcare clinics will remain open at all in the long-term.[150]

118.     Non-specialized health centers, like federally qualified health centers ("FQHCs"), do not have the capacity or the geographic distribution to absorb as many new family planning patients as likely will become necessary.  Studies demonstrate that, depending on the size of the remaining supply of care in medically-underserved communities, health centers could face as

---

[148] 2018 FPAR, *supra* note 10, at 53.

[149] Kinsey Hasstedt, *Beyond Rhetoric: The Real-World Impact of Attacks on Planned Parenthood and Title X*, 20 GUTTMACHER POL'Y REV. 86, 87 (2017), https://www.guttmacher.org/gpr/2017/08/beyond-rhetoric-real-world-impact-attacks-planned-parenthood-and-title-x.

[150] Ariana Eunjung Cha & Sheila Regan, *Patients Face Higher Fees and Longer Waits after Planned Parenthood Quits Federal Program*, THE WASHINGTON POST (Aug. 24, 2019), https://www.washingtonpost.com/business/2019/08/24/patients-face-higher-fees-longer-waits-after-planned-parenthood-quits-federal-program/.

much as a tripling in the number of family planning patients served based solely on the effects of excluding Planned Parenthood from the Title X program.[151]  In reality, the number of patients seeking care at remaining health centers is likely to grow at an *even greater rate* because clinics outside the Planned Parenthood network have left or will leave the Title X program as a result of the Rule.

119.    Upon information and belief, and as predicted by commenters, the small handful of new providers who obtained grants in 2019 are in no way poised to fill the vast gaps in Title X services that have been caused by the Rule.  Indeed, HHS itself has acknowledged that the Rule has resulted in service gaps.[152]  Although HHS has awarded "supplemental funds" to some grantees remaining in the program with the stated goal of addressing those gaps, the majority (83%) of the grantees that received additional funding were located in states that have either not had any changes to their Title X program, or lost less than 1/5 of their network.[153]  And because there have been no funds yet awarded to new grantees in the six states in which all grantees have withdrawn or ceased using Title X funds, there remain no Title X programs currently operating in the state.[154]  Maine Family Planning is unaware of any organizations in Maine planning to apply to provide Title X-funded services.  Indeed, upon information and belief, other providers of family planning services in Maine have chosen *not* to apply to become Title X grantees because of the Rule.

---

[151] As of 2015, only 60% of FQHCs even offered contraceptive care to more than 10 women per year.  JENNIFER J. FROST & MIA R. ZOLNA, GUTTMACHER INST., RESPONSE TO INQUIRY CONCERNING THE AVAILABILITY OF PUBLICLY FUNDED CONTRACEPTIVE CARE TO U.S. WOMEN: MEMO TO SENATOR PATTY MURRAY, RANKING MEMBER, SENATE HEALTH, EDUCATION, LABOR AND PENSIONS COMMITTEE 2 (2017), https://www.guttmacher.org/article/2017/05/guttmacher-murray-memo-2017.

[152] Fredriksen et al, *supra* note 146.

[153] *Id.*

[154] *Id.*

### i) Impact of the Rule on Maine, Maine Family Planning, and Its Patients

120.    Maine Family Planning, like many other grantees, has been forced to leave the Title X program because implementing the Rule would materially and irreparably damage the provision of both family planning services and abortion care in Maine.  Maine Family Planning has been the state's only Title X grantee since the program's inception and it is the provider or funder of much of Maine's family planning services and abortion care.  Complying with the Rule would force Maine Family Planning to significantly cut its services.  The rurality and poverty in Maine would exacerbate the effects of those cuts and the resulting hardships.

### a.  Geography and Demographics of Maine

121.    Maine is the most rural state in the country, with more than 60% of the population living outside of urban areas.[155]  Maine's diverse geography includes thousands of miles of coastline, 15 year-round inhabited islands, and the highest percent of forest-covered land area (89%) of any state in the nation.[156]  Of Maine's 1.3 million inhabitants, 61.3% reside in rural areas.[157]  Maine's three largest cities, Portland (66,715), Lewiston (36,211), and Bangor (32,237), contain only 10% of the state's population (1,330,158).[158]  Fourteen of Maine's 16 counties are

---

[155] U.S. CENSUS BUREAU, MAINE: 2010 POPULATION AND HOUSING UNIT COUNTS 2 tbl. 2 (2012), https://www2.census.gov/library/publications/decennial/2010/cph-2/cph-2-21.pdf; Press Release, U.S. Census Bureau, Growth in Urban Population Outpaces Rest of Nation (Mar. 26, 2012), https://www.census.gov/newsroom/releases/archives/2010_census/cb12-50.html.

[156] COLBY, ENVTL. POLICY GRP., THE STATE OF MAINE'S ENVIRONMENT 108 (2014), http://web.colby.edu/stateofmaine2014/files/2012/09/2014-Full-Report-Draft.pdf  ("15 unbridged Maine islands support year-round populations."); U.S. DEP'T OF AGRIC., FOREST INVENTORY AND ANALYSIS: FISCAL YEAR 2016 BUSINESS REPORT 71 tbl. B-11 (2017), https://www.fs.fed.us/sites/default/files/fs_media/fs_document/publication-15817-usda-forest-service-fia-annual-report-508.pdf (showing 89% of forest-covered land area).

[157] *See* sources cited in note 155, *supra*.

[158] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter desired city or state in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down) (last visited Mar. 1, 2019).

more than 50% rural; nine of the 16 are more than 80% rural.[159]

122.    Geography and low population density account for many of the challenges rural Mainers face in accessing health care.  Interstate 95, which in winter weather is usually reduced to one lane north of Orono and is occasionally closed, is the sole north-south highway and transportation within and among counties is limited.  The long distances and excessive travel time are major obstacles to accessing health care, especially with limited public transportation outside of Portland.  The more remote and rural areas, with low population densities, have fewer health care choices compared with the more heavily populated southern counties.

123.    There are also several economic indicators that directly affect Maine residents' need for subsidized family planning services, including income, poverty rates, and insurance coverage.

124.    Poverty is a significant problem in Maine.  Nearly 13% of Maine residents,[160] and 42.1% of single mothers in the State,[161] have incomes at or below the federal poverty level ($12,060 for a single person and $20,420 for a family of three).  The poverty rate is disproportionately high among women of color: 51.3% of African-American women, 27.8% of Latina women, and 35.5% of Native American women in Maine were living in poverty between 2011 and 2013.[162]  It is also higher in Maine's more rural counties: Aroostook, Oxford,

---

[159] MAINE: 2010 POPULATION AND HOUSING UNIT COUNTS, *supra* note 155, at 9 tbl. 7.

[160] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter "Maine" in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down; then select "Poverty" in left column) (last visited Feb. 28, 2019).

[161] INST. FOR WOMEN'S POLICY RES., THE STATUS OF WOMEN IN THE STATES, 2015, at 158 (2015), https://iwpr.org/wp-content/uploads/wpallimport/files/iwpr export/publications/R400-FINAL%208.25.2015.pdf.

[162] INST. FOR WOMEN'S POLICY RES., THE STATUS OF WOMEN IN MAINE, 2015: HIGHLIGHTS 3 (2015), http://statusofwomendata.org/app/uploads/2015/08/Maine-Fact-Sheet.pdf.  Because the federal poverty level does not take into account the cost of child care, medical expenses, utilities, or taxes, these statistics undercount the number of Maine residents who are struggling to make ends meet.  Many abortion patients (59%) have had at least

Penobscot, Piscataquis, Somerset, and Washington Counties all have poverty rates over 15%; the rate in Piscataquis and Washington Counties is over 18%.[163]

125.    Two-thirds of the patients who sought abortion services at Maine Family Planning in 2018 required financial support.  Maine Family Planning's poor and low-income patients routinely tell their health care providers that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for abortion care.  Although Maine's Medicaid program covers the cost of transportation to receive Medicaid-covered health services, because Maine's Medicaid program excludes coverage for abortion in almost all cases, Plaintiffs' poor and low-income patients who are enrolled in or eligible for Medicaid cannot receive state assistance either with the cost of their abortions or with the cost of travel to their appointments.

126.    Lack of health insurance and limited coverage also are barriers to accessing health care in Maine.  9% of Mainers lack health insurance.[164]  Title X subsidized services, in addition to accepting Medicaid, have provided a safety net for uninsured and underinsured Mainers for nearly fifty years.  While a patient may come to a clinic primarily seeking contraception, STI testing, or pregnancy testing, the relationship with their provider reaches far beyond simply dispensing a pack of birth control pills.

---

one previous birth.  Three-quarters of abortion patients nationally are low-income, with nearly half living below the federal poverty level. JENNA JERMAN ET AL., GUTTMACHER INST., CHARACTERISTICS OF U.S. ABORTION PATIENTS IN 2014 AND CHANGES SINCE 2008 at 1 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

[163] U.S. CENSUS BUREAU: AMERICAN FACT FINDER, https://factfinder.census.gov/faces/nav/jsf/pages/community_facts.xhtml?src=bkmk (enter county name in top search bar; then select "2015 ACS 5-Year Population Estimate" from "Population" drop-down menu; then select "Poverty" in left column) (last visited Feb. 28, 2019).

[164] U.S. CENSUS BUREAU: AMERICAN COMMUNITY SURVEY, https://www.census.gov/acs/www/data/data-tables-and-tools/data-profiles/2017/ (enter "Maine" in left drop-down menu; then select "Economic Characteristics" from the hyperlinks listed below) (last visited Feb. 28, 2019).

**b.  History and Scope of Services Provided by Maine Family Planning**

127.    Maine Family Planning was founded in 1971 for the express purpose of competing for, receiving, distributing, and managing the Title X grant for the state of Maine—and to do so in a manner that addresses the complex geography and challenges faced by Mainers.

128.    For forty-eight years, Maine Family Planning has been the sole statewide Title X grantee for Maine.  Thus, Maine Family Planning's compliance with all Title X rules and regulations has been tested and confirmed over the course of decades, both by OPA and by a diverse and frequent array of auditors.  Neither OPA nor any other government or independent auditor has ever found a violation of the Title X requirements by Maine Family Planning.

129.    Maine Family Planning began as an umbrella agency, subcontracting with eight other non-profits in other parts of Maine to provide Title X-supported services for low-income women and teens.  Maine Family Planning's role during its first 15 years included grant management, training, some research, and advocacy.

130.    Beginning in April 1997, Maine Family Planning started providing abortion care, using resources independent from the Title X program.  Maine Family Planning's decision to separately provide abortion was in response to a growing dearth of abortion services in the region. This need became critical after several violent incidents against abortion providers in the region, including a 1994 mass shooting at Planned Parenthood clinics in Brookline, Massachusetts that resulted in multiple fatalities, and caused existing providers throughout New England to stop providing abortion services.  Maine Family Planning thus elected to fill the resulting gap in necessary health care for the people of Maine, working closely with the Maine State Attorney General's Office of Civil Rights to facilitate that effort.  To that end, Maine Family Planning identified and purchased a stand-alone building in North Augusta, which would serve as Maine

Family Planning's headquarters and would include a clinical space fully equipped to offer first trimester abortion care.

131.    In 1997, Maine Family Planning decided to end its subcontract with the local agency providing family planning services in Augusta, and to hire its family planning staff in order to co-locate family planning services with the abortion care services already being provided at Maine Family Planning's new headquarters site.  Maine Family Planning began offering Title X services in its Augusta building in July 1998, a year after its initiation of abortion services.

132.    Over the course of the following decade, Maine Family Planning also took direct control over other family planning clinics.  By 2012, Maine Family Planning directly managed 18 clinical sites where Title X services would be provided.

133.    Today, Maine Family Planning operates eighteen family planning centers and provides funding through subcontracts that support thirty-two additional sites.[165]  Altogether, Maine Family Planning's 50-site network is geographically comprehensive, with sites in fifteen counties, and meets the clinical and educational reproductive health needs of approximately 24,000 Mainers annually.  As of 2018, 78% of patients qualified for free or reduced fee services.

134.    Through Maine Family Planning's clinics, it provides a broad range of family planning services for individuals and families, so that they can postpone, prevent, or facilitate the spacing of pregnancy.  Services tailored to the unique needs of the individual patient include: annual gynecological exams; screening for cervical and breast cancer; family planning

---

[165] Specifically, Maine Family Planning's network includes:  eighteen family planning clinics directly operated by Maine Family Planning (located in Augusta, Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Rockland, Rumford, Skowhegan and Waterville); four sites managed by Planned Parenthood of Northern New England (in Portland, Sanford, Topsham, Biddeford); four FQHCs with 20 clinic sites in total (six of which are located in Portland, and others are in Belgrade, Bethel, Bingham, Lovejoy, Madison, Mt. Abram, Rangeley, Sheepscot, Strong, Waterville, Vinalhaven); and five school-based Health Centers (three in Portland, and one in Readfield, and one in Calais).

counseling; contraceptive services; preconception consultation; screening, diagnosis, and treatment of urinary, vaginal, and sexually transmitted infections.  An extensive, well-established referral network connects clients to comprehensive primary care and other diagnostic screenings and services, if not offered on-site.  All of Maine Family Planning's services are provided by advanced practice registered nurses ("APRNs"), *i.e.*, certified nurse practitioners and/or certified nurse-midwives, often with the support of medical assistants.

135.   At Maine Family Planning's Augusta clinic, the organization also provides medication abortions through eleven weeks of pregnancy, as dated from the last day of a woman's menstrual period ("LMP"), and aspiration abortions through the end of the first trimester (*i.e.,* 14.0 weeks LMP).  Abortion services are provided one day a week in Augusta, a day on which no family planning services (including dispensing of contraception) are provided at that site.

136.   Maine Family Planning employs seven physicians part-time at its Augusta clinic, including Plaintiff Dr. Doe, whose only role at Maine Family Planning is to provide abortion services.  Each physician works at most one or two days a month.  And, except for rare occasions, there is only one physician offering abortion services on any given day.

137.   Abortion services at Maine Family Planning's clinics outside Augusta consist only of medication abortion through eleven weeks LMP.[166]

138.   It is Maine Family Planning's policy that only costs that are reasonable, allowable, and allocable to a federal award will be charged to that award, either directly or indirectly.  Thus,

---

[166] Until recently, Maine Family Planning had offered medication abortion at its seventeen satellite clinics only through a telehealth program, because longstanding state law had restricted provision of abortion to physicians only and the satellite clinics do not staff physicians on site.  A new state law went into effect on September 19, 2019, which removed the physician-only restriction and authorizes APRNs to provide abortions in Maine.  *See* An Act to Authorize Certain Health Care Professionals to Perform Abortion, P.L. 2019, ch. 262 §§ 1596 to 1599-A (enacted June 10, 2019).  Accordingly, APRNs at Maine Family Planning's satellite clinics now provide medication abortion directly.

throughout decades during which Maine Family Planning was a Title X grantee, Maine Family Planning always clearly and properly separated its Title X activities from non-Title X activities, including abortion services, in accordance with longstanding Title X policy and regulations.  This was primarily done by maintaining a financial management system that clearly separated and accounted for all expenses and revenues associated with the Title X project.  In addition, Maine Family Plainning's contracts with all its Title X subgrantees required those subrecipients to separate or identify family planning expenses as appropriate.  The Title X administrators have never found fault with Maine Family Planning's cost-allocation methods.

### c.   Implementation of the Rule's Separation Requirements by Maine Family Planning

139.    The Rule's physical separation requirement forces providers, like Maine Family Planning, that currently provide both abortion care and Title X family planning care, to choose between providing the two services at their clinics.  Many Title X projects are established practices that have developed over the course of many years (and some, like Maine Family Planning, over the course of decades), in reliance on the longstanding policy that allows them to share facilities with abortion providers.  Forcing post hoc physical separation of these established practices decades later would be expensive, complicated and, in many cases, impossible.

140.    In order to comply with the Rule's Separation Requirements, Maine Family Planning would have no choice but to eliminate abortion services at seventeen of its eighteen locations, leaving at most only its abortion practice in Augusta.[167]  It would be physically implausible for Maine Family Planning to execute the Rule's Separation Requirements and

---

[167] There is already an existing scarcity of abortion services both in Maine and nationwide. According to the most recent statistics, 90% of all U.S. counties already lacked an abortion clinic in 2014, and 39% of women of reproductive age lived in those counties.   Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States*, 2014, 49 PERSPEC. ON SEXUAL & REPROD. HEALTH 1, 4 (2017).

continue to provide abortion services near its non-Augusta locations.  In more rural parts of the state, it is difficult or impossible to find landlords willing to rent space for the sole purpose of providing abortion care.  Nor could Maine Family Planning convert its existing non-Augusta clinics into multiple or "separate" spaces; the sites are far too small and consist only of one or two exam rooms.

141.    But, even if it were physically possible to create separate spaces for abortion care at or near some existing Maine Family Planning clinics, the costs of creating a physically and financially separate entity at each site would be prohibitive.  Establishing even small new clinic sites to provide abortion care—which would require staffing, separate work stations and record-keeping systems, security (including the installation of video cameras and ballistic glass), and much more—would cost far more than the $20,000–$40,000 estimated in the preamble to the Rule.[168]

142.    Nor would it be logistically and financially feasible for Maine Family Planning to create separate abortion clinics at or near its seventeen non-Augusta sites while still providing the full range of other family planning services.  Maine Family Planning provides approximately 500 abortions per year, about 75% of which typically are performed at its Augusta clinic.  This discrepancy is due to factors outside Maine Family Planning's control, including the rural nature of Maine which results in sparse populations in large parts of the state.

143.    Finally, it would be extremely challenging, if not impossible, for Maine Family Planning to staff any such new abortion facilities in those locations. Because most of Maine Family Planning's clinics have provided 26 or fewer abortions per year to date, the practical reality is that this volume of services is not sufficient to support the financial and logistical needs

---

[168] Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. at 7,781–82.

of a standalone abortion clinic, regardless of whether Maine Family Planning can find providers to staff such clinics.

144.   Likewise, while Maine Family Planning could endeavor to create a separate abortion facility near its Augusta location in order to continue providing the abortion services currently offered at its Augusta Headquarters, it is by no means clear that it would be able to do so.  To create a new facility in Augusta, the startup costs alone would exceed $200,000, and likely would cost much more.

145.   Upon information and belief, it is unlikely that new health care professionals or organizations would begin providing abortion services in Maine if Maine Family Planning were to close its clinics, particularly in the rural areas where those clinics are located.  Maine Family Planning is not aware of any potential new abortion providers in Maine, and potential healthcare professionals who are trained and motivated to provide abortion services typically do not hesitate to make themselves known to Maine Family Planning.  Nor have any new abortion providers opened in Maine since Maine Family Planning itself started providing abortion services more than twenty years ago, despite the fact that abortion access has been challenging in the state throughout that time.

146.   If Maine Family Planning were to comply with the Rule's Separation Requirements, the State of Maine would go from having twenty abortion clinics to at most just three—an 85% decrease in the number of clinics in the state.  The only three remaining publicly-accessible health centers (*i.e.*, clinics that are open to women who are not already established patients) where a woman would be able to obtain abortion care in Maine would be: (1) Maine

Family Planning's Augusta clinic; (2) Planned Parenthood's Portland Health Center; and (3) Mabel Wadsworth Center, located in Bangor, Maine.[169]

147.    Under these circumstances, more than half of Maine women would live in counties without an abortion provider, and the distances many women would have to travel to obtain *any* kind of abortion services would be substantial, increasing by multiple orders of magnitude.  For example, while currently 7.9% of patients are traveling more than 25 miles to reach their nearest abortion provider, if Maine Family Planning's 17 satellite clinics close, 76% of patients (including those seeking medication abortion) would have to travel more than 25 miles to reach their nearest clinics.  In addition, none of these women are currently traveling 100 miles or more to a clinic offering at least medication abortion, but if Maine Family Planning's satellites were to close, 10% of patients will have to travel more than 100 miles to their nearest clinic (including those seeking medication abortion).  This large shift in travel distances would significantly impede access to abortion services in Maine.

148.    Empirical evidence demonstrates that even comparatively small increases in driving distance, like 25 miles, can lead to substantial decreases in access to abortion.[170]  In part, this is because increased travel distances also translate to additional travel costs and incidentals. A woman facing these long travel distances to obtain an abortion typically must arrange and pay for transportation and take time off work.  Low-wage workers often have no access to paid time off or sick days.  A woman facing such a lengthy journey to access an abortion often also must

---

[169] The only other providers of abortion care in Maine—Maine Medical Center in Portland and Central Maine Medical Center in Lewiston—generally treat only pre-existing patients, among other limitations on their services. In addition, neither of these other facilities advertises abortion services on their website.

[170] Some scholars estimate that an increase in travel distance from 0 to 25 miles reduces abortion rates by approximately 10%.  Jason M. Lindo et al., *How Far Is Too Far? New Evidence on Abortion Clinic Closures, Access, and Abortions* 2, 18 (Nat'l Bureau of Econ. Research, Working Paper No. 23366, 2018), http://people.tamu.edu/~jlindo/HowFarIsTooFar.pdf.

arrange and pay for child care.[171]  These costs can be prohibitive for poor and low-income women who cannot afford to forgo wages or risk job loss.

149.    If Maine Family Planning were forced to shut down 17 of its 18 abortion clinics in order to implement the Rule, the resulting burdens associated with increased travel distances for an abortion in Maine would be tremendous.  A woman who lives in Fort Kent, for example, would need to travel more than six hours round-trip to Bangor to obtain care.  A woman who lives in Skowhegan, Farmington, or Belfast would be required to travel up to two hours round-trip to Augusta to obtain an abortion.  If she lives in Calais, Machias, or Presque Isle, she would have to travel up to four or five hours round-trip to Bangor.

150.    A woman who lives on the island of Vinalhaven would face a full-day commute, or more, to obtain any abortion care.  She would first have to take a ferry to Rockland (which runs only six times daily), and then find and pay for transportation for the one-hour drive to Augusta.  After her procedure, she would need to find and pay for transportation to return to Rockland, and then take a return ferry, the last of which departs at 4:30 pm.  If she were unable to make the return ferry, she would need to find and pay for overnight lodging.

151.    A woman who lives on one of Maine's more remote islands would have an even more difficult and expensive commute to obtain abortion care.  For instance, a woman on Matinicus would have only two travel options: an air taxi to Knox County Regional Airport (which flies only twice daily; typically has only three seats available; and costs $60 each way) or a ferry (which runs only two to four days in any given month and takes more than two hours each way).  She would then need to find and pay for transportation to and from Augusta, and she

---

[171] 59% of women who obtained abortion in 2014 had had at least one previous birth.  JENNA JERMAN ET AL., GUTTMACHER INST., CHARACTERISTICS OF U.S. ABORTION PATIENTS IN 2014 AND CHANGES SINCE 2008 (May 2016), https://www.guttmacher.org/sites/default/files/report_pdf/characteristics-us-abortion-patients-2014.pdf.

would almost certainly have to find and pay for overnight lodging before she can return to the island.

152.    A variety of factors make travel throughout Maine particularly difficult if not impossible for many women, including but not limited to: high rates of rural poverty; lack of public transportation; Maine's large rural population; poor weather conditions during the winter; and Maine's limited access to major roadways, as Interstate 95 is the only major highway in the state.  For some women, increased travel distances will lead to significantly longer travel times, particularly where women must travel on local or country roads and/or during inclement weather. Depending on the weather conditions, these journeys may take far longer, or simply be impossible.

153.    For the women who nonetheless may be able to travel increased distances, travel still would inevitably delay their access to abortion, and such delay would harm patients in myriad ways.

154.    While abortion is safe at any point in pregnancy, the risks of complications and the complexity of the procedure increase with increasing gestational age.  Abortion-related mortality occurs at a rate of 0.3 per 100,000 procedures at eight weeks of gestation or less, but 6.7 per 100,000 procedures at 18 weeks of gestation or more.[172]  Every day a woman remains pregnant when she does not wish to be, she endures the continued risks of complications of pregnancy and the physical and emotional symptoms of pregnancy, including fatigue and nausea, which can be severe and even debilitating.

---

[172] Suzanne Zane et al., *Abortion-Related Mortality in the United States: 1998–2010*, 126 OBSTETRICS & GYNECOLOGY 258, 260 tbl.2 (2015).

155.    Abortion care during the first trimester of pregnancy is substantially less expensive than in the second trimester:  the median prices of a surgical abortion at ten weeks LMP is $508, while the cost rises to $1,195 at twenty weeks LMP.[173]  For patients who struggle to afford a first trimester procedure, a second trimester procedure could be completely out of reach.  This is especially true for women with low incomes for whom paying out of pocket (as is required in many states) is extremely burdensome.[174]

156.    Certain procedures are only available during particular periods during pregnancy. Medication abortion is only accessible up to 10 weeks.  Delays in access abortion prevent some women from receiving their preferred abortion procedure.

157.    Some women prefer medication abortion and it is clinically preferred for women with certain medical conditions, including obesity and uterine anomalies.  Because Maine Family Planning only offers medication aborton through 11 weeks LMP, women delayed past that cutoff would be deprived the choice of a medication abortion.

158.    The burdens from delayed access to care for women seeking abortion care in the second trimester are greater still.  Fewer providers may be available to treat patients who experience significant delays in accessing abortion care.  As of 2014, only 72% of abortion clinics in the United States provided care after the first trimester of pregnancy (between 12 and 14 weeks

---

[173] Rachel K. Jones et al., *Differences in Abortion Service Delivery in Hostile, Middle-ground, and Supportive States in 2014*, 28 WOMEN'S HEALTH ISSUES 212, 216 tbl. 4 (2018); *Medicaid Funding of Abortion*, GUTTMACHER INST. (Feb. 2018), https://www.guttmacher.org/evidence-you-can-use/medicaid-funding-abortion.

[174] Thirty-four states and the District of Columbia ban Medicaid coverage for abortion care.  *Medicaid Funding of Abortion*, supra note 173.  Twenty-six states also prohibit plans purchased on the ACA Marketplace from covering abortion care.  Alina Salganicoff & Laurie Sobel, *Abortion Coverage in the ACA Marketplace Plans: The Impact of Proposed Rules for Consumers, Insurers and Regulators*, HENRY J. KAISER FAMILY FOUNDATION, at fig.1 (Dec. 21, 2018), https://www.kff.org/womens-health-policy/issue-brief/abortion-coverage-in-the-aca-marketplace-plans-the-impact-of-proposed-rules-for-consumers-insurers-and-regulators/.

LMP, depending on the state).[175]  The scarcity of second trimester providers is particularly burdensome for patients with low incomes.  If a patient misses her opportunity to access abortion care in the first trimester, accessing abortion care during the second trimester will likely involve significantly increased travel distance and cost.

159.   Some women, especially from rural areas of the state, would be unable to travel to Maine Family Planning's Augusta clinic before its gestational limit of 14.0 weeks.  On information and belief, Mabel Wadsworth Center in Bangor only provides abortion through 14.3 weeks while Planned Parenthood's Portland Health Center provides abortion services through 18.6 weeks.  Thus, a patient seeking abortion care in Maine between 14.0 and 14.3 weeks would have to travel to either Bangor or Portland, and the only option for patients seeking abortion in Maine after 14.3 weeks would be to travel to Portland.

160.   Increased logistical burdens around accessing abortion also undermine the ability of patients to keep their decision to have an abortion private.  This exposes patients who are seeking abortions in dangerous situations, such as those in abusive relationships or victims of unreported rape or incest, to a greater risk of violence or other harms.

161.   The Rule would further contribute to a climate of secrecy and stigma against abortion, which deters clinicians from offering abortion care and penalizes those who continue to provide it.  Stigma in turn harms pregnant women seeking abortions by reducing the number of abortion providers, reducing their access to the few remaining providers, and demeaning their constitutionally-protected decisions.

---

[175] *Induced Abortion in the United States*, GUTTMACHER INST. (Jan. 2018), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states.

162.    These burdens can result in patients incurring increased risks and costs, experiencing psychological harm, and potentially attempting to self-induce abortions if they cannot get to a provider, even though they would have preferred a clinic-based abortion.  For some patients, the needless delays created by the Rule will result in them not being able to obtain abortion care at all.

163.    Patients who cannot obtain abortion care, and who are therefore required to give birth, experience meaningful physical, economic, and emotional harms as a result.  Recent studies demonstrate that women denied abortions are more likely to live in poverty, to raise children alone, and to remain with an abusive partner, and they are less likely to have and achieve aspirational plans for the future.[176]

164.    In addition, as detailed above, delays in access to abortion care increase health risks for patients and the complexity and costs of their abortion procedures, limit patients' options of providers, force women to endure the continued risks of complications of pregnancy and the physical and emotional symptoms of pregnancy, prevent some women from accessing their preferred abortion procedure, and prevent others from accessing abortion altogether in the state of Maine and elsewhere.

**d.   Implementation of the Gag Rule by Maine Family Planning Is Similarly Untenable**

165.    Were Maine Family Planning to implement the Rule, patients seeking access to an abortion would also be prevented by the Gag Rule from learning information that is necessary to their receipt of timely care.

---

[176] Diana Greene Foster et. al, *Effects of Carrying an Unwanted Pregnancy to Term on Women's Existing Children*, 205 J. PEDIATRICS 183 (2019), https://www.jpeds.com/article/S0022-3476(18)31297-6/pdf.

166.    Maine Family Planning's health care providers and staff, as well as the medical professionals who work for other providers in its network, would be forced to fundamentally alter how they speak to patients regarding their health care options.  Currently, Maine Family Planning's APRNs and its other medical staff refer their family planning patients who are interested in abortion services to an appropriate physician upon request.  Maine Family Planning has a state-wide network of referral options, which its APRNs and other medical staff invoke based on each patient's particular medical condition, location, preferences, and other needs.

167.    If Maine Family Planning implemented the Gag Rule, it would be expressly prohibited from providing abortion referral.[177]  Any time a patient came to Maine Family Planning for Title X services and also requests referral information for abortion, the medical staff would be required to refuse to provide that information—even if the patient has explicitly stated that she has decided to have an abortion, even if the patient is persistent in her desire or need for that information, and even if she explains that she does not know how to find an abortion provider on her own.

168.    Instead, Maine Family Planning's staff would be able to give patients who want an abortion referral only a list of comprehensive primary health care providers.  Upon information and belief, if Maine Family Planning's satellite clinics stopped providing abortion in compliance with the Separation Rule, there would be at most one comprehensive primary health care provider in Maine that also provides abortion services to new patients: the Mabel Wadsworth Clinic in Bangor.  Mabel Wadsworth Clinic would, therefore, be the only abortion provider that Title X providers in Maine could include on a list given to patients—and they would not be able to

---

[177] The only exception in the Rule is for cases requiring "emergency care."  *Id.* at 7,789.  Even that narrow exception is ambiguous at best as the Rule fails to define what constitutes an "emergency."

identify Mabel as an abortion provider or even tell patients that the list *contained* an abortion

provider.  Women of reproductive age in the state of Maine live an average of 103 miles from

Mabel, with 82% living farther than 50 miles away.

169.    Maine Family Planning would no longer be able to refer patients to its own

abortion providers, nor could any other Title X providers refer abortion patients to it, since most

of Maine Family Planning's sites do not provide primary care and, in any event, the

organization's remaining abortion services, if any, would be annexed to a standalone practice in

Augusta due to the Rule's new Separation Requirements.

170.    At the same time, the Rule's restrictions on "nondirective counseling" would

prevent Maine Family Planning's APRNs and medical staff from engaging in an open dialogue

with their patients about abortion as an option.  Indeed, some of Maine Family Planning's medical

professionals would be prevented from speaking to patients about abortion at all because they

would not meet the Rule's definition of APPs.[178]

171.    Because each of these limitations on the provision of information to Maine Family

Planning's patients delays the access of those patients to abortion care, as detailed above, the Gag

Rule ultimately increases health risks for Maine patients and the complexity and costs of their

abortion procedures, limits patients' options of providers, forces women to endure the continued

risks of complications of pregnancy and the physical and emotional symptoms of pregnancy,

prevents some women from accessing their preferred abortion procedure, and prevents others

from accessing abortion altogether in the state of Maine and elsewhere.

---

[178] While all of Maine Family Planning's APRNs hold a specialized nursing license from the state of Maine like those identified in the Rule as meeting the definition of APP, several of them do not have a graduate level degree and thus would not qualify under the Rule's definition of APP for purposes of providing "nondirective counseling." *See id.* at 7,787.  These APRNs were licensed in Maine prior to the State's graduate degree requirement for these programs, and thus have been "grandfathered in" as allowed by the State.   As recognized by the State, these APRNs are highly qualified to provide family planning and abortion services due to their years of experience and training.

172.    Implementation of the Gag Rule also would be complicated, time-consuming, and expensive (none of which is accounted for by the analysis in the Rule), particularly because Maine Family Planning would need to unwind processes that have been in place for decades in reliance on HHS's longstanding rules.  For example, to implement the Gag Rule, Maine Family Planning would need to create new policies, new call center scripts, and all new forms, and it would need to provide robust in-person training for both its staff and its call centers.

###    e.   Harm to Maine Family Planning

173.    Maine Family Planning has suffered and will continue to suffer ongoing irreparable harm as a result of being forced out of the Title X program and from the premature termination of its grant.  Maine Family Planning also will continue to suffer irreparable harm if it is unable to apply or compete for upcoming Title X grant cycles as a result of the Rule.

174.    Participation in the Title X program is inextricably intertwined with Maine Family Planning's historical mission and with its ability to operate in the longterm.  Maine Family Planning's reliance on Title X funds, in order to continue providing services at its own sites and through its established network of subgrantees, has been significant.  Prior to being forced out of the program, Maine Family Planning had been receiving nearly $2 million per year in Title X funds, which comprised over 27% of Maine Family Planning's annual budget.  Because Maine Family Planning has been forced out of the Title X program, it is unlawfully being denied access to that government funding going forward.

175.    HHS has implemented the Title X program for decades in a manner consistent with the provision of care by Maine Family Planning.  Mainers, especially the most vulnerable among them, have relied on this infrastructure for their reproductive healthcare.  Many have relied on Maine Family Planning as their exclusive source of healthcare.  It strains credulity that private

donation will be able to replace and fully mitigate the harm caused by the Rule.  It is similarly implausible that the government may rely on private donors to make up for its abandoning of the Title X infrastructure that it has nurtured—an infrastructure increasingly developed around comprehensive reproductive healthcare.  Such private donors are not a possible or appropriate replacement for the Title X program.

176.    Without Title X funds or equivalent private donations, which Maine Family Planning has no expectation of receiving on an indefinite basis, Maine Family Planning would be forced to cut back a significant portion of its services, including closing the majority of its satellite clinics, downsizing staff, and eliminating some family planning services altogether.  In addition, Maine Family Planning would potentially need to end its provision of subsidized family planning services through many of its subgrantee sites.

177.    Moreover, Maine Family Planning's loss of Title X funds has forced it to redirect its development efforts, in order to obtain funds that are necessary merely to maintain its core family planning programs.  As a result, Maine Family Planning has had to forgo opportunities to fundraise for or otherwise develop other aspects of its practice and mission.

178.    Moreover, as a result of being forced out of the Title X Program, Maine Family Planning and its providers have lost access to numerous other resources on which they relied to support their provision of family planning services.  For example, Maine Family Planning no longer has access to technical assistance from the National Family Planning Training Center, on which it had substantially relied to conduct training on topics like clinical flow and patient management, or to a regional consultant through OPA.  Title X training programs were an especially important resource for Maine Family Planning because it is not large enough to maintain its own in-house training program.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION—ADMINISTRATIVE PROCEDURE ACT: CONTRARY TO LAW AND IN EXCESS OF STATUTORY AUTHORITY

179.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

180.    Plaintiffs are entitled to relief under the Administrative Procedure Act because the Rule is unlawful under federal statutes and the Constitution.

181.    The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action, finding, or conclusion that is "an abuse of discretion," "not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority, or limitations, or short of statutory right."[179]

182.    The Rule violates the law because its Gag Rule provisions contravene the Nondirective Counseling Mandate set forth in the Continuing Appropriations Act, 2019.[180]

183.    The Rule further violates the law because its physical separation and Gag Rule provisions contravene section 1554 of the Patient Protection and Affordable Care Act. [181]

184.    Section 1554 requires that HHS not promulgate any regulation that "interferes with communications regarding a full range of treatment options between the patient and the provider," that "restricts the ability of health care providers to provide full disclosure of all relevant information to patients making health care decisions," or that "violates the principles of informed consent and the ethical standards of health care professionals."

---

[179] 5 U.S.C. § 706(2)(A)–(C).

[180] Pub. L. 115–245, Div. B, § 208, 132 Stat. 2981, 3070–71.

[181] 42 U.S.C. § 18114 (2012).

185.    Because the Rule prevents health care providers from providing appropriate referrals to their patients to address the possibility of an abortion, and because it prevents medical professionals from engaging in an open dialogue with their patients about abortion, the Rule does not allow providers to discuss a full range of treatment options or fully disclose all relevant information.  In forcing health care providers to arrange for unnecessary and unwanted prenatal care referrals, the Rule similarly interferes with patient–provider communications.  As attested to by the American Medical Association, the American College of Obstetricians and Gynecologists, the American Academy of Nursing, and other organizations, it also violates the ethical standards of health care professionals.

186.    Section 1554 further requires that HHS not promulgate any regulation that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care" or "impedes timely access to health care services."

187.    Because the Rule requires Title X providers to physically segregate their Title X family planning services from their abortion services, forcing patients to seek care at multiple locations, it creates unreasonable barriers for patients with unwanted pregnancies to obtain care and impedes timely access to abortion services.  Furthermore, the Rule's ban on referring Title X patients for abortion care impedes those patients' timely access to abortion care given the difficulties for patients of obtaining accurate and appropriate information about abortion providers.  The Rule also creates unreasonable barriers and impedes timely access to healthcare services by imposing restrictions that will force many health care providers to leave the Title X program and/or close clinics altogether.

188.     The Rule violates the law because it is not based on a permissible construction of Title X.  By way of example and not limitation, the Rule contravenes Congress's mandate that Title X projects provide "comprehensive" and "voluntary" services.[182]

189.     The Rule also is not a permissible construction of Title X because it is contrary to Congress's clear intent, as evidenced by the legislative history leading up to Title X, as well as Congress's legislative actions and its statements on the floor relating to the Title X program throughout the nearly fifty years since Title X's enactment.

190.     The Rule is unlawful because it violates the First Amendment.

191.     The Rule is unlawful because it violates the Due Process Clause of the Fifth Amendment.

192.     The Rule is unlawful because it discriminates based on the exercise of a fundamental right and based on sex.

193.     The Rule is unlawful because it erects an unconstitutional condition to receipt of federal funds.

194.     By issuing the unlawful Rule, Defendants abused their discretion in violation of 5 U.S.C. § 706(2)(A).

195.     Because Defendants' actions are "not in accordance with law," "contrary to constitutional right," "an abuse of discretion," and in excess of statutory authority and short of statutory right, the Government Defendants have violated the Administrative Procedure Act.

196.     Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

---

[182] 42 U.S.C. §§ 300a, 300a-5.

## SECOND CAUSE OF ACTION—ADMINISTRATIVE PROCEDURE ACT:
## ARBITRARY AND CAPRICIOUS

197.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

198.    Plaintiffs are entitled to relief under the Administrative Procedure Act because the Rules are arbitrary and capricious.

199.    The Administrative Procedure Act requires courts to "hold unlawful and set aside" any agency action, finding, or conclusion that is "an abuse of discretion," "arbitrary and capricious," "not in accordance with the law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory . . . authority, or limitations, or short of statutory right."[183]

200.    Defendants' issuance of the Rule exceeded their statutory authority, abused their discretion, and is arbitrary and capricious because the Rule was adopted without permissible or valid justification.

201.    Defendants' issuance of the Rule exceeded their statutory authority, abused their discretion, and is arbitrary and capricious because the Rule rescinds longstanding regulatory requirements without any reasoned explanation.

202.    Although the Rule purports to identify "justifications" for reversing its longstanding position, it provides no reasonable explanation for these significant changes.

203.    At the same time, the Rule fails to address and/or meaningfully consider material facts and evidence submitted during the comment period on the Proposed Rule, including but not limited to harms that would be imposed by the Separation Requirements and Gag Rule.

---

[183] 5 U.S.C. § 706(2)(A)–(C).

204. Defendants' cost-benefit analysis likewise fails to weigh meaningful harms caused by the Rule against its purely speculative benefits.

205. The Rule is inconsistent with the weight of the hundreds of thousands of comments that were submitted in response to the notice of public rulemaking, and thus is arbitrary, capricious, and an abuse of discretion.

206. By issuing the unlawful Rule, Defendants abused their discretion in violation of 5 U.S.C. § 706(2)(A).

207. Because Defendants' actions are "arbitrary and capricious," "an abuse of discretion," and in excess of statutory authority and short of statutory right, Defendants have violated the Administrative Procedure Act.

208. Absent declaratory and injunctive relief, the Defendants' violations will cause ongoing harm to Plaintiffs.

### THIRD CAUSE OF ACTION—UNCONSTITUTIONAL CONDITIONS

*Fifth Amendment Due Process,*
*Undue Burden on Plaintiffs' Patients Right to Liberty and Privacy*

209. The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

210. The Rule imposes an unconstitutional condition on Plaintiffs' receipt of Title X funds.

211. The Rule requires Plaintiffs to adopt policies and standards of care for patients that violate Plaintiffs' patients' Fifth Amendment rights, and interferes with Plaintiffs' practice of medicine.

212. The Rule requires Plaintiffs to adopt policies and take steps that will inflict a substantial burden on their patients' ability to access abortion care, and thus infringe those patients' fundamental right to abortion access.

213. The Due Process Clause of the Fifth Amendment prohibits the government from denying fundamental rights such as the right to liberty.

214. The right to liberty encompasses the right to abortion.

215. Implementation of the Rule by Maine Family Planning, as applied to patients seeking abortion at Maine Family Planning's satellite clinics would violate Plaintiffs' patients' right to liberty as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because it would impose an undue burden on Plaintiffs' patients' fundamental right to choose abortion before viability.

216. The Rule therefore imposes an unconstitutional condition on Plaintiffs' receipt of federal funding and violates Plaintiffs' and Plaintiffs' patients' rights as secured by the Fifth Amendment of the United States Constitution.

217. Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs' patients.

## FOURTH CAUSE OF ACTION—UNCONSTITUTIONAL CONDITION

### *First Amendment*

218. The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

219. The Rule imposes an unconstitutional condition on Plaintiffs' receipt of Title X funds.

220.     The Rule requires Plaintiffs to adopt policies and standards of care for patients that violate Maine Family Planning's First Amendment rights and the First Amendment rights of Maine Family Planning's employees, and that interferes with Plaintiffs' practice of medicine.

221.     Implementation of the Rule by Maine Family Planning would subject Maine Family Planning and its employees to deprivations of their rights under the First Amendment to the United States Constitution.

222.     Providers of family planning services, including those funded by Title X, are medical providers who are obliged by their training, their codes of ethics, and their duties toward their patients to provide appropriate and complete information to those patients.  These providers help their patients make deeply personal decisions and their candor is crucial.

223.     Implementation of the Rule significantly impinges on the relationship between Title X providers and their patients, including but not limited to patient's relationships with physicians and APRNs.

224.     The relationship between health care professionals and patients is a traditional sphere of free expression that is entitled to protection under the First Amendment, even when subsidized by the government.

225.     The First Amendment provides a right to be free from governmental prohibitions on speech as well as from compelled speech by the government.

226.     The First Amendment further provides a right to be free from governmental regulations of speech that prefer one particular viewpoint in speech over other perspectives on the same topic.

227.    If Maine Family Planning were to implement the Rule, the Rule would violate the

rights of Maine Family Planning and its employees under the First Amendment, including in the

following ways:

        a.     by prohibiting Maine Family Planning and Maine Family Planning's employees from speaking their professional and medical opinions;

        b.     by compelling Maine Family Planning and Maine Family Planning's employees to speak in ways that they would not otherwise speak;

        c.     by barring Maine Family Planning and Maine Family Planning's employees from answering their patients' questions or requests for medical guidance;

        d.     by compelling Maine Family Planning and Maine Family Planning's employees to mislead their patients;

        e.     by undermining the sacred trust inherent in the patient-provider relationship;

        f.     by compelling Maine Family Planning and Maine Family Planning's employees to violate medical ethics and the standard of care;

        g.     by imposing a content-based and viewpoint-based restriction on the speech of Maine Family Planning and Maine Family Planning's employees;

        h.     by prohibiting Maine Family Planning and Maine Family Planning's employees from expressing their viewpoints;

        i.     by prohibiting Maine Family Planning and Maine Family Planning's employees from engaging in activities that encourage, promote, or advocate for abortion;

        j.     by chilling Maine Family Planning and Maine Family Planning's employees' speech through use of a vague standard that exposes Maine Family Planning and Maine Family Planning's employees to penalties for expressing their viewpoint and/or their statements regarding the best standard of care for patients.

228.    The Rule's restrictions on First Amendment rights are not justified by a

compelling or important governmental interest.

229.    Even if Defendants have a compelling or important government interest, the Rule is not substantially related or narrowly tailored to achieve that interest and/or achieves it in ways that are far more intrusive than necessary.

230.    The Rule therefore imposes an unconstitutional condition on Plaintiffs' receipt of federal funding and violates Plaintiffs' rights as secured by the First Amendment of the United States Constitution.

231.    Absent declaratory and injunctive relief, the Defendants' violations will cause ongoing harm to Maine Family Planning and Maine Family Planning's employees.

## SIXTH CAUSE OF ACTION—UNCONSTITUTIONAL CONDITION

### *Equal Protection*

232.    The foregoing allegations are re-alleged and incorporated by reference as if restated fully here.

233.    The Rule imposes an unconstitutional condition on Plaintiffs' receipt of Title X funds.

234.    The Due Process Clause of the Fifth Amendment prohibits the government from denying equal protection of the laws.

235.    If Maine Family Planning were to implement the Rule, the Rule would deny Plaintiffs' patients the equal protection of the laws because it treats pregnant individuals seeking abortion care differently from pregnant individuals seeking prenatal care or otherwise intending to continue their pregnancies.

236.    Pursuant to the Rule, health care providers in a Title X program must provide incomplete, inaccurate, and misleading information that is inconsistent with medical ethics to pregnant patients seeking abortion care.  By contrast, they may provide complete, accurate, and medically appropriate care to pregnant patients seeking prenatal care.

75

237. If Maine Family Planning were to implement the Rule, the Rule would deny Plaintiffs' patients the equal protection of the laws because it discriminates on the basis of sex.

238. Defendants cannot proffer any rationally related legitimate government interest or legitimate justification for the Rule, let alone an important, exceedingly persuasive, or compelling justification. The reasons offered by Defendants in the preamble to the Rule are unfounded and pretextual.

239. Even if Defendants have an important, exceedingly persuasive, or compelling government interest, the Rule is not substantially related or narrowly tailored to achieve that interest.

240. Absent declaratory and injunctive relief, Defendants' violations will cause ongoing harm to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Issue a declaratory judgment that the Rule was issued in violation of, and violates, the Administrative Procedure Act, the Affordable Care Act, and the First and Fifth Amendments to the United States Constitution, on its face and/or as applied to Plaintiffs;

b. Enter a permanent injunction prohibiting Defendants from implementing or enforcing the Rule and vacating the Rule in its entirety;

c. Retain jurisdiction until Defendants have fully satisfied their court-ordered obligations;

d. Award Plaintiffs attorneys' fees and costs, as provided by any applicable statute or regulation or the inherent powers of the Court;

e. Grant all further and additional relief that the Court may determine is just and proper.

Dated:  November 22, 2019                    Respectfully submitted,


                                             /s/ Richard L. O'Meara
                                             Richard O'Meara
                                             Murray Plumb & Murray
                                             75 Pearl Street
                                             Portland, ME 04104
                                             Telephone: (207) 773-5651
                                             romeara@mpmlaw.com

                                             Emily Nestler*
                                             Molly Duane*
                                             Arielle Humphries*
                                             Center for Reproductive Rights
                                             199 Water Street, 22nd Floor
                                             New York, NY 10038
                                             Telephone: (917) 637-3600
                                             enestler@reprorights.org

                                             Emily Ullman*
                                             Jennifer Saperstein*
                                             Covington & Burling LLP
                                             One CityCenter
                                             850 Tenth Street NW
                                             Washington, DC 20001
                                             Telephone: (202) 662-6000
                                             eullman@cov.com
                                             _____

                                             *Attorneys for Plaintiffs The Family Planning
                                             Association of Maine d/b/a Maine Family Planning
                                             and J. Doe, DO, MPH*

* Admitted to appear *pro hac vice*.