# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, on behalf of itself, its staff, and its patients, *et al.*;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*;<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:19-cv-00100-LEW |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs hereby move for summary judgment on all claims set forth in Plaintiffs'

Amended Complaint pursuant to Federal Rule of Civil Procedure 56, and oppose Defendants'

motion to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6)

and motion in the alternative for summary judgment.   The reasons for this motion and

opposition are set forth in the following memorandum of law.

Richard L. O'Meara
Murray Plumb & Murray
75 Pearl Street
Portland, ME 04104
Telephone: (207) 773-5651
romeara@mpmlaw.com

Emily Nestler*
Molly Duane*
Arielle Humphries*
Center for Reproductive Rights
199 Water Street, 22nd Floor
New York, NY 10038
Telephone: (917) 637-3600
enestler@reprorights.org

Emily Ullman*
Jennifer Saperstein*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
eullman@cov.com

*Attorneys for Plaintiffs*                                    *\*Admitted Pro Hac Vice*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

I.      Maine Family Planning ................................................................................................ 3

II.     The Title X Program ................................................................................................... 4

III.    The Rule ....................................................................................................................... 6

      A.     The Gag Rule ................................................................................................. 6

      B.     Physical Separation Requirements ................................................................ 7

IV.    Collapse of Title X Program ....................................................................................... 8

V.     Procedural History ...................................................................................................... 8

STANDARD OF REVIEW ................................................................................................. 9

ARGUMENT ....................................................................................................................... 9

I.      The Rule Violates the APA Because It Is Arbitrary and Capricious ................................. 9

      A.     The Gag Rule Is Arbitrary and Capricious ........................................................ 11

      B.     The Physical Separation Requirements Are Arbitrary and Capricious. ............... 17

            1.     Defendants Lack a Reasoned Explanation for Instituting the Separation Requirements. ............................................................... 17

            2.     Defendants Calculated Compliance Costs Without an Adequate Basis. ...................................................................................... 18

            3.     Defendants Failed to Account for Reliance Interests. ............................. 19

            4.     Defendants Failed to Account for Harm to the Title X Network and the Provision of Abortion Services. ........................................... 20

II.     The Rule Is Not in Accordance with Law. ................................................................. 21

      A.     The Gag Rule Violates Congress's Nondirective Counseling Mandate. ............. 21

      B.     Both the Gag Rule and Separation Requirements Are Contrary to Section 1554 of the ACA. ........................................................................................ 24

III.    The Rule Violates the APA Because It Is Contrary to Title X. ........................................ 28

i

IV.    The Rule Imposes an Unconstitutional Condition in Violation of Plaintiffs' Patients Fundamental Right to Choose Abortion Before Viability. ............................... 30

    A.    Because Rust Did Not Address This Claim, the Court Must Apply the Unconstitutional Conditions Standard to the Facts at Hand. ................................ 31

    B.    As-Applied to Plaintiffs and Their Patients, the Rule's Conditions Reach Protected Conduct Outside the Title X Program. .................................................. 32

    C.    As-Applied to Plaintiffs and Their Patients, the Rule's Conditions Would Be Unconstitutional if Applied Directly. ................................................................ 34

        1.    The Rule Conditions Funding on MFP Shuttering Abortion Service at Its Satellite Clinics. ............................................................................. 34

        2.    Implementation of the Rule Would Impose an Undue Burden on Plaintiffs' Patients Access to Abortion. .................................................... 35

V.    The Rule Violates the Equal Protection Clause. .......................................................... 39

    A.    The Rule is Subject to Heightened Scrutiny because it Discriminates Against Patients Based on their Exercise of a Fundamental Right...................... 39

    B.    The Rule Fails Any Level of Scrutiny. .................................................................. 41

VI.    The Rule Violates the First Amendment. ........................................................... 42

    A.    Speech Between Medical Professionals and Patients Is Recognized by the Supreme Court as Subject to Paramount First Amendment Protection................ 42

    B.    The Gag Rule is Subject to Heightened Scrutiny. .................................................. 43

    C.    The Rule Fails any Level of Heightened Scrutiny................................................. 44

    D.    The Rule Violates the First Amendment As Applied to Plaintiffs. ...................... 45

CONCLUSION ...................................................................................................................... 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AID v. All. for Open Soc. Int'l Inc.*,
    570 U.S. 205 (2013)...........................................................................................................30, 32

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) ......................................................................................15

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002).......................................................................................................27

*Bolling v. Sharpe*,
    347 U.S. 497 (1954).......................................................................................................39

*Boston Redevelopment Auth. v. Nat'l Park Serv.*,
    838 F.3d 42 (1st Cir. 2016).............................................................................................9

*Brill v. Countrywide Home Loans, Inc.*,
    427 F.3d 446 (7th Cir. 2005) ........................................................................................29

*Brown v. Sec'y of Health & Human Servs.*,
    46 F.3d 102 (1st Cir. 1995)...........................................................................................26

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962).......................................................................................................9

*Chevron v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984).......................................................................................................28

*Citizens Awareness Network v. United States*,
    391 F.3d 338 (1st Cir. 2004).....................................................................................10, 11

*City of Arlington v. FCC*,
    569 U.S. 290 (2013).......................................................................................................28

*City of Cleburne Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).......................................................................................................39

*Clifton v. Heckler*,
    755 F.2d 1138 (5th Cir. 1985) ......................................................................................29

*Commodity Fut. Tr. Comm'n v. Schor*,
    478 U.S. 833 (1986).......................................................................................................30

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ...................................................................................43

*Cook v. Gates*,
  528 F.3d 42 (1st Cir. 2008) ...................................................................................39

*Council of Parent Attorneys & Advocates, Inc. v. DeVos*,
  365 F. Supp. 3d 28, 53 (D.D.C. 2019) ...................................................................21

*Ctr. for Sustainable Econ. v. Jewell*,
  779 F.3d 588 (D.C. Cir. 2015) ...............................................................................26

*Dickerson v. Latessa*,
  872 F.2d 1116 (1st Cir. 1989) ........................................................................39, 41

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ....................................................................................17, 19

*Essential Access Health, Inc. v. Azar*,
  No. 19-15979 ..........................................................................................................10

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...........................................................................10, 11, 15, 17

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000)...............................................................................................28

*Getty v. Fed. Savs. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) .............................................................................15

*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of
  Baltimore*,
  879 F.3d 101 (4th Cir. 2018) .................................................................................44

*Gresham v. Azar*,
  No. 19-5094, -- F.3d --, 2020 WL 741278 (D.C. Cir. Feb. 14, 2020) ..............14, 15

*Hispanic Affairs Project v. Acosta*,
  901 F.3d 378 (D.C. Cir. 2018) ...............................................................................26

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) .................................................................................37

*Jackson Women's Health Org. v. Dobbs*,
  945 F.3d 265 (5th Cir. 2019) .................................................................................35

*Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*,
  138 S. Ct. 2448 (2018)............................................................................................44

*June Med. Serv. v. Gee,*
    306 F. Supp. 3d 886, 893 (M.D. La. 2018) ........................................................... 38

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) ...................................................................................... 34, 35

*Koretoff v. Vilsack,*
    707 F.3d 394 (D.C. Cir. 2013) (per curiam) ...................................................... 26

*Legal Services Corp. v. Velazquez,*
    531 U.S. 533 (2001) ........................................................................................... 43

*Maine Ass'n of Interdependent Neighborhoods v. Petit,*
    659 F. Supp. 1309 (D. Me. 1987) ...................................................................... 18

*Maine Medical Center v. Burwell,*
    841 F.3d 10 (1st Cir. 2016) ................................................................................ 30

*Mayor & City Council of Baltimore v. Azar,*
    Civ. Action No. RDB-19-1103, 2020 WL 758145 (D. Md. Feb. 14, 2020) ............ 8, 11, 12, 19

*McCullen v. Coakley,*
    573 U.S. 464 ...................................................................................................... 32

*McGuire v. Reilly,*
    230 F. Supp. 2d. 189 (D. Mass. 2002) ................................................................ 9

*McNabb for McNabb v. Bowen,*
    829 F.2d 787 (9th Cir. 1987) ............................................................................. 30

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ...................................................................................... 10

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ........................................................................................... 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................... *passim*

*N.L.R.B. v. Bell Aerospace Co.,*
    416 U.S. 267 (1974) ........................................................................................... 30

*NAACP v. Trump,*
    315 F. Supp. 3d 457, 473 (D.D.C. 2018) ........................................................... 20

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ................................................................................ *passim*

*Nat. Res. Defs. Council v. EPA*,
    755 F.3d 1010 (D.C. Cir. 2014) ................................................................26

*Natural Res. Def. Council, Inc. v. U.S. EPA*,
    824 F.2d 1258 (1st Cir. 1987) ..................................................................17

*Obergerfell v. Hodges*,
    135 S. Ct. 2584 (2015) .......................................................................37, 41

*Ohralik v. Ohio State Bar Ass'n*,
    436 U.S. 447 (1978) ..................................................................................45

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ..................................................................................19

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ....................................................................................10

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ..................................................................................42

*Planned Parenthood Ariz., Inc. v. Humble*,
    753 F.3d 905 (9th Cir. 2014) ....................................................................38

*Planned Parenthood of Greater Ohio v. Hodges*,
    917 F.3d 908, 916 (6th Cir. 2019) (en banc) ...........................................37

*Planned Parenthood of Ind. & Ky., Inc v. Comm'r of Ind. State Dep't of Health*,
    896 F.3d 809 (7th Cir. 2018) ....................................................................38

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind.*,
    699 F.3d 962 (7th Cir. 2012) ....................................................................36

*Planned Parenthood of Minn. v. Minnesota*,
    612 F.2d 359 (8th Cir. 1980) ....................................................................42

*Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833 (1992) ...............................................................31, 35, 36, 39

*Planned Parenthood of Sw. and Cent. Fla. v. Philip*,
    194 F. Supp. 3d 1213, 1220 (N.D. Fla. 2016) ..........................................35

*Planned Parenthood of Wis., Inc. v. Schimel*,
    806 F.3d 908 (7th Cir. 2015) ....................................................................38

*Planned Parenthood of Wis., Inc. v. Van Hollen*,
    738 F.3d 786 (7th Cir. 2013) ....................................................................38

*Red Lion Broad. Co. v. FCC*,
   395 U.S. 367 (1969)....................................................................................28

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015)...............................................................................44

*Roe v. Wade*,
   410 U.S. 113 (1973)....................................................................................35

*Ruiz v. Bally Total Fitness Holding Corp.*,
   496 F.3d 1 (1st Cir. 2007)...........................................................................27

*Rust v. Sullivan*,
   500 U.S. 173 (1991).......................................................................... *passim*

*Sierra Club v. E.P.A.*,
   671 F.3d 955 (9th Cir. 2012) .....................................................................18

*Sierra Club v. Pruitt*,
   293 F. Supp. 3d 1050, 1061 (N.D. Cal. 2018) ..........................................26

*Skinner v. Okla. ex rel. Williamson*,
   316 U.S. 535 (1942)....................................................................................40

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011)....................................................................................44

*California v. Azar*,
   No. 19-15974, slip op. (9th Cir. Feb. 25, 2020) (en banc).........................9

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir. 2009) ...................................................................17

*Stuart v. Camnitz*,
   774 F.3d 238 (4th Cir. 2014) .....................................................................44

*Taylor v. U.S.*,
   749 F.2d 171 (3d Cir. 1984)........................................................................29

*U.S. Postal Serv. v. Postal Regulatory Comm'n*,
   785 F.3d 740 (D.C. Cir. 2015).............................................................10, 13

*United States v. Arif*,
   897 F.3d 1 (1st Cir. 2018).....................................................................24, 28

*United States v. Windsor*,
   133 S. Ct. (2013)........................................................................................41

*Van Hollen, Jr. v. Fed. Election Comm'n*,
811 F.3d 486 (D.C. Cir. 2016) ........................................................................10

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .........................................................................................44

*Whole Woman's Health v. Hellerstedt*,
136 S. Ct. 2292 (2016) ..........................................................................36, 37, 39

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) (en banc) .......................................................44

**Statutes**

42 U.S.C. § 254c-6 ....................................................................................................22, 23

Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* 5 U.S.C. ........................... *passim*

Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981 (2018). ........................22

Public Health Service Act, 84 Stat. 1506,
*as amended* 42 U.S.C. §§ 300 to 300a-6 ....................................................... *passim*

Patient Protection and Affordable Care Act,
42 U.S.C. § 18113-16 (2012) ..............................................................5, 25, 27

**Regulations and Other Authorities**

83 Fed. Reg. 57551-52 (Nov. 15, 2018) ......................................................................26

Compliance With Statutory Program Integrity Requirements,
83 Fed. Reg. 25502 (June 1, 2018) ..............................................................22, 24

Compliance With Statutory Program Integrity Requirements,
84 Fed. Reg. 7714 (Mar. 4, 2019)
(to be codified at 42 C.F.R. pt. 59)..........................  ................................ *passim*

Fed. R. Civ. P. 56(a) ......................................................................................................9

Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion
is a Method of Family Planning; Standard of Compliance for Family Planning
Services Projects, 53 Fed. Reg. 2922 (Feb. 2, 1988) ...............................................18

Standards of Compliance for Abortion-Related Services in Family Planning
Services Projects, 65 Fed. Reg. 41270 (July 3, 2000)) ....................................2423

## INTRODUCTION

For nearly fifty years, the Title X federal family planning program has provided high-quality, affordable family planning services to millions of Americans.  The program has been recognized by the U.S. Centers for Disease Control as one of the ten most important public health achievements of the 20th century and one that has improved the lives of women and children nationwide.  Until recently, Maine Family Planning ("MFP") had been the sole Title X grantee in Maine for 47 years.  MFP provides healthcare for approximately 24,000 Mainers annually and has saved the Maine and federal governments an estimated $33 million in a single year.

In March 2019, against this backdrop of nationwide and local success, Defendants promulgated a new regulation, 84 Fed. Reg. 7,714 (the "Rule"), that offers no improvement on the program, but exacts a heavy price from providers and their patients by imposing unnecessary, unethical, and costly restrictions on Title X grantees and sub-grantees.  Most harmful to Plaintiffs and their patients are two provisions:  (1) the "Gag Rule," which prohibits health professionals from providing patients with abortion referral information—even if patients directly request it—while simultaneously mandating that each patient be referred for prenatal services, regardless of whether such a referral is wanted or appropriate; the Gag Rule also requires that patients never be counseled about abortion without also being forced to hear information about carrying a pregnancy to term; and (2) the physical separation requirements, which mandate that all clinics providing Title X services must be physically separated from any abortion services, notwithstanding that Title X funds have never been used to provide abortion at those sites.  This second requirement specifically targets Title X providers like MFP, which have been providing Title X services and abortion at the same locations for decades in reliance on longstanding program policies and rules.

The Rule was universally condemned by leading medical organizations and health policy organizations as contrary to medical ethics and damaging to public health, and commenters

accurately predicted that many providers would be forced to leave the Title X program rather than be subject to the Rule's improper requirements.  Since the Rule went into partial effect in August 2019, Title X has lost 25% of its grantee sites and nearly half its capacity to serve patients—even before the physical separation requirements are in effect.  MFP is among the grantees who were forced out of the program.

The Rule's disastrous consequences stem in part from Defendants' improper regulatory process:  Defendants' decision-making in promulgating the Rule was arbitrary and capricious because they brushed aside the overwhelming evidence of its negative impacts without explanation, and cited only concerns about *possible* confusion or *hypothetical* commingling of resources—without a shred of evidence that any such problems had arisen in the fifty years since the Title X program's inception.  Rather than address the facts and law in place *today*, Defendants rested their rulemaking primarily on *Rust v. Sullivan*, 500 U.S. 173 (1991)—a case that addressed a similar rule from over thirty years ago that never fully went into effect—in lieu of providing any evidence or assessment of the facts and law at hand.  Defendants' failure to "examine the relevant data" and articulate a "rational connection between the facts found and the choice made" in promulgating the Rule is a textbook violation of the Administrative Procedure Act.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The Rule also is unlawful because it violates two controlling statutes that were enacted in the wake of *Rust*: (1) the Nondirective Counseling Mandate that has been included in the Title X appropriations bill every year since 1996; and (2) a provision of the Affordable Care Act that prohibits HHS from issuing regulations that interfere with patient-provider communications and impose unreasonable barriers to health care.  And the Rule is beyond the bounds of Defendants' regulatory authority under Title X itself, as clarified by Congress's response following *Rust*.

Finally, the Rule is unconstitutional:  it imposes unconstitutional conditions in violation of Plaintiffs' patients' fundamental right to choose abortion before viability, the Equal Protection Clause, and the First Amendment right to freedom of speech.

For these reasons, summary judgment should be granted for Plaintiffs, the Defendants' motion should be denied, and the Rule should be vacated.

## BACKGROUND

### I.   Maine Family Planning

Maine Family Planning ("MFP") was a Title X grant recipient from 1972 until August 19, 2019, and was Maine's only Title X grantee during that entire period.  Pls.' SUMF ¶ 2.

MFP currently provides family planning services to roughly 24,000 people across Maine. *Id.* ¶ 3. It directly operates 18 family planning clinics and disburses supportive funding to 32 additional sites.  *Id.*  Many of its patients live in Medically Underserved Areas, qualify for free or reduced fee services, or otherwise have limited access to healthcare.  *Id.* ¶ 5-6.

MFP also separately provides abortion services at each of its directly-operated clinics.  *Id.* ¶ 14.  Both medication and surgical abortions are provided at the Augusta clinic; MFP offers only medication abortions at its non-Augusta clinics.  *Id.* ¶¶ 16-17. At all times since MFP began providing abortion, its abortion care has been funded privately and kept financially separate from its family planning services.  *Id.* ¶ 15.  MFP has never been found in violation of any Title X requirements by government auditors or by its own internal oversight.  *Id.* ¶ 20.

When the Rule went into effect, MFP was in the early months of a three-year, $5.49 million Title X grant, which composed over 27% of MFP's annual budget. *Id.* ¶¶ 40, 141-43.  As a result of the untenable conditions imposed by the Rule, MFP was forced to withdraw from the Title X program in August 2019.  *Id.* ¶ 143.  While MFP has been able to secure short-term replacement

funding, it anticipates that, absent additional long-term funds, it will be forced to close or discontinue funding many of its sites. *Id.* ¶¶ 144-45.

## II.      The Title X Program

The Title X program was created in 1970 with goals of making "comprehensive voluntary family planning services readily available to all," "enabl[ing] public and nonprofit private entities to plan and develop comprehensive [family planning] programs," and funding related research and training. *Id.* ¶ 25.  Prior to the Rule, Title X served over four million diverse and largely low-income patients at nearly 4,000 sites. *Id.* ¶ 27, 32-34.  Title X has prevented hundreds of thousands of unplanned pregnancies and tens of thousands of sexually transmitted infections per year, saving billions of dollars in public money. *Id.* ¶¶ 33-34.  Under § 1008 of the statute, Title X funds may not be "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

With only one brief and controversial exception thirty years ago, the regulations governing Title X have always allowed Title X projects to share facilities with abortion providers and have consistently required Title X providers to offer "nondirective" options counseling to pregnant women and referrals for abortion services upon request. *Id.* ¶ 36.  "Nondirective counseling" is commonly understood in medicine to mean patient-directed counseling that presents neutral and unbiased information regarding all options relevant to the patient and consistent with the patient's expressed wishes to hear the information, including in the context of pregnancy, prenatal care, adoption, and/or abortion. *Id.* ¶ 37.

In 1988, HHS issued a rule ("the 1988 Rule") that prohibited Title X recipients from referring for or counseling on abortion care, and required physical and financial separation of Title X services from abortion. *Id.* ¶ 38.  The 1988 Rule was initially enjoined, but the United States Supreme Court, in *Rust*, ultimately held that it was facially lawful. *Id.*  The 1988 Rule never went

into full effect before being suspended in 1993.  *Id.* ¶ 43.  Upon its suspension, the previously

governing regulations and standards were put back into effect.  *Id.*

After *Rust*, Congress took several actions relevant to this litigation.  In response to the 1988

Rule and prior to its suspension, in September 1992 Congress passed a bill (the "FPAA") that

explicitly allowed abortion counseling within Title X and would have required counseling and

referral on all pregnancy options, including abortion.  *Id.* ¶ 40.  After then-President Bush vetoed

the bill, Congress responded by including similar language in its appropriations bill for Title X,

which has been included every year since 1996 and requires that "all pregnancy counseling shall

be nondirective" (the "Nondirective Counseling Mandate") alongside the statement that "amounts

provided to [Title X] projects . . . shall not be expended for abortions." *Id.*

Additionally, in 2010, Congress passed Section 1554 of the Patient Protection and

Affordable Care Act ("ACA"), 42 U.S.C. § 18114 (2012), which reads:

> Notwithstanding any other provision of this Act, the Secretary of Health and
> Human Services shall not promulgate any regulation that— (1) creates any
> unreasonable barriers to the ability of individuals to obtain appropriate medical
> care; (2) impedes timely access to health care services; (3) interferes with
> communications regarding a full range of treatment options between the patient and
> the provider; (4) restricts the ability of health care providers to provide full
> disclosure of all relevant information to patients making health care decisions; (5)
> violates the principles of informed consent and the ethical standards of health care
> professionals; or (6) limits the availability of health care treatment for the full
> duration of a patient's medical needs.

HHS likewise took steps to further codify its longstanding guidance on abortion

counseling.  In 2000, HHS issued regulations requiring Title X projects to provide pregnant women

with "neutral, factual information and nondirective counseling on each of [her] options, and

referral on request, except with respect to any option(s) about which the pregnant woman indicates

she does not wish to receive such information and counseling."  *Id.* ¶ 44.  And in 2014, HHS

created a set of Quality Family Planning guidelines ("2014 QFP"), which are incorporated into the

Title X program.  *Id.* ¶ 45.  The evidence-based 2014 QFP requires that "[pregnancy] test results should be presented to the client, followed by a discussion of options and appropriate referrals" consistent with the recommendations of professional medical organizations.  *Id.*

## III.  The Rule

On May 22, 2018, HHS released a notice of proposed rulemaking ("Proposed Rule"), reversing its longstanding policy and largely reinstating the 1988 Rule.  *Id.* ¶ 47.  Despite the opposition of most major medical associations and thousands of other commenters, HHS published the final regulations in largely identical form on March 4, 2019.  *Id.* ¶ 55-56.  All provisions of the Rule are in effect other than the physical separation requirements.  This suit challenges two of those provisions: the Gag Rule and the physical separation requirements.

### A.     The Gag Rule

The Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion."  Final Rule, 84 Fed. Reg. 7788-89.  No information about abortion providers, identified as such, may be provided to a patient.  At the same time, Title X providers must provide all pregnant patients with a referral to prenatal services, regardless of the patients' wishes, on the purported grounds that prenatal referrals are "medically necessary."  *Id.* at 7728, 7789.  The provider may also provide the patient a list of "comprehensive primary health care providers," and "some, but not the majority" of the providers on the list may, though are not required to, be providers that "also provide abortion as part of their comprehensive services."  *Id.* at 7789.  The list may not include abortion providers who do not provide primary care, even if they are the only abortion providers in the area.  Even if a patient asks directly, Title X providers *may not* tell the patient which, if any, abortion providers are on the list, because it "cannot be used to indirectly refer for abortion or to identify abortion providers to a client."  *Id.* at 7761, 7789.

The Rule states that physicians and narrowly-defined "advanced practice providers" ("APPs") may provide what it asserts to be "nondirective pregnancy counseling," yet requires that counseling be performed in a way that is entirely directive. *Id.* at 7787, 7789. Under the Rule, physicians and APPs must give patients information about carrying the pregnancy to term in conjunction with any information about abortion, even if the patient has already stated that she has decided to have an abortion. *Id.* at 7747. Meanwhile, medical providers that fall outside the Rule's narrow definition of APP are entirely prohibited from speaking the word "abortion." The Rule goes even further by preventing Title X clinics from making available to their patients any materials, written, video, web-based or otherwise, that so much as mention abortion, even if no Title X funds are involved in providing the materials. *Id.* at 7790.

### B.   Physical Separation Requirements

The Rule requires that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities including the provision of abortion services. *Id.* at 7789. Whether this criterion is met is to be determined through a "review of facts and circumstances," with relevant factors including but not limited to:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.* The preamble notes that physical separation at a "free-standing clinic," like MFP, "might require more circumstances to be taken into account in order to satisfy a clear separation between Title X services and abortion services" because having the "same entrances, waiting rooms,

7

signage, examination rooms, and the close proximity between Title X and impermissible services" presents "greater opportunities for confusion" than at a hospital. *Id.* at 7767.

## IV.    Collapse of Title X Program

Since the Rule went into effect, roughly 25% of all Title X service sites have left the program, approximately 1,000 clinics in total. Pls.' SUMF ¶ 123. This includes Planned Parenthood (responsible for providing services to over 40% of the program's patients) and the state health systems of Hawaii, Oregon, Washington, and New York, all of which had signaled their intention to leave the program before the Rule was finalized. *Id.* No new awards to new grantees have been made since the Rule went into effect, and while HHS has released supplemental funding, that funding went to existing grantees with limited capacity and geographical reach. *Id.* The program's capacity to provide contraceptive services has been reduced by at least 47% nationwide, and in six states—including Maine—there are no Title X services currently available. *Id.*

## V.    Procedural History

On March 6, 2019, MFP and Dr. Doe filed this lawsuit individually and on behalf of their patients. ECF No. 1. Following this Court's denial of Plaintiffs' motion for a preliminary injunction and during the appeal process, the Rule went into effect nationwide. ECF No. 97. As a result, MFP was forced to leave the Title X program, dismissed its appeal of the preliminary injunction, and filed an Amended Complaint. *Id.* On January 16, 2020, Defendants moved to dismiss or in the alternative for summary judgment. ECF No. 111.

On February 14, 2020, the United States District Court for the District of Maryland granted partial summary judgment in Plaintiffs' favor in a suit brought by the city of Baltimore, vacating the Rule as to Maryland only. *Mayor & City Council of Baltimore v. Azar*, Civ. Action No. RDB-

19-1103, 2020 WL 758145 (D. Md. Feb. 14, 2020).  The Baltimore decision is the first to assess

the validity of the Rule on a complete administrative record.[1]

## STANDARD OF REVIEW

The standard for summary judgment in the context of an administrative law claim related

to agency action is unusual: the motion "is simply a vehicle to tee up a case for judicial review

and, thus, an inquiring court must review an agency action not to determine whether a dispute of

fact remains but, rather, to determine whether the agency action" complied with the APA.  *Boston*

*Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016).  By contrast, the ordinary

Rule 56(a) standard for summary judgment—that summary judgment should be granted when

"there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law"—applies to Defendants' constitutional claims.  *See* Fed. R. Civ. P. 56(a); *McGuire*

*v. Reilly*, 230 F. Supp. 2d. 189, 193 (D. Mass. 2002).

## ARGUMENT

**I.      The Rule Violates the APA Because It Is Arbitrary and Capricious**

Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), an agency

action must be based on a "reasoned analysis" that indicates the agency "examine[d] the relevant

data and articulate[d] a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State*

*Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 42-43 (1983) (quoting *Burlington Truck Lines v. United*

*States*, 371 U.S. 156, 168 (1962)).  While an agency's change in policy does not necessarily

---

[1] On February 25, 2020, the Ninth Circuit released a consolidated opinion vacating the three preliminary injunctions against the Rule entered by district courts in that Circuit on the grounds that the Rule does not violate the APA. *California v. Azar*, No. 19-15974, slip op. (9th Cir. Feb. 25, 2020) (en banc).  This decision was made in a different procedural posture than the motion at hand and, in any event, is not binding on this Court.  Moreover, the Ninth Circuit did not have before it any constitutional claims; its ruling was confined to APA causes of action.

demand "a more detailed justification than what would suffice for a new policy created on a blank slate," such justification *is* required when the new policy rests upon factual findings that contradict the agency's prior findings or when the "policy has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 105 (2015). In all instances, however, an agency acts arbitrarily and capriciously when it fails to offer a "reasoned explanation" for changing course. *Fox*, 556 U.S. at 515.

In general, a rule is arbitrary and capricious where the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. "[A]gency action is lawful only if it rests 'on a consideration of the relevant factors,'" and the agency must consider "the advantages *and* the disadvantages" of the proposal before taking action. *Michigan v. EPA*, 135 S. Ct. 2699, 2706-07 (2015). As distilled by the First Circuit, the agency's calculus in achieving its goals "must fairly account for any benefits lost by modifying existing rules, as well as any advantages expected to be gained through the adoption of updated rules." *Citizens Awareness Network v. United States*, 391 F.3d 338, 352 (1st Cir. 2004).

Importantly, the arbitrary and capricious standard must consider the *rulemaking* at hand—because agencies may not make policy decisions, even those otherwise within the scope of the law, without a properly reasoned justification. *See, e.g.*, *U.S. Postal Serv. v. Postal Regulatory Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) (finding agency decision arbitrary and capricious even where interpretation of statute was not foreclosed by ambiguous statute); *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 495 (D.C. Cir. 2016) (conducting *State Farm* analysis after

finding statutory interpretation permissible under *Chevron*).   Thus, Defendants' repeated insistence that *Rust* justifies their rulemaking process here, Defs.' Mem. at 30-36, is misplaced. Defendants' consideration of the *current* factual landscape and *current* problems could not have been "already blessed by the Supreme Court," *id.* at 36, in a case that took placed nearly thirty years ago and that was based on a different administrative record.   Plaintiffs are aware of no caselaw, nor have Defendants cited any, supporting the principle that once a regulation is promulgated and found not to be arbitrary and capricious, its re-promulgation at a different time and under different circumstances is *de facto* properly reasoned under the APA.   Because each arbitrary and capricious analysis must examine the administrative record and the agency's reasoning for the precise regulation at issue, the decision in *Rust* does not control here.

### A.      The Gag Rule Is Arbitrary and Capricious

Far from explaining its contrary factual findings or addressing the "serious reliance interests" of existing Title X grantees, *Fox*, 556 U.S. at 515, Defendants' promulgation of the Gag Rule does not even survive the First Circuit's test in *Citizens Awareness Network*: it fails to "fairly account" for the "benefits lost" as a result of the Rule, and offers no tangible benefits to the new policy.   391 F.3d at 352.   The administrative record demonstrates that the Gag Rule reduces compliance with medical ethics, the accessibility of family planning care, the quality of family planning care, and the accessibility of abortion care.   Pls.' SUMF ¶¶ 87-108.   Defendants failed to account for these losses, insisting without basis that no benefits would be lost at all.   *Id.* ¶¶ 87-88.

**Medical Ethics.**   As the District of Maryland found upon reviewing the complete administrative record, the Gag Rule is "inadequately justified and objectively unreasonable" given its departure from medical ethics, and Defendants fail to explain why it departs from those ethics or why such departure is justified.   *Mayor & City Council of Baltimore*, 2020 WL 758145, at *1.

11

The Gag Rule ignores unequivocal comments from nearly every leading medical association and public health policy organization, including the American College of Obstetricians and Gynecologists ("ACOG") and the American Association of Nursing ("AAN"). Those comments made clear that the Gag Rule is incompatible with health care professionals' ethics obligations and with the standard of care, and that it will seriously harm the provision of healthcare to American women. Pls.' SUMF ¶¶ 87-98.  In fact, Defendants have conceded that they are unaware of a single professional organization in the record that supported the Rule. *Id.* ¶ 51.

The Rule does not directly address any of these comments, instead noting only that HHS "disagrees." Pls.' SUMF ¶ 98.  That is clearly insufficient.  As the Maryland Court noted in its decision finding the Rule arbitrary & capricious in violation of the APA: "[t]o be sure, HHS was not required to demonstrate that any professional organization supported the Rule, but it was required to provide a reasoned explanation for its disagreement with the medical ethics concerns of every major medical association in the country, while simultaneously finding the Final Rule consistent with medical ethics." *Mayor & City Council of Baltimore*, 2020 WL 758145, at *10.

Defendants attempt to circumvent the administrative record on this point by arguing that: (1) enactment of conscience statutes by Congress means that refusing to provide abortion referrals is consistent with medical ethics; and (2) *Rust*'s upholding of the 1988 Rule means that the current Rule must be ethical.  Defs.' Mem. at 33.  These theories are not sensible.  First, Congress's determination that a physician may not be *forced* to refer for abortion in some circumstances is not analogous to the Gag Rule, which prevents *every* physician in the Title X program from referring for abortion notwithstanding their medical judgment and the particular needs of their patients. Pls.' SUMF ¶¶ 58-72.  And Defendants' reliance on *Rust* is also unavailing:  *Rust* did not base its holding on any findings about ethical responsibilities, *see* 500 U.S. 173, and, in any event,

12

interpretation of medical ethics standards from 1988 would not render the present rulemaking well-reasoned today, *U.S. Postal Serv.*, 785 F.3d at 740.

**Accessibility of Family Planning Care.**  Numerous commenters pointed out that, based on scientific studies, historical analogies, and the commenters' own stated intentions, the Gag Rule would result in a major reduction in Title X participation and coverage.  Pls.' SUMF ¶¶ 109-22.  Planned Parenthood and at least four states, collectively representing a significant portion of Title X's services, affirmatively stated that they would leave the program were the Gag Rule to go into effect.  *Id.* ¶ 110.  The record shows that the loss of Planned Parenthood alone from the Title X program is likely to lead to a "decline in the use of the most effective methods of birth control and an increase in births among women who previously used long-acting reversible contraception."  *Id.* ¶ 118.  And data resulting from similar state-level legislation barring abortion-affiliated providers from participating in family planning programs consistently demonstrates that the quantity and quality of family planning services decreases under such laws, and that replacement providers were unlikely to be sufficient substitutes in quality or quantity.  *Id.* ¶¶ 118-19.  The Rule's bald claim in response, that the agency was unaware of "actual data that could demonstrate a causal connection between the type of changes to Title X regulations contemplated in this rulemaking and an increase in unintended pregnancies, births, or costs," 84 Fed. Reg. at 7775, runs counter to the evidence presented.  *See State Farm*, 463 U.S. at 43.

At the same time, HHS speculated that abortion-related restrictions in the Rule "may" increase the number of new providers applying to be grantees because those providers "*may* have chosen not to apply" previously due to their conscience objections.  84 Fed. Reg. at 7780 (emphasis added).  But, the only source HHS cited for that assertion was a comment based on a single 2011 poll of medical professionals, which addressed religious objections under certain conscience

statutes but does not address the question of Title X participation at all, much less any impact that changes to the Title X program would have on faith-based providers. 84 Fed. Reg. at 7780 n.138, 7781 n.139. By contrast, as commenters explained, there is no basis to conclude that the Rule will result in additional faith-based providers joining the Title X program. Pls.' SUMF ¶ 110.

Contradicting its own prediction that new providers would enter the program, HHS noted that "the Department cannot calculate or anticipate future turnover in grantees" and that such calculations would be "purely speculative" because "[v]arious entities may change their decision to apply to be a grantee or sub-grantees." 84 Fed. Reg. at 7782. But, commenters *did* provide evidence that many grantees would leave the program due to the Rule, Pls.' SUMF ¶¶ 109-18, demonstrating that HHS's ultimate conclusion that the Rule would not have "significant impact on access to services" or on patient travel times was completely unsupported, 84 Fed. Reg. at 7782. Defendants' only defense is that they do not agree with the data presented, which is not the same as having a factual basis to disagree. Defs.' Mem. at 31.

HHS's failure to rigorously analyze comments indicating that a Rule will cause loss of healthcare coverage is patently arbitrary and capricious. *See Gresham v. Azar*, No. 19-5094, -- F.3d --, 2020 WL 741278 (D.C. Cir. Feb. 14, 2020). Indeed, the D.C. Circuit recently explained just that, in analyzing HHS's approval of work requirements for Medicaid imposed by the State of Arkansas. In *Gresham*, commenters had raised concerns that the rule's "requirements would be burdensome on families or create barriers to coverage," and, as the court noted, those predictions came to pass. *Id.* at *7. The Secretary's response was to state cursorily that outreach done by the State would prevent these harms from occurring. Such analysis was insufficient:

> In total, the Secretary's analysis of the substantial and important problem is to note the concerns of others and dismiss those concerns in a handful of conclusory sentences. Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking. *See, e.g.*, *Am.*

> *Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" the consequences of a decision); *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986) (analyzing whether an agency actually considered a concern rather than merely stating that it considered the concern).

*Id.* Here, too, the commenters have so far been proven correct as to their predictions about the likely decrease of capacity and access that the Rule would cause. Pls.' SUMF ¶ 123. As described *infra*, Title X has suffered a devastating loss of capacity and sites in the wake of the Rule, and no new grantees have been awarded any Title X funds since it went into effect.

**Quality of Family Planning Care.** Defendants' promulgation of the Rule also disregarded the 2014 QFP, which are HHS's own Title X program requirements and national standards of care. *Id.* ¶¶ 45, 99. The QFP was prepared by a team of experts within HHS and its sub-agencies (CDC and OPA), was backed by extensive research, and was fully reaffirmed in December 2017. *Id.* ¶ 99. The QFP requires "client-centered" care, which for pregnant patients includes nondirective "[o]ptions counseling" with "appropriate referrals." *Id.* ¶ 99. The QFP emphasizes that pregnancy "[o]ptions counseling should be provided in accordance with the recommendations from professional medical associations such as ACOG and AAP." *Id.* ¶ 99. Thus, the agency's decision-making is inconsistent with its own pre-existing patient care guidance, which recommends the very same practices urged by commenters and ignored in the Rule. *Id.* ¶¶ 90, 94, 99.

Defendants argue that directing Title X providers to ignore portions of the QFP is merely a legal and policy decision equivalent to changing from the 2000 Guidelines. Defs.' Mem. at 34. But, the QFP is not merely a policy document or a legal interpretation, it is the agency's own evidence-based, researched document intended to direct providers on how to provide what the agency deems the highest quality care. Pls.' SUMF ¶ 99. HHS thus cannot provide "a reasoned explanation" for "disregarding facts and circumstances that underlay" its prior position. *Fox*, 556 U.S. at 516. Putting aside whether HHS might be able to decide, within the bounds of arbitrary

15

and capricious review, that a reduction in the quality of some patient care is worthwhile if there is a compensating tradeoff, that was not what happened here.  Instead, the Rule simply fails to address impact on patient care quality caused by deviating from the QFP at all.  Pls.' SUMF ¶ 95.

**Accessibility of Abortion Care.**  Defendants did not conduct *any* analysis of the Gag Rule's impact on abortion access, much less a "reasoned" analysis.  The Rule's claim that there will be no costs resulting from the Gag Rule, 84 Fed. Reg. at 7719, disregards entirely the costs of endangering patients by withholding referrals and delaying abortion access,[2]  Pls.' SUMF ¶¶ 100-108, and evidence that the Rule will result in patients' inability to timely access abortion.  *Id* ¶¶ 90, 107-08.  While all abortion procedures are safe, the risks, costs, and complexity of abortion increase with gestational age, and delay may mean some women cannot access their medically-indicated abortion procedure, or any abortion care at all.  *Id.* ¶¶ 90, 107-08, 138.

Defendants baldly assert, without any citation or support, that a doctor giving patients personalized information about how abortion might relate to them and their circumstances is "not necessary for women's health" because "[i]nformation about abortion and abortion providers is widely available and easily accessible, including on the internet."  84 Fed. Reg. at 7746.  Even assuming *arguendo* that the Internet could be deemed an appropriate substitute for the counseling performed by a knowledgeable healthcare provider, which it is not, Defendants ignore evidence in the record that many patients of limited means or education lack the "knowledge and ability to navigate the health care system" and/or lack "regular access to communication tools (e.g., internet, phone) that are needed to access and research" this information.  Pls.' SUMF ¶ 105.  Mere

---

[2] This category of injury to patients is distinct from the injuries caused by the reduction in *family planning services*, discussed above.  Yet, Defendants' motion refuses to acknowledge the distinction.  Defs.' Mem. at 34 (responding to assertion that the Rule would impact patients by arguing only that HHS considered the impact on *Title X patients*).

speculation that Title X patients can find information about abortion on the Internet as support for the Rule runs "counter to the evidence" presented to the agency. *State Farm*, 463 U.S. at 43.

Because Defendants' justification is marred by unsupported assumptions and failures to acknowledge significant costs, the Gag Rule is arbitrary and capricious and should be vacated.

### B.     The Physical Separation Requirements Are Arbitrary and Capricious.

Defendants' decision to implement the physical separation requirements is arbitrary and capricious because they failed to provide a reasoned explanation for changing course and failed to consider the serious reliance interests engendered by 50 years of the prior policy. *Fox*, 556 U.S. at 515. As with the Gag Rule, the agency also underestimated the costs of this policy reversal.

### 1.     Defendants Lack a Reasoned Explanation for Instituting the Separation Requirements.

Defendants have not offered a single evidence-based reason for the physical separation requirements, much less the "good reasons" that are required when upending an agency's longstanding policy. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016). The Rule's only purported justifications for the physical separation requirements are: (1) to protect against the theoretical "risk" of "intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs," 84 Fed. Reg. at 7715; and (2) to address the "potential for confusion," *id.* at 7725. But the agency has failed to "point to any evidence in the administrative record which supports th[e] bald assertion" that such *factual* problems, as opposed to legal ones, even exist. *Natural Res. Def. Council, Inc. v. U.S. EPA*, 824 F.2d 1258, 1286 (1st Cir. 1987). This support need not, of course, be empirical—but it must underpin a reasoned decision. *See Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (finding that agency supported its decision to institute proposed rule by "thoroughly explain[ing] its concern" that regulated entities "could . . . and were" acting improperly).

17

Despite the fact that Title X providers are subject to extensive compliance review by HHS to ensure federal funds are not used for prohibited activities, the Rule does not provide a single example of "co-mingling" funds or of any other Title X violation, much less an example tied to the policy permitting colocation of Title X and abortion services.  Pls.' SUMF ¶ 78; *Maine Ass'n of Interdependent Neighborhoods v. Petit*, 659 F. Supp. 1309, 1322 (D. Me. 1987) (vacating rule because evidence was "more or less plucked out of thin air").  Nor have Defendants presented evidence of any "confusion," much less that these regulations would prevent any such confusion.

In the absence of evidence to support its hypothetical concerns, the Rule rests entirely on the "conclusions and [] approach in the 1988 regulations with respect to physical and financial separation" and the Court's finding in *Rust* that the 1988 regulations were not arbitrary and capricious.  84 Fed. Reg. 7764.  In relying on *Rust*, however, the agency fails to acknowledge that the 1988 Rule was "promulgated in direct response to [] observations" in 1982 reports by the General Accounting Office and Office of the Inspector General that were based on contemporaneous audits of forty-six Title X clinics.  *See Rust*, 500 U.S. at 188; 53 Fed. Reg. 2922, 2,924.  Those reports cannot form the basis of any credible analysis of the Title X program 36 years later, particularly since the Rule itself recognizes that the relevant makeup of Title X clinics has since changed dramatically.  84 Fed. Reg. at 7765.  The Rule does not cite a single study, report, or piece of analysis to show that its concerns apply today, much less one similar to what was before the Court in *Rust.  See Sierra Club v. E.P.A.*, 671 F.3d 955, 966 (9th Cir. 2012) (noting agency stands on "shaky legal ground relying on significantly outdated data, given the amount of time that [new information] was available" before it acted); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (agency must show it had rational basis "at the time" of decision).

      **2.**      <u>**Defendants Calculated Compliance Costs Without an Adequate Basis.**</u>

In assessing the costs of the Rule's physical separation requirements, Defendants

concluded that those costs would be on average $20,000 to $40,000.  84 Fed. Reg. at 7781-82.

These numbers were provided without supporting calculations and are neither correct nor

consistent with the evidence in the record.  Pls.' SUMF ¶¶ 80-82.  Many providers submitted

comments explaining it would cost them hundreds of thousands, and in some instances millions,

of dollars to create such separate facilities.  *Id.* ¶¶ 80-82.  Though Defendants asserted that some

grantees may not have to build new buildings and would "likely choose the lowest cost method [of

compliance], given their circumstances," the record demonstrated that even very minor steps taken

to comply would cost more than the Rule predicted—*e.g.*, changes in maintenance of electronic

records alone could cost hundreds of thousands of dollars.  *Id.* ¶ 81.  Plaintiffs are unaware of, and

Defendants have not cited, *any* comments providing an estimate of $40,000 or less for a grantee

site to become compliant, nor did HHS offer any scenarios in which such an estimate would be

appropriate.[3]  *Id.* ¶ 81.  As the Maryland Court found after reviewing the Rule's administrative

record, "HHS's conclusory response to commenters' evidence-backed concerns about the serious

problems the physical separation requirement will cause flies in the face of established APA

principles."  *Mayor & City Council of Baltimore*, No. RDB-19-1103, 2020 WL 758145, at *11.

### 3.    Defendants Failed to Account for Reliance Interests.

The Rule also fails to acknowledge, as required by law, the "serious reliance interests"

engendered by HHS's longstanding policy.  *Encino Motorcars*, 136 S. Ct. at 2126; *see also NAACP*

*v. Trump*, 315 F. Supp. 3d 457, 473 (D.D.C. 2018) (observing that agency "demonstrate[d] no true

---

[3] In this Court's decision denying Plaintiffs' motion for a preliminary injunction, the Court found that MFP was unlikely to incur economic harms as severe as those claimed due to the possibility of providing abortions through alternative means like telemedicine.  *See* ECF No. 77 at 40-41.  While MFP disagrees with that assertion—for one, it is uncontested in this litigation that physical separation would cost MFP more than $40,000 even if performed *only* in Augusta—it is irrelevant to the question of whether *Defendants* considered particular scenarios in performing a reasoned analysis of the costs to Title X grantees.  There is no evidence in the Rule that Defendants considered the use of telemedicine or the provision of abortions outside the clinic setting as a method of reducing compliance costs.

cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are.").  As discussed in section I.B.2, above, Defendants baselessly minimized the overall costs of compliance in assessing the costs of the Rule.  But in addition, and contrary to *Encino Motorcars*, Defendants did not properly characterize those costs as stemming from significant reliance interests.[4]  Many Title X projects, like MFP, are established practices that have developed over the course of decades in facilities shared with abortion providers under the current regime.  Pls.' SUMF ¶¶ 10-12, 76-86.  As described above, Defendants were presented with overwhelming evidence that forcing *post hoc* physical separation of these established practices would be complicated, expensive, and, in many cases, impossible. *Id.* ¶¶ 76-86.  In short, the greatest compliance costs would fall on the grantees with the most serious reliance on prior, longstanding policy.  Defendants' refusal to take those interests into account, based on an assertion that *Rust* permits them to so behave, is legally insufficient.

### 4.   Defendants Failed to Account for Harm to the Title X Network and the Provision of Abortion Services.

As with the Gag Rule, evidence was specifically presented to Defendants demonstrating that the physical separation requirements would cause providers to drop out of the Title X program and decrease patients' access to care.  Pls.' SUMF ¶¶ 109-122.  In comments, states with rural areas rebutted the proposition that facilities would remain available and travel distances would remain the same. *Id.* ¶¶ 113, 115. Washington demonstrated that implementing the Rule's physical separation requirements and other provisions would leave over half of Washington's counties

---

[4] In its order denying a preliminary injunction, the Court found that MFP's reliance interests were weakened because MFP should have expected HHS's regulations to change. ECF No. 77 at 38-39. As a threshold matter, there is no basis for MFP to have expected HHS's co-location regulations to change.  Title X has permitted co-location of Title X services and abortion services for 50 years.  During the one period in which that permission was in question, the outcry from the medical community was so significant that the President personally directed HHS to revise its new regulations.  But, regardless, Defendants failed to examine this question at all, and so its answer cannot be used to demonstrate that Defendants performed a reasoned analysis under *State Farm*.

without a Title X provider. *Id* ¶ 115.  Evidence in the record showed that, in many of these areas, patients would be left with no other option for obtaining family planning services. *Id* ¶ 113.  In fact, now that Washington has dropped out of the Title X program entirely, there are *no* Title X grantees in Washington—just like there are no remaining Title X providers in Maine, a similarly rural and difficult-to-travel-in state. *Id.* ¶¶ 115, 123, 143.

Defendants also failed to consider the inevitable impact of the physical separation requirements on abortion access, as fewer clinics will be able to offer abortion services, imposing barriers to care.  *Id.* ¶ 82.  As explained in a comment from a non-partisan think tank, "the end result" of the physical separation requirement "is that some women will lose access to some critical health care services, and that loss of access will result in a number of very real health, financial, physical, and psychological consequences for women and their families." *Id.* ¶ 84.

In sum, Defendants promulgated the Rule without any comprehensive assessment of the substantial costs associated with the physical separation requirement, nor of the harms it will cause to the healthcare of those served by the Title X program.  It should be vacated accordingly.  *See Council of Parent Attorneys & Advocates, Inc. v. DeVos,* 365 F. Supp. 3d 28, 53 (D.D.C. 2019) (vacating regulation because agency failed to consider all relevant factors).

## II.     The Rule Is Not in Accordance with Law.

The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law."  5 U.S.C. § 706(2).  While *Rust* held that the similar 1988 Rule was a permissible construction of the ambiguous § 1008, *see* 500 U.S. at 188, two federal statutes enacted after *Rust* cabin HHS's discretion: (1) the Nondirective Counseling Mandate, part of the Title X appropriations bill every year since 1996; and (2) Section 1554 of the ACA, passed in 2010.

### A.     The Gag Rule Violates Congress's Nondirective Counseling Mandate.

Congress's Nondirective Counseling Mandate requires that "all pregnancy counseling shall

be nondirective."  Continuing Appropriations Act, 2019, Pub. L. 115–245, 132 Stat. 2981, 3070-71 (2018).  While this term is not defined in the appropriations bill, according to common usage in medical ethics, as well as the language of Title X itself, it means that Title X patients must be presented with information about all of their pregnancy options consistent with the patient's desire to hear that information.[5]  Pls.' SUMF ¶¶ 37; *see also* 42 U.S.C. § 300a-5 (requiring acceptance of Title X information to be strictly "voluntary").  Even in the Proposed Rule and the final Rule, nondirective counseling is defined, respectively, as "the provision of information on all available options without promoting, advocating, or encouraging one option over another," 83 Fed. Reg. 25512 n.41, and "the meaningful presentation of options where the [healthcare provider] is not suggesting or advising one option over another." 84 Fed. Reg. at 7716.  Although the Rule purports to implement this requirement by giving "permission for nondirective pregnancy counseling," 84 Fed. Reg. at 7725, the terms of the Rule actually mandate *directive* counseling in several respects.

First, the Rule provides that medical professionals may furnish information about abortion only in conjunction with information about prenatal care or adoption while "[i]nformation about maintaining the health of the mother and unborn child" may be furnished alone.  *Id.* at 7789.  In other words, if a woman comes to a Title X provider, tests positive for pregnancy, and requests only information about abortion, her healthcare provider must also speak to her about prenatal care or adoption.  If she requests information about prenatal care or adoption, no discussion about unwanted options is necessary.  Nondirective counseling is by definition neutral, unbiased, and patient-directed. Pls.' SUMF ¶ 37.  Mandating that medical professionals provide information that the patient neither wants nor needs—information that, given the often-stigmatized nature of a

---

[5] The Public Health Services Act, for example, defines counseling as "nondirective" when options are presented to a patient "on an equal basis."  *See* 42 U.S.C. § 254c-6(a)(1) (directing the Secretary to make grants to train health center staff in "providing adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women").

woman's decision to request abortion, may well suggest to the patient that her provider disapproves of her decision, *see id.* ¶ 103—is none of those things.

Second, the Rule imposes one-sided referral restrictions that are calculated to drive patients away from choosing abortion: it prohibits referrals for abortion, but requires referrals for all pregnant women for prenatal care.[6]  Funneling a patient into prenatal care, which is unnecessary for a woman who does not plan to continue her pregnancy, while preventing the provision of abortion referral, is indisputably a directive action; it does not treat "all options" similarly. [7]

Unable to dispute that referrals are neither presented "on an equal basis" nor allowed for "all options" under the Rule, Defendants instead contend that these referrals are not subject to the Nondirective Mandate at all, arguing that they are not a form of "pregnancy counseling."  Defs.' Mem. at 19.  But, there is no bright line between counseling and referrals, as indeed this Court has acknowledged.  *See* ECF No. 77 at 33.  Both Congress and HHS have expressly recognized that referrals are part of nondirective counseling.  *See, e.g.*, 42 U.S.C. § 254c-6(a)(1), (a)(2)(B)(ii) (requiring provision of "adoption information and referrals to pregnant women on an equal basis with all other courses of action included in nondirective counseling to pregnant women"); 65 Fed. Reg. 41270, 41279 (July 3, 2000) (under 2000 Guidelines, Title X grantees must "[o]ffer pregnant women the opportunity to [be] provided information and counseling regarding each of the following options" and, "if requested to provide such information and counseling . . . include referral upon request").  Indeed, HHS has in this very rulemaking described nondirective

---

[6] The Rule also bars providers from "support[ing]" or "promot[ing]" abortion "as a method of family planning."  84 Fed. Reg. 7788-89.  Insofar as this provision also prevents Title X staff from presenting abortion as an option to patients, it similarly violates the Nondirective Counseling Mandate.

[7] Defendants argue that because there is a severability clause, these provisions are not directive; if one provision were severed either all referrals would be permitted or all banned, and that is nondirective.  Defs.' Mem. at 18.  But that formulation clarifies precisely that having *both* provisions is directive.  If HHS had chosen to either permit all referrals or ban all referrals, patients would not be steered to prenatal care; as the Rule was actually formulated, they are.

counseling as including referrals. *See* 84 Fed. Reg. at 7730 ("[P]ostconception adoption information and referrals [should] be included as part of any nondirective counseling in Title X projects"); *id.* at 7747 (discussing "nondirective pregnancy counseling, or referrals made . . . during such counseling); *id.* at 7748 ("Referrals for . . . adoption are . . . permitted, as long as the counseling remains nondirective."). And HHS's own QFP guideline discusses pregnancy testing, nondirective counseling, and referrals all under the heading "Pregnancy Testing and Counseling," Pls.' SUMF ¶ 99 (2014 QFP at 13-14), further indicating that referrals are a form of counseling.

Defendants further argue that the Nondirective Counseling Mandate cannot be read to prohibit directive counseling (including referrals) because doing so would render it an impermissible implied amendment or repeal of § 1008. This is incorrect. "[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed Congressional contention to the contrary, to regard each as effective." *United States v. Arif*, 897 F.3d 1, 7 (1st Cir. 2018). This is just what the Court should do here—*i.e.,* apply § 1008 in conjunction with the Nondirective Counseling Mandate. Indeed, Defendants have accepted since 1996 that the Nondirective Counseling Mandate imposes an additional and compatible requirement on Title X, and until now has always applied that nondirective requirement to encompass abortion referrals without issue. *See* Proposed Rule, 83 Fed. Reg. 25502, 25502 (June 1, 2018) (recognizing that "Congress has . . . imposed additional requirements" on the Title X program since its creation, including the Nondirective Counseling Mandate). And this is wholly consistent with *Rust*, which held only that the 1988 Rule was a "permissible interpretation" of § 1008, not an imperative. Thus, the Nondirective Counseling Mandate readily coexists with § 1008 and must be read as such.

**B.      Both the Gag Rule and Separation Requirements Are Contrary to Section 1554 of the ACA.**

The Gag Rule and physical separation requirements also are unlawful and should be set

aside because they violate every prong of Section 1554 of the ACA.  42 U.S.C. § 18114.  As was detailed in Plaintiffs' motion for a preliminary injunction: (1) the Rule's impact in reducing access to family planning and abortion services constitutes an unreasonable barrier to appropriate medical care and an impediment to timely access to healthcare; (2) by prohibiting referrals for and written materials about abortion, by limiting provider/patient discussion about abortion, and by requiring health care professionals to provide a deliberately misleading list of "comprehensive primary health care providers" in response to a request for an abortion referral, the Gag Rule on its face prevents doctors from communicating about abortion as a treatment option—including, for example, the appropriateness of particular medical providers for a given patient—and providing "full disclosure" to patients; (3) by preventing health care professionals from giving information about or referrals to abortion services, the Rule expressly requires Title X providers to withhold relevant and medically-useful information that is known to the provider, and which a reasonable patient with an unwanted pregnancy would want and need, thereby violating medical ethics and the principles of informed consent.  *See* ECF No. 17-1 at 15-20; *see also* Pls.' SUMF ¶¶ 54-61, 108-113, 118-19, 123-37.

Defendants do not and cannot contest that, if Section 1554 applies, the Rule violates it. Instead, they argue that Plaintiffs have waived any claim under Section 1554; that Section 1554 is inapplicable to government-funded programs; that Section 1554 applies only to regulations promulgated under the ACA; and that Section 1554 does not impliedly repeal Title X.  *See* Defs.' Mem. at 24-27.  Each of these arguments is unavailing.

First, waiver does not bar Plaintiffs' Section 1554 claim.  "[T]he waiver rule does not apply to preclude argument where the scope of the agency's power to act is concerned."  *Sierra Club v. Pruitt*, 293 F. Supp. 3d 1050, 1061 (N.D. Cal. 2018).  Whether an agency has statutory authority

to promulgate particular regulations is a "key assumption" that the agency must examine "as part of its affirmative burden of promulgating and explaining a nonarbitrary, non-capricious rule" even if not raised in comments. *Id.* (quoting *Nat. Res. Defs. Council v. EPA*, 755 F.3d 1010, 1022-23 (D.C. Cir. 2014)); *Brown v. Sec'y of Health & Human Servs.*, 46 F.3d 102, 114 (1st Cir. 1995) ("The claim turns primarily on issues of law concerning the scope of the Secretary's powers; such issues of law we are equipped to settle . . . now."). Moreover, issue exhaustion is a prudential doctrine applied flexibly with the goals of permitting the agency to develop its reasoning in response to challenges and of preventing litigants from "sandbagging" the agency. *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 389-91 (D.C. Cir. 2018). Here, those goals have been met: the substantive components of every prong of Section 1554 were raised repeatedly before HHS, and HHS rejected each. *See* Pls.' SUMF ¶ 54. The agency thus has had the required "fair opportunity to address" these issues. *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 602 (D.C. Cir. 2015). Indeed, HHS was demonstrably aware of Section 1554 prior to the Rule's being finalized, having analyzed it in a separate rulemaking related to contraception. *See* 83 Fed. Reg. 57551-52 (Nov. 15, 2018). Finally, as recognized in *Koretoff v. Vilsack*, 707 F.3d 394 (D.C. Cir. 2013) (per curiam), the case on which Defendants rely, waiver via failure to comment at most prevents a party from raising arguments prior to the application of the regulation to the party. *See* Defs.' Mem. at 25 ("A party can raise such 'statutory arguments if and when the Secretary applies the rule' to them but 'the price for a ticket to facial review is to raise objections in the rulemaking.'" (quoting *Koretoff*, 707 F.3d at 399, 401)). Because HHS enforced the Rule against MFP and the other Title X grantees in August, Plaintiffs now can raise all grounds on which the Rule is invalid.

Second, there is no basis for Defendants' position that Section 1554 is confined to the ACA and does not apply to other government-funded programs. Defendants cite no statutory text or

legislative history in support of their view, Defs.' Mem. at 26-27, and it is contrary to the plain text of Section 1554 itself, which states that HHS "shall not promulgate *any* regulation" that would impede healthcare access in the enumerated ways. SUMF ¶ 46 (emphasis added).  The ACA elsewhere *explicitly specifies* when its provisions are limited to programs created by the Act itself, thereby further demonstrating that Congress intended the statute to apply broadly otherwise. *Compare* 42 U.S.C. § 18116 (prohibiting discrimination on the basis of race in "any health program or activity, any part of which is receiving Federal financial assistance"), *with* 42 U.S.C. § 18113 (prohibiting discrimination on the basis of provision of assisted suicide by a "health care provider that receives Federal financial assistance under this Act").  Congress has shown that it knows how to limit the effect of ACA provisions to the Act where it wants; its choice not to do so here is clear. "[I]t is settled beyond hope of contradiction that 'courts must presume that a legislature says in a statute what it means and means in a statute what it says.'"  *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007) (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002)).  Further, "[c]ourts are not free to disregard the plain language of a statute and, instead, conjure up legislative purposes and intent out of thin air." *Id.*  Nor is there an "obvious injustice" or an "absurd result[]," *id.* at 9, that would compel the Court to create the otherwise unfounded limitations that Defendants propose.  Defendants argue that Section 1554 would unduly restrict HHS's ability to operate government programs if read to apply beyond the ACA, because it could somehow reach any regulatory change that disadvantaged a single patient. Defs.' Mem. at 26.  This is a red herring.  Regardless of whether disadvantaging some small set of patients would rise to the level of a 1554 violation, the record here reflects a tremendous reduction in healthcare access.

Finally, as discussed *supra* in Part II.A, Defendants misapply the doctrine of implied repeal.  Section 1554 does not conflict with § 1008 of Title X, as Defendants assert.  Defs.' Mem.

at 27. The Rule is at best merely one possible interpretation of § 1008, *Rust*, 500 U.S. at 184, and Section 1554 separately limits the universe of regulations that may be promulgated by Defendants. As with the Nondirective Counseling Mandate, § 1008 and Section 1554 are "capable of co-existence" and it is "the duty of the courts" to give effect to both. *Arif*, 897 F.3d at 7.

## III.   The Rule Violates the APA Because It Is Contrary to Title X.

Where, as here, an administrative agency has not "stayed within the bounds of its statutory authority," *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), the rule must be set aside. To determine whether the agency has improperly construed a statute it administers, courts apply the test set forth in *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The Court must first determine whether Congress has directly spoken to the precise question at issue. *Id.* at 842. If Congress's intent is ambiguous, the Court considers whether a regulation is a reasonable construction of the statute. *Id.* at 842-43.

While the *Rust* Court held that the plain language of Title X was ambiguous with respect to the meaning of § 1008, 500 U.S. at 184, after *Rust*, Congress clarified its intent—that § 1008 was never intended to (i) limit abortion counseling, including abortion referral, nor (ii) require physical and financial separation of Title X from abortion services—both through explicit legislative action and through ratification of HHS's longstanding policies. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 380-81 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction."); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) ("[T]he meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand."); *State Farm*, 463 U.S. at 45 ("[I]interpretation of a statute may be confirmed or ratified by subsequent congressional failure to change that interpretation.").

*First*, after *Rust,* Congress passed the FPAA, which required counseling and referral on all pregnancy options, including prenatal care and delivery, infant care, foster care, adoption, *and pregnancy termination*.  Pls.' SUMF ¶ 39.  In passing the FPAA, members of Congress described the 1988 Rule as, *inter alia*, "bad medicine, bad law, and bad precedent" and as "a step toward two-tier health care in America."  *Id.* ¶ 41.  Denouncing the 1988 Rule, Congressman Studds unequivocally stated:

> *When we created the title X program 20 years ago, we did not intend to muzzle health care providers.*  But we didn't say that loudly and clearly enough. But this time, let there be no mistake.  Title X providers must be able to inform individuals of all pregnancy management options and we must write this explicitly into law.

*Id.* (emphasis added).

That the FPAA was ultimately vetoed does not reduce its importance; it is well-settled that Congress establishes its intent in bills that it passes, regardless of whether the President ultimately signs the bill into law.  *See Clifton v. Heckler*, 755 F.2d 1138, 1145 n.15 (5th Cir. 1985) ("Regardless of the President's veto of the bill . . . we find its legislative history instructive on the question of the intended nature of the . . . original [statute]."); *Taylor v. U.S.*, 749 F.2d 171, 174 (3d Cir. 1984) (finding Congress had clarified a legislative term through later-enacted bill despite President declining to sign later bill into law).  Defendants cite *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448 (7th Cir. 2005), for the purported principle that "naked legislative history has no legal effect," Defs.' Mem. at 27—but *Brill* addressed only the legal effect of a Senate Judiciary Committee report that was never incorporated into legislative text.  That is not analogous to applying the actual text of a bill passed by Congress as a tool to clarify Congress's intent.

*Second*, as described above, Congress has expressed its intent with respect to § 1008 through its annual appropriations bills. *See Morton v. Ruiz*, 415 U.S. 199 (1974) (looking to annual appropriations as evidence of whether Congress ratified agency's interpretation of statute);

*McNabb for McNabb v. Bowen*, 829 F.2d 787, 793 n.6 (9th Cir. 1987) (referring "to reports of the congressional appropriations committee for guidance in determining the proper [interpretation] of statute). Congress must effectively reenact Title X yearly by appropriating funds for it, and has done so for decades without any change to § 1008—even though HHS's policies requiring nondirective counseling and permitting colocation of Title X and abortion services were reaffirmed in 1993 and have been set forth in regulations since 2000. By consistently including both the condition that Title X funds "shall not be expended for abortion" and the Nondirective Counseling Mandate in its appropriations bills, Congress has recognized the controversy and made its assent to HHS's longstanding policy clear. "It is well established that when Congress revisits a statute giving rise to longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is one intended by Congress.'" *See Commodity Fut. Tr. Comm'n v. Schor*, 478 U.S. 833, 846 (1986); *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 274-75 (1974) (explaining that longstanding interpretation of a statute should be "accord[ed] great weight" "where Congress has re-enacted the statute without pertinent change").

Because "Congress has spoken directly on [this] particular issue," *Maine Medical Center v. Burwell*, 841 F.3d 10, 17 (1st Cir. 2016), and because the Gag Rule and Separation Requirement contradict Congress's stated intent, the Rule cannot stand.

## IV. The Rule Imposes an Unconstitutional Condition in Violation of Plaintiffs' Patients Fundamental Right to Choose Abortion Before Viability.

Under the doctrine of unconstitutional conditions, the government may not deny a benefit, even one an individual has no entitlement to, on a basis that infringes constitutional rights. *AID v. All. for Open Soc. Int'l Inc.*, 570 U.S. 205, 213 (2013). In other words, the government may not impose a requirement indirectly via a "condition on the receipt of federal funds" that would be

unconstitutional "were it enacted as a direct regulation." *Id.*

The Due Process Clause of the Fifth Amendment protects Plaintiffs' patients'[8] fundamental right to choose abortion before viability. *See Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 847, 879 (1992). Because the Rule effectively requires MFP to shutter abortion services at its 17 satellite clinics as a condition to receiving Title X funds, and would thereby impose an undue burden on abortion access in Maine, it imposes an unconstitutional condition on MFP and its patients. The government may not impose a requirement indirectly via a "condition on the receipt of federal funds" that would be unconstitutional "were it enacted as a direct regulation." *Id.*

### A. Because Rust Did Not Address This Claim, the Court Must Apply the Unconstitutional Conditions Standard to the Facts at Hand.

As a threshold matter, Defendants are incorrect to argue that *Rust* "disposes of Plaintiffs' Fifth Amendment claim because the Supreme Court held that the restrictions at issue in the Rule do not violate a woman's Fifth Amendment abortion right." Defs.' Mem. at 38. The *Rust* Court considered only a *facial* challenge to the *gag provisions* of the 1988 Rule (which prohibited abortion counseling and referral), 500 U.S. at 201-02, which is materially different from the as-applied challenge to the physical separation requirements before this Court.

First, the *Rust* Court explicitly left open the possibility of future as-applied challenges. 500 U.S. at 183 ("[W]e are concerned only with the question whether, on their face, the regulations [are unconstitutional]."). By contrast, Plaintiffs here raise an *as-applied* challenge to the Rule's *physical separation Requirements*, Compl. ¶¶ 209-217, an entirely different claim than what was before the Court in *Rust. See generally McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (an as-applied claim, unlike a facial challenge, requires a plaintiff only to show that the challenged law "has in

---

[8]Plaintiffs use the shorthand "Plaintiffs' patients" throughout this section to refer to patients seeking abortion at MFP's satellite clinics, which is the group for whom Plaintiffs seek as-applied relief on this claim. Am. Compl. ¶¶ 209-217.

fact been (or is sufficiently likely to be) unconstitutionally *applied* to him").

Second, because the claim in *Rust* was limited to the 1988 gag rule, 500 U.S. at 201-02, *Rust* did not address the impact of physical separation requirements on the right to abortion access generally, much less with respect to Plaintiffs and their patients in the state of Maine.

Finally, the scope of the evidentiary record is very different in this case from what was before the Court in *Rust*. Among other things, the record here contains ample evidence that implementation of the Rule would substantially curtail abortion access in Maine by forcing MFP to shutter 17 of the abortion clinics in the state. *See infra* Part IV.C.2. The Supreme Court recently reaffirmed that *Rust's* holding was contingent on the Court's finding that the plaintiffs *did not* offer facts showing that protected conduct was curtailed. *AID*, 570 U.S. at 217.

Because the due process claims in *Rust* were materially different from the case presented here, *Rust* does not control and this Court must apply the unconstitutional conditions doctrine to the facts at hand as they affect MFP and its patients. To make that determination, the Court must determine: (1) whether the conditions "define the federal program" or "reach outside it"; and (2) whether the funding conditions in the Rule would be deemed unconstitutional if enacted directly. *AID*, 570 U.S. at 217. The Rule fails on both fronts.

**B.   As-Applied to Plaintiffs and Their Patients, the Rule's Conditions Reach Protected Conduct Outside the Title X Program.**

To determine whether a funding condition is beyond the scope of a government program, the Court must determine whether the requirements "define the limits of the government spending program' or are 'outside the contours of the program itself." *AID*, 570 U.S. at 214-15. Thus, the relevant inquiry is whether the Rule's physical separation requirements affect "protected conduct outside the scope" of the Title X program." *Id.* at 218 (quoting *Rust*, 500 U.S. at 197). By requiring MFP to stop providing abortion services at all of its satellite clinics, the Rule does just that.

As Defendants recognize, the Title X program has a "*preconception* focus," 84 Fed. Reg. 7722, 7724, and "does not include postconception care," *id.* at 7787, *see also* Defs. Mem. at 1 (stating that Title X "narrowly addresses preconception family planning."). There is thus no question that provision of abortion constitutes conduct outside the program's scope, which is why MFP has always funded abortion separately from its Title X services. Pls.' SUMF ¶¶ 7-8. Nor is there any dispute about whether implementation of the Rule would affect MFP's provision of abortion services. The record demonstrates that the Rule's physical separation requirements are impossible for MFP to meet, and thus that its implementation would require MFP to shutter abortion services at its satellite clinics. Pls.' SUMF ¶¶ 76. In other words, the Rule conditions MFP's receipt of federal funds on the complete relinquishment of abortion services at those 17 clinics, even though MFP's provision of abortion services falls wholly outside the Title X program.

Contrary to Defendants' contentions, this situation is wholly distinguishable from the facts leading to *Rust*'s conclusion that *"Congress' refusal to fund abortion counseling and advocacy* leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all." *Id.* at 202 (emphasis added). MFP currently has 18 locations where it provides abortion in Maine, and the Rule would require it to eliminate 17 of them including in the state's most rural areas. Pls.' SUMF ¶¶ 76-77, 81. Unlike the gag provisions at issue in *Rust*, shuttering 17 out of 18 abortion clinics in Maine would not merely change treatment for Title X patients; rather, it would eliminate 85% of the abortion clinics in Maine, thereby restricting access to health care for patients completely separate from the Title X program– including for patients who never use Title X services at all. This staggering reduction in access to abortion services in Maine thus would *not* "leave[] a pregnant woman [in Maine] with the same choices" that she would have had absent Title X. *Rust*, 500 U.S. at 202.

Defendants' argument that these claims are foreclosed because the government "may validly choose *to fund* childbirth over abortion and 'implement that judgment by the allocation of public funds' for medical services relating to childbirth but not those relating to abortion" misses the mark. Defs.' Mem. at 38 (quoting *Rust*, 500 U.S.at 201 (citations omitted) (emphasis added)). Plaintiffs do not suggest that the government must fund MFP's abortion services. On the contrary, MFP was a Title X grantee for decades while also providing abortion services, and never used any Title X money to provide abortions. Pls.' SUMF ¶¶ 48-49. The only question here is whether the government can leverage Title X money to decimate those separately-funded services. It cannot.

### C. As-Applied to Plaintiffs and Their Patients, the Rule's Conditions Would Be Unconstitutional if Applied Directly.

Because the Rule's conditions regulate activity that falls outside the scope of the Title X program with respect to MFP and its patients (*i.e.*, provision of abortion at MFP's satellite clinics), the relevant inquiry is whether the Government could impose those same restrictions directly. "A predicate for any unconstitutional conditions claim is that the government could not have constitutionally ordered the person asserting the claim to do what it attempted to pressure that person into doing." *Koontz*, 570 U.S. at 612. Here, the Rule conditions funding on MFP shuttering abortion services at its 17 satellite clinics, which would impose an undue burden on Plaintiffs' patients' fundamental right to abortion. That policy is an unconstitutional condition because it would clearly violate the Fifth Amendment if imposed directly.

### 1. The Rule Conditions Funding on MFP Shuttering Abortion Services at Its Satellite Clinics.

MFP separately provides both family planning services and medication abortion services at its satellite clinics, which has been permitted by Title X for nearly fifty years. Pls.' SUMF ¶¶ 48 & n.121, 49. Notwithstanding that no Title X money has ever been used to provide abortion services by MFP, the Rule requires it to "physically separate" abortion services—*i.e.*, move them

to different buildings and use different staff, among other things.  84 Fed. Reg. 7774, 7781.  These new requirements would be logistically impossible and financially infeasible for MFP to meet at its 17 satellite locations.  Pls.' SUMF ¶¶ 76.[9]  In other words, the Rule presents MFP with a singular choice: either give up federal funding for family planning services, or else give up separately providing abortion services at its satellite clinics.  Under well-settled precedent, it would be unlawful for the government to make that order directly—*e.g.,* it could not directly ban those satellite clinics from offering previability abortion.  *See Roe v. Wade*, 410 U.S. 113, 163-64 (1973); *Casey*, 505 U.S. at 879 (1992); *cf. Jackson Women's Health Org. v. Dobbs*, 945 F.3d 265, 274 (5th Cir. 2019) (affirming injunction against 15-week abortion ban).[10]

## 2.    Implementation of the Rule Would Impose an Undue Burden on Plaintiffs' Patients' Access to Abortion.

Even assuming *arguendo* that the Government could ban MFP from providing abortion at its satellite clinics under some circumstances, implementation of the Rule here would be unconstitutional because it imposes an undue burden on Plaintiffs' patients' access to abortion. Abortion restrictions are unconstitutional when they impose an "undue burden," meaning when the burdens imposed by the law outweigh any benefits conferred.  *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300, 2309 (2016) ("*WWH*") (quoting *Casey*, 505 U.S. at 878).  Thus, the government can only "treat abortion providers differently" with respect to its programs if "the difference in treatment does not unduly burden a woman's right to obtain an abortion."  *Planned*

---

[9] It also is not clear that MFP could continue providing abortion services at its Augusta location.  Pls.' SUMF ¶¶ 77.

[10] That MFP has withdrawn from the program, rather than cede to this pressure, does not alter the analysis.  Even when a party "refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury."  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 607 (2013); *see also Planned Parenthood of Sw. and Cent. Fla. v. Philip*, 194 F. Supp. 3d 1213, 1220 (N.D. Fla. 2016) ("They say the plaintiffs were not actually coerced—they have not stopped providing abortions, and have no plans to do so—but the same was true in *Koontz*; there, as here, the affected party did not yield to the coercion. The Court said this did not matter.").

*Parenthood of Ind., Inc. v. Comm'r of Ind.*, 699 F.3d 962, 988 (7th Cir. 2012). The undue burden test—adopted by the Supreme Court after *Rust* was decided[11]—is a balancing test, requiring "that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *WWH*, 136 S. Ct. at 2309 (2016). After carefully examining the credible evidence, a court may uphold a regulation only if the benefits it advances outweigh the burdens it imposes. *Id.* at 2310. Because the undue burden standard is a form of heightened scrutiny, Defendants bear the burden of producing evidence showing that the Rule actually advances a valid government interest through permissible means. *Id.* at 2309. A court cannot simply defer to the government's judgment or justification for regulating, and unduly burdensome laws cannot be "considered a permissible means of serving [the government's] legitimate ends." *Id.* at 2309.

Here, any purported benefits of the Rule are entitled to little if any weight. Under the undue burden standard, the government cannot simply assert an interest without evidence that its interest is actually furthered. *WWH*, 136 S. Ct. at 2310. As detailed above, Defendants have baldly asserted that the Rule's purpose is to "ensure compliance with, and enhance implementation of," the requirements of Section 1008, 84 Fed. Reg. at 7715, without offering any evidence that this interest is served by the Rule. *See supra* Part I.B.1.

By contrast, implementation of the Rule by MFP would impose burdens that vastly outweigh any of the Rule's hypothetical benefits as applied to Plaintiffs' patients. Loss of abortion services at MFP's 17 satellite locations would heavily burden patients who would be forced to

---

[11] This change in the applicable legal standard is yet another reason *Rust* is distinguishable from the circumstances here. When the *Rust* Court considered whether the gag provisions of the 1988 Rule facially violated the Fifth Amendment right to abortion, it did not weigh the benefits against the burdens of the rule, as is required today. *Compare Rust*, 500 U.S. at 201-02, *with WWH*, 136 S. Ct. at 2310-11. Contrary to Defendants' mischaracterizations, Defs.' Brief at 39, Plaintiffs do not argue that *Casey* or *WWH* overrule *Rust*, only that *Rust* is distinguishable because those subsequent cases provide the operative standard for evaluating laws that burden women's right to abortion.

travel great distances for abortions, delaying care or preventing it altogether. Pls.' SUMF ¶¶ 125-26, 131. More than half of Maine women would then live in counties without an abortion provider, significantly increasing existing travel distances to providers.[12] *See id.* Based on a sample of MFP's patients over the last 18 months, the percentage of patients living farther than 25 miles from a provider would increase from 6.1% to 82.7%; the percentage of patients living 50 miles from a provider would jump from less than 1% to 31%. *Id* ¶¶ 126. No women in that sample currently live 100 miles or more from a clinic, but if MFP's satellites close, 15.1% would have to travel *more than 100 miles* to their nearest clinic. *Id.*; *compare WWH*, 136 S. Ct. at 2302 (striking down law where restrictions meant "the number of women of reproductive age living more than 50 miles from a clinic [] doubled" and "those living more than 100 miles [] increased by 150%").[13]

The burden of increased travel distances is compounded by other challenges specific to Maine. *See Planned Parenthood of Ind. & Ky., Inc v. Comm'r of Ind. State Dep't of Health*, 896 F.3d 809, 824 (7th Cir. 2018) (requiring consideration of impact "based on the reality of the abortion provider and its patients, not as it could if providers and patients had unlimited resources"). Maine's economic conditions, geography, rurality, large gap in public transportation, and harsh winter weather make traveling in the state challenging and exacerbate burdens associated with drastic increases in driving distances. Pls.' SUMF ¶¶ 45, 129. Moreover, most patients who

---

[12] Out of an abundance of caution, Plaintiffs have calculated distances to nearest abortion provider based on clinics in Maine and neighboring states. However, "the proper formulation of the undue burden analysis focuses solely on the effects within the regulating state." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th Cir. 2014).

[13] In *Planned Parenthood of Greater Ohio v. Hodges*, the Court noted that this type of evidence regarding clinic closures and increased travel distances is the "kind of evidence [that] may support an undue burden challenge by establishing a 'substantial obstacle' in the way of those seeking abortions." 917 F.3d 908, 916 (6th Cir. 2019) (en banc). While the *Hodges* Court nonetheless rejected the unconstitutional conditions claim at hand, it did so because: (1) it was "not clear that the plaintiffs filed an undue burden challenge on behalf of individual women," as opposed to on their own behalf; and (2) the record contained no evidence that Planned Parenthood would stop providing abortions under the regulation at issue. *Id.* By contrast, MFP has brought the instant case on behalf of itself *and its patients*. And there is abundant and undisputed evidence in the record that MFP would stop providing abortions at its satellite clinics under the Rule. Pls.' SUMF ¶¶ 14, 135, 143.

seek abortion services at MFP have poverty-level incomes, *Id.* ¶¶ 6, 130-31, and many do not have the money they need to travel to a clinic in a different city for abortion care. *Id.* ¶ 130. MFP's abortion patients largely work in low-wage jobs that do not offer paid time off or sick leave, impose unpredictable schedules, and render resources like childcare or transportation difficult and costly. *Id.* Empirical studies confirm that increased distance to abortion services present significant obstacles for such low-income patients and could be prohibitive for women who cannot afford to forgo wages or risk job loss. *Id.* ¶¶ 128, 130; *see Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 919 (7th Cir. 2015) (explaining that a 90-mile trip for abortion services "may be prohibitively expensive" for low-income women in need of abortion services).

Finally, the Gag Rule would further compound the harms resulting from these clinic closures. *See June Med. Serv. v. Gee*, 306 F. Supp. 3d 886, 893 (M.D. La. 2018) ("[C]ourts should address the cumulative effects of abortion regulations.") (citing *Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013); *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014)). For many MFP patients, locating abortion providers without assistance from their Title X provider will be difficult, even prohibitively so. Many MFP patients live in communities where other health care professionals are unwilling or unable to provide informed abortion referrals, and many lack reliable access to the Internet or other independent research sources. Pls.' SUMF ¶¶ 104-07, 133. This effort will cause additional delays for some, and likely will be insurmountable for others. *Id.* ¶¶ 132-38.[14]

Accordingly, because Defendants have failed to demonstrate that the purported interests served by the Rule justify the severe burdens its implementation would impose on Plaintiffs'

---

[14]For these same reasons, the Gag Rule also would independently impose an undue burden because it would delay abortion access for some patients, and prevent access for others altogether. Pls.' SUMF 87-108; *Casey*, 505 U.S. at 882 (holding that "misleading" abortion patients or providing "[un]truthful" information would be an undue burden).

patients' fundamental right to abortion, summary judgment should be granted for Plaintiffs.

**V.      The Rule Violates the Equal Protection Clause.**

The Due Process Clause of the Fifth Amendment prohibits the government from denying

equal protection of the laws. *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *Cook v. Gates*, 528

F.3d 42, 60 n.11 (1st Cir. 2008). Here, the Rule denies equal protection because it impermissibly

discriminates against pregnant patients seeking to exercise their fundamental right to abortion. The

Rule is thus subject to heightened scrutiny, but it cannot survive any level of scrutiny.

**A.      The Rule is Subject to Heightened Scrutiny because it Discriminates Against
         Patients Based on their Exercise of a Fundamental Right.**

The Equal Protection Clause prohibits the government from drawing classifications on the

basis of a group's exercise of a fundamental right. *City of Cleburne Tex. v. Cleburne Living Ctr.*,

473 U.S. 432, 440 (1985). Patients have a fundamental right to access previability abortion, which

is a component of personal liberty guaranteed by the Fifth Amendment. *WWH*, 136 S. Ct. at 2309-

10; *Casey*, 505 U.S. at 851. Classifications impinging on a fundamental right are subject to

heightened scrutiny and are unconstitutional unless the regulation is narrowly tailored to achieve

a compelling government interest. *Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir. 1989); *see

also Skinner v. Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (applying strict scrutiny to

invalidate law on equal protection grounds where individuals were deprived of right to procreate).

Here, the Rule singles out the class of pregnant patients seeking abortion for discriminatory

treatment. The government concedes that *all* post-conception care, including prenatal care and

abortion, is beyond the scope of Title X. Defs.' Mem. at 1 ("Title X . . . does not fund medical

care for pregnant women, and instead narrowly addresses preconception family planning."); *id.* at

39. Thus, pregnant patients seeking abortion and those seeking to carry to term are similarly

situated—both groups seek counseling and referral for how to access the *post-conception* care they need and that care, by definition, is outside the scope of Title X under either circumstance.

Yet, although both groups of patients are similarly situated, the Rule prohibits information that applies *only* for the class of pregnant patients seeking to exercise their fundamental right to abortion.  Under the Rule, patients who intend to carry their pregnancy to term can, and indeed *must*, receive information about how to exercise that option, including referral for prenatal services. Pls.' SUMF ¶ 65. But, the Rule does not offer patients who seek to terminate their pregnancy comparable treatment.  Instead, the Rule *prohibits* Title X providers from referring patients who seek to terminate their pregnancy for the care they need, even if the patient *explicitly asks* for referral to an abortion provider.  *Id.* ¶¶ 58-64.  Thus, even though *both* prenatal care *and* abortion services fall outside the ambit of the Title X program, only patients seeking abortion services are singled out and denied the critical information they need.  Harm from this discriminatory treatment is further compounded by the fact that Title X patients typically cannot obtain this information outside the Title X program.  *Id.* ¶¶ 104-06.

To be sure, the government is not required to "facilitate[e]" abortion, *Rust*, 500 U.S. at 201, just as it has no obligation to facilitate *any* post-conception care, or even to have instituted a government program to fund any family planning services in the first place. ECF 48 at 38. However, once the government inserts itself into this sphere—*i.e.* funding family planning services that include providing information to pregnant patients for post-conception pregnancy care—it is constrained by the Equal Protection Clause when it provides discriminatory treatment for classes of patients.  *See United States v. Windsor*, 133 S. Ct. at 2675, 2694 (2013) (finding that the state, once it decided to offer marital benefits, could not single out and exclude same-sex married couples from these benefits); *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2601 (2015).

## B.     The Rule Fails Any Level of Scrutiny.

At most, the government asserts that the Rule serves its interests in: (1) protecting against the theoretical "risk" of "intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs," and addressing the "potential for confusion," 84 Fed. Reg at 7715, 7725; *see supra* Part I.B.1, and (2) potentially encouraging new providers to enter the Title X program, *see supra* Part I.A.   The Rule's unequal treatment of patients seeking abortion is not narrowly tailored or otherwise closely related to those purported interests.  *See Dickerson*, 872 F.2d at 1119.  First, while the Government may have an interest in ensuring that its funds are used for the purposes circumscribed by Congress in some circumstances, nothing in the record suggests the Rule is closely related to such concerns here.  Instead, Defendants assert only that the Rule could prevent *potential* co-mingling of funds used for Title X services and abortion services or *potential* confusion among the public, *see supra* Part I.B.1, but the sweeping restrictions imposed by the Rule are not narrowly tailored to address that.  On the contrary, the government offers no *actual evidence* of "co-mingling" or "confusion" for the Rule to address, much less an explanation as to why the Rule's broad limitations prevent such theoretical problems.

Second, to the extent the Government claims the Rule serves its interest in encouraging new providers to enter the Title X program—*i.e.*, those who previously did not do so because of their opposition to abortion or other services—there is no evidence in the record that the Rule would or could encourage new providers to enter the program.  *See* § I.A.   And putting aside whether it is ever appropriate to withhold an abortion referral from a patient who needs and/or requests one, the Rule is clearly overbroad in this regard.  Defendants fail to explain why a policy

merely *allowing* abortion referrals by some Title X providers would in any way prevent entities who object to abortion from participating in the program without providing such referrals.[15]

Accordingly, the Rule violates the Equal Protection Clause and should be vacated.

## VI.   The Rule Violates the First Amendment.

Under the doctrine of unconstitutional conditions, the government may not take funds away from an entity based on the exercise of the right to free speech. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Supreme Court precedent developed post-*Rust* demonstrates that First Amendment protections are at their zenith when the government seeks to control the form and content of individuals' protected speech—with particular protection for the speech of medical professionals. *Nat'l Inst. of Family & Life Advocates ("NIFLA") v. Becerra*, 138 S. Ct. 2361, 2374 (2018). The Gag Rule prevents providers from speaking honestly with their patients and compels speech about prenatal referrals even when not medically or ethically appropriate. Such government control over the speech of medical professionals violates the First Amendment. *Id*.

### A.   Speech Between Medical Professionals and Patients Is Recognized by the Supreme Court as Subject to Paramount First Amendment Protection.

The Rule asserts that *Rust* renders the Gag Rule acceptable under the First Amendment, in part because *Rust* holds that the government may generally regulate speech within its own programs such that First Amendment protections do not apply. 84 Fed. Reg. at 7759. But, *Rust* left open the question of whether the patient-provider relationship is a "traditional sphere of free

---

[15] The Rule's unequal treatment of pregnant patients seeking abortion fails even if heightened scrutiny does not apply. Even under the most permissive standard, the government must demonstrate that its classification is rationally related to its interest. As detailed above, Defendants have failed to identify any evidence that it had any problem with commingling of funds, confusion, or hindering providers from applying to the program in the first place—much less how any such nonexistent problems could rationally be solved by forcing providers to withhold medical information from patients. *See Planned Parenthood of Minn. v. Minnesota*, 612 F.2d 359, 360–61 (8th Cir. 1980) (concluding that legislation prohibiting grants to "any nonprofit corporation which performs abortions" violated equal protection absent evidence that Plaintiff improperly used state or federal funding for abortion services and thus that there was "no rational distinction between [Planned Parenthood] and any other non-profit.").

expression" that is "so fundamental to the functioning of our society" that it is entitled to First Amendment protection even within a government-funded program. 500 U.S. at 192-95, 200.

Since *Rust*, courts have answered this question, recognizing explicitly that (i) traditional spheres of free expression are worthy of paramount protection from government interference, such that the government cannot control speech within them through conditions on government funds, *Legal Services Corp. v. Velazquez* , 531 U.S. 533, 543 (2001),[16] and (ii) the patient-provider relationship is such a sphere, *NIFLA*, 138 S. Ct. at 2371-74. In *NIFLA*, the Supreme Court made clear that "speech is not unprotected merely because it is uttered by professionals," and that speech by medical professionals cannot be limited or compelled based on the whims of the government. 138 S. Ct. at 2371-74. *NIFLA* clarified that because "doctors help patients make deeply personal decisions, and their candor is crucial," regulating the content of medical professionals' speech "pose[s] inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information." *Id.* at 2774.[17] Because the Gag Rule regulates the content of patient-provider communications, First Amendment protections apply.

### B.     The Gag Rule is Subject to Heightened Scrutiny.

Since *Rust*, the Supreme Court has expanded and increased scrutiny regarding several

---

[16] The *Velazquez* Court first explained that the government cannot "use an existing medium of expression," like the attorney-client relationship, and "control it, in a class of cases, in ways which distort its usual functioning," 531 U.S. at 543. The Court then distinguished *Rust* on two bases specific to the facts before the Court at the time *Rust* was decided: (1) because "[t]here, a patient could receive the approved Title X family planning counseling funded by the Government and later could consult an affiliate or independent organization to receive abortion counseling," whereas the program in *Velazquez* precluded activity through alternative channels, 531 U.S. at 547; and (2) because, in *Velazquez*, there was no "programmatic message of the kind recognized in *Rust*," *id.* at 548. The facts today stand in stark contrast. In Maine, for example, due to rurality and poverty, many patients cannot consult any other organization to receive abortion counseling because MFP is their only access to a health care provider. *See* Pls.' SUMF ¶ 6.

[17] Other courts have also found that regulations constituting "state attempts to compel physicians to deliver its message, especially when that message runs counter to the physician's professional judgment and the patient's autonomous decision about what information she wants" go beyond permissible interference with the provider-patient relationship. *Stuart v. Camnitz*, 774 F.3d 238, 255 (4th Cir. 2014); *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1311 (11th Cir. 2017) (en banc) (law that preventing physicians from discussing gun ownership and safety with patients); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) (law prohibiting physicians from discussing medical marijuana).

categories of suspect speech regulation—each of which is directly implicated here.  The Gag Rule
mandates government-compelled speech and imposes speech requirements that discriminate based
on both content and viewpoint, all of which are highly suspect and subject to heightened scrutiny.
*See, e.g.*, *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464
(2018); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-28 (2015).

Heightened scrutiny now applies "whenever the government creates a regulation of speech
because of disagreement with the message it conveys," and this principle has "great relevance in
the fields of medicine and public health, where information can save lives."  *Sorrell v. IMS Health
Inc.*, 564 U.S. 552, 566 (2011) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989));
*Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Baltimore*, 879 F.3d
101, 112 (4th Cir. 2018) ("Especially in this context [of speech related to abortion], content-based
regulation 'raises the specter that the government may effectively drive certain ideas or viewpoints
from the marketplace.'").  By forcing healthcare professionals to speak a particular message—*e.g.*,
referrals for prenatal care—and banning referrals for abortion, the Gag Rule is content-based
compelled speech.[18]  It is also viewpoint-based because it favors prenatal care and adoption over
abortion.  And, unlike the 1988 Rule, it is speaker-based because it bans anyone except physicians
and APPs from providing counseling on pregnancy options that includes abortion.

## C.    The Rule Fails any Level of Heightened Scrutiny.

Here, as in *NIFLA*, there is no need to determine if strict or intermediate scrutiny applies,
as the Rule fails even intermediate scrutiny.  *NIFLA*, 138 S. Ct. at 2375.  The Gag Rule is not

---

[18] Notably, the Gag Rule goes much further than the restrictions struck down in *NIFLA*, as the *NIFLA* regulations
simply required that a sign be posted.  Here, the Gag Rule controls what medical professionals themselves both are
able to and are required to say, as well as written materials.  *See Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457
(1978) (observing difference between written advertisements that "leave[] the recipient free to act . . . or not" and "in-
person solicitation" that "may exert pressure and often demands an immediate response").

substantially related to Defendants' minimal purported interests, as the existing Title X program already accomplishes these goals through less burdensome means.  Defendants have not put forth any record of Title X violations to show need for this Rule in the first place.  *See supra* Part I.A, V.B.  But, even had they demonstrated a need to inform Title X patients about the government's policy against funding abortion, Defendants could accomplish this goal via less intrusive means, such as the methods suggested in *NIFLA*, which included "a public-information campaign" or posting information "on public property near" clinics.  *See NIFLA*, 138 S. Ct. at 2376.

### D. The Rule Violates the First Amendment As Applied to Plaintiffs.

Even if the Rule were not a facial violation of Title X providers' First Amendment rights, it is an unconstitutional condition as applied to MFP's right to freedom of speech.  With respect to MFP, the Rule goes beyond dictating the contours of the Title X program to "significantly impinge" upon the provider-patient relationship.  *See Rust*, 500 U.S. at 200.  Because MFP's providers often are their patients' only point of contact with the health care system, its patients have nowhere else to turn for reliable health care information.  Pls.' SUMF ¶¶ 6, 133.  Even in instances where patients have access to other providers, it is no substitute for the dialogue between MFP providers and their patients.  For example, MFP sometimes sees patients only after they have already received dangerously inaccurate information about abortion. *Id.* ¶ 133.

### <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs, deny Defendants' motion, and vacate the Rule.

Dated: February 27, 2020                        Respectfully submitted,

                                                /s/ Richard L. O'Meara
                                                Richard L. O'Meara
                                                Murray Plumb & Murray
                                                75 Pearl Street
                                                Portland, ME 04104
                                                Telephone: (207) 773-5651
                                                romeara@mpmlaw.com

                                                Emily Nestler*
                                                Rabia Muqaddam*
                                                Center for Reproductive Rights
                                                199 Water Street, 22nd Floor
                                                New York, NY 10038
                                                Telephone: (917) 637-3600
                                                enestler@reprorights.org

                                                Emily Ullman*
                                                Jennifer Saperstein*
                                                Covington & Burling LLP
                                                One CityCenter
                                                850 Tenth Street NW
                                                Washington, DC 20001
                                                Telephone: (202) 662-6000
                                                eullman@cov.com

                                                *Attorneys for Plaintiffs The Family Planning
                                                Association of Maine d/b/a Maine Family Planning
                                                & Dr. J. Doe*

                                                *Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 27th day of February, 2020, I filed a copy of the above Motion with the Clerk of Court through the ECF system, which automatically sent a Notice of Electronic Filing to all counsel of record.

<u>/s/ Richard L. O'Meara</u>
Richard L. O'Meara
Murray Plumb & Murray
75 Pearl Street
Portland, ME 04104
Telephone: (207) 773-5651

*Counsel for Plaintiffs*