UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| THE FAMILY PLANNING ASSOCIATION OF MAINE D/B/A MAINE FAMILY PLANNING, *et al.*, | ) ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 1:19-cv-00100-LEW |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants | ) | |

## DECISION AND ORDER

In this action, The Family Planning Association of Maine d/b/a Maine Family Planning, on its own behalf and on behalf of its staff and patients, and J. Doe, a doctor of osteopathic medicine, who similarly seeks to vindicate personal and third-party/patient rights ("Plaintiffs"), allege that the United States Department of Health and Human Services, Secretary Alex M. Azar II, and Deputy Assistant Secretary Diane Foley, M.D., through the Department's Office of Population Affairs ("Defendants"), have exercised rulemaking authority under the Title X family planning program in violation of the Administrative Procedures Act, and that the new Final Rule [1] governing post-conception activities and certain program separation requirements, if allowed to stand, will deprive

---

[1] Compliance with Statutory Program Integrity Requirements ("Final Rule" or "Rule"), 84 Fed. Reg. 7714 (Mar. 4, 2019) (codified at 42 C.F.R. pt. 59).

Plaintiffs and those they serve of fundamental freedoms enshrined in the First and Fifth Amendments to the United States Constitution.

Now pending are Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 111) and Plaintiffs' Motion for Summary Judgment (ECF No. 113).

## BACKGROUND

The Title X program is a federal welfare program that provides grants to providers to support public access to contraceptive and reproductive health products and services. The Title X program states that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. As commented by the Supreme Court, "[t]hat restriction was intended to ensure that Title X funds would 'be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities.'" *Rust v. Sullivan*, 500 U.S. 173, 178-79 (1991) (*citing* H.R. Conf. Rep. No. 91-1667, p. 8 (1970), U.S. Code Cong. & Admin. News 1970, pp. 5068, 5081-82).

For many years, Maine Family Planning operated under the auspices of a regulatory regime first formally promulgated in 2000. The 2000 rule required Title X grant recipients to provide "nondirective counseling" to patients in the event of "an unplanned pregnancy," and also permitted Title X grant recipients to provide abortion services in their Title X project facilities, provided that the projects paid for the services with funding derived from sources other than their Title X grant. In the event the Title X grantee did not separately

provide abortion services, the 2000 rule required that the grantee provide abortion referrals if the patient requested such a referral. Standard of Compliance for Abortion-Related Services in Family Planning Services Projects, 65 Fed. Reg. 41,270-01 (July 3, 2000).

On March 4, 2019, following a public notice and comment period, Defendant Department of Health and Human Services promulgated new regulations with the stated goal of "ensur[ing] compliance with, and enhance[ing] implementation of, the statutory requirement that none of the funds appropriated for Title X may be used in programs where abortion is a method of family planning, as well as related statutory requirements." Compliance with Statutory Program Integrity Requirements ("Final Rule" or "Rule"), 84 Fed. Reg. 7714, 7715 (Mar. 4, 2019) (codified at 42 C.F.R. pt. 59).

The Final Rule requires "clear physical and financial program separation from programs that use abortion as a method of family planning." *Id.* at 7765, 7789, codified at 42 C.F.R. § 59.15 (the "separation requirement"). It also reformats the standards to be applied to consultation services with respect to "post-conception activities." *Id.* at 7788, codified at 42 C.F.R. § 59.14. The new standards permit nondirective counseling, including abortion counseling, but prohibit referrals for abortion services.

## A.    The Separation Requirement

The separation requirement provides that Title X projects "must be organized so that [they are] physically and financially separate . . . from activities which are prohibited." 42 C.F.R. § 59.15 (2019). The Rule states: "[A] Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient." *Id.*

3

The Department asserts the separation requirement will serve to "protect[] against the intentional or unintentional co-mingling of Title X resources with non-Title X resources or programs" as well as counteract "the potential for ambiguity between approved Title X activities and non-Title X activities and services." [2]  Final Rule, 84 Fed. Reg. at 7715 (discussing need for "clear financial and physical separation"), 7765 ("The performance of abortions at nonspecialized clinics that also may provide Title X services increases the risk and potential both for confusion and for the co-mingling or misuse of Title X funds.").

## B.    Post-Conception Activities

The Final Rule's post-conception activities provision begins with an express prohibition on abortion referral: "A Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion."  42 C.F.R. § 59.14(a) (2019). [3]

The post-conception activities provision also requires Title X projects to provide patients who are "medically verified as pregnant" with a referral for prenatal care.  *Id.* § 59.14(b).  According to the Department, "[p]renatal care is medically necessary for any

---

[2] By addressing "the fungibility of Title X resources and the potential use of Title X resources to support programs where . . . abortion is a method of family planning," the Department seeks to prevent the use of Title X resources to "facilitate the development of, and ongoing use of, infrastructure for non-Title X activities." Final Rule, 84 Fed. Reg. at 7715.  The Department's policy perspective is succinctly stated, as follows: "Commenters' insistence that requiring physical and financial separation would increase the cost for doing business only confirms the need for such separation.  If the co-location of a Title X clinic with an abortion clinic permits the abortion clinic to achieve economies of scale, the Title X project (and, thus, Title X funds) would be supporting abortion as a method of family planning."  *Id.* at 7766.

[3] However, "[r]eferrals for abortion for emergency care purposes are not prohibited."  Final Rule, 84 Fed. Reg. at 7747.  The rule provides that in cases of emergency – such as the discovery of an ectopic pregnancy – a Title X provider "shall only be required to refer the client immediately to an appropriate provider of medical services needed to address the emergency," which may include a referral for abortion.  42 C.F.R. § 59.14(b)(2), (e)(2); Final Rule, 84 Fed. Reg. at 7747-48.

patient who is pregnant, so referrals for such care do not render counseling directive." Final Rule, 84 Fed. Reg. at 7761.  In the Department's view, referrals for prenatal care should be *de rigueur* "[b]ecause prenatal care is essential in order to optimize the health of the mother and unborn child, and to help ameliorate the current health inequality as it relates to low income women." *Id.* at 7762.

The post-conception activities provision further states that once a Title X client is confirmed to be pregnant, a Title X project "may also choose to provide" the client with additional information, including:

(i)    Nondirective pregnancy counseling, when provided by physicians or advanced practice providers;

(ii)   A list of licensed, qualified, comprehensive primary health care providers (including providers of prenatal care);

(iii)  Referral to social services or adoption agencies; and/or

(iv)   Information about maintaining the health of the mother and unborn child during pregnancy.

*Id.* § 59.14(b).

Should a Title X provider decide to do so, it may furnish a client with a list of "comprehensive primary health care providers," which list "may be limited to those that do not provide abortion" or may include providers that "also provide abortion as part of their comprehensive health care services"; however, those providers who perform abortions must not constitute the majority of the references provided.   42 C.F.R. § 59.14(c)(2).  While the project cannot exclude from its list providers that do not supply abortion services, *id.*, it may exclude providers that do.  *Id.* § 59.14(e)(4), (5).  Additionally,

5

if the list includes both types of providers, "[n]either the list nor project staff may identify which providers on the list perform abortion."[4]  *Id.* § 59.14(c)(2).

The Final Rule's post-conception activities provision then concludes much as it begins: "[a] Title X project may not use the provision of any prenatal, social service, emergency medical, or other referral, of any counseling, or of any provider lists, as an indirect means of encouraging or promoting abortion as a method of family planning."  *Id.* § 59.14(c)(1).

## C.    Title X Grant Recipients May Provide Abortion Services

Despite the prohibition against abortion referral and other program speech that would identify abortion providers, nothing in either the separation requirement or the post-conception activities provision precludes Title X grantees from providing abortion services through separate programs and facilities.  "The rule continues to allow organizations to receive Title X funds even if they also provide abortion as a method of family planning, as long as they comply with the physical and financial separation requirements."  84 Fed. Reg. at 7766.

## D.    Maine Family Planning's Service Model

As of the commencement of this litigation, Maine Family Planning was both the

---

[4] In support of the prohibition on providing referrals for abortion providers, the Department asserts:

> [I]n most instances when a referral is provided for abortion, that referral necessarily treats abortion as a method of family planning.  The Department believes both the referral for abortion as a method of family planning, and such abortion procedure itself, are so linked that such a referral makes the Title X project or clinic a program one where abortion is a method of family planning, contrary to the prohibition against the use of Title X funds in such programs.

Final Rule, 84 Fed. Reg. at 7717.

sole statewide Title X grantee for the State of Maine and one of the primary providers and funders of abortion services in Maine.  Because the Final Rule requires that abortion facilities be physically separate from Title X facilities and prohibits abortion referrals, the Final Rule is incompatible with Maine Family Planning's abortion service model, which relies on both the co-location of abortion services in clinic space partially paid for with Title X funds and the referral of Title X patients to Maine Family Planning and affiliated abortion providers.

Although the Final Rule does not prohibit Plaintiffs from continuing to provide abortion services, it raises significant barriers which would require Plaintiffs to reconfigure their operations in order to remain in the Title X program.  In particular, to remain in the program Maine Family Planning would need to obtain new clinic space or other facilities for the provision of abortion services and/or convert some of its existing clinics into abortion clinics unaffiliated with the Title X project. [5]

## D.    Preliminary Injunction Proceedings

In 2019, in advance of the effective date of the Final Rule, Maine Family Planning and other Title X program participants in California, Maryland, Oregon, and Washington filed civil actions to enjoin implementation of the Final Rule.  In a Decision and Order issued on July 3, 2019, I denied Plaintiffs' request for injunctive relief.  *Family Planning*

---

[5] In their papers, Plaintiffs speak of their network of 18 clinics and state that they would have to discontinue abortion services in 17 of the clinics if they remained in the Title X program.  They evidently do not envision a path forward that involves more than one but fewer than 18 abortion clinics operated by Maine Family Planning.  Plaintiffs' Statement of Material Facts ¶¶ 4, 14, 124, 125, 135 (ECF No. 114).

*Ass'n of Maine v. United States Dep't of Health & Human Servs*., 404 F. Supp. 3d 286 (D. Me. 2019).[6]   However, the United States District Courts for the Districts of Oregon and Washington granted preliminary injunctive relief on a nationwide basis.[7]   *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019); *Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash. 2019).   A panel of the Ninth Circuit stayed the nationwide injunctions, No. 19-15974, 2020 WL 878528, 2020 U.S. App. LEXIS 5696 (9th Cir. Feb. 24, 2020), as did the Ninth Circuit, sitting *en banc*, upon further review, 928 F.3d 1153 (9th Cir. July 11, 2019). [8]

Although Plaintiffs appealed my denial of preliminary injunctive relief to the First Circuit Court of Appeals, on October 23, 2019, the First Circuit dismissed Plaintiffs' appeal of the denial of preliminary injunctive relief, pursuant to a stipulation.   No. 19-1836, 2019 WL 8112705, 2019 U.S. App. LEXIS 39141 (1st Cir. Oct. 23, 2019).

## E.   Maine Family Planning's Departure from the Title X Program

On August 23, 2019, Maine Family Planning departed the program and terminated

---

[6] *See also* Decision and Order on Motion to Amend Order, 2019 WL 3774619, 2019 U.S. Dist. LEXIS 135409 (D. Me. Aug. 9, 2019).

[7] The Northern District of California and the District of Maryland granted statewide injunctions only. *Mayor & City Council of Baltimore v. Azar*, No. 19-1103, 2020 WL 758145, 2020 U.S. Dist. LEXIS 26061 (D. Md. Feb. 14, 2020); *California v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019), *vacated and remanded*, No. 19-15974, 2020 WL 878528, 2020 U.S. App. LEXIS 5696 (9th Cir. Feb. 24, 2020).   Judge Chen of the Northern District of California determined that the plaintiffs would likely succeed on their APA and statutory claims, but he did not reach the constitutional claims.   His injunction was vacated by a panel opinion and, ultimately, the Ninth Circuit sitting *en banc* held that the plaintiffs' claims were not viable. Judge Bennett of the District of Maryland addressed the merits after a divided panel of the Fourth Circuit stayed his initial entry of a preliminary injunction.   In his memorandum opinion on the merits, Judge Bennett found that the Final Rule is arbitrary and capricious, but he rejected all other legal arguments. Secretary Azar filed a notice of appeal of the ruling on February 25, 2020.

[8] On February 24, 2020, the Ninth Circuit opined that the plaintiffs before it "will not prevail on the merits of their legal claims," vacated the district courts' preliminary injunction orders, and remanded the cases. *California v. Azar*, 950 F.3d 1067, 1105 (9th Cir. 2020) (*en banc*) (7-4).

a three-year Title X grant that began on April 1, 2019.  Amended Complaint ¶ 19 (ECF No. 99).  Maine Family Planning alleges it was "forced to leave … because implementing the Rule would materially and irreparably damage the provision of both family planning services and abortion care in Maine." *Id.* ¶ 120.  Given the "rurality and poverty in Maine," Plaintiffs allege, compliance with the Rule "would exacerbate the effects of those cuts and the resulting hardships." *Id.*   Plaintiffs also object to the post-conception activities provision, which they say "would … fundamentally alter how they speak to patients regarding their health care options," *id.* ¶ 166, and they maintain that the prohibition on abortion referrals will delay patient access to care, increasing risks and costs, *id.* ¶ 171.

## DISCUSSION

The matter is before the Court on review of an administrative rulemaking process. Judicial review of administrative proceedings is deferential.  *Visiting Nurse Ass'n Gregoria Auffant*, *Inc. v. Thompson*, 447 F.3d 68, 72-73 (1st Cir. 2006); *Associated Fisheries of Maine*, *Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). Absent a showing that an exercise of administrative rulemaking authority was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or unsupported by substantial evidence; or contrary to constitutional right, power, privilege, or immunity; or in excess of statutory jurisdiction, authority, or limitations; or short of statutory right, the exercise is presumed valid.  5 U.S.C. § 706(2); *Rhode Island Hosp. v. Leavitt*, 548 F.3d 29, 33-34 (1st Cir. 2008).

"In applying these standards, an inquiring court must 'review the whole record or those parts of it cited by a party.'"  *Sasen v. Spencer*, 879 F.3d 354, 360 (1st Cir. 2018) (quoting 5 U.S.C. § 706(2)).  The court "may not substitute its judgment for that of the

agency, even if it disagrees with the agency's conclusions." *Id.* Although "the agency's answers to questions of law engender de novo review," when "the agency's legal analysis implicates the interpretation of a statute or regulation that it is charged with administering," the court ordinarily accords "some weight to the agency's views." *Id.* **A.    Arbitrary and Capricious**

Plaintiffs contend the Final Rule's post-conception activities provision is arbitrary and capricious because it reduces compliance with medical ethics, accessibility of care, and quality of care, and because its practical impact is to reduce access to both Title X and abortion services.   Plaintiffs' Motion at 11-17; Plaintiffs' Reply at 3-6 (ECF No. 125). Plaintiffs' contentions and the evidence they offer in support thereof do not disclose an arbitrary or capricious exercise of rulemaking authority.

The Final Rule does not prohibit abortion counseling.  Providers are free to discuss the abortion option with their patients.  Although the Final Rule prohibits abortion referrals, it does not do so arbitrarily, given that Congress stipulated that Title X funds not be "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, and the relative ambiguity behind this admonition "plainly allows" Defendants' decision to construe it in a manner that withholds abortion referral authority from Title X providers. *Rust*, 500 U.S. at 184.  This is so notwithstanding "a sharp break with prior interpretations." *Id.* at 185 (quoting *Chevron*, 467 U.S. at 862).

Nor does the lack of a referral deny patients access to abortion care.  Patients remain free to access abortion services, including services provided by Plaintiffs. These considerations were fully vetted by Defendants in the rulemaking process, and the Supreme

10

Court has already deemed Defendants' rationale to be one acceptable and reasonable method of administering the Title X grant program.  To find the prohibition against abortion referral arbitrary and capricious would be to ignore *Rust* entirely.[9]  While the AMA's Code of Medical Ethics is a weighty consideration, I would note that it does not mandate that physicians make referrals for any and all care their patients desire.  Rather, it states patients "should be able to expect that their physician will cooperate in coordinating medically indicated care with other health care professionals."  Patient Rights, Code of Medical Ethics Opinion 1.1.3.  I certainly do not take issue with this ethical canon, but observe that while the AMA says the Department must condone abortion referrals, it does not state that physicians must make abortion referrals.  The AMA also gives physicians freedom to decline to accept a patient in non-emergency situations, including where the care requested by the patient "is incompatible with the physician's deeply held personal, religious, or moral beliefs in keeping with ethics guidance on exercise of conscience."  *Id.* Opinion 1.1.2.  Thus, the AMA does not hold the position that abortion referral is mandatory and acknowledges that physicians can withhold referrals on grounds of conscience.  Given this yardstick, Plaintiffs' argument that it is arbitrary and capricious for the Department to make a similar policy determination in the context of the Title X program does not measure up.[10]

---

[9] Plaintiffs appear to argue that medical ethics have changed since 1988.  Plaintiffs' Motion at 12-13.  The record does not support that contention.

[10] Plaintiffs' expert in medical ethics points to the AMA Code of Ethics to reinforce his viewpoint. Declaration of Matthew Wynia, MD (ECF No. 113-4).  He also cites a committee opinion of the American College of Obstetrics and Gynecologists that purportedly mandates abortion referral, even for physicians who are opposed on grounds of conscience.  ACOG Committee Opinion, *available at* https://www.acog.org/clinical-guidance-and-publications/committee-opinions/committee-on-ethics/informed-

Turning to the separation requirement, Plaintiffs contend it is arbitrary and capricious because it purportedly lacks "a single evidence-based reason." Plaintiffs' Motion at 17. According to Plaintiffs, before Defendants can impose a separation requirement, Defendants need to audit grantees and determine that Title X funds are, in fact, expended on abortion services. *Id.* at 18. Plaintiffs further argue that Defendants failed to adequately account for the serious reliance interests of providers who have co-located Title X and abortion practices for years, and of the patients who might lose local access to either Title X or abortion services (or both) due to the economic burdens imposed by the separation requirement. *Id.* at 19-21.

The Final Rule cites the following justification for requiring physical separation:

> [S]hared facilities create a risk of the intentional or unintentional use of Title X funds for impermissible purposes, the co-mingling of Title X funds, the appearance and perception that Title X funds being used in a given program may also be supporting that program's abortion activities, and the use of Title X funds to develop infrastructure that is used for the abortion activities of Title X clinics. Even with the strictest accounting and charging of expenses, a shared facility greatly increases the risk of confusion and the likelihood that a violation of the Title X prohibition will occur.

84 Fed. Reg. at 7764. Defendants' concerns are not arbitrary and capricious. Maine Family Planning has used Title X funds to sustain a wide-ranging network of dual-purpose family planning *and* abortion clinics. Plaintiffs have acknowledged in this litigation that Maine

---

consent ("Even in the context of justified conscientious refusal, physicians must provide the patient with accurate and unbiased information about her medical options and make appropriate referrals."). I note that the committee opinion addresses the process of obtaining informed consent for treatment. Title X providers do not perform abortion, so they need not obtain informed consent for abortion treatment. Indeed, it is odd that a mandatory referral opinion is offered in the context of an informed consent discussion. In any event, the opinion that abortion referrals are mandatory does not have the force of law, and if it did it is doubtful it would survive constitutional challenge. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15, 217 (2013).

Family Planning sustained its geographically-expansive, clinic-based family planning and abortion service model with funds secured through the Title X grant, which funds it now needs to replace to prevent disruption or reduction of its abortion network. Amended Complaint ¶ 176.  To be sure, Maine Family Planning was not violating the law when it built out its statewide network of dual-purpose clinics, but it built the network on shifting sands and the current administration's assessment that a Title X contribution to abortion clinic overhead is a subsidy is every bit as reasonable as the assessment of prior administrations that sharing clinic space and other infrastructure is not a subsidy if abortion services are not paid for with Title X funds.  At the end of the day, it depends on how one looks at it and, evidently, what one's political leanings are.  Answers to political questions are not arbitrary and capricious just because they are not preferred by industry experts.

As for an evidence-based assessment of Plaintiffs' reliance interest, this case involves a federal agency imposing conditions on the administration of its own grant program.  Defendants have provided a "reasonable explanation for the change," *Encino Motorcars*, *LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016), and its reason appropriately takes into consideration the fact that it is funding a family planning program that does not permit a subsidy for abortion services.  Although the Department has not been able to persuade Plaintiffs, their healthcare experts, or several jurists that its new policy is better than its old policy, that decidedly is not the standard of review.  *F.C.C. v. Fox Television Stations*, *Inc*., 556 U.S. 502, 515 (2009).

In summary, "an agency is not forever bound by an earlier resolution of an interpretive issue, but … a change must be addressed expressly, at least by the agency's

articulate recognition that it is departing from its precedent." *Nat'l Labor Relations Bd. v. Lily Transp. Corp*., 853 F.3d 31, 36 (1st Cir. 2017) (Souter, J.). The administrative record satisfies this standard,[11] alternative administrative viewpoints[12] notwithstanding.

## B.     Contrary to Law

Plaintiffs argue the Final Rule is not in accordance with law because it violates the nondirective counseling mandate contained in the Continuing Appropriations Act of 2019 and fails to meet objectives set forth in the Affordable Care Act. Plaintiffs' Motion at 21-27; Plaintiffs' Reply at 6-9. An administrative decision that is "contrary to the 'unambiguously expressed intent of Congress'" will not stand, but in order to overturn agency action on this ground, an "unmistakably clear expression of congressional intent" must be evident. *Lily Transp*., 853 F.3d at 34 (quoting *Strickland v. Comm'r*, 48 F.3d 12, 16-17 (1st Cir. 1995)). Unless a clear line has been crossed, I must "defer to the views of the agency Congress has entrusted with relevant rule-making authority," and afford "considerable deference" to its views. *Id.* (quoting *Royal Siam Corp. v. Chertoff*, 484 F.3d 139, 145 (1st Cir. 2007)).

### 1.     *The appropriations mandate*

The nondirective counseling mandate provides that "all pregnancy counseling" under Title X "shall be nondirective." Continuing Appropriations Act, 132 Stat. 2981,

---

[11] To the extent Plaintiffs contend Defendants ignored the evidence, that is not a fair characterization. Prior to finalizing the 2019 Rule, the Department received "over 500,000 public comments." Final Rule, 84 Fed. Reg. at 7722. Following the public notice and comment period, the Department "consider[ed] the comments," made modifications to the rule in response to those comments, and ultimately finalized the rule. *Id.*

[12] I have in mind here the 2014 Quality of Family Planning Care ("QFP") document. *See* Plaintiffs' Motion at 15-16.

3070-71 (2018).  As I explained in the Decision and Order on the preliminary injunction motion, the history of Title X regulation permits a line of demarcation between counseling and referrals and Congress has not clearly overridden the distinction in the appropriations language.  Nor have "administrative and judicial interpretations … settled the meaning" of the term "counseling" such that the courts can know with confidence that the nondirective counseling mandate encompasses abortion referral. *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (observing that "the uniformity of the administrative and judicial interpretations" of a statutory provision "confirm[ed]" the Court's interpretation of how Congress understood the provision would be applied).  Given this leeway, Defendants' "interpretation of the phrase 'pregnancy counseling' as a concept that is distinct from the term 'referrals' is reasonable and consistent with common usage." *California v. Azar*, 950 F.3d at 1086.  In line with the appropriations mandate, the Rule provides that if there is to be pregnancy counseling, all such counseling will be nondirective.

Though the Rule requires a referral for prenatal services and permits providers to supply a list of comprehensive primary health care providers, these measures leave ample room for Title X grantees to provide nondirective counseling concerning the abortion option, and to explain that the prenatal care referral is mandated and an abortion referral is prohibited within the Title X program.  In the words of the Ninth Circuit, the Department "could reasonably conclude that referrals for prenatal care are nondirective ... because a referral for prenatal care does not steer the client toward any particular option and does not discourage a client from seeking an abortion outside of the Title X program." *Id.* at 1089.

The Final Rule is not incompatible with Congress's nondirective counseling

15

mandate.

### 2. The Affordable Care Act

Plaintiffs argue the Final Rule conflicts with certain provisions of the Affordable

Care Act ("ACA").  Specifically, the ACA includes the following language:

> Notwithstanding any other provision of this Act, the Secretary of Health and
> Human Services shall not promulgate any regulation that—
>
> (1)  creates any unreasonable barriers to the ability of individuals to obtain
>      appropriate medical care;
>
> (2)  impedes timely access to health care services;
>
> (3)  interferes with communications regarding a full range of treatment
>      options between the patient and the provider;
>
> (4)  restricts the ability of health care providers to provide full disclosure of
>      all relevant information to patients making health care decisions;
>
> (5)  violates the principles of informed consent and the ethical standards of
>      health care professionals; or
>
> (6)  limits the availability of health care treatment for the full duration of a
>      patient's medical needs.

42 U.S.C. § 18114.

When I ruled on Plaintiffs' motion for preliminary injunction, I reasoned that the

Rule does not violate the ACA because the preclusion of undue administrative interference

in the private healthcare arena does not prevent the Department from administering its own

health services grant program.  I reasoned that a contrary ruling would mean that, in all

matters pertaining to government medical assistance programs administered by the

Department of Health and Human Services, the boards of professional healthcare

organizations will have, effectively, captured the agency.  I still hold that view.

16

Additionally, the Ninth Circuit has observed that the ACA provision at issue here only purports to give preclusive effect "[n]otwithstanding any other provisions of this Act," and not "notwithstanding any other provision of law." *California v. Azar*, 927 F.3d 1068, 1079 n.4 (9th Cir. 2019).   Because the ACA did not address the implementation of Congress's choice not to support abortion programming through the Title X program, and because the Final Rule does not impose an obstacle in the path of a patient pursuing medical care outside the Title X program, the Rule does not run afoul of the ACA.   Simply stated, prohibiting abortion referral by a Title X provider and withholding a subsidy for abortion programming do not impose a barrier between women and abortion providers.   *Rust*, 500 U.S. at 196-203; *California v. Azar*, 950 F.3d at 1092-93.

## C.   Contrary to the Constitution

Plaintiffs argue the Rule is contrary to constitutional right, power, privilege or immunity; specifically, the liberty interest of patients to choose abortion, Plaintiffs' Motion at 30-39; the equal protection right of "pregnant patients seeking abortion," *id.* at 39-42; and the free speech rights of both providers and patients, *id.* at 42-45.   See also Plaintiffs' Reply at 10-12.   Defendant argues these contentions are foreclosed by *Rust* or are otherwise untenable.   Defendant's Motion at 37-40; Defendant's Opp'n at 20-25 (ECF No. 122).

### 1.   Due process right to choose abortion

Plaintiffs argue the separation requirement of the Final Rule imposes an unconstitutional condition on their patients' right to terminate a pregnancy prior to viability.   Plaintiffs' Motion at 30-39.   In other words, they contend that Defendant, by conditioning participation in the Title X program on the operation of family planning

projects that do not share space with abortion providers, has exercised its rule-making power to shut down abortion clinics.  This argument is a creative reimagining of the economic reliance argument.  In effect, because Plaintiffs have built out a statewide network of clinics that provide both Title X services and abortion services, compliance with the Rule would impose unworkable financial burdens because a similarly expansive network of stand-alone abortion clinics is not sustainable.  The irony of the argument, of course, is that it substantiates Defendant's concern that the Title X program is subsidizing abortion.

Plaintiffs' as applied, unconstitutional-condition, due process argument is misguided.  Plaintiffs, all of whom are providers, do not have a constitutional right to provide abortions.  *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 912 (6th Cir. 2019); *Planned Parenthood of Ind.*, *Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 986-88 (7th Cir. 2012).  And in any event, by law they are free to provide abortion services even if they participate in the Title X program; only they must separate their abortion clinics and their Title X clinics.  As for the alleged impact on a woman's right to choose, women may obtain Title X services regardless of any election they might make concerning abortion in the event of an unplanned pregnancy.

Finally, Plaintiffs' reliance on *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016), as contrary authority is mistaken, as the instant case involves conditions related to participation in a government spending program, not the imposition of an undue regulatory burden on private providers who are not administering a government program, as was the case in *Whole Woman's Health*.  *Id.* at 2310-18 (invalidating a Texas law that

imposed a hospital-admitting-privilege condition on physicians who provide abortion services and required that their facilities meet surgical-center requirements).

### 2. *Equal protection*

Plaintiffs argue the Final Rule "discriminates against pregnant patients seeking to exercise their fundamental right to abortion," in violation of equal protection precepts embodied in the Due Process Clause of the Fifth Amendment.  Plaintiffs' Motion at 48, citing, *inter alia*, *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942) (striking down a state law that authorized forced sterilization of habitual criminals, relying on the Equal Protection Clause).  Plaintiffs' equal protection theory focuses on the Final Rule's mandate that all Title X patients who are pregnant receive a referral for prenatal care.  They argue that, "even though both prenatal care and abortion services fall outside the ambit of the Title X program, only patients seeking abortion services are singled out and denied the critical information they need."  Plaintiffs' Motion at 40.

Plaintiffs are wrong to characterize the prenatal care referral as a violation of equal protection. Equal protection requires that the government accord similar treatment to similarly situated people; it does not dictate that dissimilarly situated people be treated differently.  *See*, *e.g.*, *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014).  Giving every pregnant Title X patient a referral for prenatal care is not discriminatory because it gives every pregnant patient the same thing.

### 3. *Provider – patient speech*

Plaintiffs contend the Defendants have forced them from the Title X program because Defendants do not condone their exercise of free speech.  Plaintiffs' Motion at 42.

19

As Plaintiffs see it, the Final Rule "prevents providers from speaking honestly with their patients and compels speech about prenatal referrals even when not medically or ethically appropriate," purportedly in violation of the First Amendment. *Id.* Because the Final Rule does nothing to restrict Plaintiffs' speech outside of the Title X program, and does not preclude abortion proponents and providers from participating in the Title X program, Plaintiffs' "unconstitutional condition" theory is misguided.

In *Rust v. Sullivan*, the Supreme Court considered whether provider-patient speech within the Title X program is beyond the scope of governmental regulation, the very question presented here.   In the words of the *Rust* Court:

> Title X program regulations do not significantly impinge upon the doctor-patient relationship. Nothing in them requires a doctor to represent as his own any opinion that he does not in fact hold.  Nor is the doctor-patient relationship established by the Title X program sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice. The program does not provide post conception medical care, and therefore a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her. The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program. In these circumstances, the general rule that the Government may choose not to subsidize speech applies with full force.

*Rust*, 500 U.S. at 200.  Plaintiffs fail to identify a meaningful way in which the Final Rule differs from the regulations considered in *Rust*, for purposes of a First Amendment inquiry. Moreover, the Final Rule is less exacting than the rule under review in *Rust*.  The Final Rule authorizes nondirective counseling, including abortion counseling; it only prohibits an abortion referral.

Since *Rust*, the Supreme Court has not indicated or even hinted that it might be inclined to depart from the principle set forth in *Rust*.  To the contrary, it has pointed to *Rust* as a reliable standard against which to compare other cases.  Most simply stated, the *Rust* standard holds that "programmatic" messaging in government-funded programs is permitted so that the government can "specify the advice deemed necessary for its legitimate objectives."[13]  *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 548 (2001).  *See also Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) (discussing scenarios, like those addressed in *Rust*, when "the State is the speaker" or when the government "use[s] private speakers to transmit specific information pertaining to its own program" and confirming that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes").  Because the Final Rule does not "seek to leverage funding to regulate speech outside the contours of the program itself," but instead seeks to "define the limits of the government spending program," the Final Rule does not unconstitutionally condition the receipt of government funding on the relinquishment of a fundamental speech right.  *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013).

## CONCLUSION

Plaintiffs' Motion for Summary Judgment (ECF No. 113) is **DENIED**.  Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 111) is

---

[13] Supreme Court cases predating the *Rust* decision also support this distinction.  *See, e.g., Maher v. Roe*, 432 U.S. 464, 475 (1977) ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.").

**GRANTED**.  Plaintiffs' Amended Complaint is **DISMISSED**.

> **SO ORDERED.**

Dated this 9th day of June, 2020

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE
